# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| O'NEILL, BRAGG & STAFFIN, P.C.: | : | |
| 720 Johnsville Boulevard, Ste. 1220 | : | |
| Warminster, Pennsylvania 18974, | : | |
| | : | |
| GARY L. BRAGG, ESQUIRE | : | |
| 720 Johnsville Boulevard, Ste. 1220 | : | |
| Warminster, Pennsylvania 18974, | : | |
| | : | |
| and | : | |
| | : | |
| ALVIN M. STAFFIN, ESQUIRE | : | |
| 720 Johnsville Boulevard, Ste. 1220 | : | |
| Warminster, Pennsylvania 18974, | : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| vs. | : | Case No. |
| | : | |
| BANK OF AMERICA | : | |
| CORPORATION | : | |
| c/o Corporation Trust Center | : | |
| 1209 Orange Street | : | |
| Wilmington, Delaware 19801 | : | |
| | : | |
| Defendant. | : | |

## **COMPLAINT**

O'Neill, Bragg & Staffin, P.C. (hereinafter "OBS"), Gary L. Bragg, Esquire ("Bragg") and Alvin M. Staffin, Esquire ("Staffin," or, together with OBS and Bragg, "Plaintiffs") bring this action by way of complaint (this "Complaint") against Bank of America Corporation (hereinafter the "Bank" and/or "Defendant") and by way of the within Complaint alleges as follows:

{00899240;7}

## PARTIES

1.      OBS is a Pennsylvania Professional Corporation, incorporated on December 15, 1992 in the Commonwealth of Pennsylvania and assigned Pennsylvania entity number 2189690.

2.      OBS's principal place of business is located at 720 Johnsville Boulevard, Suite 1220, Warminster, Pennsylvania 18974.

3.      Bragg is a shareholder in and is the President of Plaintiff OBS, and is a citizen of the State of Washington, with a residential address at 7423 Better Way Loop SE, Unit #101, Snoqualmie, WA 98065.

4.       Staffin, who is commonly called "Mel," is a shareholder in and is the Vice President of Plaintiff OBS.  Staffin is a citizen of the Commonwealth of Pennsylvania, with a residential address at 13 Amaryllis Lane, Newtown, Pennsylvania 18940.

5.      Defendant Bank was incorporated in the State of Delaware on May 27, 2009, and operates as a foreign business corporation in the Commonwealth of Pennsylvania under entity number 3884047.

6.      Defendant's principal place of business is located at Bank of America Corporate Center, 100 North Tryon Street, Asheville, North Carolina 28255.

7.      Defendant was previously incorporated as NationsBank (DE) Corporation, NationsBank Corporation and BankAmerica Corporation.

## VENUE AND JURISDICTION

8.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are citizens of diverse jurisdictions and the amount in controversy exceeds $75,000.

9.    Plaintiffs' principal place of business is located within the Eastern District of Pennsylvania. As such, venue is appropriate within the Eastern District of Pennsylvania pursuant to 28 U.S.C.§ 1391(b)(1).

10.    Furthermore, one of the key governing agreements in the case at bar, the Deposit Agreement and Disclosures Effective November 10, 2017 (the "2017 Deposit Agreement") between OBS and Defendant, a true and correct copy of which is attached hereto as **Exhibit 1**, states that "[a]ny action or proceeding regarding your account or this deposit agreement must be brought in the state in which the financial center that maintains your account is located. You submit to the personal jurisdiction of that state." Ex. 1 p. 70.

11.    The conflict between the parties arose after the November 10, 2017 effective date of the 2017 Deposit Agreement.

12.    Pursuant to the June 3, 2005 letter from Defendant to OBS entitled "Important updates to your analyzed business accounts," a true and correct copy of which is attached hereto as **Exhibit 2**, OBS's account at Defendant Bank is "serviced by Escrow Management Customer Service in Scranton, PA." Ex. 2 p. 3.

13.    Therefore, the parties agreed in the 2017 Deposit Agreement to submit the dispute herein to a court of competent jurisdiction located in the Commonwealth of Pennsylvania.

## FACTS

14.    OBS is a law firm engaged in the provision of sophisticated real estate and corporate transactional legal services to clients in from its principal place of business in the Commonwealth of Pennsylvania.

15.    Bragg and Staffin are the sole remaining founders and principals of OBS.

16.    In compliance with the requirements of 240 Pa. Code Rule 1.15 *et seq.,* OBS maintains an Interest On Lawyer Trust Account ("IOLTA") master account for the receipt and management/holding in trust of client funds.

17.    In order to carry out its obligations of safeguarding, recordkeeping and notification with respect to client funds and property, Bragg and Staffin, on behalf of OBS, established an IOLTA account with Defendant's predecessor-in-interest, Summit Bancorp ("Summit").  Staffin signed the Escrow Account Control Agreement with Defendant on behalf of OBS.  A true and correct copy of the March 22, 2002 Escrow Account Control Agreement between OBS and Summit is attached hereto as **Exhibit 3**.

18.    In further exercise of its statutory obligations with respect to client funds, Staffin and Bragg, on behalf of OBS, established numerous IOLTA sub-accounts at Summit, wherein funds belonging to each of OBS's clients were segregated for the protection and safety of each such client's funds (the "IOLTA Sub-Accounts").

19.    The primary purpose of maintaining IOLTA Sub-Accounts was to insulate each client's assets from one another.

20.    Upon information and belief, Summit was acquired by FleetBoston Financial Corporation ("Fleet").

21.    In 2004, upon information and belief, Fleet merged with Defendant Bank.

22.    In May 2017, OBS established IOLTA Sub-Account number 728 titled IOLTA - Eagle Funding Midtown Loan (hereinafter, the "Eagle Funding Sub-Account").

23.    Eagle Funding is a client of OBS.

24.    In 2017, Bragg provided legal counsel to Eagle Funding with respect to loan transactions between Eagle Funding and its borrower, Midtown.

25.    Staffin was generally aware of OBS's relationship with Eagle Funding and of Bragg's work on the loan transaction between Eagle Funding and Midtown, but was not directly involved in that matter.

26.    The Eagle Funding Sub-Account statement documents an initial transfer of loan funds from Eagle Funding to Midtown in May 2017, and a second transfer of loan funds in August 2017.

27.    On or before December 6, 2017, a computer hacker working on behalf of an entity called Cochen International Ltd ("Cochen") gained access to Bragg's Microsoft Exchange e-mail account.

28.    The computer hacker created e-mail correspondence, which appeared to originate from Bragg's e-mail address, directed to Staffin.   The e-mail correspondence appeared to originate from an account bearing Bragg's name and matching Bragg's OBS e-mail address, and contained Bragg's OBS signature line.

29.    The correspondence reflected familiarity with and knowledge of the Eagle Funding loan to Midtown, gleaned from the hacker's illicit and wholly unauthorized access to prior e-mails between Bragg and Staffin and Eagle Funding.

30.    The correspondence was, in actuality, from the Cochen computer hacker.

31.    A true and correct copy of the December 6, 2017 e-mail correspondence between the Cochen computer hacker (posing as Bragg) and Staffin is attached hereto as **Exhibit 4**.  It reads in relevant portion:

> Hacker (as Bragg): Hi Mel – Are you going to be in the office tomorrow?  I have wire for $580,000 to send to Midtown Resources for an

|            | Eagle Funding loan to them but this is going to Midtown Resources [sic] investment account in Hong Kong.  Let me know so i [sic] can forward the wiring instructions to you first [sic] tomorrow, as tomorrow will be an [sic] busy day for me. Thanks. Regards. Gary |
|------------|------|
| Staffin:   | I am in tomorrow |
| Hacker:    | Mel – I just received Midtown Resources [sic] investment wiring instructions in Hong Kong see below. |
|            | Bank Name: Bank of China Hk Ltd |
|            | Bank Address: 774 Nathan Road Hong Kong |
|            | Swift: BKCHHKHH |
|            | Account Name: Cochen International Ltd |
|            | Account#: 012-692-08439-8. |
|            | Please transfer from our trust account, they need a swift copy once the wire is sent, email that to me once you take care of this.  Thanks in advance.  Thanks.  Regards. |
| Staffin:   | From which subaccount? |
| Hacker:    | From our trust account 49990 51003, sub #728.  Thanks. |
| Staffin:   | No time to do this right now.  Will have to be tomorrow. |
| Hacker:    | Get this done first thing in the morning and email transfers swift copy once completed.  Regards. |
| Staffin:   | Sounds like an order. |
| Hacker:    | Tomorrow will be an [sic] busy day for me and this needs to be out tomorrow.  Appreciate your help. |
| Staffin:   | Me too |

Ex. 4.

32.     Bragg was in Seattle, Washington at the time of the aforestated rogue emails.

33.     It was entirely plausible to Staffin that Eagle Funding required a transfer in a time-sensitive manner and that Bragg was unable to execute the transfer while travelling in Seattle.  <u>See</u> Affidavit of Alvin M. Staffin, Esquire, a true and correct copy of which is attached hereto as **<u>Exhibit 5</u>**, at ¶ 12 ("The e-mail

contained a variety of references which signaled to me that the e-mail was sent by Bragg.  It addressed me by my nickname, "Mel," indicated familiarity with both Eagle Funding and Midtown Resources, recited the IOLTA Sub-Account number assigned to Eagle Funding, and reflected awareness that Bragg was not in the office and could not effectuate the transfer himself.").

34.    Based upon the sender's sound and accurate knowledge of the names involved in the Eagle Funding-Midtown loan transaction and the details of the Eagle Funding Sub-Account, as well as details such as Staffin's nickname, Staffin had no reason to question the authenticity of the request or its purported sender. See Affidavit of Alvin Mark Staffin, December 27, 2017, submitted on behalf of Plaintiff in *O'Neill, Bragg & Staffin, P.C. v. Cochen International Limited,* High Court of Hong Kong, Special Administrative Region, Court of First Instance, a true and correct copy of which is attached hereto as **Exhibit 6**, at ¶ 7.

35.    Believing that Bragg made the transfer request, at 5:52pm[1] on December 6, 2017, Staffin requested that Defendant transfer $580,000 from the Eagle Funding IOLTA Sub-Account to the Bank of China account identified in the December 6, 2017 e-mail correspondence.  Id. ¶ 8.  A true and correct copy of the December 6, 2017 transfer request is attached hereto as **Exhibit 7**.

---

[1] All times are Eastern Standard Time.

36. Very shortly after he requested the transfer of funds, Staffin telephoned Bragg to discuss the transfer. Ex. 5 ¶ 14; Ex. 6 ¶ 9.

37. Bragg informed Staffin that Bragg did not receive a transfer request from Eagle Funding, and did not send an e-mail instructing Staffin to make any such transfer. Ex. 5 ¶ 15; Ex. 6 ¶ 9.

38. Staffin realized that OBS had been victimized by a computer hacker, and immediately notified Defendant Bank of the fraud. He spoke with a member of the Banks' Wire Transfer team named Jason, who did not furnish his last name. Staffin urgently requested that the transfer be stopped. Ex. 5 ¶¶ 18-19, 22; Ex. 6 ¶¶ 9, 12.

39. Jason informed Staffin that Defendant was powerless to stop the transfer until the funds were actually sent to and received by the Bank of China. Ex. 5 ¶ 21; Ex. 6 ¶ 12; Ex. 8 p. 1.

40. Jason suggested that Staffin request a wire recall from the receiving bank, the Bank of China, the following morning. Ex. 5 ¶ 21.

41. The Eagle Funding Sub-Account had a balance at the time of the requested wire transfer by Staffin of approximately $1,900, which was entirely insufficient to fund the $580,000 transfer request. Ex. 6 ¶ 12.

42. In a letter dated December 21, 2017, a true and correct copy of which is attached hereto as **Exhibit 8**, Defendant recounted that "Mr. Staffin asked if the

funds were available to cover the outgoing wire.  Jason indicated that he didn't see any indication that the payment was stopped by the Risk area." Ex. 8 p. 1.

43.     Jason indicated to Staffin that he was surprised the transfer request had not been automatically flagged or terminated by the Risk Department in light of the obvious insufficiency of funds in the Eagle Funding Sub-Account.  Ex. 5 ¶ 20.

44.     At the same time, Bragg called Defendant's Check Fraud Claims team and spoke with a representative named Christian Rios ("Rios").  Ex. 5 ¶ 22; Ex. 8 p. 1.

45.     Staffin was conferenced into Bragg's call with Rios.  Ex. 5 ¶ 22.

46.     Rios informed Bragg and Staffin that "he could request the funds back, but the client would need to check their [sic] account the next day to see if the attempt was successful.   If unsuccessful, the client may call the Money Movement team between 8a- 8p ET." Ex. 8 p. 1; see also Ex. 5 ¶ 22.

47.     Rios also noted that the Eagle Funding Sub-Account held only $2,000. Ex. 5 ¶ 22.

48.     On December 6, 2017, the online report for the Eagle Funding Sub-Account indicated that the transfer was "processing." Ex. 6 ¶ 12.

49.     The wire transfer for the full amount of $580,000 was received by the Bank of China at 5:00 am on December 7, 2017.  Id.

50.     Accordingly, on December 7, 2017, the online report for the Eagle Funding Sub-Account indicated that the wire transfer was completed.  Ex. 6 ¶ 12.

51.     Because the $1,900 balance in the Eagle Funding Sub-Account was insufficient to fund the $580,000 fraudulent transfer, Defendant, on its own accord, withdrew funds from *other IOLTA Sub-Accounts belonging to Plaintiff's other clients* contrary to the reason and purpose for structuring segregated IOLTA Sub-Accounts.  Id.

52.     At 6:00am on December 7, 2017, pursuant to instructions from Christian Rios and from Jason, Staffin began attempting to contact Defendant to initiate a wire recall request from the Bank of China.  Ex. 5 ¶ 24.

53.     Staffin finally got through to Defendant's representative at 8:35am. Ex. 5 ¶¶ 23-24; Ex. 8 p. 1.

54.     At 8:47am on December 7, 2017, Defendant's correspondence with Plaintiff reflects that Defendant initiated a wire recall request.  Id.

55.     Later that morning, Staffin received a call from a member of Defendant's Fraud Monitoring team named Tammy, who refused to provide her last name.  Ex. 5 ¶ 26.

56.     During the December 7, 2017 call, Tammy confirmed the wire recall request, and informed Staffin that he would receive updates on the status of that

wire recall request from a representative assigned to OBS's "team" named Adam Lewinski.  Ex. 5 ¶ 27.

57.   Lewinski did not contact Staffin for a week, despite Staffin's numerous calls and voicemails to Lewinski seeking wire recall status updates and requesting that Defendant shut down the IOLTA and open a new OBS account because of ongoing security concerns. Ex. 5 ¶¶ 28-30.

58.   Also on December 7, 2017, Staffin reported the wire fraud to the Federal Bureau of Investigation's internet crime telephone hotline.  Ex. 6 ¶ 14.

59.   The Federal Bureau of Investigation ("FBI") collected documents from Staffin and initiated a criminal investigation of the fraud.  Id.

60.   On December 7, 2017, the Cochen e-mail hacker again contacted Staffin, while posing as Bragg.  A true and correct copy of which communication is attached hereto as **Exhibit 9**.

61.   Staffin was aware that the communication was not from Bragg, but testified that "in order not to alert the fraudsters that we were already aware of the earlier fraud to prevent dissipation of the monies, I appeared to be co-operative to the request."  Ex. 6 ¶ 10.

62.   Therein, the Cochen e-mail hacker wrote:

Hacker (as Bragg): Hi Mel – Are you in the office?  Thanks.  Regards.  Gary
Staffin:        yes

| Hacker: | Mel – Can you please share how much we have in trust account 49990 51003 as of today after the last wire to Midtown Resources.  Thanks.  Regards, Gary |
| Staffin: | I'll call you |
| Hacker: | Mel – Okay can you call me after 1:30 pm. |
| | Please I hope this is not stressful for you, Can you please wire $980,000 to Midtown Resources for investment account. |
| | Can you get this out today?  I would appreciate your effort on this.  Thanks.  Regards, Gary |

Ex. 9.

63.    No further contact from the e-mail hacker was received.  Ex. 6 ¶ 10.

64.    On December 8, 2017, Bragg electronically transmitted a letter to Brian Moynihan, President and Chief Executive Officer of Defendant, documenting the wire fraud and requesting restoration of the $580,000 withdrawn from many of the IOLTA Sub-Accounts.  Defendant's Wire Transfer and Escrow Management departments were copied on the December 8, 2017 letter.  A true and correct copy of Plaintiff's December 8, 2017 letter to Defendant is attached hereto as **Exhibit 10**.

65.    Shockingly, also on December 8, 2017, Defendant's Escrow Department called OBS to report that the Eagle Funding Sub-Account was overdrawn.  Ex. 10 p. 2.

66.    Of course, the overdraft was not reflective of the fact that the Bank funded the overdraft with *other* IOLTA Sub-Account monies; furthermore, the

overdraft should have been evident to Defendant when the transfer request was initially made at 5:52pm on December 6, 2017.  Ex. 7.

67.     According to Defendant's agent and Wire Operations team member Jason, the overdraft should have been evident to Defendant's Risk Department, which failed to stop or even flag the transfer.  See Ex. 5 ¶ 20 ("Jason indicated surprise that the $580,000 transfer was not automatically flagged or stopped by the Bank's Risk Area because the Eagle Funding IOLTA Sub-Account held less than $2,000."); Ex. 8 p. 1 ("Jason indicated that he didn't see any indication that the payment was stopped by the Risk area.").

68.     Finally, the overdraft was clearly evident upon Plaintiffs' call to Defendant's Check Fraud and Wire Operations teams on December 6, 2017.  Ex. 5 ¶ 22 ("Rios also noted that the balance in the Eagle Funding IOLTA Sub-Account was less than $2,000."); Ex. 8 p. 1.

69.     On December 8, 2017, according to defendant's correspondence, Swift received the following response from the Bank of China with respect to the wire recall request:

> WE COULD ONLY ARRANGE THE REFUND PURSUANT TO A HONG KONG COURT ORDER BINDING ON US AND WHEN THERE IS SUFFICIENT CREDIT BALANCE IN THE CUSTOMER'S ACCOUNT AT THE MATERIAL TIME.  WE SUGGEST YOU TO REPORT THE CASE TO AND SEEK ASSISTANCE FROM THE HONG KONG POLICE FORCE.

Ex. 8 p. 2 (allcaps in original).

70.     On December 10, 2017, upon the suggestion of the FBI and in light of the Bank of China's response to Staffin's transfer recall request, Bragg filed a cyber crime report with the Hong Kong police.  Ex. 6 ¶ 15.

71.     The case was referred for investigation to District Investigation Team 5 of Wong Tai Sin Police Station.  A true and correct copy of the cyber crime report and accompanying correspondence from District Investigation Team 5 of Wong Tai Sin Police Station is attached hereto as **Exhibit 11**.

72.     Also on December 10, 2017, Bragg electronically transmitted a letter to the Bank of China's Fraud department, documenting the wire fraud and requesting a freeze upon the account(s) of the recipient of the fraudulent transfer, Cochen International.  A true a correct copy of Plaintiff's December 10, 2017 letter to the Bank of China is attached hereto as **Exhibit 12**.

73.     The Bank of China responded by e-mail dated December 18, 2017, a true and correct copy of which is attached hereto as **Exhibit 13**, stating in relevant portion:

> We would like to explain that under normal circumstances, incoming remittance [sic] will be processed according to the instruction given by the remitting bank and subject to our bank's normal practice; the remitting bank may cancel the instruction provided that the transfer is not yet processed by the receiving bank.  We learnt that you have reported it to the Hong Kong law enforcement authorities, we will give our full cooperation when we receive instructions from the Hong Kong law enforcement authorities.

Ex. 13.

74.    In other words, according to the Bank of China, it was Defendant Bank's responsibility as remitting bank to cancel the instruction/wire transfer.

75.    On December 20, 2017, Plaintiffs retained the law firm of Tanner DeWitt Solicitors in Hong Kong ("TDS"), in an attempt to recover the $580,000 in stolen funds.

76.    On December 27, 2017, TDS appeared before the High Court of the Hong Kong Special Administrative Region on behalf of Plaintiffs and submitted the Affidavit of Alvin Mark Staffin.  See Ex. 6.

77.    On December 28, 2017, the High Court of the Hong Kong Special Administrative Region entered an Order, a true and correct copy of which is attached hereto as **Exhibit 14a**, freezing Cochen's accounts at the Bank of China which at that time contained $23,497.32.[2]  Ex. 14a.  The Order also required further disclosure of transactions in Cochen's accounts by January 5, 2018, which resulted in the garnishment from Cochen and transfer to TDS of $83,509.21.  Id. After deduction of TDS's fees and costs, the sum recovered from Cochen is $58,730.11.

78.    TDS also brought suit against two third-level recipients of the fraudulently transferred funds from Cochen, YKY Limited ("YKY") and Extrade Electronic (HK) Limited ("Extrade").   Final judgment was ultimately entered

---

[2] All sums are listed in U.S. dollars.

against YKY in the amount of $21,130 (including $7,130 in costs), a true and correct copy of which final judgment is attached hereto as **Exhibit 14b**, but garnishment proceedings remain ongoing.  Final judgment was ultimately entered against Extrade in the amount of $35,130 (including $7,130 in costs), a true and correct copy of which final judgment is attached hereto as **Exhibit 14c**, but garnishment proceedings remain ongoing.

79.     Meanwhile, by letter dated December 12, 2017 (and received December 14, 2017), Defendant informed OBS in writing of the overdraft on its IOLTA.   A true and correct copy of Defendant's December 12, 2017 correspondence with OBS is attached hereto as **Exhibit 15**.

80.     Bragg and Staffin, on behalf of OBS, engaged in a variety of immediate actions to mitigate and rectify damage to their IOLTA and to client-specific IOLTA Sub-Accounts caused by the computer hack and wire fraud, including the following:

     a.   In order to prevent OBS's clients from suffering any losses as a result of the wire fraud, *Bragg and Staffin personally restored all sub-accounts of the IOLTA in full from their personal funds.*

     b.   Staffin sought to close the IOLTA by repeatedly contacting Adam Lewinski, the Bank's designated Wire Fraud team member, on December 7, 2017 and thereafter.  However, Lewinski did not respond

until December 19, 2017 and informed OBS that the Bank was not handling new IOLTA accounts and could not accommodate OBS's demand that the existing IOLTA account be closed immediately without a written instruction, which Staffin provided.

c.   On the night of December 6, 2017, immediately upon discovering the hacking, OBS contacted its information technology consultant  who changed Bragg's password on his Microsoft Exchange e-mail account. Bragg changed the passwords on his OBS and personal internet-enabled computers.  OBS also took other internal security steps.

d.   OBS established new IOLTA accounts for each client at Citizens Bank of Pennsylvania, where client funds over $2,000 are not in sub-accounts, but rather in completely separate accounts. Client funds under $2,000 are comingled with distinct account ledgers.

e.   OBS established a new wire transfer protocol, requiring all transfers to be confirmed telephonically prior to entry of a transfer order.

81.   By letter dated January 12, 2018, a true and correct copy of which is attached hereto as **Exhibit 16**, Ms. Morgan responded: "The information provided was satisfactory and this matter is closed.  Be assured this has not been treated as a disciplinary matter and no disciplinary file has been opened against O'Neill, Bragg and Staffin."

82.    Bragg and Staffin also caused OBS to close the Defendant Bank's IOLTA and all associated IOLTA Sub-Accounts, including the Eagle Funding Sub-Account, by letter to Defendant dated December 19, 2017.  A true and correct copy of OBS's December 19, 2017 letter to Defendant is attached hereto as **Exhibit 17**.  See also Ex. 5 ¶ 31.

83.    On February 28, 2018, in response to OBS's December 19, 2017 written request to close the IOLTA and all sub-accounts, Defendant informed OBS in writing that "In April, the Escrow Management Service will be removed from your Full Analysis Business Checking ending in 51003."  A true and correct copy of Defendant's February 28, 2018 communication to OBS is attached hereto as **Exhibit 18**.

84.    The February 28, 2018 communication, which OBS received on March 5, 2018, states that "the account referenced above is currently set up with the Escrow Management Service based on the terms of the *Deposit Agreement and Treasury Services Agreement – Escrow Management Service Addendum*."  Ex. 20 p. 1 (italics in original).  It also states that OBS's "agreement with the Bank [is] outlined in the *Deposit Agreement and Disclosures . . .*"  Id. (italics in original).

85.    Plaintiffs were never provided with the *Deposit Agreement and Treasury Services Agreement – Escrow Management Service Addendum*.

86.     Therefore, on March 6, 2018, one day after receiving the February 28, 2018 communication from Defendant, Staffin e-mailed the Liquidity Team Contact, to whom the February 28, 2018 communication directed all questions. See Ex. 18 p. 1.   A true and correct copy of Staffin's March 6, 2018 e-mail correspondence with Defendant's Liquidity Team Contact is attached hereto as **Exhibit 19**.

87.     Therein, Staffin wrote: "Please e-mail to me the 'Deposit Agreement and Treasury Services Agreement - Escrow Management Service Addendum' referenced in your letter." Ex. 19.

88.     Later that day, Defendant's Liquidity Team responded: "We have receive [sic] your inquiry.   We noticed that your account is in [sic] already in a close [sic] status and that is [sic] letter should not have been mailed to you. We apologize for any inconvenience this may have caused." Id.

89.     Defendant's Liquidity Team has never provided) the *Deposit Agreement and Treasury Services Agreement – Escrow Management Service Addendum* that Staffin requested, which Defendant Bank purports to govern the closed IOLTA and its IOLTA Sub-Accounts.

90.     The *Deposit Agreement and Disclosures* referenced in Defendant's February 28, 2018 communication was also not provided to OBS, but is readily available online.  It contains the following relevant provisions:

**Overdrafts and Declined or Returned Items**
When we determine that you do not have enough funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item. . . we either authorize and pay the insufficient funds item and overdraw your account (an overdraft item) or we decline or return the insufficient funds item without payment (a returned item).
We pay overdrafts at our discretion, which means that we do not guarantee that we will always, or ever, authorize and pay them. . .

Ex. 1 p. 17.

**Business Accounts – Overdraft Practices and Settings**
We automatically apply our standard business overdraft setting to business accounts.  With our standard business overdraft setting, we may occasionally authorize and pay overdrafts for all types of transactions. . .

<u>Id.</u> p. 19.

**What Are Problems and Unauthorized Transactions**
Problems and unauthorized transactions include suspected fraud; missing deposits; unauthorized electronic transfers . . .

<u>Id.</u> p. 42.

**We Are Not Liable If You Fail To Report Promptly**
Except as otherwise expressly reported elsewhere in this agreement, if you fail to notify us in writing of suspected problems or unauthorized transactions within 60 days after we make your statement or items available to you, you agree that:

- you may not make a claim against us relating to the unreported problems or unauthorized transactions, regardless of the care or lack of care we may have exercised in handling your account; and
- you may not bring any legal proceeding or action against us to recover any amount alleged to have been improperly paid out of your account.

<u>Id.</u> p. 43.

**Written Confirmation and Other Assistance**
. . . If you assert a claim regarding a problem, you must cooperate with us in the investigation and prosecution of your claim and any attempt to recover funds.  You also agree to assist us in identifying and in seeking criminal and civil penalties against the person responsible.  You must file reports and complaints with appropriate law enforcement authorities. . .

<u>Id.</u>

**Our Investigation and Maximum Liability**
. . . Our maximum liability is the lesser of your actual damages proved or the amount of the missing deposit . . .

<u>Id.</u>

**Placing A Stop Payment Order**  We may accept a written or oral stop payment order from any person who has a right to withdraw funds from the account . . .
*<u>If we pay an item subject to a valid and timely stop payment order, we may be liable to you if you had a legal right to stop payment and you establish that you suffered a loss because of the payment.</u>*  Our liability, if any, is limited to the actual loss suffered, up to the amount of the item.  You must prove your loss to our satisfaction.  We are not liable to you for any special, incidental or consequential loss or damage of any kind.

<u>Id.</u> pp. 54-55 (emphasis supplied).

**Funds Transfer Services**
. . . We provide separate agreements to you that govern the terms of some funds transfer services . . .

<u>Id.</u> p. 64.

91.    Upon information and belief, the "Funds Transfer Services" section of the Deposit Agreement and Disclosures references the Telephone Wire Transfer Agreement.

92.     The Telephone Wire Transfer Agreement, a true and correct copy of which is attached hereto as **Exhibit 20**, governs wire transfer requests made by telephone, including Staffin's December 6, 2017 transfer request.   It states in relevant portion:

> **Cancellation of Wire Transfer Requests**
> . . . If you or a bank sending us a draw request sends us a wire transfer request instructing us to cancel or amend a telephone or draw wire transfer request and we are able to verify the authenticity of the cancellation or amendment request using the Security Procedure, as applicable, we will make a reasonable effort to act on that request . . .

Ex. 20 § 4.

> **Limitation of Liability**
> (a) For wire transfer requests which are subject to Article 4A of the Uniform Commercial Code, as adopted in the state whose laws govern this Agreement ("Article 4A"), we are liable only for damages required to be paid under Article 4A or Subpart B of Regulation J of the Board of Governors of the Federal Reserve System, as amended form time to time and as applicable, except as otherwise agreed in this Agreement.
> *****
> (c) If we are obligated to pay interest compensation, we will pay such compensation or credit your account, as we determine, upon your written request . . .
> *****
> (e) We will not be responsible for the acts or omissions of you or your agents . . .

Id. §§ 6(a), 6(c) & 6(e).

93.   The document which created OBS's original IOLTA account is the March 22, 2002 Escrow Control Account Agreement.   It provides, in relevant portion:

**WITHDRAWALS AND TRANSFERS**
. . . If a check is presented to the Bank at a time when there is insufficient balance of available funds in the Subaccount, the Bank, in its discretion, may pay the check or return the check and, in either event, charge the Depositor a service charge. . .

**STOP PAYMENT**
The Depositor may direct the Bank to stop payment of any check, draft or direction to transfer funds orally or in writing.   An oral direction must be confirmed in writing within **14** days.   Otherwise it will expire.   A written direction to stop payment will be effective for **6** months, unless renewed in writing.
*****
**LIABILITY**
The Bank shall not be liable to the Depositor for any loss or expense incurred by the Depositor with respect to the Account or this Agreement unless such loss or expense is directly attributable to the gross negligence or willful misconduct of the Bank.   In no event shall the Bank be liable to the Depositor for consequential damages.

Ex. 3 §§ 3, 4 & 12 (boldface in original).

94.   The Uniform Commercial Code has been adopted by the Commonwealth of Pennsylvania at 13 Pa.C.S. § 1101 *et seq.*

95.   Section 4A of the Uniform Commercial Code is codified in the Commonwealth of Pennsylvania at 13 Pa.C.S. §§ 4A101-4A507, and provides in relevant portion as follows:

**§ 4A211.  Cancellation and amendment of payment order.**

(a)  Communication. – A communication of the sender of a payment order canceling or amending the order may be transmitted to the receiving bank orally, electronically or in writing. If a security procedure is in effect between the sender and the receiving bank, the communication is not effective to cancel or amend the order unless the communication is verified pursuant to the security procedure or the bank agrees to the cancellation or amendment.

(b)  Communication received before payment order accepted. – Subject to subsection (a), a communication by the sender canceling or amending a payment order is effective to cancel or amend the order if notice of the communication is received at a time and in a manner affording the receiving bank a reasonable opportunity to act on the communication before the bank accepts the payment order.

(c)  Communication received after payment order accepted. – After a payment order has been accepted, cancellation or amendment of the order is not effective unless the receiving bank agrees or a funds-transfer system rule allows cancellation or amendment without agreement of the bank:

(1)  With respect to a payment order accepted by a receiving bank other than the beneficiary's bank, cancellation or amendment is not effective unless a conforming cancellation or amendment of the payment order issued by the receiving bank is also made.

(2)  *With respect to a payment order accepted by the beneficiary's bank, cancellation or amendment is not effective unless the order was issued in execution of an unauthorized payment order or because of a mistake by a sender in the funds transfer which resulted in the issuance of a payment order*:

(i)  that is a duplicate of a payment order previously issued by the sender;

(ii)  *that orders payment to a beneficiary not entitled to receive payment from the originator*; or

> (iii)  that orders payment in an amount greater than the amount the beneficiary was entitled to receive from the originator.
>
> If the payment order is canceled or amended, the beneficiary's bank is entitled to recover from the beneficiary any amount paid to the beneficiary to the extent allowed by the law governing mistake and restitution.
>
> *****
>
> (d)*Canceled payment order. – A canceled payment order cannot be accepted. If an accepted payment order is canceled, the acceptance is nullified and no person has any right or obligation based on the acceptance.* Amendment of a payment order is deemed to be cancellation of the original order at the time of amendment and issue of a new payment order in the amended form at the same time.

13 Pa.C.S. § 4A211.

96.    Notably, the UCC Section 4A as adopted by the Commonwealth of Pennsylvania is specifically superseded by Federal Reserve regulations and operating circulars.  <u>See</u> 13 Pa.C.S. § 4A107 ("Regulations of the Board of Governors of the Federal Reserve System and operating circulars of the Federal Reserve banks supersede any inconsistent provision of this division to the extent of the inconsistency.").

97.    Such a regulation, codified at 12 CFR § 205.17(d)(5) and entitled "Alternative plans for covering overdrafts," states as follows:

> If the institution offers a line of credit subject to the Board's Regulation Z (12 CFR part 226) or a service that transfers funds from another account of the consumer held at the institution to cover overdrafts, the institution must state that fact. An institution may, but

is not required to, list additional alternatives for the payment of overdrafts.

12 CFR § 205.17(d)(5).

98.   It is undisputed that Staffin and Bragg contacted Defendant on December 6, 2017 shortly after the wire transfer confirmation to report that the wire transfer resulted from a fraud perpetrated against Plaintiffs.  Ex. 5 ¶¶ 18-22; Ex. 6 ¶ 12; Ex. 7 p. 1.

99.   It is also undisputed that Defendant's agent, Jason, informed Staffin that Defendant was powerless to stop the fraudulent wire transfer until the funds were actually sent to and received by the Bank of China.  Ex. 5 ¶¶ 20-21; Ex. 6 ¶ 12; Ex. 7 p. 1.

100.   It is further undisputed that – in complete contravention of the Bank's stated policy, per its representative, Jason – the Bank of China's procedure allows that "the remitting bank may cancel the instruction provided that the transfer is not yet processed by the receiving bank."  Ex. 13.

101.   Upon information and belief, Defendant, by its agent, failed to initiate a cancellation of wire transfer request pursuant to Section 4 of the Telephone Wire Transfer Agreement during Staffin's call to Defendant on December 6, 2017.  See Ex. 20 § 4.

102.   Such failure is patently unreasonable.   The multiple cancellation requests made by Plaintiffs are effective pursuant to Section 4 of the Escrow

Control Account Agreement, which allows a stop payment direction to be made "orally or in writing." Ex. 3 § 4.

103.   On December 6, 2017, the online report for the Eagle Funding Sub-Account indicated that the transfer was "processing." Ex. 6 ¶ 12.

104.   Therefore, prior to final processing of the fraudulent wire transfer request by the Bank of China, Defendant neglected to cancel the wire transfer, which failure is patently not reasonable.

105.   13 Pa.C.S. 4A211(b) provides that "a communication by the sender canceling or amending a payment order is effective to cancel or amend the order if notice of the communication is received at a time and in a manner affording the receiving bank a reasonable opportunity to act on the communication before the bank accepts the payment order."

106.   Bragg and Staffin contacted Defendant a second time on December 6, 2017, at which point Defendant's agent Rios offered to "request the funds back," and instructed Bragg and Staffin to follow up with Defendant's Money Movement team the following day.  Ex. 5 ¶ 22; Ex. 8 p. 1.

107.   The wire transfer was listed by Defendant as being received by the Bank of China at 5:00 am on December 7, 2017.  Id.

108.   Even assuming, *arguendo,* that the wire transfer was received by the Bank of China immediately upon Defendant's confirmation at 5:50pm on

December 6, 2017 – which it was not, as Defendant's own online recording system demonstrated – the multiple cancellation requests are effective transfer order cancellations under UCC 4A, as codified at 13 Pa.C.S. 4A211(c)(2)(ii), which provides:

> "Communication received after payment order accepted. – After a payment order has been accepted, cancellation or amendment of the order is not effective unless the receiving bank agrees or a funds-transfer system rule allows cancellation or amendment without agreement of the bank: . . . *With respect to a payment order accepted by the beneficiary's bank, cancellation or amendment is not effective unless the order was issued in execution of an unauthorized payment order or because of a mistake by a sender in the funds transfer which resulted in the issuance of a payment order*: . . . (ii) *that orders payment to a beneficiary not entitled to receive payment from the originator*. . ."

(emphasis supplied).

109.   Cochen was not entitled to receive any funds, wire transfers or payments from OBS.

110.   Any authorization provided by Staffin was the good faith mistaken consequence of an overt fraud perpetrated by Cochen.

111.   Defendant's wrongful execution of the wire transfer request was the result of Cochen's fraud.

112.   Defendant's failure and refusal to terminate the transfer resulted in the payment of both Eagle Funding and other client IOLTA funds to Cochen, which was not authorized to receive any such payment from OBS or Eagle Funding.

113.   Therefore, even if the Bank of China received the fraudulent transfer of funds prior to Plaintiffs' calls to the Bank, such transfer was nevertheless effectively cancelled pursuant to UCC 4A211(c)(2)(ii), as codified by the Commonwealth of Pennsylvania, insofar as the transfer was caused by a mistake and resulted in payment to a beneficiary not entitled to receive payment from the originator.

114.   The Telephone Wire Transfer Agreement between the parties specifically contemplates the Defendant's potential liability Under UCC 4A.  <u>See</u> Ex. 3 § 12.

115.   Regardless of when the cancellation was received by the Bank of China, there is no dispute that it was timely made on December 6, 2016 immediately upon discovery by Plaintiffs of the fraud perpetrated against them.

116.   Under the terms of Defendant's own contract(s), Defendant Bank is indisputably liable to Plaintiffs for payment of the wire transfer, as it was subject to a valid and timely stop payment order.  <u>See</u> Ex. 1 p. 55 ("If we pay an item subject to a valid and timely stop payment order, we may be liable to you if you had a legal right to stop payment and you establish that you suffered a loss because of the payment.  Our liability, if any, is limited to the actual loss suffered, up to the amount of the item.").

117.   Defendant Bank issued an Attorney Trust Account Overdraft Report with respect to the Eagle Funding Sub-Account, which was received by Plaintiffs on December 14, 2017.  See Ex. 15.

118.   That overdraft report does not acknowledge or reflect the Bank's own impermissible act of sweeping other client IOLTA Sub-Accounts, which Defendant was not authorized or empowered to do.

119.   Without authorization from Plaintiffs, and in breach of the terms of Section 3 of the Escrow Control Account Agreement, Defendant swept these other IOLTA Sub-Accounts of the IOLTA in order to fund the fraudulent wire transfer to Cochen, which wire transfer Plaintiffs had validly cancelled pursuant to Section 4 of the Telephone Wire Transfer Agreement.

120.   Defendant's act of sweeping other IOLTA Sub-Accounts also violates 12 CFR § 205.17(d)(5), insofar as Defendant Bank never stated to Plaintiffs that it offered such a "service that transfers funds from another account of the consumer held at the institution to cover overdrafts . . ." as required by law.

121.   Indeed, neither the Escrow Account Control Agreement nor the Deposit Agreement and Disclosures nor the Telephone Wire Transfer Agreement discloses to Plaintiffs that Defendant will sweep all IOLTA Sub-Accounts if one client's sub-account is overdrawn.  See Ex. 1, 3 & 20.

122.   Plaintiffs' obvious intent and purpose when setting up IOLTA Sub-Accounts for each client was to safeguard each client's funds by insulating the funds of each client from those of all other clients.

123.   OBS funded the litigation in Hong Kong against Cochen, and to date has received $58,730.11 from Cochen, after deduction of litigation costs.

124.   The litigation in Hong Kong against YKY and Extrade resulted in monetary awards in OBS's favor, but no garnishment or receipt of those ill-gotten funds to date.  See Ex. 14b-14c.

125.   The fraudulent transfer of $580,000 from the Eagle Funding Sub-Account was effected by Defendant Bank's multiple acts of negligence and unreasonable behavior.

126.   Defendant's failure to stop or cancel the fraudulent transfer of $580,000 from the Eagle Funding Sub-Account at Staffin's timely request violates the terms of the Telephone Wire Transfer Agreement.

127.   Defendant's failure to stop or cancel the fraudulent transfer of $580,000 from the Eagle Funding Sub-Account at Staffin's request violates the terms of the Escrow Control Account Agreement.

128.   Defendant's failure to stop or cancel the fraudulent transfer of $580,000 from the Eagle Funding Sub-Account at Staffin's request violates 13 Pa.C.S. 4A211(c)(2)(ii).

129.   Plaintiffs have requested that Defendant repay the $580,000 Plaintiffs lost due to the fraudulent transfer, which sum has not been repaid.

130.   Defendant's refusal to repay the $580,000 to Plaintiffs violates the terms of the Deposit Agreement and Disclosures.

131.   Defendant's unauthorized and impermissible act in sweeping the IOLTA Sub-Accounts of other clients violates Defendant Bank's essential obligations as the holder of attorney trust funds.

132.   Plaintiffs have been injured as a result of Defendant's negligent, reckless and/or willful acts and omissions, and as a result of the Defendant Bank's unreasonable and ultra vires behavior.

### Count I
### Breach of Escrow Control Account Agreement

133.   The allegations of the previous paragraphs are incorporated as though fully set forth herein.

134.   The Escrow Control Account Agreement was executed between OBS and Defendant's predecessor-in-interest, Summit, in 2002.

135.   The Escrow Control Account Agreement was not replaced when Fleet purchased Summit, or when Defendant merged with Fleet.

136.   The Escrow Account Control Agreement governed the IOLTA on December 6, 2017.

137.   Defendant is bound by the terms of the Escrow Account Control Agreement.

138.   The Escrow Account Control Agreement provides, in relevant portion:

> **3. WITHDRAWALS AND TRANSFERS**
> . . . If a check is presented to the Bank at a time when there is insufficient balance of available funds in the Subaccount, the Bank, in its discretion, may pay the check or return the check and, in either event, charge the Depositor a service charge. . .
>
> **4. STOP PAYMENT**
> The Depositor may direct the Bank to stop payment of any check, draft or direction to transfer funds orally or in writing.   An oral direction must be confirmed in writing within **14** days.   Otherwise it will expire.   A written direction to stop payment will be effective for **6** months, unless renewed in writing.

Ex. 3 §§ 3-4 (boldface in original).

139.   In this case, the $580,000 fraudulent transfer order was presented to Defendant when the Eagle Funding Sub-Account contained only $1,900.

140.   Under Section 3 of the Escrow Account Control Agreement, the Defendant had two options – it could either pay the transfer or reject the transfer request. Ex. 3 § 3.

141.   Instead of selecting one of the two contractually provided and agreed-upon options in the event of an overdraft, the Defendant unlawfully swept OBS's clients' IOLTA Sub-Accounts.

142.   In the event of an overdraft in one IOLTA Sub-Account, the Escrow Account Control Agreement does *not* permit Defendant to sweep isolated sub-accounts containing the protected funds of unrelated clients.

143.   Defendant's act of sweeping the unrelated IOLTA Sub-Accounts to satisfy the Eagle Funding Sub-Account overdraft constitutes a breach of the clear terms of Section 3 of the Escrow Account Control Agreement.

144.   As a result of Defendant's breach of Section 3 of the Escrow Account Control Agreement, on December 18, 2017 Plaintiffs experienced a negative balance in the IOLTA account, including all of its Sub-Accounts.

145.   To rectify the negative balance and protect OBS's clients, Bragg and Staffin personally replenished the $580,000 that was impermissibly swept from the IOLTA Sub-Accounts.

146.   Section 4 of the Escrow Account Control Agreement sets forth the procedure whereby a customer may stop payment of a direction to transfer funds. Ex. 3 § 4.

147.   It specifically provides that such direction may be made "orally or in writing," and if oral "must be confirmed in writing within 14 days." Id.

148.   The clear implication of Section 4 of the Escrow Account Control Agreement is that a valid stop payment direction made in compliance with the procedures set forth therein will be honored by Defendant.

149.  In this case, Plaintiffs gave multiple stop payment directions on December 6, 2017 to Defendant's agents, Wire Operations team member Jason and Check Fraud Claims team member Christian Rios.  Ex. 5 ¶¶ 18-22; Ex. 6 ¶ 12; Ex. 8 p. 1.

150.  At 6:00am on December 7, 2017, Staffin contacted Defendant to initiate a wire recall request from the Bank of China, which request was actually transmitted by the Bank at 8:37am that day.  Ex. 5 ¶¶ 23-25; Ex. 8 p. 1.

151.  These stop payment and wire recall requests were confirmed in writing on December 8, 2017 – well within the 14 day period required by Section 4 of the Escrow Account Control Agreement – by letter from Bragg to Brian Moynihan, President and Chief Executive Officer of Defendant, Defendant's Wire Transfer department, and Defendant's Escrow Management department.  See Ex. 10.

152.  Although Plaintiffs complied with the requirements of Section 4 of the Escrow Account Control Agreement, Defendant failed to issue the stop payment order.

153.  Defendant's failure to issue the stop payment request upon Plaintiff's _three_ valid oral directives and written confirmation constitutes a violation of Section 4 of the Escrow Account Control Agreement.

154.   As a result of Defendant's breach of Section 4 of the Escrow Account Control Agreement, the fraudulent transfer request was processed, Cochen wrongfully received Plaintiffs' funds, and Bragg and Staffin were compelled to personally replenish $580,000 in client funds and to expend $20,000 and valuable resources to prosecute a criminal case in Hong Kong against Cochen.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant for breach of the Escrow Account Control Agreement, and award Plaintiffs damages in an amount to be determined at trial, together with such other relief as the Court deems just and appropriate.

## Count II
## Breach of Deposit Agreement and Disclosures

155.   The allegations of the previous paragraphs are incorporated as though fully set forth herein.

156.   The Deposit Agreement and Disclosures, effective November 2017, governs the Defendant's relationship with OBS, according to Defendant's own communication to Plaintiffs. See Ex. 18 p. 1.

157.   The Deposit Agreement and Disclosures contains the following relevant provisions:

**Overdrafts and Declined or Returned Items**
When we determine that you do not have enough funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item. . . we either authorize and pay the insufficient funds item and overdraw your account (an overdraft

item) or we decline or return the insufficient funds item without payment (a returned item).

We pay overdrafts at our discretion, which means that we do not guarantee that we will always, or ever, authorize and pay them. . .

Ex. 1 p. 17.

**Business Accounts – Overdraft Practices and Settings**

We automatically apply our standard business overdraft setting to business accounts.  With our standard business overdraft setting, we may occasionally authorize and pay overdrafts for all types of transactions. . .

<u>Id.</u> p. 19.

**Placing A Stop Payment Order**

<u>*If we pay an item subject to a valid and timely stop payment order, we may be liable to you if you had a legal right to stop payment and you establish that you suffered a loss because of the payment.*</u>  Our liability, if any, is limited to the actual loss suffered, up to the amount of the item.  You must prove your loss to our satisfaction.  We are not liable to you for any special, incidental or consequential loss or damage of any kind.

<u>Id.</u> pp. 54-55 (emphasis supplied).

158.   In this case, the $580,000 fraudulent transfer order was presented to Defendant when the Eagle Funding Sub-Account contained only $1,900.

159.   Under the terms of the Deposit Agreement and Disclosures pertaining to overdrafts, the Defendant has two options – it can "either authorize and pay the insufficient funds item and overdraw your account (an overdraft item) or we decline or return the insufficient funds item without payment (a returned item)." Ex. 1 p. 17.

160.   Instead of selecting one of the two contractually provided and agreed-upon options in the event of an overdraft, the Defendant unlawfully swept OBS's IOLTA Sub-Accounts.

161.   In the event of an overdraft in one IOLTA Sub-Account, the Deposit Agreement and Disclosures does *not* permit Defendant to sweep isolated sub-accounts containing the protected funds of unrelated clients.

162.   Defendant's act of sweeping the unrelated IOLTA Sub-Accounts to satisfy the Eagle Funding Sub-Account overdraft constitutes a breach of the clear terms of the Deposit Agreement and Disclosures.

163.   As a result of Defendant's breach of the Deposit Agreement and Disclosures, Bragg and Staffin personally replenished the $580,000 that was impermissibly swept from the IOLTA.

164.   The Deposit Agreement and Disclosures contemplates wrongful payment of an item that is subject to a valid and timely stop payment request.  Ex. 1 pp. 54-55.

165.   As discussed *supra,* Section 4 of the Escrow Control Account Agreement sets forth the procedure whereby a customer may stop payment of a direction to transfer funds. Ex. 3 § 4.

166.   Plaintiffs complied with the requirements of Section 4 of the Escrow Control Account Agreement when they orally requested that Defendant stop

payment of the fraudulent transfer request on December 6, 2017 (twice) and on December 7, 2017, and when they confirmed such request in writing on December 8, 2017.

167.   Nevertheless, Defendant failed to issue the validly and timely requested stop payment on the fraudulent wire transfer.

168.   The Deposit Agreement and Disclosures directs that when Defendant fails to issue a validly and timely requested stop payment, Defendant "may be liable to you if you had a legal right to stop payment and you establish that you suffered a loss because of the payment." Ex. 1 pp. 54-55.

169.   In this case, Plaintiffs had a legal right to stop payment on the fraudulent wire transfer because (a) Plaintiffs lawfully controlled the Eagle Funding IOLTA Sub-Account from which the funds were supposed to originate; (b) the transfer order had resulted from fraud; (c) the stop payment request was timely made; and (d) the stop payment request complied with the requirements of Section 4 of the Escrow Control Account Agreement.

170.   As a result of the Defendant's failure to honor the valid stop payment order, Plaintiffs suffered a loss insofar as (a) Bragg and Staffin personally replenished $580,000 into OBS' IOLTA, and (b) OBS funded litigation against Cochen in Hong Kong.

171.   Although Plaintiffs have informed Defendant, by its agents, of their loss, both orally and in writing, Defendant has refused to acknowledge and honor its liability to Plaintiffs, in violation of the clear terms of the Deposit Agreement and Disclosures.

172.   Defendant's continuing refusal to make Plaintiffs whole has forced Plaintiffs to bring the instant litigation to seek redress under the Deposit Agreement and Disclosures.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant for breach of the Deposit Agreement and Disclosures, and award Plaintiffs damages in an amount to be determined at trial, together with such other relief as the Court deems just and appropriate.

## Count III
## Breach of Telephone Wire Transfer Agreement

173.   The allegations of the previous paragraphs are incorporated as though fully set forth herein.

174.   The Telephone Wire Transfer Agreement "sets forth the terms and conditions of the wire transfer service" offered by Defendant.  Ex. 20 p. 1.

175.   It provides in relevant portion:

**Cancellation of Wire Transfer Requests**
. . . If you or a bank sending us a draw request sends us a wire transfer request instructing us to cancel or amend a telephone or draw wire transfer request and we are able to verify the authenticity of the

cancellation or amendment request using the Security Procedure, as applicable, we will make a reasonable effort to act on that request . . .

Ex. 20 § 4.

176. Thus, Section 4 of the Defendant's Telephone Wire Transfer Agreement clearly imposes upon the Defendant the obligation to *make a reasonable effort to act* on a request to cancel a wire transfer. Id.

177. Appended to the Telephone Wire Transfer Agreement is a "Procedures Guide and Additional Terms for Wire Transfer Clients." Section 6 thereof outlines the precise procedures which must be undertaken to cancel a wire transfer:

(a) Cancellation requests must be made directly to the Bank's Wire Transfer Department, using the telephone numbers provided in the Operating Hours section of this Procedures Guide.

(b) Client's Authorized Representative must provide to the Bank their [sic] PIN and the Transaction Reference Number that was assigned upon the initiation of the wire transfer to be cancelled.

(c) Upon receipt of a cancellation request, Bank will make a reasonable effort to cancel the wire transfer, including contacting the receiving financial institution to reverse the wire transfer; however, bank will not be liable if the wire transfer is not reversed.

Ex. 20 p. 6 § 6.

178. Pursuant to the Escrow Control Account Agreement, Staffin is an authorized representative of OBS with respect to the IOLTA and all of its IOLTA Sub-Accounts.

179. Staffin initiated the wire transfer cancellation process by calling Defendant and by speaking with Jason in Defendant's Wire Transfer department. Ex. 5 ¶¶ 18-21.

180. In the course of the above-described call, Staffin provided Jason with the transaction reference number assigned to the fraudulent wire transfer request. Id.

181. Thus, Plaintiffs, by and through Staffin, satisfied their obligations under Section 6 of the Procedures Guide and Additional Terms for Wire Transfer Clients that is contained in the Telephone Wire Transfer Agreement.

182. Defendant Bank, however, did not satisfy its own obligations under Section 6 of the Procedures Guide and Additional Terms for Wire Transfer Clients that is contained in the Telephone Wire Transfer Agreement.

183. Specifically, Defendant, by and through its agents Christian Rios, Jason, Tammy and Adam Lewinski, did not make a reasonable effort to cancel the wire transfer.

184. None of the Bank's agents contact the Bank of China or engaged in any other affirmative act intended to reverse the wire transfer.

185. Indeed, none of the Bank's agents made any effort to cancel the wire transfer. Instead, Bank Wire Transfer team member Jason informed Plaintiffs that the wire transfer could not be cancelled at all, and Plaintiffs' only recourse was to

contact the Wire Transfer team the following morning to request that the transfer be recalled *after it was received by the Bank of China*.  Ex. 5 ¶¶ 21-22.

186.   The information provided to Plaintiffs by the Bank was patently incorrect, and in fact the opposite was true – according to the Bank of China, the wire transfer *could* be cancelled *at any point until it was processed by the Bank of China*.  See Ex. 13 ("the remitting bank may cancel the instruction provided that the transfer is not yet processed by the receiving bank.").

187.   Thus, the Defendant's direction to Plaintiffs to wait until the wire transfer was processed by the Bank of China and then request a recall of that transfer was *exactly wrong* and contravened Defendant's own obligations under Section 6 of the Bank's Procedures Guide and Additional Terms for Wire Transfer Clients as well as Section 6 of the Telephone Wire Transfer Agreement.

188.   As a result of Defendant's Breach of the Telephone Wire Transfer Agreement, Plaintiffs have suffered substantial actual damages.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant for breach of the Telephone Wire Transfer Agreement, and award Plaintiffs damages in an amount to be determined at trial, together with such other relief as the Court deems just and appropriate.

## Count IV
## Violation of 13 Pa.C.S. §§ 4A211(b)

189.   The allegations of the previous paragraphs are incorporated as though fully set forth herein.

190.   13 Pa.C.S. § 4A211(b) provides that "a communication by the sender canceling or amending a payment order is effective to cancel or amend the order if notice of the communication is received at a time and in a manner affording the receiving bank a reasonable opportunity to act on the communication before the bank accepts the payment order."

191.   This codification of UCC § 4A reflects the policy of the Bank of China.  See Ex. 13 ("the remitting bank may cancel the instruction provided that the transfer is not yet processed by the receiving bank.").

192.   Staffin contacted Defendant on December 6, 2017 soon after receiving the wire transfer confirmation to report that the wire transfer resulted from a fraud perpetrated against Plaintiffs.  Ex. 5 ¶ 18; Ex. 6 ¶ 12; Ex. 8 p. 1.

193.   Defendant wrongfully informed Staffin that Defendant was powerless to stop the fraudulent wire transfer until the funds were actually sent to and received by the Bank of China.  Ex. 5 ¶¶ 21-22; Ex. 6 ¶ 12; Ex. 8 p. 1.

194.   In truth, pursuant to the policy of the Bank of China, the policy of Defendant as set forth in Section 4 of the Escrow Control Account Agreement, the Deposit Agreement and Disclosures (at pages 54-55), Section 4 of the Telephone

Wire Transfer Agreement and Section 6 of the Procedures Guide and Additional Terms for Wire Transfer Clients; and the provisions of 13 Pa.C.S. § 4A211(b), cancellation of a wire transfer order is effective *until* receipt.

195.   Upon information and belief, Defendant, by its agent, failed to initiate a cancellation of wire transfer request pursuant to 13 Pa.C.S. § 4A211(b) during Plaintiffs' calls on December 6, 2017.

196.   The multiple cancellation requests made by Plaintiffs on December 6, 2017 are effective under 13 Pa.C.S. § 4A211(b), because they were made "at a time and in a manner affording the receiving bank a reasonable opportunity to act on the communication before the bank accepts the payment order."

197.   On December 6, 2017, the online report for the Eagle Funding Sub-Account indicated that the transfer was "processing."  Ex. 6 ¶ 12.

198.   Therefore, prior to the Bank of China's receipt of the $580,000 fraudulent wire transfer funds, Defendant failed and/or refused and/or neglected to effectuate Staffin's valid and timely cancellation of the wire transfer.

199.   The wire transfer was listed by Defendant as being received by the Bank of China at 5:00 am on December 7, 2017.  Ex. 8 p. 1.

200.   As a result of Defendant's Breach of the Telephone Wire Transfer Agreement, Plaintiffs have suffered actual damages.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant for breach of 13 Pa.C.S. § 4A211(b), and award Plaintiffs damages in an amount to be determined at trial, together with such other relief as the Court deems just and appropriate.

**Count V**
**Violation of 13 Pa.C.S. § 4A211(c)(2)(ii)**

201.   The allegations of the previous paragraphs are incorporated as though fully set forth herein.

202.   In the event that 13 Pa.C.S. § 4A211(b) is deemed inapplicable to the instant case insofar as the fraudulent transfer order is perceived to have been "received" by the Bank of China prior to Plaintiffs' oral stop payment order/transfer cancellation request, 13 Pa.C.S. § 4A211(c)(ii) applies.

203.   13 Pa.C.S. § 4A211(c)(2)(ii) provides in relevant part:

> Communication received after payment order accepted. – After a payment order has been accepted, cancellation or amendment of the order is not effective unless the receiving bank agrees or a funds-transfer system rule allows cancellation or amendment without agreement of the bank:. . .*With respect to a payment order accepted by the beneficiary's bank, cancellation or amendment is not effective unless the order was issued in execution of an unauthorized payment order or because of a mistake by a sender in the funds transfer which resulted in the issuance of a payment order*: . . .*that orders payment to a beneficiary not entitled to receive payment from the originator*. . .

13 Pa.C.S. § 4A211(c)(2)(ii) (emphasis supplied).

204.   Even if the Bank of China received the fraudulent wire transfer prior to Staffin's oral cancellation request on December 6, 2017, the cancellation order was nevertheless valid.

205.   The wire transfer order resulted from "a mistake by a sender in the funds transfer which resulted in the issuance of a payment order . . . that orders payment to a beneficiary not entitled to receive payment from the originator."

206.   In this case, the mistake was the sender's assumption that the transfer order was lawfully and validly made.

207.   In actuality, the transfer order was made pursuant to criminally fraudulent activity which cannot be the basis of a valid and lawful wire transfer order.

208.   In such a case, 13 Pa.C.S. § 4A211(c)(2)(ii) provides that cancellation is effective *even if the cancellation is effected after the payment is received*.

209.   In derogation of the clear requirements of 13 Pa.C.S. § 4A211(c)(2)(ii), Defendant has failed and refused to honor Plaintiffs' valid cancellation of the fraudulent wire transfer request.

210.   As a result of Defendant's Breach of 13 Pa.C.S. § 4A211(c)(2)(ii), Plaintiffs have suffered actual damages.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant for breach of 13 Pa.C.S.

§ 4A211(c)(2)(ii), and award Plaintiffs damages in an amount to be determined at trial, together with such other relief as the Court deems just and appropriate.

**Count VI**
**Violation of 13 Pa.C.S. § 4A211(e)**

211.   The allegations of the previous paragraphs are incorporated as though fully set forth herein.

212.   13 Pa.C.S. § 4A211(e), which codifies UCC § 4A, sets forth the following requirement for cancelled payment orders:

> *Canceled payment order. – A canceled payment order cannot be accepted. If an accepted payment order is canceled, the acceptance is nullified and no person has any right or obligation based on the acceptance.* Amendment of a payment order is deemed to be cancellation of the original order at the time of amendment and issue of a new payment order in the amended form at the same time.

13 Pa.C.S. § 4A211(e) (emphasis supplied).

213.   In this case, Plaintiffs submit that the order was cancelled prior to its receipt by the Bank of China.  However, the timing of the cancellation is irrelevant under 13 Pa.C.S. § 4A211(e), only the fact of valid cancellation is important.

214.   Under UCC § 4A, as codified at 13 Pa.C.S. § 4A211(e), regardless of whether the order has been received and accepted, cancellation nullifies the order.

215.   In this case, Staffin and Bragg cancelled the fraudulent wire transfer order orally on December 6, 2017.  Ex. 5 ¶¶ 19, 22.

216.   Per Defendant's instruction, on the morning of December 7, 2017, Plaintiffs requested that the Defendant initiate a wire recall request, after the Bank of China received the fraudulent wire funds. Id. ¶ 24.

217.   In derogation of the clear requirements of 13 Pa.C.S. § 4A211(e), Defendant Bank enforced OBS's "obligation" on the cancelled wire transfer request.

218.   In further derogation of the clear requirements of 13 Pa.C.S. § 4A211(e), Defendant failed and refused to refund the $580,000 Defendant Bank unlawfully and without authorization swept from OBS's IOLTA, and its IOLTA Sub-Accounts thereof, in furtherance of Defendant's wrongful enforcement of OBS's "obligation" on the cancelled wire transfer request.

219.   As a result of Defendant's violation of 13 Pa.C.S. § 4A211(e), Plaintiffs have suffered actual damages.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant for breach of 13 Pa.C.S. § 4A211(e), and award Plaintiffs damages in an amount to be determined at trial, together with such other relief as the Court deems just and appropriate.

### Count VII
### Violation of 12 CFR § 205.17(d)(5)

220.   The allegations of the previous paragraphs are incorporated as though fully set forth herein.

221.   UCC §4A as adopted by the Commonwealth of Pennsylvania, which binds Defendant Bank, is superseded by Federal Reserve regulations and operating circulars, which also bind Defendant Bank.  See 13 Pa.C.S. § 4A107 ("Regulations of the Board of Governors of the Federal Reserve System and operating circulars of the Federal Reserve banks supersede any inconsistent provision of this division to the extent of the inconsistency.").

222.   12 CFR § 205.17(d)(5) states that "[i]f the institution offers . . . a service that transfers funds from another account of the consumer held at the institution to cover overdrafts, the institution must state that fact."

223.   Without authorization from Plaintiffs, and in breach of the terms of Section 3 of the Escrow Control Account Agreement, Defendant Bank swept other IOLTA Sub-Accounts of the IOLTA in order to fund the fraudulent wire transfer to Cochen from the Eagle Funding Sub-Account which only contained $1,900, in spite of the fact that the wire transfer was validly cancelled by the Plaintiffs.

224.   Defendant's act of sweeping IOLTA Sub-Accounts also violates 12 CFR § 205.17(d)(5), insofar as Defendant never stated to Plaintiffs that it offered such a "service that transfers funds from another account of the consumer held at the institution to cover overdrafts . . ." as required by law.

225.   Neither the Escrow Account Control Agreement nor the Deposit Agreement and Disclosures nor the Telephone Wire Transfer Agreement discloses

to Plaintiffs that Defendant Bank will sweep any IOLTA Sub-Accounts if one sub-account is overdrawn.  See Ex. 1, 3 & 20.

226.  As a result of Defendant's violation of 12 CFR § 205.17(d)(5) Plaintiffs have suffered actual damages.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant for violation of 12 CFR § 205.17(d)(5) and award Plaintiffs damages in an amount to be determined at trial, together with such other relief as the Court deems just and appropriate.

## Count VIII
## Negligence Per Se

227.  The allegations of the previous paragraphs are incorporated as though fully set forth herein.

228.  Negligence per se may be demonstrated by proof that a defendant has violated a law or regulation whose purpose is found to be, at least in part (a) to protect a class of persons which includes the one whose interest is invaded, (b) to protect the particular interest which is invaded, (c) to protect that interest against the kind of harm that has resulted, and (d) to protect that interest against the particular hazard from which the harm results.  O'Neal v. Department of the Army, 852 F. Supp. 327, 335 (M.D.Pa. 1994) (citing Centolanza v. Lehigh Valley Dairies, 430 Pa. Super. 463, 635 A.2d 143, 149-50 (Pa. Super. 1993)).

229.   Each and any of the laws and/or regulations blatantly disregarded and/or breached by Defendant Bank as pled in this Complaint constitute negligence per se, and the collective violation of said laws and/or regulations also constitutes negligence per se.

230.   As a result of Defendant's negligence per se, Plaintiffs have suffered actual damages.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant for negligence per se, and award Plaintiffs damages in an amount to be determined at trial, together with such other relief as the Court deems just and appropriate.

## Count IX
## Negligence

231.   The allegations of the previous paragraphs are incorporated as though fully set forth herein.

232.   Under Pennsylvania law, "in order to prevail in a negligence action under common law, the plaintiff must establish that: (1) the defendant owed a duty of care to the plaintiff; (2) that duty was breached; (3) the breach resulted in the plaintiff's injury; and (4) the plaintiff suffered an actual loss or damages." Moon v. Dauphin Cnty., 129 A.3d 16, 21 (Pa. Cmwlth. 2015)(citing Brown v. Dep't of Transp., 11 A.3d 1054, 1056 (Pa. Cmwlth. 2011)).

233.   Pennsylvania courts have determined that the duty of care owed by a bank to its customer when charging the customer's account is set forth in 13 Pa.C.S. § 4401(a)-(b) as follows:

(a)   General rule. — A bank may charge against the account of a customer an item that is properly payable from that account even though the charge creates an overdraft. An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and the bank.

(b)   Limitation on customer liability. — A customer is not liable for the amount of an overdraft if the customer neither signed the item nor benefited from the proceeds of the item.

234.   This duty of care supersedes any duty set forth in the contract between bank and customer, and "the parties to the agreement cannot disclaim the responsibility of a bank for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure." 13 Pa.C.S. § 4103(a).

235.   In this case, Defendant breached its duty of good faith and committed actions and/or inactions which constitute negligence by failing to exercise ordinary care in the execution of Staffin's cancellation/stop payment request with respect to the fraudulent wire transfer order.

236.   Defendant further breached its duty of care to Plaintiffs by sweeping OBS's IOLTA Sub-Accounts in an unauthorized effort to satisfy an overdraft wrongfully made, in blatant derogation of 13 Pa.C.S. § 4401(b).

237.   As a result of Defendant's breach, Plaintiffs were injured in the amount of $580,000 which Bragg and Staffin personally paid to replenish the IOLTA, plus substantial additional funds in excess of $20,000 which OBS paid to fund the Hong Kong litigation against Cochen.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant for negligence, and award Plaintiffs damages in an amount to be determined at trial, together with such other relief as the Court deems just and appropriate.

**SILVERANG, DONOHOE,**
**ROSENZWEIG & HALTZMAN, LLC**

Philip S. Rosenzweig, Esquire
PA Attorney ID Nos. 62461
prosenzweig@sanddlawyers.com
595 East Lancaster Avenue, Suite 203
St. Davids, PA 19087
(610) 263-0115

*Attorneys for Plaintiffs*