## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| O'NEILL, BRAGG & STAFFIN, P.C. :<br>720 Johnsville Boulevard, Ste. 1220 :<br>Warminster, Pennsylvania 18974, :<br> :<br>GARY L. BRAGG, ESQUIRE :<br>720 Johnsville Boulevard, Ste. 1220 :<br>Warminster, Pennsylvania 18974, :<br> :<br>and :<br> :<br>ALVIN M. STAFFIN, ESQUIRE :<br>720 Johnsville Boulevard, Ste. 1220 :<br>Warminster, Pennsylvania 18974, :<br> :<br>Plaintiffs, :<br> :<br>vs. :<br> :<br>BANK OF AMERICA :<br>CORPORATION :<br>c/o Corporation Trust Center :<br>1209 Orange Street :<br>Wilmington, Delaware 19801 :<br> :<br>and :<br> :<br>BANK OF AMERICA, N.A. :<br>Legal Order Processing/Christiana IV :<br>800 Samoset Drive :<br>Newark, Delaware 19713 :<br> :<br>Defendants. : | CIVIL ACTION<br><br>Case No. 2:18-cv-02109-HB |

## FIRST AMENDED COMPLAINT

O'Neill, Bragg & Staffin, P.C. (hereinafter "OBS"), Gary L. Bragg, Esquire ("Bragg")

and Alvin M. Staffin, Esquire ("Staffin," or, together with OBS and Bragg, "Plaintiffs") bring

this action by way of the instant first amended complaint (this "Complaint") against Bank of

America Corporation and Bank of America, N.A. (hereinafter collectively the "Bank" and/or "Defendant") and by way of the within Complaint alleges as follows:

## PARTIES

1.      OBS is a Pennsylvania Professional Corporation, incorporated on December 15, 1992 in the Commonwealth of Pennsylvania and assigned Pennsylvania entity number 2189690.

2.      OBS's principal place of business is located at 720 Johnsville Boulevard, Suite 1220, Warminster, Pennsylvania 18974.

3.      Bragg is a shareholder in and is the President of Plaintiff OBS, and is a citizen of the State of Washington, with a residential address at 7423 Better Way Loop SE, Unit #101, Snoqualmie, WA 98065.

4.       Staffin, who is commonly called "Mel," is a shareholder in and is the Vice President of Plaintiff OBS.  Staffin is a citizen of the Commonwealth of Pennsylvania, with a residential address at 13 Amaryllis Lane, Newtown, Pennsylvania 18940.

5.      Defendant Bank was incorporated in the State of Delaware on May 27, 2009, and operates as a foreign business corporation in the Commonwealth of Pennsylvania under entity number 3884047.

6.      Defendant's principal place of business is located at Bank of America Corporate Center, 100 North Tryon Street, Asheville, North Carolina 28255.

7.      Defendant was previously incorporated as NationsBank (DE) Corporation, NationsBank Corporation and BankAmerica Corporation.

## VENUE AND JURISDICTION

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are citizens of diverse jurisdictions and the amount in controversy exceeds $75,000.

9.      Plaintiffs' principal place of business is located within the Eastern District of Pennsylvania.  As such, venue is appropriate within the Eastern District of Pennsylvania pursuant to 28 U.S.C.§ 1391(b)(1).

10.      Furthermore, one of the key governing agreements in the case at bar, the Deposit Agreement and Disclosures Effective November 10, 2017 (the "2017 Deposit Agreement") between OBS and Defendant, a true and correct copy of which is attached hereto as **Exhibit 1**, states that "[a]ny action or proceeding regarding your account or this deposit agreement must be brought in the state in which the financial center that maintains your account is located.  You submit to the personal jurisdiction of that state." Ex. 1 p. 70.

11.      The conflict between the parties arose after the November 10, 2017 effective date of the 2017 Deposit Agreement.

12.      Pursuant to the June 3, 2005 letter from Defendant to OBS entitled "Important updates to your analyzed business accounts," a true and correct copy of which is attached hereto as **Exhibit 2**, OBS's account at Defendant Bank is "serviced by Escrow Management Customer Service in Scranton, PA." Ex. 2 p. 3.

13.      Therefore, the parties agreed in the 2017 Deposit Agreement to submit the dispute herein to a court of competent jurisdiction located in the Commonwealth of Pennsylvania.

## FACTS

14.      OBS is a law firm engaged in the provision of sophisticated real estate and corporate transactional legal services to clients in from its principal place of business in the Commonwealth of Pennsylvania.

15.      Bragg and Staffin are the sole remaining founders and principals of OBS.

16.   In compliance with the requirements of 240 Pa. Code Rule 1.15 *et seq.,* OBS maintains an Interest On Lawyer Trust Account ("IOLTA") master account for the receipt and management/holding in trust of client funds.

17.   In order to carry out its obligations of safeguarding, recordkeeping and notification with respect to client funds and property, Bragg and Staffin, on behalf of OBS, established an IOLTA account with Defendant's predecessor-in-interest, Summit Bancorp ("Summit").  Staffin signed the Escrow Account Control Agreement with Defendant on behalf of OBS.  A true and correct copy of the March 22, 2002 Escrow Account Control Agreement between OBS and Summit is attached hereto as **Exhibit 3**.

18.   In further exercise of its statutory obligations with respect to client funds, Staffin and Bragg, on behalf of OBS, established numerous IOLTA sub-accounts at Summit, wherein funds belonging to each of OBS's clients were segregated for the protection and safety of each such client's funds (the "IOLTA Sub-Accounts").

19.   The primary purpose of maintaining IOLTA Sub-Accounts was to insulate each client's assets from one another.

20.   Upon information and belief, Summit was acquired by FleetBoston Financial Corporation ("Fleet").

21.   In 2004, upon information and belief, Fleet merged with Defendant Bank.

22.   In May 2017, OBS established IOLTA Sub-Account number 728 titled IOLTA - Eagle Funding Midtown Loan (hereinafter, the "Eagle Funding Sub-Account").

23.   Eagle Funding is a client of OBS.

24.   In 2017, Bragg provided legal counsel to Eagle Funding with respect to loan transactions between Eagle Funding and its borrower, Midtown.

25.     Staffin was generally aware of OBS's relationship with Eagle Funding and of Bragg's work on the loan transaction between Eagle Funding and Midtown, but was not directly involved in that matter.

26.     The Eagle Funding Sub-Account statement documents an initial transfer of loan funds from Eagle Funding to Midtown in May 2017, and a second transfer of loan funds in August 2017.

27.     On or before December 6, 2017, a computer hacker working on behalf of an entity called Cochen International Ltd ("Cochen") gained access to Bragg's Microsoft Exchange e-mail account.

28.     The computer hacker created e-mail correspondence, which appeared to originate from Bragg's e-mail address, directed to Staffin.   The e-mail correspondence appeared to originate from an account bearing Bragg's name and matching Bragg's OBS e-mail address, and contained Bragg's OBS signature line.

29.     The correspondence reflected familiarity with and knowledge of the Eagle Funding loan to Midtown, gleaned from the hacker's illicit and wholly unauthorized access to prior e-mails between Bragg and Staffin and Eagle Funding.

30.     The correspondence was, in actuality, from the Cochen computer hacker.

31.     A true and correct copy of the December 6, 2017 e-mail correspondence between the Cochen computer hacker (posing as Bragg) and Staffin is attached hereto as **Exhibit 4**.   It reads in relevant portion:

> Hacker (as Bragg):    Hi Mel – Are you going to be in the office tomorrow?  I have wire for $580,000 to send to Midtown Resources for an Eagle Funding loan to them but this is going to Midtown Resources [sic] investment account in Hong Kong.  Let me know so i [sic] can forward the wiring instructions to you first [sic] tomorrow, as tomorrow will be an [sic] busy day for me. Thanks. Regards. Gary

| Staffin: | I am in tomorrow |
|---|---|
| Hacker: | Mel – I just received Midtown Resources [sic] investment wiring instructions in Hong Kong see below. |
| | Bank Name: Bank of China Hk Ltd |
| | Bank Address: 774 Nathan Road Hong Kong |
| | Swift: BKCHHKHH |
| | Account Name: Cochen International Ltd |
| | Account#: 012-692-08439-8. |
| | Please transfer from our trust account, they need a swift copy once the wire is sent, email that to me once you take care of this.  Thanks in advance. Thanks.  Regards. |
| Staffin: | From which subaccount? |
| Hacker: | From our trust account 49990 51003, sub #728.  Thanks. |
| Staffin: | No time to do this right now.  Will have to be tomorrow. |
| Hacker: | Get this done first thing in the morning and email transfers swift copy once completed.  Regards. |
| Staffin: | Sounds like an order. |
| Hacker: | Tomorrow will be an [sic] busy day for me and this needs to be out tomorrow.  Appreciate your help. |
| Staffin: | Me too |

Ex. 4.

32.     Bragg was in Seattle, Washington at the time of the aforestated rogue emails.

33.     It was entirely plausible to Staffin that Eagle Funding required a transfer in a time-sensitive manner and that Bragg was unable to execute the transfer while travelling in Seattle.  See Affidavit of Alvin M. Staffin, Esquire, a true and correct copy of which is attached hereto as **Exhibit 5**, at ¶ 12 ("The e-mail contained a variety of references which signaled to me that the e-mail was sent by Bragg.  It addressed me by my nickname, "Mel," indicated familiarity with both Eagle Funding and Midtown Resources, recited the IOLTA Sub-Account number assigned to Eagle Funding, and reflected awareness that Bragg was not in the office and could not effectuate the transfer himself.").

34.     Based upon the sender's sound and accurate knowledge of the names involved in the Eagle Funding-Midtown loan transaction and the details of the Eagle Funding Sub-Account, as well as details such as Staffin's nickname, Staffin had no reason to question the authenticity of

the request or its purported sender.  See Affidavit of Alvin Mark Staffin, December 27, 2017, submitted on behalf of Plaintiff in *O'Neill, Bragg & Staffin, P.C. v. Cochen International Limited,* High Court of Hong Kong, Special Administrative Region, Court of First Instance, a true and correct copy of which is attached hereto as **Exhibit 6**, at ¶ 7.

35.      Believing that Bragg made the transfer request, at 5:52pm[1] on December 6, 2017, Staffin requested that Defendant transfer $580,000 from the Eagle Funding IOLTA Sub-Account to the Bank of China account identified in the December 6, 2017 e-mail correspondence.  Id. ¶ 8. A true and correct copy of the December 6, 2017 transfer request is attached hereto as **Exhibit 7**.

36.      Very shortly after he requested the transfer of funds, Staffin telephoned Bragg to discuss the transfer.  Ex. 5 ¶ 14; Ex. 6 ¶ 9.

37.      Bragg informed Staffin that Bragg did not receive a transfer request from Eagle Funding, and did not send an e-mail instructing Staffin to make any such transfer.  Ex. 5 ¶ 15; Ex. 6 ¶ 9.

38.      Staffin realized that OBS had been victimized by a computer hacker, and immediately notified Defendant Bank of the fraud.  He spoke with a member of the Banks' Wire Transfer team named Jason, who did not furnish his last name.  Staffin urgently requested that the transfer be stopped.  Ex. 5 ¶¶ 18-19, 22; Ex. 6 ¶¶ 9, 12.

39.      Jason informed Staffin that Defendant was powerless to stop the transfer until the funds were actually sent to and received by the Bank of China.  Ex. 5 ¶ 21; Ex. 6 ¶ 12; Ex. 8 p. 1.

40.      Jason suggested that Staffin request a wire recall from the receiving bank, the Bank of China, the following morning.  Ex. 5 ¶ 21.

---

[1] All times are Eastern Standard Time.

41.     The Eagle Funding Sub-Account had a balance at the time of the requested wire transfer by Staffin of approximately $1,900, which was entirely insufficient to fund the $580,000 transfer request.  Ex. 6 ¶ 12.

42.     In a letter dated December 21, 2017, a true and correct copy of which is attached hereto as **Exhibit 8**, Defendant recounted that "Mr. Staffin asked if the funds were available to cover the outgoing wire.  Jason indicated that he didn't see any indication that the payment was stopped by the Risk area."  Ex. 8 p. 1.

43.     Jason indicated to Staffin that he was surprised the transfer request had not been automatically flagged or terminated by the Risk Department in light of the obvious insufficiency of funds in the Eagle Funding Sub-Account.  Ex. 5 ¶ 20.

44.     At the same time, Bragg called Defendant's Check Fraud Claims team and spoke with a representative named Christian Rios ("Rios").  Ex. 5 ¶ 22; Ex. 8 p. 1.

45.     Staffin was conferenced into Bragg's call with Rios.  Ex. 5 ¶ 22.

46.     Rios informed Bragg and Staffin that "he could request the funds back, but the client would need to check their [sic] account the next day to see if the attempt was successful. If unsuccessful, the client may call the Money Movement team between 8a- 8p ET."  Ex. 8 p. 1; see also Ex. 5 ¶ 22.

47.     Rios also noted that the Eagle Funding Sub-Account held only $2,000.  Ex. 5 ¶ 22.

48.     On December 6, 2017, the online report for the Eagle Funding Sub-Account indicated that the transfer was "processing."  Ex. 6 ¶ 12.

49.     The wire transfer for the full amount of $580,000 was received by the Bank of China at 5:00 am on December 7, 2017.  Id.

50.     Accordingly, on December 7, 2017, the online report for the Eagle Funding Sub-Account indicated that the wire transfer was completed.  Ex. 6 ¶ 12.

51.     Because the $1,900 balance in the Eagle Funding Sub-Account was insufficient to fund the $580,000 fraudulent transfer, Defendant, on its own accord, withdrew funds from *other IOLTA Sub-Accounts belonging to Plaintiff's other clients* contrary to the reason and purpose for structuring segregated IOLTA Sub-Accounts.  Id.

52.     At 6:00am on December 7, 2017, pursuant to instructions from Christian Rios and from Jason, Staffin began attempting to contact Defendant to initiate a wire recall request from the Bank of China.  Ex. 5 ¶ 24.

53.     Staffin finally got through to Defendant's representative at 8:35am.  Ex. 5 ¶¶ 23-24; Ex. 8 p. 1.

54.     At 8:47am on December 7, 2017, Defendant's correspondence with Plaintiff reflects that Defendant initiated a wire recall request.  Id.

55.     Later that morning, Staffin received a call from a member of Defendant's Fraud Monitoring team named Tammy, who refused to provide her last name.  Ex. 5 ¶ 26.

56.     During the December 7, 2017 call, Tammy confirmed the wire recall request, and informed Staffin that he would receive updates on the status of that wire recall request from a representative assigned to OBS's "team" named Adam Lewinski.  Ex. 5 ¶ 27.

57.     Lewinski did not contact Staffin for a week, despite Staffin's numerous calls and voicemails to Lewinski seeking wire recall status updates and requesting that Defendant shut down the IOLTA and open a new OBS account because of ongoing security concerns. Ex. 5 ¶¶ 28-30.

58.     Also on December 7, 2017, Staffin reported the wire fraud to the Federal Bureau of Investigation's internet crime telephone hotline.  Ex. 6 ¶ 14.

59.     The Federal Bureau of Investigation ("FBI") collected documents from Staffin and initiated a criminal investigation of the fraud.  Id.

60.     On December 7, 2017, the Cochen e-mail hacker again contacted Staffin, while posing as Bragg.  A true and correct copy of which communication is attached hereto as **Exhibit 9**.

61.     Staffin was aware that the communication was not from Bragg, but testified that "in order not to alert the fraudsters that we were already aware of the earlier fraud to prevent dissipation of the monies, I appeared to be co-operative to the request." Ex. 6 ¶ 10.

62.     Therein, the Cochen e-mail hacker wrote:

| | |
|---|---|
| Hacker (as Bragg): | Hi Mel – Are you in the office?  Thanks.  Regards.  Gary |
| Staffin: | yes |
| Hacker: | Mel – Can you please share how much we have in trust account 49990 51003 as of today after the last wire to Midtown Resources.  Thanks. Regards, Gary |
| Staffin: | I'll call you |
| Hacker: | Mel – Okay can you call me after 1:30 pm. |
| | Please I hope this is not stressful for you, Can you please wire $980,000 to Midtown Resources for investment account. |
| | Can you get this out today?  I would appreciate your effort on this. Thanks.  Regards, Gary |

Ex. 9.

63.     No further contact from the e-mail hacker was received.  Ex. 6 ¶ 10.

64.      On December 8, 2017, Bragg electronically transmitted a letter to Brian Moynihan, President and Chief Executive Officer of Defendant, documenting the wire fraud and requesting restoration of the $580,000 withdrawn from many of the IOLTA Sub-Accounts. Defendant's Wire Transfer and Escrow Management departments were copied on the December

8, 2017 letter. A true and correct copy of Plaintiff's December 8, 2017 letter to Defendant is attached hereto as **Exhibit 10**.

65.     Shockingly, also on December 8, 2017, Defendant's Escrow Department called OBS to report that the Eagle Funding Sub-Account was overdrawn. Ex. 10 p. 2.

66.     Of course, the overdraft was not reflective of the fact that the Bank funded the overdraft with _other_ IOLTA Sub-Account monies; furthermore, the overdraft should have been evident to Defendant when the transfer request was initially made at 5:52pm on December 6, 2017. Ex. 7.

67.     According to Defendant's agent and Wire Operations team member Jason, the overdraft should have been evident to Defendant's Risk Department, which failed to stop or even flag the transfer. See Ex. 5 ¶ 20 ("Jason indicated surprise that the $580,000 transfer was not automatically flagged or stopped by the Bank's Risk Area because the Eagle Funding IOLTA Sub-Account held less than $2,000."); Ex. 8 p. 1 ("Jason indicated that he didn't see any indication that the payment was stopped by the Risk area.").

68.     Finally, the overdraft was clearly evident upon Plaintiffs' call to Defendant's Check Fraud and Wire Operations teams on December 6, 2017. Ex. 5 ¶ 22 ("Rios also noted that the balance in the Eagle Funding IOLTA Sub-Account was less than $2,000."); Ex. 8 p. 1.

69.     On December 8, 2017, according to defendant's correspondence, Swift received the following response from the Bank of China with respect to the wire recall request:

> WE COULD ONLY ARRANGE THE REFUND PURSUANT TO A HONG KONG COURT ORDER BINDING ON US AND WHEN THERE IS SUFFICIENT CREDIT BALANCE IN THE CUSTOMER'S ACCOUNT AT THE MATERIAL TIME. WE SUGGEST YOU TO REPORT THE CASE TO AND SEEK ASSISTANCE FROM THE HONG KONG POLICE FORCE.

Ex. 8 p. 2 (allcaps in original).

70.     On December 10, 2017, upon the suggestion of the FBI and in light of the Bank of China's response to Staffin's transfer recall request, Bragg filed a cyber crime report with the Hong Kong police.  Ex. 6 ¶ 15.

71.     The case was referred for investigation to District Investigation Team 5 of Wong Tai Sin Police Station.  A true and correct copy of the cyber crime report and accompanying correspondence from District Investigation Team 5 of Wong Tai Sin Police Station is attached hereto as **Exhibit 11**.

72.     Also on December 10, 2017, Bragg electronically transmitted a letter to the Bank of China's Fraud department, documenting the wire fraud and requesting a freeze upon the account(s) of the recipient of the fraudulent transfer, Cochen International.  A true a correct copy of Plaintiff's December 10, 2017 letter to the Bank of China is attached hereto as **Exhibit 12**.

73.     The Bank of China responded by e-mail dated December 18, 2017, a true and correct copy of which is attached hereto as **Exhibit 13**, stating in relevant portion:

> We would like to explain that under normal circumstances, incoming remittance [sic] will be processed according to the instruction given by the remitting bank and subject to our bank's normal practice; the remitting bank may cancel the instruction provided that the transfer is not yet processed by the receiving bank. We learnt that you have reported it to the Hong Kong law enforcement authorities, we will give our full cooperation when we receive instructions from the Hong Kong law enforcement authorities.

Ex. 13.

74.     In other words, according to the Bank of China, it was Defendant Bank's responsibility as remitting bank to cancel the instruction/wire transfer.

75.     On December 20, 2017, Plaintiffs retained the law firm of Tanner DeWitt Solicitors in Hong Kong ("TDS"), in an attempt to recover the $580,000 in stolen funds.

76.     On December 27, 2017, TDS appeared before the High Court of the Hong Kong Special Administrative Region on behalf of Plaintiffs and submitted the Affidavit of Alvin Mark Staffin.  See Ex. 6.

77.     On December 28, 2017, the High Court of the Hong Kong Special Administrative Region entered an Order, a true and correct copy of which is attached hereto as **Exhibit 14a**, freezing Cochen's accounts at the Bank of China which at that time contained $23,497.32.[2]  Ex. 14a.  The Order also required further disclosure of transactions in Cochen's accounts by January 5, 2018, which resulted in the garnishment from Cochen and transfer to TDS of $83,509.21.  Id. After deduction of TDS's fees and costs, the sum recovered from Cochen is $58,730.11.

78.     TDS also brought suit against two third-level recipients of the fraudulently transferred funds from Cochen, YKY Limited ("YKY") and Extrade Electronic (HK) Limited ("Extrade").  Final judgment was ultimately entered against YKY in the amount of $21,130 (including $7,130 in costs), a true and correct copy of which final judgment is attached hereto as **Exhibit 14b**, but garnishment proceedings remain ongoing.  Final judgment was ultimately entered against Extrade in the amount of $35,130 (including $7,130 in costs), a true and correct copy of which final judgment is attached hereto as **Exhibit 14c**, but garnishment proceedings remain ongoing.

79.     Meanwhile, by letter dated December 12, 2017 (and received December 14, 2017), Defendant informed OBS in writing of the overdraft on its IOLTA.  A true and correct copy of Defendant's December 12, 2017 correspondence with OBS is attached hereto as **Exhibit 15**.

---

[2] All sums are listed in U.S. dollars.

80.     Bragg and Staffin, on behalf of OBS, engaged in a variety of immediate actions to mitigate and rectify damage to their IOLTA and to client-specific IOLTA Sub-Accounts caused by the computer hack and wire fraud, including the following:

a.   In order to prevent OBS's clients from suffering any losses as a result of the wire fraud, *Bragg and Staffin personally restored all sub-accounts of the IOLTA in full from their personal funds.*

b.   Staffin sought to close the IOLTA by repeatedly contacting Adam Lewinski, the Bank's designated Wire Fraud team member, on December 7, 2017 and thereafter.  However, Lewinski did not respond until December 19, 2017 and informed OBS that the Bank was not handling new IOLTA accounts and could not accommodate OBS's demand that the existing IOLTA account be closed immediately without a written instruction, which Staffin provided.

c.   On the night of December 6, 2017, immediately upon discovering the hacking, OBS contacted its information technology consultant  who changed Bragg's password on his Microsoft Exchange e-mail account.  Bragg changed the passwords on his OBS and personal internet-enabled computers.  OBS also took other internal security steps.

d.   OBS established new IOLTA accounts for each client at Citizens Bank of Pennsylvania, where client funds over $2,000 are not in sub-accounts, but rather in completely separate accounts. Client funds under $2,000 are comingled with distinct account ledgers.

e.   OBS established a new wire transfer protocol, requiring all transfers to be confirmed telephonically prior to entry of a transfer order.

81.     By letter dated January 12, 2018, a true and correct copy of which is attached hereto as **Exhibit 16**, Ms. Morgan responded: "The information provided was satisfactory and this matter is closed.  Be assured this has not been treated as a disciplinary matter and no disciplinary file has been opened against O'Neill, Bragg and Staffin."

82.     Bragg and Staffin also caused OBS to close the Defendant Bank's IOLTA and all associated IOLTA Sub-Accounts, including the Eagle Funding Sub-Account, by letter to Defendant dated December 19, 2017.  A true and correct copy of OBS's December 19, 2017 letter to Defendant is attached hereto as **Exhibit 17**.  See also Ex. 5 ¶ 31.

83.     On February 28, 2018, in response to OBS's December 19, 2017 written request to close the IOLTA and all sub-accounts, Defendant informed OBS in writing that "In April, the Escrow Management Service will be removed from your Full Analysis Business Checking ending in 51003."  A true and correct copy of Defendant's February 28, 2018 communication to OBS is attached hereto as **Exhibit 18**.

84.     The February 28, 2018 communication, which OBS received on March 5, 2018, states that "the account referenced above is currently set up with the Escrow Management Service based on the terms of the *Deposit Agreement and Treasury Services Agreement – Escrow Management Service Addendum*."  Ex. 20 p. 1 (italics in original).  It also states that OBS's "agreement with the Bank [is] outlined in the *Deposit Agreement and Disclosures* . . ."  Id. (italics in original).

85.     Plaintiffs were never provided with the *Deposit Agreement and Treasury Services Agreement – Escrow Management Service Addendum*.

86.     Therefore, on March 6, 2018, one day after receiving the February 28, 2018 communication from Defendant, Staffin e-mailed the Liquidity Team Contact, to whom the

February 28, 2018 communication directed all questions.  See Ex. 18 p. 1.  A true and correct copy of Staffin's March 6, 2018 e-mail correspondence with Defendant's Liquidity Team Contact is attached hereto as **Exhibit 19**.

87.    Therein, Staffin wrote: "Please e-mail to me the 'Deposit Agreement and Treasury Services Agreement - Escrow Management Service Addendum' referenced in your letter." Ex. 19.

88.    Later that day, Defendant's Liquidity Team responded: "We have receive [sic] your inquiry.  We noticed that your account is in [sic] already in a close [sic] status and that is [sic] letter should not have been mailed to you. We apologize for any inconvenience this may have caused." Id.

89.    Defendant's Liquidity Team has never provided) the *Deposit Agreement and Treasury Services Agreement – Escrow Management Service Addendum* that Staffin requested, which Defendant Bank purports to govern the closed IOLTA and its IOLTA Sub-Accounts.

90.    The *Deposit Agreement and Disclosures* referenced in Defendant's February 28, 2018 communication was also not provided to OBS, but is readily available online.  It contains the following relevant provisions:

> **Overdrafts and Declined or Returned Items**
> When we determine that you do not have enough funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item. . . we either authorize and pay the insufficient funds item and overdraw your account (an overdraft item) or we decline or return the insufficient funds item without payment (a returned item).
> We pay overdrafts at our discretion, which means that we do not guarantee that we will always, or ever, authorize and pay them. . .

Ex. 1 p. 17.

**Business Accounts – Overdraft Practices and Settings**
We automatically apply our standard business overdraft setting to business accounts.  With our standard business overdraft setting, we may occasionally authorize and pay overdrafts for all types of transactions. . .

<u>Id.</u> p. 19.

**What Are Problems and Unauthorized Transactions**
Problems and unauthorized transactions include suspected fraud; missing deposits; unauthorized electronic transfers . . .

<u>Id.</u> p. 42.

**We Are Not Liable If You Fail To Report Promptly**
Except as otherwise expressly reported elsewhere in this agreement, if you fail to notify us in writing of suspected problems or unauthorized transactions within 60 days after we make your statement or items available to you, you agree that:
- you may not make a claim against us relating to the unreported problems or unauthorized transactions, regardless of the care or lack of care we may have exercised in handling your account; and
- you may not bring any legal proceeding or action against us to recover any amount alleged to have been improperly paid out of your account.

<u>Id.</u> p. 43.

**Written Confirmation and Other Assistance**
. . . If you assert a claim regarding a problem, you must cooperate with us in the investigation and prosecution of your claim and any attempt to recover funds. You also agree to assist us in identifying and in seeking criminal and civil penalties against the person responsible.  You must file reports and complaints with appropriate law enforcement authorities. . .

<u>Id.</u>

**Our Investigation and Maximum Liability**
. . . Our maximum liability is the lesser of your actual damages proved or the amount of the missing deposit . . .

<u>Id.</u>

**Placing A Stop Payment Order**  We may accept a written or oral stop payment order from any person who has a right to withdraw funds from the account . . .
*If we pay an item subject to a valid and timely stop payment order, we may be liable to you if you had a legal right to stop payment and you establish that you suffered a loss because of the payment.*  Our liability, if any, is limited to the actual loss suffered, up to the amount of the item.  You must prove your loss to

our satisfaction.   We are not liable to you for any special, incidental or consequential loss or damage of any kind.

Id. pp. 54-55 (emphasis supplied).

**Funds Transfer Services**
. . . We provide separate agreements to you that govern the terms of some funds transfer services . . .

Id. p. 64.

91.    Upon information and belief, the "Funds Transfer Services" section of the Deposit Agreement and Disclosures references the Telephone Wire Transfer Agreement.

92.    The Telephone Wire Transfer Agreement, a true and correct copy of which is attached hereto as **Exhibit 20**, governs wire transfer requests made by telephone, including Staffin's December 6, 2017 transfer request.  It states in relevant portion:

**Cancellation of Wire Transfer Requests**
. . . If you or a bank sending us a wire transfer request sends us a wire transfer request instructing us to cancel or amend a telephone or draw wire transfer request and we are able to verify the authenticity of the cancellation or amendment request using the Security Procedure, as applicable, we will make a reasonable effort to act on that request . . .

Ex. 20 § 4.

**Limitation of Liability**
(a) For wire transfer requests which are subject to Article 4A of the Uniform Commercial Code, as adopted in the state whose laws govern this Agreement ("Article 4A"), we are liable only for damages required to be paid under Article 4A or Subpart B of Regulation J of the Board of Governors of the Federal Reserve System, as amended form time to time and as applicable, except as otherwise agreed in this Agreement.
*****
(c) If we are obligated to pay interest compensation, we will pay such compensation or credit your account, as we determine, upon your written request . . .
*****
(e) We will not be responsible for the acts or omissions of you or your agents . . .

Id. §§ 6(a), 6(c) & 6(e).

93.     The document which created OBS's original IOLTA account is the March 22,

2002 Escrow Control Account Agreement.  It provides, in relevant portion:

> **WITHDRAWALS AND TRANSFERS**
> . . . If a check is presented to the Bank at a time when there is insufficient balance
> of available funds in the Subaccount, the Bank, in its discretion, may pay the
> check or return the check and, in either event, charge the Depositor a service
> charge. . .
>
> **STOP PAYMENT**
> The Depositor may direct the Bank to stop payment of any check, draft or
> direction to transfer funds orally or in writing.  An oral direction must be
> confirmed in writing within **14** days.  Otherwise it will expire.  A written direction
> to stop payment will be effective for **6** months, unless renewed in writing.
> *****
> **LIABILITY**
> The Bank shall not be liable to the Depositor for any loss or expense incurred by
> the Depositor with respect to the Account or this Agreement unless such loss or
> expense is directly attributable to the gross negligence or willful misconduct of
> the Bank.  In no event shall the Bank be liable to the Depositor for consequential
> damages.

Ex. 3 §§ 3, 4 & 12 (boldface in original).

94.     The Uniform Commercial Code has been adopted by the Commonwealth of

Pennsylvania at 13 Pa.C.S. § 1101 *et seq.*

95.     Section 4A of the Uniform Commercial Code is codified in the Commonwealth of

Pennsylvania at 13 Pa.C.S. §§ 4A101-4A507, and provides in relevant portion as follows:

**§ 4A211.  Cancellation and amendment of payment order.**

(a)   Communication. – A communication of the sender of a payment order
canceling or amending the order may be transmitted to the receiving bank orally,
electronically or in writing. If a security procedure is in effect between the sender
and the receiving bank, the communication is not effective to cancel or amend the
order unless the communication is verified pursuant to the security procedure or
the bank agrees to the cancellation or amendment.

(b)   Communication received before payment order accepted. – Subject to
subsection (a), a communication by the sender canceling or amending a payment
order is effective to cancel or amend the order if notice of the communication is
received at a time and in a manner affording the receiving bank a reasonable

opportunity to act on the communication before the bank accepts the payment order.

(c)  Communication received after payment order accepted. – After a payment order has been accepted, cancellation or amendment of the order is not effective unless the receiving bank agrees or a funds-transfer system rule allows cancellation or amendment without agreement of the bank:

> (1)  With respect to a payment order accepted by a receiving bank other than the beneficiary's bank, cancellation or amendment is not effective unless a conforming cancellation or amendment of the payment order issued by the receiving bank is also made.

> (2)  *With respect to a payment order accepted by the beneficiary's bank, cancellation or amendment is not effective unless the order was issued in execution of an unauthorized payment order or because of a mistake by a sender in the funds transfer which resulted in the issuance of a payment order*:

>> (i)  that is a duplicate of a payment order previously issued by the sender;

>> (ii)  *that orders payment to a beneficiary not entitled to receive payment from the originator*; or

>> (iii)  that orders payment in an amount greater than the amount the beneficiary was entitled to receive from the originator.

> If the payment order is canceled or amended, the beneficiary's bank is entitled to recover from the beneficiary any amount paid to the beneficiary to the extent allowed by the law governing mistake and restitution.

*****

(d)  *Canceled payment order. – A canceled payment order cannot be accepted. If an accepted payment order is canceled, the acceptance is nullified and no person has any right or obligation based on the acceptance.* Amendment of a payment order is deemed to be cancellation of the original order at the time of amendment and issue of a new payment order in the amended form at the same time.

13  Pa.C.S. § 4A211.

> 96.    Notably, the UCC Section 4A as adopted by the Commonwealth of Pennsylvania

is specifically superseded by Federal Reserve regulations and operating circulars.  See 13 Pa.C.S.

§ 4A107 ("Regulations of the Board of Governors of the Federal Reserve System and operating circulars of the Federal Reserve banks supersede any inconsistent provision of this division to the extent of the inconsistency.").

97.    Such a regulation, codified at 12 CFR § 205.17(d)(5) and entitled "Alternative plans for covering overdrafts," states as follows:

> If the institution offers a line of credit subject to the Board's Regulation Z (12 CFR part 226) or a service that transfers funds from another account of the consumer held at the institution to cover overdrafts, the institution must state that fact. An institution may, but is not required to, list additional alternatives for the payment of overdrafts.

12 CFR § 205.17(d)(5).

98.    It is undisputed that Staffin and Bragg contacted Defendant on December 6, 2017 shortly after the wire transfer confirmation to report that the wire transfer resulted from a fraud perpetrated against Plaintiffs.  Ex. 5 ¶¶ 18-22; Ex. 6 ¶ 12; Ex. 7 p. 1.

99.    It is also undisputed that Defendant's agent, Jason, informed Staffin that Defendant was powerless to stop the fraudulent wire transfer until the funds were actually sent to and received by the Bank of China.  Ex. 5 ¶¶ 20-21; Ex. 6     ¶ 12; Ex. 7 p. 1.

100.    It is further undisputed that – in complete contravention of the Bank's stated policy, per its representative, Jason – the Bank of China's procedure allows that "the remitting bank may cancel the instruction provided that the transfer is not yet processed by the receiving bank."  Ex. 13.

101.    Upon information and belief, Defendant, by its agent, failed to initiate a cancellation of wire transfer request pursuant to Section 4 of the Telephone Wire Transfer Agreement during Staffin's call to Defendant on December 6, 2017.  See Ex. 20 § 4.

102.    Such failure is patently unreasonable.  The multiple cancellation requests made by Plaintiffs are effective pursuant to Section 4 of the Escrow Control Account Agreement, which allows a stop payment direction to be made "orally or in writing."  Ex. 3 § 4.

103.    On December 6, 2017, the online report for the Eagle Funding Sub-Account indicated that the transfer was "processing."  Ex. 6 ¶ 12.

104.    Therefore, prior to final processing of the fraudulent wire transfer request by the Bank of China, Defendant neglected to cancel the wire transfer, which failure is patently not reasonable.

105.    13 Pa.C.S. 4A211(b) provides that "a communication by the sender canceling or amending a payment order is effective to cancel or amend the order if notice of the communication is received at a time and in a manner affording the receiving bank a reasonable opportunity to act on the communication before the bank accepts the payment order."

106.    Bragg and Staffin contacted Defendant a second time on December 6, 2017, at which point Defendant's agent Rios offered to "request the funds back," and instructed Bragg and Staffin to follow up with Defendant's Money Movement team the following day. Ex. 5 ¶ 22; Ex. 8 p. 1.

107.    The wire transfer was listed by Defendant as being received by the Bank of China at 5:00 am on December 7, 2017.  Id.

108.    Even assuming, *arguendo,* that the wire transfer was received by the Bank of China immediately upon Defendant's confirmation at 5:50pm on December 6, 2017 – which it was not, as Defendant's own online recording system demonstrated – the multiple cancellation requests are effective transfer order cancellations under UCC 4A, as codified at 13 Pa.C.S. 4A211(c)(2)(ii), which provides:

"Communication received after payment order accepted. – After a payment order has been accepted, cancellation or amendment of the order is not effective unless the receiving bank agrees or a funds-transfer system rule allows cancellation or amendment without agreement of the bank: . . . _With respect to a payment order accepted by the beneficiary's bank, cancellation or amendment is not effective unless the order was issued in execution of an unauthorized payment order or because of a mistake by a sender in the funds transfer which resulted in the issuance of a payment order_: . . . (ii) _that orders payment to a beneficiary not entitled to receive payment from the originator_. . ."

(emphasis supplied).

109.   Cochen was not entitled to receive any funds, wire transfers or payments from OBS.

110.   Any authorization provided by Staffin was the good faith mistaken consequence of an overt fraud perpetrated by Cochen.

111.   Defendant's wrongful execution of the wire transfer request was the result of Cochen's fraud.

112.   Defendant's failure and refusal to terminate the transfer resulted in the payment of both Eagle Funding and other client IOLTA funds to Cochen, which was not authorized to receive any such payment from OBS or Eagle Funding.

113.   Therefore, even if the Bank of China received the fraudulent transfer of funds prior to Plaintiffs' calls to the Bank, such transfer was nevertheless effectively cancelled pursuant to UCC 4A211(c)(2)(ii), as codified by the Commonwealth of Pennsylvania, insofar as the transfer was caused by a mistake and resulted in payment to a beneficiary not entitled to receive payment from the originator.

114.   The Telephone Wire Transfer Agreement between the parties specifically contemplates the Defendant's potential liability Under UCC 4A.  See Ex. 3 § 12.

115.    Regardless of when the cancellation was received by the Bank of China, there is no dispute that it was timely made on December 6, 2016 immediately upon discovery by Plaintiffs of the fraud perpetrated against them.

116.    Under the terms of Defendant's own contract(s), Defendant Bank is indisputably liable to Plaintiffs for payment of the wire transfer, as it was subject to a valid and timely stop payment order. <u>See</u> Ex. 1 p. 55 ("If we pay an item subject to a valid and timely stop payment order, we may be liable to you if you had a legal right to stop payment and you establish that you suffered a loss because of the payment.  Our liability, if any, is limited to the actual loss suffered, up to the amount of the item.").

117.    Defendant Bank issued an Attorney Trust Account Overdraft Report with respect to the Eagle Funding Sub-Account, which was received by Plaintiffs on December 14, 2017.  <u>See</u> Ex. 15.

118.    That overdraft report does not acknowledge or reflect the Bank's own impermissible act of sweeping other client IOLTA Sub-Accounts, which Defendant was not authorized or empowered to do.

119.    Without authorization from Plaintiffs, and in breach of the terms of Section 3 of the Escrow Control Account Agreement, Defendant swept these other IOLTA Sub-Accounts of the IOLTA in order to fund the fraudulent wire transfer to Cochen, which wire transfer Plaintiffs had validly cancelled pursuant to Section 4 of the Telephone Wire Transfer Agreement.

120.    Defendant's act of sweeping other IOLTA Sub-Accounts also violates 12 CFR § 205.17(d)(5), insofar as Defendant Bank never stated to Plaintiffs that it offered such a "service that transfers funds from another account of the consumer held at the institution to cover overdrafts . . ." as required by law.

121.    Indeed, neither the Escrow Account Control Agreement nor the Deposit Agreement and Disclosures nor the Telephone Wire Transfer Agreement discloses to Plaintiffs that Defendant will sweep all IOLTA Sub-Accounts if one client's sub-account is overdrawn. See Ex. 1, 3 & 20.

122.    Plaintiffs' obvious intent and purpose when setting up IOLTA Sub-Accounts for each client was to safeguard each client's funds by insulating the funds of each client from those of all other clients.

123.    OBS funded the litigation in Hong Kong against Cochen, and to date has received $58,730.11 from Cochen, after deduction of litigation costs.

124.    The litigation in Hong Kong against YKY and Extrade resulted in monetary awards in OBS's favor, but no garnishment or receipt of those ill-gotten funds to date.  See Ex. 14b-14c.

125.    The fraudulent transfer of $580,000 from the Eagle Funding Sub-Account was effected by Defendant Bank's multiple acts of negligence and unreasonable behavior.

126.    Defendant's failure to stop or cancel the fraudulent transfer of $580,000 from the Eagle Funding Sub-Account at Staffin's timely request violates the terms of the Telephone Wire Transfer Agreement.

127.    Defendant's failure to stop or cancel the fraudulent transfer of $580,000 from the Eagle Funding Sub-Account at Staffin's request violates the terms of the Escrow Control Account Agreement.

128.    Defendant's failure to stop or cancel the fraudulent transfer of $580,000 from the Eagle Funding Sub-Account at Staffin's request violates 13 Pa.C.S. 4A211(c)(2)(ii).

129.    Plaintiffs have requested that Defendant repay the $580,000 Plaintiffs lost due to the fraudulent transfer, which sum has not been repaid.

130.    Defendant's refusal to repay the $580,000 to Plaintiffs violates the terms of the Deposit Agreement and Disclosures.

131.    Defendant's unauthorized and impermissible act in sweeping the IOLTA Sub-Accounts of other clients violates Defendant Bank's essential obligations as the holder of attorney trust funds.

132.    Plaintiffs have been injured as a result of Defendant's negligent, reckless and/or willful acts and omissions, and as a result of the Defendant Bank's unreasonable and ultra vires behavior.

## Count I
## Breach of Escrow Control Account Agreement

133.    The allegations of the previous paragraphs are incorporated as though fully set forth herein.

134.    The Escrow Control Account Agreement was executed between OBS and Defendant's predecessor-in-interest, Summit, in 2002.

135.    The Escrow Control Account Agreement was not replaced when Fleet purchased Summit, or when Defendant merged with Fleet.

136.    The Escrow Account Control Agreement governed the IOLTA on December 6, 2017.

137.    Defendant is bound by the terms of the Escrow Account Control Agreement.

138.    The Escrow Account Control Agreement provides, in relevant portion:

**3. WITHDRAWALS AND TRANSFERS**
. . . If a check is presented to the Bank at a time when there is insufficient balance of available funds in the Subaccount, the Bank, in its discretion, may pay the

check or return the check and, in either event, charge the Depositor a service charge. . .

**4. STOP PAYMENT**
The Depositor may direct the Bank to stop payment of any check, draft or direction to transfer funds orally or in writing. An oral direction must be confirmed in writing within **14** days. Otherwise it will expire. A written direction to stop payment will be effective for **6** months, unless renewed in writing.

Ex. 3 §§ 3-4 (boldface in original).

139.    In this case, the $580,000 fraudulent transfer order was presented to Defendant when the Eagle Funding Sub-Account contained only $1,900.

140.    Under Section 3 of the Escrow Account Control Agreement, the Defendant had two options – it could either pay the transfer or reject the transfer request. Ex. 3 § 3.

141.    Instead of selecting one of the two contractually provided and agreed-upon options in the event of an overdraft, the Defendant unlawfully swept OBS's clients' IOLTA Sub-Accounts.

142.    In the event of an overdraft in one IOLTA Sub-Account, the Escrow Account Control Agreement does _not_ permit Defendant to sweep isolated sub-accounts containing the protected funds of unrelated clients.

143.    Defendant's act of sweeping the unrelated IOLTA Sub-Accounts to satisfy the Eagle Funding Sub-Account overdraft constitutes a breach of the clear terms of Section 3 of the Escrow Account Control Agreement.

144.    As a result of Defendant's breach of Section 3 of the Escrow Account Control Agreement, on December 18, 2017 Plaintiffs experienced a negative balance in the IOLTA account, including all of its Sub-Accounts.

145.    To rectify the negative balance and protect OBS's clients, Bragg and Staffin personally replenished the $580,000 that was impermissibly swept from the IOLTA Sub-Accounts.

146.    Section 4 of the Escrow Account Control Agreement sets forth the procedure whereby a customer may stop payment of a direction to transfer funds.  Ex. 3 § 4.

147.    It specifically provides that such direction may be made "orally or in writing," and if oral "must be confirmed in writing within 14 days."  Id.

148.    The clear implication of Section 4 of the Escrow Account Control Agreement is that a valid stop payment direction made in compliance with the procedures set forth therein will be honored by Defendant.

149.    In this case, Plaintiffs gave multiple stop payment directions on December 6, 2017 to Defendant's agents, Wire Operations team member Jason and Check Fraud Claims team member Christian Rios.  Ex. 5 ¶¶ 18-22; Ex. 6 ¶ 12; Ex. 8 p. 1.

150.    At 6:00am on December 7, 2017, Staffin contacted Defendant to initiate a wire recall request from the Bank of China, which request was actually transmitted by the Bank at 8:37am that day.  Ex. 5 ¶¶ 23-25; Ex. 8 p. 1.

151.    These stop payment and wire recall requests were confirmed in writing on December 8, 2017 – well within the 14 day period required by Section 4 of the Escrow Account Control Agreement – by letter from Bragg to Brian Moynihan, President and Chief Executive Officer of Defendant, Defendant's Wire Transfer department, and Defendant's Escrow Management department.  See Ex. 10.

152.    Although Plaintiffs complied with the requirements of Section 4 of the Escrow Account Control Agreement, Defendant failed to issue the stop payment order.

153.     Defendant's failure to issue the stop payment request upon Plaintiff's *three* valid oral directives and written confirmation constitutes a violation of Section 4 of the Escrow Account Control Agreement.

154.     As a result of Defendant's breach of Section 4 of the Escrow Account Control Agreement, the fraudulent transfer request was processed, Cochen wrongfully received Plaintiffs' funds, and Bragg and Staffin were compelled to personally replenish $580,000 in client funds and to expend $20,000 and valuable resources to prosecute a criminal case in Hong Kong against Cochen.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant for breach of the Escrow Account Control Agreement, and award Plaintiffs damages in an amount to be determined at trial, together with such other relief as the Court deems just and appropriate.

## Count II
## Breach of Deposit Agreement and Disclosures

155.     The allegations of the previous paragraphs are incorporated as though fully set forth herein.

156.     The Deposit Agreement and Disclosures, effective November 2017, governs the Defendant's relationship with OBS, according to Defendant's own communication to Plaintiffs. See Ex. 18 p. 1.

157.     The Deposit Agreement and Disclosures contains the following relevant provisions:

**Overdrafts and Declined or Returned Items**
When we determine that you do not have enough funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item. . . we either authorize and pay the insufficient funds item and overdraw your

account (an overdraft item) or we decline or return the insufficient funds item
without payment (a returned item).

We pay overdrafts at our discretion, which means that we do not guarantee that
we will always, or ever, authorize and pay them. . .

Ex. 1 p. 17.

**Business Accounts – Overdraft Practices and Settings**

We automatically apply our standard business overdraft setting to business
accounts.  With our standard business overdraft setting, we may occasionally
authorize and pay overdrafts for all types of transactions. . .

Id. p. 19.

**Placing A Stop Payment Order**

*If we pay an item subject to a valid and timely stop payment order, we may be
liable to you if you had a legal right to stop payment and you establish that you
suffered a loss because of the payment.*  Our liability, if any, is limited to the
actual loss suffered, up to the amount of the item.  You must prove your loss to
our satisfaction.  We are not liable to you for any special, incidental or
consequential loss or damage of any kind.

Id. pp. 54-55 (emphasis supplied).

158.    In this case, the $580,000 fraudulent transfer order was presented to Defendant

when the Eagle Funding Sub-Account contained only $1,900.

159.    Under the terms of the Deposit Agreement and Disclosures pertaining to

overdrafts, the Defendant has two options – it can "either authorize and pay the insufficient funds

item and overdraw your account (an overdraft item) or we decline or return the insufficient funds

item without payment (a returned item)." Ex. 1 p. 17.

160.    Instead of selecting one of the two contractually provided and agreed-upon

options in the event of an overdraft, the Defendant unlawfully swept OBS's IOLTA Sub-

Accounts.

161.   In the event of an overdraft in one IOLTA Sub-Account, the Deposit Agreement and Disclosures does _not_ permit Defendant to sweep isolated sub-accounts containing the protected funds of unrelated clients.

162.   Defendant's act of sweeping the unrelated IOLTA Sub-Accounts to satisfy the Eagle Funding Sub-Account overdraft constitutes a breach of the clear terms of the Deposit Agreement and Disclosures.

163.   As a result of Defendant's breach of the Deposit Agreement and Disclosures, Bragg and Staffin personally replenished the $580,000 that was impermissibly swept from the IOLTA.

164.   The Deposit Agreement and Disclosures contemplates wrongful payment of an item that is subject to a valid and timely stop payment request.  Ex. 1 pp. 54-55.

165.   As discussed _supra,_ Section 4 of the Escrow Control Account Agreement sets forth the procedure whereby a customer may stop payment of a direction to transfer funds.  Ex. 3 § 4.

166.   Plaintiffs complied with the requirements of Section 4 of the Escrow Control Account Agreement when they orally requested that Defendant stop payment of the fraudulent transfer request on December 6, 2017 (twice) and on December 7, 2017, and when they confirmed such request in writing on December 8, 2017.

167.   Nevertheless, Defendant failed to issue the validly and timely requested stop payment on the fraudulent wire transfer.

168.   The Deposit Agreement and Disclosures directs that when Defendant fails to issue a validly and timely requested stop payment, Defendant "may be liable to you if you had a legal

right to stop payment and you establish that you suffered a loss because of the payment." Ex. 1 pp. 54-55.

169.    In this case, Plaintiffs had a legal right to stop payment on the fraudulent wire transfer because (a) Plaintiffs lawfully controlled the Eagle Funding IOLTA Sub-Account from which the funds were supposed to originate; (b) the transfer order had resulted from fraud; (c) the stop payment request was timely made; and (d) the stop payment request complied with the requirements of Section 4 of the Escrow Control Account Agreement.

170.    As a result of the Defendant's failure to honor the valid stop payment order, Plaintiffs suffered a loss insofar as (a) Bragg and Staffin personally replenished $580,000 into OBS' IOLTA, and (b) OBS funded litigation against Cochen in Hong Kong.

171.    Although Plaintiffs have informed Defendant, by its agents, of their loss, both orally and in writing, Defendant has refused to acknowledge and honor its liability to Plaintiffs, in violation of the clear terms of the Deposit Agreement and Disclosures.

172.    Defendant's continuing refusal to make Plaintiffs whole has forced Plaintiffs to bring the instant litigation to seek redress under the Deposit Agreement and Disclosures.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant for breach of the Deposit Agreement and Disclosures, and award Plaintiffs damages in an amount to be determined at trial, together with such other relief as the Court deems just and appropriate.

<u>Count III</u>
<u>Breach of Telephone Wire Transfer Agreement</u>

173.    The allegations of the previous paragraphs are incorporated as though fully set forth herein.

174.    The Telephone Wire Transfer Agreement "sets forth the terms and conditions of the wire transfer service" offered by Defendant.  Ex. 20 p. 1.

175.    It provides in relevant portion:

**Cancellation of Wire Transfer Requests**
. . . If you or a bank sending us a draw request sends us a wire transfer request instructing us to cancel or amend a telephone or draw wire transfer request and we are able to verify the authenticity of the cancellation or amendment request using the Security Procedure, as applicable, we will make a reasonable effort to act on that request . . .

Ex. 20 § 4.

176.    Thus, Section 4 of the Defendant's Telephone Wire Transfer Agreement clearly imposes upon the Defendant the obligation to *make a reasonable effort to act* on a request to cancel a wire transfer.  <u>Id.</u>

177.    Appended to the Telephone Wire Transfer Agreement is a "Procedures Guide and Additional Terms for Wire Transfer Clients."  Section 6 thereof outlines the precise procedures which must be undertaken to cancel a wire transfer:

(a)    Cancellation requests must be made directly to the Bank's Wire Transfer Department, using the telephone numbers provided in the Operating Hours section of this Procedures Guide.

(b)    Client's Authorized Representative must provide to the Bank their [sic] PIN and the Transaction Reference Number that was assigned upon the initiation of the wire transfer to be cancelled.

(c)    Upon receipt of a cancellation request, Bank will make a reasonable effort to cancel the wire transfer, including contacting the receiving financial institution to reverse the wire transfer; however, bank will not be liable if the wire transfer is not reversed.

Ex. 20 p. 6 § 6.

178.    Pursuant to the Escrow Control Account Agreement, Staffin is an authorized representative of OBS with respect to the IOLTA and all of its IOLTA Sub-Accounts.

179.    Staffin initiated the wire transfer cancellation process by calling Defendant and by speaking with Jason in Defendant's Wire Transfer department.  Ex. 5 ¶¶ 18-21.

180.    In the course of the above-described call, Staffin provided Jason with the transaction reference number assigned to the fraudulent wire transfer request. Id.

181.    Thus, Plaintiffs, by and through Staffin, satisfied their obligations under Section 6 of the Procedures Guide and Additional Terms for Wire Transfer Clients that is contained in the Telephone Wire Transfer Agreement.

182.    Defendant Bank, however, did not satisfy its own obligations under Section 6 of the Procedures Guide and Additional Terms for Wire Transfer Clients that is contained in the Telephone Wire Transfer Agreement.

183.    Specifically, Defendant, by and through its agents Christian Rios, Jason, Tammy and Adam Lewinski, did not make a reasonable effort to cancel the wire transfer.

184.    None of the Bank's agents contact the Bank of China or engaged in any other affirmative act intended to reverse the wire transfer.

185.    Indeed, none of the Bank's agents made any effort to cancel the wire transfer. Instead, Bank Wire Transfer team member Jason informed Plaintiffs that the wire transfer could not be cancelled at all, and Plaintiffs' only recourse was to contact the Wire Transfer team the following morning to request that the transfer be recalled *after it was received by the Bank of China*. Ex. 5 ¶¶ 21-22.

186.     The information provided to Plaintiffs by the Bank was patently incorrect, and in fact the opposite was true – according to the Bank of China, the wire transfer *could* be cancelled *at any point until it was processed by the Bank of China.*  See Ex. 13 ("the remitting bank may cancel the instruction provided that the transfer is not yet processed by the receiving bank.").

187.     Thus, the Defendant's direction to Plaintiffs to wait until the wire transfer was processed by the Bank of China and then request a recall of that transfer was *exactly wrong* and contravened Defendant's own obligations under Section 6 of the Bank's Procedures Guide and Additional Terms for Wire Transfer Clients as well as Section 6 of the Telephone Wire Transfer Agreement.

188.     As a result of Defendant's Breach of the Telephone Wire Transfer Agreement, Plaintiffs have suffered substantial actual damages.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant for breach of the Telephone Wire Transfer Agreement, and award Plaintiffs damages in an amount to be determined at trial, together with such other relief as the Court deems just and appropriate.

## Count IV
## [Intentionally omitted]

189-199.     Intentionally omitted.

## Count V
## Violation of 13 Pa.C.S. § 4A211(c)(2)(ii)

200.     The allegations of the previous paragraphs are incorporated as though fully set forth herein.

201.     In the event that 13 Pa.C.S. § 4A211(b) is deemed inapplicable to the instant case insofar as the fraudulent transfer order is perceived to have been "received" by the Bank of

China prior to Plaintiffs' oral stop payment order/transfer cancellation request, 13 Pa.C.S. §
4A211(c)(ii) applies.

202.    13 Pa.C.S. § 4A211(c)(2)(ii) provides in relevant part:

Communication received after payment order accepted. – After a payment order
has been accepted, cancellation or amendment of the order is not effective unless
the receiving bank agrees or a funds-transfer system rule allows cancellation or
amendment without agreement of the bank:. . .*With respect to a payment order
accepted by the beneficiary's bank, cancellation or amendment is not effective
unless the order was issued in execution of an unauthorized payment order or
because of a mistake by a sender in the funds transfer which resulted in the
issuance of a payment order*: . . .*that orders payment to a beneficiary not entitled
to receive payment from the originator*. . .

13 Pa.C.S. § 4A211(c)(2)(ii) (emphasis supplied).

203.    Even if the Bank of China received the fraudulent wire transfer prior to Staffin's

oral cancellation request on December 6, 2017, the cancellation order was nevertheless valid.

204.    The wire transfer order resulted from "a mistake by a sender in the funds transfer

which resulted in the issuance of a payment order . . . that orders payment to a beneficiary not

entitled to receive payment from the originator."

205.    In this case, the mistake was the sender's assumption that the transfer order was

lawfully and validly made.

206.    In actuality, the transfer order was made pursuant to criminally fraudulent activity

which cannot be the basis of a valid and lawful wire transfer order.

207.    In such a case, 13 Pa.C.S. § 4A211(c)(2)(ii) provides that cancellation is effective

*even if the cancellation is effected after the payment is received.*

208.    In derogation of the clear requirements of 13 Pa.C.S.                         §

4A211(c)(2)(ii), Defendant has failed and refused to honor Plaintiffs' valid cancellation of the

fraudulent wire transfer request.

209.    As a result of Defendant's Breach of 13 Pa.C.S. § 4A211(c)(2)(ii), Plaintiffs have suffered actual damages.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant for breach of 13 Pa.C.S. § 4A211(c)(2)(ii), and award Plaintiffs damages in an amount to be determined at trial, together with such other relief as the Court deems just and appropriate.

## Count VI
## Violation of 13 Pa.C.S. § 4A211(e)

210.    The allegations of the previous paragraphs are incorporated as though fully set forth herein.

211.    13 Pa.C.S. § 4A211(e), which codifies UCC § 4A, sets forth the following requirement for cancelled payment orders:

> *Canceled payment order. – A canceled payment order cannot be accepted. If an accepted payment order is canceled, the acceptance is nullified and no person has any right or obligation based on the acceptance.* Amendment of a payment order is deemed to be cancellation of the original order at the time of amendment and issue of a new payment order in the amended form at the same time.

13 Pa.C.S. § 4A211(e) (emphasis supplied).

212.    In this case, Plaintiffs submit that the order was cancelled prior to its receipt by the Bank of China.  However, the timing of the cancellation is irrelevant under 13 Pa.C.S. § 4A211(e), only the fact of valid cancellation is important.

213.    Under UCC § 4A, as codified at 13 Pa.C.S. § 4A211(e), regardless of whether the order has been received and accepted, cancellation nullifies the order.

214.    In this case, Staffin and Bragg cancelled the fraudulent wire transfer order orally on December 6, 2017.  Ex. 5 ¶¶ 19, 22.

215.    Per Defendant's instruction, on the morning of December 7, 2017, Plaintiffs requested that the Defendant initiate a wire recall request, after the Bank of China received the fraudulent wire funds. Id. ¶ 24.

216.    In derogation of the clear requirements of 13 Pa.C.S. § 4A211(e), Defendant Bank enforced OBS's "obligation" on the cancelled wire transfer request.

217.    In further derogation of the clear requirements of 13 Pa.C.S. § 4A211(e), Defendant failed and refused to refund the $580,000 Defendant Bank unlawfully and without authorization swept from OBS's IOLTA, and its IOLTA Sub-Accounts thereof, in furtherance of Defendant's wrongful enforcement of OBS's "obligation" on the cancelled wire transfer request.

218.    As a result of Defendant's violation of 13 Pa.C.S. § 4A211(e), Plaintiffs have suffered actual damages.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant for breach of 13 Pa.C.S.          § 4A211(e), and award Plaintiffs damages in an amount to be determined at trial, together with such other relief as the Court deems just and appropriate.

## Count VII
## Violation of 12 CFR § 205.17(d)(5)

219.    The allegations of the previous paragraphs are incorporated as though fully set forth herein.

220.    UCC §4A as adopted by the Commonwealth of Pennsylvania, which binds Defendant Bank, is superseded by Federal Reserve regulations and operating circulars, which also bind Defendant Bank.  See 13 Pa.C.S. § 4A107 ("Regulations of the Board of Governors of the Federal Reserve System and operating circulars of the Federal Reserve banks supersede any inconsistent provision of this division to the extent of the inconsistency.").

221.    12 CFR § 205.17(d)(5) states that "[i]f the institution offers . . . a service that transfers funds from another account of the consumer held at the institution to cover overdrafts, the institution must state that fact."

222.    Without authorization from Plaintiffs, and in breach of the terms of Section 3 of the Escrow Control Account Agreement, Defendant Bank swept other IOLTA Sub-Accounts of the IOLTA in order to fund the fraudulent wire transfer to Cochen from the Eagle Funding Sub-Account which only contained $1,900, in spite of the fact that the wire transfer was validly cancelled by the Plaintiffs.

223.    Defendant's act of sweeping IOLTA Sub-Accounts also violates 12 CFR § 205.17(d)(5), insofar as Defendant never stated to Plaintiffs that it offered such a "service that transfers funds from another account of the consumer held at the institution to cover overdrafts . . ." as required by law.

224.    Neither the Escrow Account Control Agreement nor the Deposit Agreement and Disclosures nor the Telephone Wire Transfer Agreement discloses to Plaintiffs that Defendant Bank will sweep any IOLTA Sub-Accounts if one sub-account is overdrawn.  See Ex. 1, 3 & 20.

225.    As a result of Defendant's violation of 12 CFR § 205.17(d)(5) Plaintiffs have suffered actual damages.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant for violation of 12 CFR § 205.17(d)(5) and award Plaintiffs damages in an amount to be determined at trial, together with such other relief as the Court deems just and appropriate.

## Count VIII
## Negligence Per Se

226.     The allegations of the previous paragraphs are incorporated as though fully set forth herein.

227.     Negligence per se may be demonstrated by proof that a defendant has violated a law or regulation whose purpose is found to be, at least in part (a) to protect a class of persons which includes the one whose interest is invaded, (b) to protect the particular interest which is invaded, (c) to protect that interest against the kind of harm that has resulted, and (d) to protect that interest against the particular hazard from which the harm results.  O'Neal v. Department of the Army, 852 F. Supp. 327, 335 (M.D.Pa. 1994) (citing Centolanza v. Lehigh Valley Dairies, 430 Pa. Super. 463, 635 A.2d 143, 149-50 (Pa. Super. 1993)).

228.     Each and any of the laws and/or regulations blatantly disregarded and/or breached by Defendant Bank as pled in this Complaint constitute negligence per se, and the collective violation of said laws and/or regulations also constitutes negligence per se.

229.     As a result of Defendant's negligence per se, Plaintiffs have suffered actual damages.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant for negligence per se, and award Plaintiffs damages in an amount to be determined at trial, together with such other relief as the Court deems just and appropriate.

<u>**Count IX**</u>
<u>**Negligence**</u>

230.    The allegations of the previous paragraphs are incorporated as though fully set forth herein.

231.    Under Pennsylvania law, "in order to prevail in a negligence action under common law, the plaintiff must establish that: (1) the defendant owed a duty of care to the plaintiff; (2) that duty was breached; (3) the breach resulted in the plaintiff's injury; and (4) the plaintiff suffered an actual loss or damages." <u>Moon v. Dauphin Cnty.</u>, 129 A.3d 16, 21 (Pa. Cmwlth. 2015)(citing <u>Brown v. Dep't of Transp.</u>, 11 A.3d 1054, 1056 (Pa. Cmwlth. 2011)).

232.    Pennsylvania courts have determined that the duty of care owed by a bank to its customer when charging the customer's account is set forth in 13 Pa.C.S. § 4401(a)-(b) as follows:

    (a)   General rule. — A bank may charge against the account of a customer an item that is properly payable from that account even though the charge creates an overdraft. An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and the bank.

    (b)   Limitation on customer liability. — A customer is not liable for the amount of an overdraft if the customer neither signed the item nor benefited from the proceeds of the item.

233.    This duty of care supersedes any duty set forth in the contract between bank and customer, and "the parties to the agreement cannot disclaim the responsibility of a bank for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure." 13 Pa.C.S. § 4103(a).

234.    In this case, Defendant breached its duty of good faith and committed actions and/or inactions which constitute negligence by failing to exercise ordinary care in the execution of Staffin's cancellation/stop payment request with respect to the fraudulent wire transfer order.

235.    Defendant further breached its duty of care to Plaintiffs by sweeping OBS's IOLTA Sub-Accounts in an unauthorized effort to satisfy an overdraft wrongfully made, in blatant derogation of 13 Pa.C.S. § 4401(b).

236.    As a result of Defendant's breach, Plaintiffs were injured in the amount of $580,000 which Bragg and Staffin personally paid to replenish the IOLTA, plus substantial additional funds in excess of $20,000 which OBS paid to fund the Hong Kong litigation against Cochen.

WHEREFORE Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant for negligence, and award Plaintiffs damages in an amount to be determined at trial, together with such other relief as the Court deems just and appropriate.

SILVERANG, DONOHOE,
ROSENZWEIG & HALTZMAN, LLC

_____
Philip S. Rosenzweig, Esquire
PA Attorney ID Nos. 62461
prosenzweig@sanddlawyers.com
595 East Lancaster Avenue,  Suite 203
St. Davids, PA  19087
(610) 263-0115

*Attorneys for Plaintiffs*

# EXHIBIT 1

# Deposit Agreement and Disclosures

*Effective November 10, 2017*



bankofamerica.com

Applies in all states.

Bank of America, N.A. Member FDIC. ©2017 Bank of America Corporation.
91-11-2000B (11/17)



29507

# Table of Contents

**Welcome to Bank of America.................................................1**
How to Get Started ..............................................................1
How to Access Your Account ...............................................1
**The Agreement for Your Account........................................2**
Binding Contract ...................................................................2
Changes to This Agreement ................................................2
Closing an Account................................................................3
Governing Law.......................................................................3
**Explanation of Some Terms .................................................4**
**Information About You and Your Account..........................5**
Information You Give Us........................................................5
Identification...........................................................................5
Bank of America's Privacy Policy for Consumers................5
Sharing Information with Affiliates........................................5
Consumer Reports and Other Inquiries................................5
Disclosing Information About You and Your Account............6
Telephone Calls: Calling, Monitoring and Recording...........6
Release of Information ...........................................................7
**Account Ownership................................................................7**
Some General Terms .............................................................7
Some Basic Terms for Joint Accounts..................................7
Some Basic Terms for "Payable on Death" Accounts..........8
Some Basic Terms for Business and Other Non-Personal Accounts.........9
Transferring Ownership...........................................................9
**Checking and Savings Accounts ........................................10**
Types of Accounts ................................................................10
Eligibility for NOW Accounts ................................................10
Demand Deposit Accounts ...................................................10
How We Calculate Interest on Interest Bearing Checking and Savings Accounts..........10
Combined Balance Service ...................................................11
Limits on Linking Accounts ...................................................12
Limits on Withdrawals and Transfers from Savings Accounts..........12
**Time Deposit or CD Account ...............................................13**
Types of CDs ........................................................................13
How We Calculate Interest on CDs ......................................13
Disbursing Interest................................................................14
CDs That Automatically Renew.............................................14
CDs That Do Not Automatically Renew.................................14
Grace Period .........................................................................14
Deposits to a CD ..................................................................15
Early Withdrawals..................................................................15
Closing or Redeeming a CD .................................................15
**Information About Fees and Charging Your Account.......16**
**Insufficient Funds – Overdrafts and Returned Items.......17**
Overdrafts and Declined or Returned Items..........................17

Impact of Holds .....................................................................17
Personal Accounts – Overdraft Practices and Settings .......19
Business Accounts – Overdraft Practices and Settings........19
Posting Orders......................................................................20
Occurrences ..........................................................................20
Overdraft Protection Plans ...................................................20
**Processing and Posting Orders..........................................22**
Processing Transactions and Posting Orders ......................22
Posting Orders......................................................................22
Changing Posting Orders......................................................23
Posting Orders Determined at End of Day ...........................23
Overdraft Fees ......................................................................23
Certain Transactions Made After Business Day Ends ..........24
**Processing Deposits and Cashed Items............................25**
Cashing Items or Accepting Items for Deposit......................25
Checks Lost in the Collection Process..................................26
Collection Items.....................................................................26
Demand Drafts and Remotely Created Checks ....................26
Deposit Preparation and Acceptance ...................................26
Deposit Error Correction .......................................................27
Encoding Deposits ................................................................27
Endorsing Checks .................................................................27
Identifying the Account for Your Deposit ..............................28
Overpayments and Reversals...............................................28
Returned Items......................................................................28
Substitute Checks .................................................................29
Third-Party Endorsements ...................................................29
**When Funds are Available for Withdrawal and Deposit Holds.......30**
Your Ability to Withdraw Funds............................................30
Longer Delays May Apply.....................................................30
Special Rules for New Accounts...........................................31
Government Checks, Cashier's Checks and Other Special Types of Checks..........31
Cash Withdrawal Limitation...................................................32
Holds on Other Funds...........................................................32
**Processing Withdrawals......................................................33**
Cashing Checks for You........................................................33
Cashing or Accepting Your Checks for Others......................33
Checks with Legends or Restrictions....................................33
Collection Items.....................................................................33
Check Stock and Ink ............................................................34
Converting Checks to Electronic Debits ...............................34
Examining Checks .................................................................34
Items Resulting from Voluntary Disclosure ..........................35
Large Cash Withdrawals .......................................................35
Paying Checks and Other Items...........................................35
Stale-Dated and Postdated Checks......................................35
Substitute Checks, Indemnified Copies, Images and Image Replacement Copies ..........35
Unpaid Items .........................................................................35

**Substitute Checks and Your Rights** ...... **36**
**Notices, Statements and Other Communications** ...... **37**
General Terms for Notices, Statements and Other Communications ...... 37
Notices ...... 37
Statements ...... 38
Check Image, Safekeeping and Enclosure Services ...... 39
Your Address and Change of Address ...... 39
**Actions You Can Take to Help Protect Your Account** ...... **40**
**Reporting Problems** ...... **42**
Your Responsibility ...... 42
What Are Problems and Unauthorized Transactions ...... 42
Reviewing Your Account Statements ...... 42
We Are Not Liable If You Fail To Report Promptly ...... 43
Written Confirmation and Other Assistance ...... 43
Our Investigation and Maximum Liability ...... 43
Business Insurance ...... 44
Opening a New Account ...... 44
**Foreign Items and Foreign Currency** ...... **44**
What is a Foreign Item ...... 44
Be Cautious About Accepting Foreign Items ...... 44
Currency Exchange Rates ...... 44
Wires Sent to a Foreign Currency Account ...... 45
You May Not Write Foreign Currency Checks ...... 45
Processing and Collecting Foreign Items ...... 45
**Other Terms and Services** ...... **47**
Account Changes ...... 47
Automatic Transfer Service ...... 47
Check and Deposit Slip Forms ...... 47
Check Copies ...... 48
Compliance ...... 48
Conflicting Demands and Disputes ...... 48
Converting an Account ...... 49
Cutoff Time for Receipt of Orders ...... 49
Death or Incompetence ...... 50
Facsimile Signature ...... 50
Deposit Bank Assessment ...... 50
Fingerprint ...... 50
"Freezing" Your Account ...... 50
Indemnification and Limitation of Liability ...... 51
Legal Process – Subpoena and Levy ...... 51
Multiple Signatures Not Required ...... 52
Notice of Withdrawal ...... 52
Powers of Attorney/Appointment and Payment to Agents ...... 53
Records ...... 53
Right of Setoff ...... 53
Sample of Your Signature ...... 54
Stop Payment Orders and Postdated Orders ...... 54
Subaccounts ...... 56
Unclaimed Property – Accounts Presumed Abandoned or Inactive ...... 56
Verification of Transactions and Right to Reverse Transactions ...... 57
Waiver, Severability, and Change of Law by Agreement ...... 57
**Electronic Banking Services** ...... **58**
Types of Electronic Banking Services ...... 58
Access ID ...... 59
Electronic Banking Disclosures ...... 60
**ATM Safety Tips** ...... **63**
Protect Your ATM Card and Personal Identification Number (PIN) ...... 63
Be Aware of Your Surroundings at ATMs ...... 63
Protect Your Privacy ...... 63
Request Emergency Assistance ...... 63
**Funds Transfer Services** ...... **64**
Remittance Transfers ...... 64
Sending Funds Transfers ...... 65
Receiving Funds Transfers ...... 66
ACH Debits and Credits ...... 66
**Tax Information** ...... **67**
**Resolving Claims** ...... **68**
What does "Claim" Mean? ...... 68
How Claims on Personal Accounts will be Resolved ...... 68
How Claims on Business Accounts will be Resolved ...... 68
Judicial Reference ...... 68
Arbitration ...... 69
Limitation and Non-Severability ...... 70
Rules of Interpretation ...... 70
Jurisdiction and Venue ...... 70

# Welcome to Bank of America

Thank you for opening and keeping an account with us.

Please read this entire agreement carefully so you understand your rights and obligations for your deposit account and deposit relationship with us and keep it in a convenient place for future reference.

In this agreement, "Bank of America", "Bank", "we", "us" and "our" means Bank of America, N.A. "You" and "Your" means each and every owner of the account and each and every other person with authority to withdraw funds from the account or otherwise operate the account.

Our accounts and services are generally available through all of our channels - in our financial centers, through telephone banking and online. However, some accounts and services may not be available at all times, in all locations, or through all channels.

## How to Get Started

After you open your account, please consider these optional services. They can help you manage your account.

- **Debit card** – use your debit card to pay for purchases at merchants that accept debit cards, to make deposits at Bank of America ATMs, and to withdraw cash from ATMs.
- **Direct Deposit** – have your paycheck, retirement benefits, or other source of income deposited electronically into your checking or savings account.
- **Online Banking** – helps you manage and keep better track of your finances. Here are some of the things you can do using Online Banking:
  - Check your account balances and review transaction history.
  - Transfer funds between your accounts or to other Bank of America customers' accounts.
  - Receive your statements and posted checks online, then review or print them at your convenience.
  - Reorder checks and change your address.
- **Online Bill Pay service** – pay your bills electronically.
- **Online Alerts** – provide an electronic notice through email or text message about account activity, such as when a direct deposit posts or when your balance drops below an amount you set.
- **Scheduled Savings Transfers** – helps make saving easier by automatically transferring money from your checking account to your savings account.
- **Keep the Change®** – helps you grow your savings by automatically transferring money from your personal checking to your savings with each eligible debit card purchase.
- **Overdraft Protection Service** from another linked account, such as your savings or credit card account – helps you avoid overdrafts and declined or returned checks and other items by automatically transferring available funds from your linked account to your checking account.

## How to Access Your Account

You can access your account and get information about our accounts and services:

- At our **financial centers** and at **Bank of America ATMs.**
- Through our **Online Banking Service** at bankofamerica.com
- By calling **customer service** at the number on your account statement.
- You can locate our nearest financial center or ATM on our website at bankofamerica.com

# The Agreement for Your Account

## Binding Contract

This *Deposit Agreement and Disclosures*, the applicable *Schedule of Fees*, the signature card and other account opening documents for your account are part of the binding contract between you and us (this "Agreement") for your deposit account and your deposit relationship with us. They contain the terms of our agreement with you. Please read all of these documents carefully.

This *Deposit Agreement and Disclosures* also summarizes certain laws and regulations that apply to common transactions, provides some disclosures for deposit accounts required by federal law, and establishes terms that cover some transactions or situations that the law either does not cover or allows us to change by this contract. The *Schedule of Fees* lists our accounts and account fees.

When you complete our account opening documents (as an example, you sign our signature card), request an account, or keep your account open, you acknowledge that you have reviewed and understand the terms of this Agreement and you agree to be governed by these terms. You understand that these terms, as we may change or supplement them periodically, are a binding contract between you and us for your deposit account and your deposit relationship.

Our deposit relationship with you is that of debtor and creditor. This Agreement and the deposit relationship do not create a fiduciary, quasi-fiduciary or special relationship between us. We owe you only a duty of ordinary care. Our internal policies and procedures are solely for our own purposes and do not impose on us a higher standard of care than otherwise would apply by law without such policies or procedures.

We give this Agreement to you when we open your account. You may obtain additional copies of this Agreement at a financial center or by calling the number on your statement.

## Changes to This Agreement

We may change this Agreement at any time. We may add new terms. We may delete or amend existing terms. We may add new accounts and services and discontinue existing accounts or services. We may convert existing accounts and services into new accounts and services.

We ordinarily send you advance notice of an adverse change to this Agreement. However, we may make changes without prior notice unless otherwise required by law. We may, but do not have to, notify you of changes that we make for security reasons or that we believe are either beneficial or not adverse to you.

When we change this Agreement, the then-current version of this Agreement supersedes all prior versions and governs your account.

If you continue to use your account or keep it open, you are deemed to accept and agree to the change and are bound by the change. If you do not agree with a change, you may close your account as provided in this Agreement.

See the *Notices, Statements and Other Communications* section for information about how we provide notice.

## Closing an Account

You or we may close your checking or savings account at any time without advance notice, except that we may require you to give us seven days advance notice when you intend to close your savings or interest bearing checking account by withdrawing your funds. See *Notice of Withdrawal* in the *Other Terms and Services* section. You or we may close your time deposit account at maturity without advance notice. Bank of America may close your account or convert your account to another account type at its discretion due to excessive overdrafts.

If an account was closed and then we reopen it, the account is subject to our standard terms and fees for that type of account. Any waiver that applied before the account was closed does not apply when we reopen the account.

If your account reaches a zero balance, or you apply for an account but never deposit funds into it, we may either keep the account open or close the account without notice.

Sometimes after an account is closed, we receive a deposit for credit to the account or a check or other item for payment from the account. If this happens, we may at our option and without any liability to you: either return the deposit, check or other item; or we may reopen the account and accept the deposit, check or other item for you, even if this overdraws your account.

Sometimes when an account which had funds in it is closed, and while we are still holding the funds from the account, we receive a withdrawal request, check or other item for payment from the account. We may refuse the withdrawal request and return the check or other item. We are not liable for any losses or damage that may result from refusing the withdrawal or dishonoring the check or other item, even if we are still holding funds that would cover the withdrawal, check or other item.

When you ask us to close your account, we may continue to pay transactions as we receive them while we process your closure request. When we complete our closure process, we may close your account, even if your account has a balance and transactions you've told us about are still pending.

If your account is overdrawn when closed, you agree to pay immediately all amounts you owe us. If your account had funds in it when closed, we may:

• hold the funds for your pick up or to pay outstanding or expected items or claims;
• deposit the funds in another of your accounts with us; or
• mail the funds to any of you by check at the address in our records for the account.

If your account earned interest before it closed, your funds stop earning interest when you ask us to close your account, even if we continue to hold the funds. As an example, if we mail funds from an interest bearing account to you by check, then your funds do not earn interest, even if the check is returned to us or is not cashed.

This Agreement continues to govern matters related to your account even after your account closes.

## Governing Law

This Agreement, and your and our rights and obligations under this Agreement, are governed by and interpreted according to federal law and the law of the state where your account is located. However, your rights and obligations for Remittance Transfers shall be governed by and interpreted as described in the *Funds Transfer Services* section. We ordinarily maintain your account at the financial center where we open your account. However, we may transfer your account to another financial center in the same state or in a different state. If state and federal law are inconsistent, or if state law is preempted by federal law, federal law governs.

# Explanation of Some Terms

## Definitions

Please keep in mind the following definitions as you review the Agreement.

**Annual Percentage Yield (APY)** is a percentage rate reflecting the total amount of interest paid on the account, based on the interest rate and frequency of compounding.

**Average daily balance** for a statement cycle – we take the balance that we determine is in the account for each day in the statement cycle, add those balances together, and then divide that sum by the number of days in the statement cycle.

**Bank of America, Bank, we, us** and **our** mean Bank of America, N.A.

**Financial Center** means a branch of Bank of America.

**Business days** – our business days are Monday through Friday, excluding bank holidays. Hours of the business day for a financial center are available at that financial center.

**Collected balance** is the ledger balance for the account minus that portion of funds deposited for which we have not received credit based on the availability schedule we apply to the account. We ordinarily apply the availability schedule provided to us by the Federal Reserve Bank to determine the time that we receive credit for deposited funds.

**Item** includes all orders and instructions for the payment, transfer or withdrawal of funds from an account. As examples, item includes: a check, substitute check, purported substitute check, electronic transaction (including an ACH transaction, ATM withdrawal or transfer, or point of sale transaction), draft, demand draft, remotely created check, remotely created consumer check, image replacement document, indemnified copy, preauthorized draft, preauthorized payment, automatic transfer, telephone-initiated transfer, Online Banking transfer or bill payment instruction, withdrawal slip, in-person transfer or withdrawal, cash ticket, deposit adjustment, or other order of instruction for the payment, transfer, or withdrawal of funds, or an image, digital image or a photocopy of any of the foregoing. *Item* also includes any written document created or authorized in your name that would be a check or draft but for the fact that it has not been signed. *Item* may also include a cash-in ticket and a deposit adjustment. *Item* may also include a check, draft, warrant, or other item deposited to your account, including a deposited item that was returned unpaid.

**Minimum daily balance** – the lowest balance that we determine is in the account during a statement cycle.

**You** and **your** means each and every owner of the account and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account.

## Headings and Interpretation

We include section and paragraph headings in this Agreement to help you find terms and provisions. The headings are for convenience or reference only. They do not limit the term or provision.

Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular.

In some sections we give examples. The examples cover some, but not all, of the situations or items that are covered by the section.

# Information About You and Your Account

## Information You Give Us

When you open a deposit account with us, you give us information about yourself and confirm that it is correct. We enter the information into our records. We may rely on that information until you notify us of a change and we have had a reasonable time to act on the new information.

## Identification

Federal law, including the USA PATRIOT Act, requires all financial institutions to obtain, verify and record information that identifies each customer who opens an account with that financial institution.

When you apply for an account, we will ask for your legal name, address, date of birth and your Tax Identification Number (TIN). We may require one or more forms of unexpired photo identification. We may validate the information you provide to us to ensure we have a reasonable assurance of your identity. We may contact you for additional information. If your account is funded before we verify your information, you may not have access to your funds. If we are not able to verify your identity to our satisfaction, we will not open your account or we may close the account if it was previously funded.

## Bank of America's Privacy Policy for Consumers

Our privacy policy for consumers is described in our publication, U.S. Consumer Privacy Notice. We provide our privacy policy to consumers who open a personal account with us. The privacy policy describes our policy on handling customer information and describes the situations when we may disclose information, including some examples.

You can also review our privacy practices on our website at bankofamerica.com/privacy.

## Sharing Information with Affiliates

**Accounts Held by Consumers** We may share information that we have about you and your accounts among the Bank of America family of companies. Please refer to our publication, U.S. Consumer Privacy Notice, for information about the categories of information we may share among the Bank of America family of companies and how you may tell us not to share certain types of information among our family of companies.

**Accounts Held by Businesses** We may share information about our experiences with you with Bank of America Corporation and its subsidiaries and affiliated companies ("Bank of America Affiliates") and selected third parties. We may also share information that you have provided to us on applications or that we receive from outside sources among the Bank of America Affiliates. However, individuals may tell us not to share information about them from applications or outside sources compiled for purposes of determining eligibility for credit, insurance or other services by either calling us at 1.888.341.5000 or by notifying us at bankofamerica.com/privacy.

## Consumer Reports and Other Inquiries

We may make any inquiries that we consider appropriate to help us verify your identity and determine if we should open, maintain, collect or close your account. This may include verification of employment and consumer reports or other reports from account information services and other consumer reporting agencies.

If you ask, we will tell you whether we requested such a report and, if we did request a report, we will tell you the name, address and telephone number of the reporting agency.

## Disclosing Information About You and Your Account

This section applies to both business and personal accounts. We may disclose information about your accounts to consumer reporting agencies and to other persons or agencies who, in our judgment, have a legitimate purpose for obtaining information.

For example, subject to any applicable financial privacy laws or other laws or regulations, we may provide information on you and your accounts:

- to consumer reporting agencies, such as ChexSystems, Inc.;
- to anyone who we reasonably believe is conducting a legitimate credit inquiry, including inquiries to verify the existence or condition of an account for a third party such as a lender, merchant or consumer reporting agency;
- in response to any subpoena, summons, court or administrative order, or other legal process which we believe requires our compliance;
- in connection with collection of indebtedness or to report losses incurred by us;
- in compliance with any agreement between us and a professional, regulatory or disciplinary body;
- in connection with potential sales of businesses;
- to service providers who help us meet your needs by assisting us in providing or offering our products or services; and
- to other third parties as is described in our publication U.S. Consumer Privacy Notice or as required under applicable law or regulation.

For personal accounts, the terms of our U.S. Consumer Privacy Notice governs in the event of a conflict between the terms of this section and the terms of our U.S. Consumer Privacy Notice.

## Account Information Services/Consumer Reporting Agencies

If we close your account because of your unsatisfactory handling, we generally report to consumer reporting agencies such as ChexSystems, Inc. your name, address, Taxpayer Identification Number (TIN), driver's license number and the date and reason we closed the account. The consumer reporting agency may supply this information to others. This may adversely impact your ability to establish an account at any financial institution for up to five years from the date of the report.

We may report information about your account to credit bureaus. Late payments, missed payments or other defaults on your account may be reflected in your credit report.

## Telephone Calls: Calling, Monitoring and Recording

When you give a telephone number directly to us, or place a telephone call to us, you authorize us to place calls to you at that number. You understand that a "telephone number" includes a cell phone number and "calls" include both telephone calls and text messages to or from your phone or cell phone. As examples, we may place calls to you about fraud alerts, deposit holds, and amounts you owe us (collection calls) on your account. When we place calls to you, we may use automatic dialers and artificial, text, or prerecorded messages.

You authorize us to monitor, and to record, telephone conversations and other electronic communications you have with us and with our representatives for reasonable business purposes, including security and quality assurance. We will not remind you that we may be monitoring or recording a call at the outset of the call unless required by law to do so.

You consent and agree in advance to these terms and conditions.

## Release of Information

You can obtain information about your account by many methods, including at a financial center, by telephone, by mail and through Online Banking. We believe we have adopted reasonable security measures for each method, but we cannot ensure against unauthorized inquiries or intrusions. You agree that we are not responsible for the release of information to anyone who has gained possession of your ATM card, debit card or other code or access device or who has learned your identifying characteristics such as personal identification number (PIN), account number or social security number, even if you have not authorized them to obtain the information.

# Account Ownership

## Some General Terms

When you open an account, we may rely on information you give us and we maintain in our records. We determine the type and ownership of the account from this information. When you ask us to make a change to this information or your account, and we agree to the change, the change is not effective until we have had a reasonable time to act on the new information. As an example, if you ask us to change the signers on your account, your requested change is not effective until we have a reasonable time to act on it. If we ask you to give us additional documents or information, and you do not do so promptly, we may close your account.

When we accept a deposit to an account or permit a withdrawal or payment from an account, we may rely upon the form of the account and the terms of this Agreement at the time we process the transaction. We do not have to inquire about the source or ownership of any funds we receive for deposit or about the application of any withdrawal or payment from an account. When we permit a withdrawal or payment from an account at the request of any signer, or the agent of any signer, in accordance with the terms of this Agreement, the withdrawal or payment is a complete release and discharge of the Bank from all claims regarding the withdrawal or payment.

If you instruct us to open an account in the names of two or more people, and we do so, but later determine that one or more of them have not completed our account opening documents or other requirements, you agree to hold us harmless for reliance on your instruction. We may in our discretion for all purposes and circumstances (including determining ownership of the account following the death of any person in whose name the account was opened) either treat the account as being owned by all persons in whose names the account was opened or treat the account as being owned solely by the persons who have signed or completed our account opening documents or other requirements. If we treat the account as owned by all persons in whose names the account was opened, we may permit the non-signing person to withdraw funds or take other action on the account without any liability to you.

We may open an account without regard to whether you are married and without regard to whether the funds on deposit are your community or separate property. We may require you to close the account in order to remove a co-owner, terminate a joint ownership or change a payable on death or trust designation.

## Some Basic Terms for Joint Accounts

If more than one person's name appears in the title of an account without a fiduciary, beneficiary or other designation, then the account is a joint account. All persons whose names appear on the account are co-owners of the account, regardless of whose money is deposited in the account. Each co-owner acts as the agent of each other co-owner. Each co-owner authorizes each other co-owner to operate the account without the consent or approval of any other co-owner. We may act and rely on the instructions of one co-owner without liability to any other co-owner. So as examples, one co-owner may without the consent or approval of the others:

- add additional persons as co-owners;
- deposit funds and withdraw or transfer part or all of the funds in the account;
- endorse for deposit to the joint account on behalf of any other co-owner an item payable to another co-owner;
- instruct us to stop payment on a check or other item that another co-owner wrote on the account;
- obtain an ATM card or a debit card;
- draw upon an overdraft or other line of credit connected to the account;
- obtain information about the account, including transactions conducted by other co-owners;
- pledge the account as security for any debts; and
- close the account.

Each co-owner is jointly and severally liable to us for all fees, charges and other amounts owed to us on, and all costs, losses and liabilities related to, this Agreement or the account. Note that our right of setoff described in the *Right of Setoff* section of this Agreement applies to joint accounts.

All joint accounts are presumed to be joint accounts with the right of survivorship, unless the applicable state law does not permit this presumption or we have agreed with you in writing that the account is owned in another capacity. **Right of survivorship means that when a co-owner dies, the funds in the account belongs to the surviving co-owner(s)**, subject to our right to charge the account for any amount the deceased co-owner or a surviving co-owner owes us. The rights of survivorship continue between surviving co-owners and we may pay the funds in the account to any surviving co-owner. The applicable state law may impose requirements that must be met to create a joint account with right of survivorship. You are solely responsible for meeting these requirements.

## Some Basic Terms for "Payable on Death" Accounts

For an individual or joint account, you may choose to make your account payable on your death to one or more payable on death ("POD") beneficiaries. You can make your account a POD account by instructing us to list each POD beneficiary on the account and complying with the applicable state law. The applicable state law usually imposes requirements that must be met to create a POD account. As an example, you may have to include certain words or letters in the account title to create a POD account, such as: "payable on death," "POD," "in trust for," "ITF," "as trustee for," "ATF," "transfer on death," "TOD," or "Totten Trust." You are solely responsible for meeting these requirements. We may treat an account which names a POD beneficiary as a POD account. However, if the applicable requirements are not met, we may treat your account as though there is no POD beneficiary.

During your lifetime, a POD account belongs to you. You may close the account, remove or add one or more POD beneficiaries, change the account type or ownership, and withdraw all or part of the funds in the account. When the account owner or last co-owner dies, we may pay any funds remaining in the account to the then surviving (if any) POD beneficiary(ies), subject to our right to charge the account for any amount a deceased owner, co-owner or POD beneficiary owes us. We may distribute the account balance, subject to any bank claims, to such beneficiaries payable to one of all surviving beneficiaries jointly, or payable individually, in equal shares, to each surviving beneficiary. A POD beneficiary does not acquire an interest in the account until after the death of the account owner or the last co-owner. A POD beneficiary may acquire an interest in the account at that time but only if the POD beneficiary is alive.

## Some Basic Terms for Business and Other Non-Personal Accounts

If the account owner is a corporation, unincorporated association, limited liability company, limited liability partnership, fiduciary, partnership, sole proprietorship or other entity holding an account in any capacity other than an individual capacity, each person signing the signature card or completing other account opening requirements represents and agrees that they:

- are fully authorized to execute all documents or otherwise complete our requirements in their stated capacity;
- have furnished all documents or other information necessary to demonstrate that authority; and
- will furnish other documents and complete other requirements as we may request from time to time.

We may refuse to recognize any resolution affecting the account that is not on our form or that appears to us to be incomplete or improperly executed.

### Transferring Ownership

Your account is for your use only. It is non-transferable and non-negotiable. Ownership of your account is transferable only on our records with our consent.

- You may not grant, transfer or assign any of your rights to your account without our written consent.
- Even if we consent, we may require that you close the account and that the new account owner open a new account in their name.
- We may refuse to acknowledge or accept your attempted pledge or assignment of your account or any interest in it, including a notice of security interest.

# Checking and Savings Accounts

### Types of Accounts

We offer several different types of checking and savings accounts for personal and business customers.

- The *Personal Schedule of Fees* describes our personal accounts and lists applicable fees.
- The *Business Schedule of Fees* describes our business accounts (other than Commercial accounts) and lists applicable fees. The *Business Schedule of Fees* does not apply to Commercial accounts.

### Eligibility for NOW Accounts

NOW accounts are commonly called interest checking accounts. Federal law provides that NOW accounts may only be opened and used by the following customers:

- individuals (including sole proprietors),
- certain nonprofit organizations,
- federal, state or local governmental entities, and
- fiduciaries (such as a bank trust department) where one or more individuals hold the entire beneficial interest in the funds.

If we believe that you are not eligible to own a NOW account, we may either close the account or convert it to another type of account. When we refer in this agreement to checking accounts, the reference includes NOW accounts.

### Demand Deposit Accounts

Demand deposit accounts are commonly called checking accounts. All types of customers can open a demand deposit account. Most demand deposit accounts do not earn interest.

We do offer an interest bearing demand deposit account to business customers. Please ask us for details.

When we refer in this agreement to checking accounts, the reference includes demand deposit accounts.

### How We Calculate Interest on Interest Bearing Checking and Savings Accounts

If you have an interest bearing checking or savings account, then please note the following.

- Your funds earn a variable rate. Your interest rate and annual percentage yield ("APY") may change. At our discretion, we may change the interest rate for your account at any time without notice or limit.
- We compound and credit interest to your account monthly.
- We use the daily balance method to calculate the interest on your account. The daily rate is $1/365$ — or in a leap year we may use $1/366$ — of the interest rate.
- For personal checking accounts and personal and business savings accounts, the daily balance method applies a daily periodic rate to the collected balance in the account each day.
- For business checking accounts, the daily balance method applies a daily periodic rate to the collected balance in the account each day (less an amount that we determine applies for reserves applicable generally to transaction accounts under the rules of the Federal Reserve).

- For Public Service Trust Accounts, the daily balance method applies a daily periodic rate to the collected balance in the account each day (less an amount that we determine is required to offset service charges).

- When you deposit a non-cash item (such as a check), interest begins to accrue on the non-cash item no later than the business day on which we receive credit for the non-cash item. The checking and savings accounts do not earn interest. Some checking and savings accounts that earn interest are described in the *Schedule of Fees* as interest bearing accounts. Other checking and savings accounts do not earn interest. We pay interest only in whole cents.

We set interest rates at our discretion. We may set the interest rate based on a specific account, customer, customer relationship, or based on the location or channel through which we open the account. This means that the interest rate and APY we offer on the same type of account may be higher or lower based on these factors. For example, an account opened through our Online Banking channel may earn a different rate (either higher or lower) than the same type of account opened in a financial center or by mail.

We may also offer interest rate bonuses and other special promotions based on these factors. Interest rate bonuses and other special promotional offers may not apply to all accounts, customers, customer relationships, locations or methods of account opening.

When we consider your customer relationship with us, that may include whether you have other accounts with us in your other accounts and how you use services that we offer with accounts.

You may obtain current interest rates for your account by calling us at the number for customer service on your statement or by asking a financial center associate.

**Balance Tiers** The daily interest rate we pay on some accounts depends on the tier into which the balance in the account falls. A tier is a range of account balances. If you have one of these accounts, your balance earns the interest rate and APY in effect that day for the balance tier associated with your end-of-day balance. We may set the rate for each tier in any amount. The interest rate for one tier may be the same rate, or a higher or lower rate, than the rate for a lower tier. We may change the tiers that apply to an account at any time without notice. Different tiers apply to different types of accounts.

**Combined Balance Service**

With some checking accounts you can designate your checking account as your primary checking account and then link many of your other accounts to it for pricing. When you link another account for pricing, you can use the balances in the other account to help you meet the combined balance required to avoid the monthly maintenance fee on your primary checking account. The *Schedule of Fees* lists the required combined balance for each checking account to which the service applies and the types of accounts that can be linked for pricing.

You must tell us what other accounts you want us to link to your checking account for pricing. We do not link your other accounts for pricing unless you tell us to do so. To determine what accounts are linked for pricing, please call us.

When an existing account is closed and a new account is opened to replace the existing account, we do not automatically link the new account to your checking account for pricing, even if the existing account was linked. You must tell us to link the new account for pricing.

When we calculate a balance or combined balance, we may ignore accrued interest, funds subject to a hold of any type, and each loan or line of credit that is in default. For each linked account, the period of time that we use as the basis for calculating the balance, and the day that we use to determine the balance, in the linked account may be different from the statement cycle for the primary checking account.

You still need to meet the balance requirements, if applicable, in each linked account to avoid the monthly maintenance fees on those accounts.

You understand that the statement for your primary checking account may include information about each linked account, including the account name, number and balance. We may make this information available to each owner and signer of any linked account. We may also send you a single combined statement that reports activity for your checking account and each deposit account linked to that account, instead of separate statements for each account. See *Combined Statements* in the *Statements and Notices* section.

**Limits on Linking Accounts**

Some restrictions apply to what accounts can be linked to checking for pricing, including the following. You may only link an account to one checking account at a time. At least one of the owners of the linked account must also be an owner of the checking account. You may not link personal and business accounts together. You may not link a loan or line of credit that is in default.

We may in our discretion place other restrictions on what accounts can be linked.

**Limits on Withdrawals and Transfers from Savings Accounts**

This Agreement and federal law impose limits on the number of certain types of withdrawals and transfers you can make each month from a savings account. Please note that these limits do not apply to withdrawals and transfers you make at one of our financial centers, by mail or at an ATM.

You can make no more than a total of six transactions each monthly statement cycle (or each month if you have a quarterly statement cycle) from among the following:

- Preauthorized transfers from your savings account (including transfers for overdraft protection).

- Telephone transfers or other electronic transmissions from your savings account.

- Online Banking and Mobile Banking transfers or bill payment transfers from your savings account.

- Transfers by check, draft or debit card, if allowed on your savings account.

We count a transaction on the date that we post it to your savings account. This date may be different from the date you authorize, transfer or write the transaction, which means a transaction made during one statement cycle may not be counted until a later statement cycle.

If you exceed the transaction limits on more than an occasional basis, we may revoke your privileges on that account or we may convert your savings account to another type of account, such as a checking account. Your funds may no longer earn interest after we convert your account.

When you use our Online Banking bill payment service, we recommend that you do not use a savings account as your bill payment account because of these limits on transfers.

Note: Even if you have no more than 6 transactions, a fee may still apply to some withdrawals or transfers. Please see the *Schedule of Fees* for your account.

# Time Deposit or CD Account

When you open a time deposit account, you agree to leave your funds in the account until the maturity date of the account. We often refer to a time deposit account as a "CD" or a "Certificate of Deposit", even though we do not issue a "certificate".

This Agreement applies to CDs you open under your Individual Retirement Account (IRA) or Coverdell Education Savings Account (CESA) plans. Please see the *Traditional/Roth Individual Retirement Custodial Accounts and Disclosure Statements* and the *Coverdell Education Savings Custodial Account and Disclosure Statement* for additional terms of these plans.

A time deposit account is neither transferable nor negotiable.

## Types of CDs

We offer several different types of CDs for personal and business customers.

The *Personal Schedule of Fees* describes our personal CDs.

The *Business Schedule of Fees* describes our business CDs.

## How we Calculate Interest on CDs

Your funds earn interest during the term of the time deposit account. We calculate interest as follows:

- Time deposits earn interest at a fixed rate except for Opt-Up® CDs and Variable Rate IRAs. Fixed rate means that the interest rate that we apply to your account on the day we open it will not change for the term of the account.

- For an Opt-Up CD, your interest rate and annual percentage yield may change. The interest rate that we apply to it on the day that we open your Opt-Up CD remains fixed throughout the term of your Opt-Up CD unless you exercise your one time option to reset the interest rate. This reset option is described in the *Schedule of Fees*.

- For a Variable Rate IRA, your funds earn a variable rate. Your interest rate and annual percentage yield may change. At our discretion, we may change the interest rate for your account at any time without notice or limit.

- For terms of 27 days or less, we credit interest to your account at maturity. For terms of 28 days or more, we compound interest monthly and we credit interest to your account monthly and at maturity or disburse it to you according to the interest disbursement option you select.

- We use the daily balance method to calculate the interest on your account. This method applies a daily periodic rate to the ledger balance that we determine is in the account each day. The daily rate is 1/365 — or in a leap year we may use 1/366 — of the interest rate.

- When you deposit a non-cash item (such as a check), interest begins to accrue on the non-cash item on the business day the deposit is received. Deposits you give us on a weekend or bank holiday are treated as received the next business day.

- The annual percentage yield for your account assumes that interest will remain on deposit until maturity. A withdrawal will reduce earnings.

We generally set interest rates for new time deposit accounts based on the type of CD, the amount you deposit, and the term you select. We set interest rates at our discretion. Rates for new accounts may change daily. We pay interest only in whole cents.

We may also set interest rates based on a specific account, customer, customer relationship or based on the location or channel through which we open the account. This means that the

interest rate and APY we offer on the same type of CD may be higher or lower based on these factors. For example, a CD opened through our Online Banking channel, may earn a different rate (either higher or lower) than the same type of CD opened in a financial center or by mail. We may also offer interest rate bonuses and other special promotions based on these factors. Interest rate bonuses and other special promotional offers may not apply to all accounts, customers, customer relationships, locations or methods of account opening.

When we consider your customer relationship with us, that may include whether you have other accounts with us, your balances with us in your other accounts and how you use services that we offer with accounts.

You may obtain current rates by calling us at the number for customer service on your statement or by asking a financial center associate.

## Disbursing Interest

You may choose to have us credit your interest to your account. With this option, we reinvest the interest in your account monthly and at maturity.

Alternatively, you may have us regularly disburse the interest from your account by having us credit the interest to a Bank of America checking or savings account or by having us mail a check for the interest.

Depending on the term of your account, disbursement options include monthly, quarterly, semi-annually, annually on the anniversary date, and at maturity.

## CDs That Automatically Renew

Unless your account information states that your time deposit does not automatically renew, we automatically renew your account by reinvesting your funds. We reinvest both principal and interest, unless you elected to have your interest disbursed. (See *Disbursing Interest* in this chapter.)

When we automatically renew your CD, the term for the reinvested CD is the same length as the previous term of your account unless we notify you that we are changing the term of the CD. For time deposits with a fixed interest rate, the interest rate and APY for any renewal term is based on the rate we offer on the first day of the new term for the type of CD, amount and term of the reinvested deposit. Unless specifically stated otherwise, any bonus or special promotion we are offering will not apply to automatically renewing accounts.

If at any maturity date we no longer offer time deposit accounts of the same term and type, we may reinvest your funds in a time deposit that we believe offers similar features.

## CDs That Do Not Automatically Renew

Some time deposit accounts do not automatically renew. If your account information states that your time deposit does not automatically renew, then your account does not earn interest after its maturity date.

## Grace Period

The grace period begins on the first day after the maturity date. The grace period is one calendar day for terms of seven through 27 days and seven calendar days for terms of 28 days or more.

You may make a deposit or withdrawal, or change the length of the term, once during the grace period and, if you take one of these actions, the grace period ends on that day. If the last day of the grace period is a non-business day (a weekend or bank holiday), then the grace period ends on the last business day before that non-business day. We may pay interest during the grace period based on the rate we offer on the first day of the new term for the type of CD, amount, and term of the deposit.

# Information About Fees and Charging Your Account

## Fees

You agree to pay for our services in accordance with the fees that apply to your account and your deposit relationship with us.

**Account Fees** Your account is subject to the fees described in the *Schedule of Fees* that applies to your account.

- The *Personal Schedule of Fees* lists account fees that apply to our personal deposit accounts.

- The *Business Schedule of Fees* lists account fees that apply to our business deposit accounts except for Commercial accounts (the *Business Schedule of Fees* does not apply to Commercial accounts).

- The schedule that applies to your account is part of the binding contract between you and us.

The fees for many of our products and services may vary from state to state or between regions within a state. We charge account fees to you based on the state or region in which the financial center where we maintain your account is located. Account fees are not based on your state of residence or the state where you use or purchase the service. Your account fees and terms may differ from those of other customers with the same type of account, based on our assessment of your overall relationship with us.

**Fees for Other Services** In addition to checking, savings and CD accounts we also offer many other services, such as wire transfers, cashier's checks and bond redemption. You can get current information about these services and the fees that apply to them at a financial center or by calling us at the customer service number shown on your account statement. We may occasionally list fees for some of these services in the *Schedule of Fees*. Fees for these services may vary from state to state. The fees you pay for these services are those charged by us in the state where we sell you the service. We may change these fees at any time without notice.

**How We Set Fees** We set our fees based on many factors, including the value we offer, our competitive position, deterrence of misuse of an account by our customers, consideration of profit and the safety and soundness of the Bank. We may also consider costs in setting fees, but we do not set our fees based only or primarily on the direct or overall costs and expenses associated with providing the particular account or service involved.

**Calculating Balances** When we calculate an account balance or combined balance to determine whether a fee applies to your account, we may use the balance that we determine is in each account. We may ignore accrued interest and funds subject to a hold of any type. For a balance in an account linked to a checking account, the period of time that we use as the basis for calculating the balance, and the day that we use to determine the balance, in the linked account may be different from the statement cycle for the primary checking account. If a loan or line of credit is linked, we may ignore each loan or line of credit that we determine is in default.

## Charging an Account

We may deduct fees, overdrafts and other amounts you owe us under this Agreement from your accounts with us or our affiliates, except that this provision does not apply to any consumer credit covered by the federal Truth in Lending law. We may make these deductions at any time without prior notice to you or request from you. If there are not enough funds in your account to cover the amounts you owe us, we may overdraw your account, without being liable to you. You agree to pay immediately all fees, overdrafts and other amounts you owe us.

---

## Deposits to a CD

You may make an additional deposit to your account during its grace period. Otherwise, for all CDs except Variable Rate IRAs you may not make deposits during the term of the CD.

You may not make a deposit to a time deposit account by wire or automated clearinghouse (ACH) transfer.

## Early Withdrawals

You have contracted to keep your funds on deposit for the stated term. You may not withdraw all or part of a time deposit account except as provided in this Agreement.

At our discretion, we may allow you to withdraw all or part of your funds at times other than the grace period. We generally withdraw interest before principal. Each time we permit you to make an early withdrawal of principal, we may charge you an early withdrawal penalty. If your account has not earned enough interest to cover an early withdrawal penalty, we deduct any interest first and take the remainder of the penalty from your principal.

We calculate all early withdrawal penalties on the principal amount withdrawn at the interest rate in effect on the account on the withdrawal date. The early withdrawal penalty is:

- For CDs with terms of less than 90 days, the greater of all interest earned on the amount withdrawn or an amount equal to seven days interest on the amount withdrawn;

- For CDs with terms of 90 days up to 12 months, the penalty is an amount equal to 90 days interest on the amount withdrawn;

- For CDs with terms of 12 months up to 60 months, the penalty is an amount equal to 180 days interest on the amount withdrawn; and

- For CDs with terms of 60 months or longer, the penalty is an amount equal to 365 days interest on the amount withdrawn.

Please note that the term of a CD is the specified period of time you agreed to leave your funds on deposit – not the time remaining until maturity of your CD.

We add to the early withdrawal penalty the amount of any cash bonuses we paid you when you opened or reinvested the account.

If we are required to pay an amount from your CD (e.g. levy or garnishment), we may charge you an early withdrawal penalty, calculated on the amount withdrawn from the CD.

An early withdrawal from an IRA may also be subject to additional federal tax (and possibly additional state and local taxes) if you are under age 59 1/2.

## Closing or Redeeming a CD

We may close or redeem an automatically renewable account at the end of the term. You may close or redeem your account during its grace period.

We may make deposits you or others make to your account (including deposits of payroll and government benefits) to pay fees, overdrafts and other amounts you owe us.

Some government payments (such as Social Security, Supplemental Security Income, Veterans and other federal or state benefits) may be protected from attachment, levy, garnishment or other legal process under federal or state law. If such protections would otherwise apply to deductions we make for amounts you owe us, to the extent that you may do so by contract, you waive these protections and agree that we may use these funds to pay fees, overdrafts and other amounts you owe us under this Agreement.

Please see the *Right to Setoff* section of the Agreement for more information.

# Insufficient Funds – Overdrafts and Returned Items

You can avoid fees for overdrafts and declined or returned items by making sure that your account always contains sufficient available funds to cover all of your transactions. We offer services that you can use to help you manage your account and help you avoid overdrafts, such as our Online Banking service and Online Alerts. Please see *How to Get Started* section in the *Introduction*.

We recommend that you enroll in one of the optional Overdraft Protection plans described below. These plans can help you avoid overdrafts and declined or returned items. While fees apply when you use an Overdraft Protection plan, the fees under the plan may be less expensive than the fees for overdrafts and declined or returned items.

**Overdrafts and Declined or Returned Items**

When we determine that you do not have enough available funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item. If you have enrolled in one of the optional Overdraft Protection plans and have enough available funds in the linked account under the Overdraft Protection plan, we transfer funds to cover the item. Otherwise, without notice to you, we either authorize or pay the insufficient funds item and overdraw your account (an overdraft item) or we decline or return the insufficient funds item without payment (a returned item).

We pay overdrafts at our discretion, which means we do not guarantee that we will always, or ever, authorize and pay them. If we overdraw your account to pay items on one or more occasions, we are not obligated to continue paying future insufficient funds items. We may pay all, some, or none of your overdrafts, without notice to you. If we do not authorize and pay an overdraft, then we decline or return the transaction unpaid.

The *Schedule of Fees* for your account explains when we charge you fees for overdrafts and for declined or returned items and the dollar amount of the fees. Please review the *Schedule of Fees* for your account carefully.

If we overdraw your account, you agree to repay us immediately, without notice or demand from us. We ordinarily use deposits you or others make to your account to pay overdrafts, fees and other amounts you owe us.

**Impact of Holds**

Sometimes funds in your account are not available to cover your checks and other items. When we determine that funds in your account are subject to a hold, dispute, or legal process, then these funds are not available to cover your checks and other items. We usually make this determination once at the end of the day when we process items. As examples of holds, holds include deposit holds, holds related to cash withdrawals, and authorization holds we place on the account for debit card transactions.

Debit card transactions and related authorization holds may impact your available balance. It is important to know that your available balance may change between the time you authorize a transaction and when the transaction is paid. When you use your debit card you authorize the merchant with whom you use your card or to whom you previously provided information to ask Bank of America to approve the transaction you want to make. At this time, in order for the transaction to go through, we must promise the merchant to pay for the purchase upon the merchant's request.

A hold immediately reduces the amount of available funds in your account by the amount of the authorization request. If, while the hold is in place, you do not have enough available funds in your account to cover other transactions you may have conducted (such as a check you previously wrote), those items may overdraw your account or be returned unpaid. This may result in an overdraft fee on the debit card transaction if this happens. In most cases, the hold expires when the transaction is paid.

The amount being held is not applied to the debit card transaction or to any specific transaction. If the hold expires and the transaction has not been paid, the amount being held is returned to your available funds. After the hold expires, we determine whether you have sufficient funds available to pay the debit card transaction. If you do not have sufficient funds, the debit transaction will cause you to overdraw and, if it is a recurring transaction, may incur an overdraft fee. This can occur even if your account did have sufficient available funds when the merchant requested authorization.

Your debit card transaction is paid when the merchant presents it to Bank of America for payment – that is, when the merchant asks us to transfer the funds from your account to the merchant. It is important to note that authorization and payment of debit card transactions do not occur simultaneously – there can be days between.

If other account activity has caused the funds available in your account to drop below zero before the debit card transaction is paid, you may no longer have sufficient funds to pay the merchant. If that occurs the debit card transaction will overdraw your account because we must honor our promise to pay the merchant. You may incur an overdraft fee when this happens.

Here is an example of how that may happen: On Monday we authorize a debit card transaction because you have enough available funds at the time. A hold is then placed on your funds until the merchant presents the transaction for payment. On Tuesday we process and post another transaction (such as a check you wrote) that reduces your available funds below zero. If the merchant presents the original debit card transaction for payment on Wednesday, and your available funds are now below the amount needed to pay the transaction, the debit card transaction will overdraw your account and you may incur an overdraft fee.

We may also treat as an insufficient funds item each fee that creates an overdraft and each deposited item returned to us unpaid that creates an overdraft.

For some business accounts, when your account is overdrawn, we also charge you interest on the overdraft amount. Please see the *Schedule of Fees* for your account.

*What are "items"?* Items include all orders and instructions for the payment, transfer, or withdrawal of funds from your account. As examples, item includes a check, draft, image, substitute check, everyday noncurring debit card transaction, recurring debit card transaction, ACH transaction, ATM transaction, preauthorized payment, automatic transfer, telephone-initiated transfer, Online Banking transfer or bill payment instruction, withdrawal slip, and in-person payment, transfer or withdrawal instruction. For more examples, please review the definition of items in the *Explanation of Some Terms* section.

*What are everyday non-recurring debit card transactions and what are recurring debit card transactions?* Everyday non-recurring debit card transactions are usually purchases made with your debit card or debit card number on a one-time or day-to-day basis. As examples, you use your debit card for purchases of groceries, gas, or coffee in the morning. Recurring debit card transactions

are usually transactions that you set up to occur automatically, such as automatic bill payments. As examples, you give merchants your debit card number to use for rent, mortgage, car, or utility payments. We rely on the merchant that processes the transaction to determine if it is a recurring transaction or an everyday non-recurring transaction.

**Personal Accounts - Overdraft Practices and Settings**

We automatically apply our standard overdraft practices to personal accounts. We refer to this as our Standard Overdraft Setting. We also offer an optional Decline All Transactions overdraft setting.

*With our Standard Overdraft Setting,* we do not authorize overdrafts for everyday non-recurring debit card transactions and ATM transactions. This means that we decline everyday non-recurring debit card transactions and ATM transactions when we determine that at the time of the transaction you may not have enough available funds in your account (or in any applicable Overdraft Protection plan) to cover the transaction. There is an exception for some ATM withdrawals. We may occasionally give the opportunity at our ATMs to agree to our overdraft practices for a specific ATM withdrawal and, if you agree, we authorize and pay that ATM withdrawal. Please note that overdraft fees can apply to these withdrawals. We tell you at our ATM when this is available. With this overdraft setting, we may authorize and pay overdrafts for other types of transactions. Other types of transactions include checks and other transactions made using your checking account number, recurring debit card transactions, ACH transactions, preauthorized payments, and automatic and online bill payments. For more examples of other transactions, please review the definition of items.

*Optional Decline All Transactions Overdraft Setting.* This is an optional overdraft setting that you can ask us to apply to your account. With the Decline All Transactions overdraft setting, you ask us not to authorize or pay any transaction unless we determine that at the time of the transaction you appear to have enough available funds in your account (or in any applicable Overdraft Protection plan) to cover the transaction. This means that you are telling us to decline or return these transactions unpaid. Please note that returned item fees can apply to declined or returned transactions. With this overdraft setting you may be offered the ability to overdraft at the ATM as described above.

*With either overdraft setting,* your account might still become overdrawn. Please see the *Impact of Holds* section for an example of how this could occur.

*With either overdraft setting,* you may still incur fees for overdrafts and declined or returned items. Please review the Schedule of Fees for your account carefully.

**Business Accounts - Overdraft Practices and Settings**

We automatically apply our standard business overdraft setting to business accounts. With our standard business overdraft setting, we may occasionally authorize and pay overdrafts for all types of transactions. For some business accounts, we offer an optional Decline All Transactions overdraft setting that you can ask us to apply to your account. With the Decline All Transactions overdraft setting, you ask us not to authorize or pay any transaction unless we determine that at the time of the transaction you appear to have enough available funds in your account (or in any applicable Overdraft Protection plan) to cover the transaction. This means that you are telling us to decline or return these transactions unpaid. Please note that returned item fees can apply to declined or returned transactions.

*With either overdraft setting,* you may still incur overdrafts and fees for overdrafts and declined or returned items.

**Posting Orders**

We determine the order in which we process and post deposits and other credits and checks and other items to your account. We may pay or authorize some items, and decline or return others, in any order we deem appropriate. When you do not have enough available funds to cover all of the items presented that day, some processing and posting orders can result in more insufficient funds items and more overdraft and returned item fees than other orders. We may choose our processing and posting orders regardless of whether additional fees result.

Please see the *Processing and Posting Orders* section for more information.

**Occurrences**

An "occurrence" is a day during which your account has at least one overdraft item or returned item. If we transfer your account to another financial center or convert it to a different type of account, your record of overdraft items and returned items continues to apply.

**Overdraft Protection Plans**

We recommend that you enroll in one of the optional Overdraft Protection plans described below to help protect your account from overdrafts and declined or returned items. You can enroll most checking accounts and money market savings accounts in these plans. Please ask us whether your account is eligible. The fees under these plans may be less expensive than the fees for overdrafts and returned items.

The *Schedule of Fees* for your account explains the fees and other charges that apply to Overdraft Protection plans. Please review the *Schedule of Fees* for your account carefully.

Please note the following. Some of these Overdraft Protection plans are not available in all states. If the account you link for overdraft protection is opened in a different state than your primary checking account, there may be limitations on the ability to transfer funds the same day. Only one plan can be linked to an account at a time. Some accounts are not eligible for these plans. Under some plans we make transfers in a minimum amount so we might not make a transfer if you do not have at least the minimum transfer amount available under the plan. To have overdraft protection, at least one of the owner(s) of the account must be an owner of the other account. Certain other restrictions apply.

**Overdraft Protection from Another Deposit Account** This plan links your account to another Bank of America deposit account for overdraft protection. The other deposit account can be a second checking account or a savings account.

When you do not have enough available funds in your account to cover an item, we may automatically transfer funds from the available balance in your other deposit account to your account. We generally charge an overdraft protection transfer fee for each transfer. Funds you deposit into your other deposit account may not be available immediately for overdraft protection transfers. If you use your savings account for this service, each transfer counts as one of the six limited transactions you are allowed each month from your savings account. We cancel this Overdraft Protection plan if your account or the other deposit account is closed.

Please see the *Schedule of Fees* for your account for more information about overdraft protection from another deposit account.

**Overdraft Protection from Your Credit Card** This plan links an eligible Bank of America credit card to your account for overdraft protection.

When you do not have enough available funds in your account to cover an item, we may automatically advance available funds from your linked credit card account and transfer the funds to your account. An advance is made under, and is subject to, the terms and conditions described in the applicable credit card agreement. We ordinarily do not make an advance if you are in default

under your credit card agreement or if the advance would cause you to exceed the amount of credit available for that type of transaction. As examples, we may decide not to advance funds from your credit card account if you fail to make a credit card payment by its due date or if you exceed any credit card limit on your credit card account. The funds advanced are subject to fees and finance charges under your credit card agreement. For some business accounts, we may also charge an additional overdraft protection transfer fee to your account for each transfer.

Please see your credit card agreement for more information about overdraft protection from your credit card account.

**Overdraft Protection from Your Line of Credit** This plan links an eligible Bank of America line of credit to your account for overdraft protection.

When you do not have enough available funds in your account to cover a check or other item, we may automatically advance funds from your linked line of credit and transfer the funds to your account. The advance is made under, and is subject to, the terms and conditions described in the line of credit agreement. We ordinarily make the advance as long as you are not in default under the line of credit agreement and as long as the advance does not cause you to exceed the amount of your available credit on your line of credit. The funds advanced are subject to fees and finance charges under the line of credit agreement. We may also charge an additional overdraft protection transfer fee to your account for each transfer.

Please see your line of credit agreement for more information about overdraft protection from your line of credit.

# Processing and Posting Orders

## Processing Transactions and Posting Orders

Posting transactions to your account impacts your account balance. Posting a credit increases your balance. Posting a debit or hold reduces your balance. Credits include teller deposits, direct deposits and credits we make. Holds include deposit holds, debit card authorizations, and holds related to cash withdrawals and electronic transfers. Debits include withdrawals, transfers, payments, checks, one-time and recurring debit card transactions, and fees.

We use automated systems to process transactions and then to post transactions to accounts. When we process multiple transactions for your account on the same day, you agree that we may in our discretion determine our posting orders for the transactions and that we may credit, authorize, accept, pay, decline or return credits, debits and holds in any order at our option.

## Posting Orders

This section summarizes how we generally post some common transactions to your account.

We group the different types of transactions into categories. We use several different categories for holds, credits, and debits. Most categories include more than one transaction type.

After the end of the business day, our automated systems assign each transaction received for that day to a category. We generally post all transactions within a category, using the posting order or orders that apply to that category, before we post any transactions assigned to the next category.

We start with the balance in your account at the beginning of the business day, subtract holds from your balance, and make any adjustments from prior days. Next, we generally add credits to your balance and then subtract debits from your balance. Some, but not all, of our categories are shown below. For each debit category shown below, we list some common types of debits that we assign to the category and summarize how we generally post them within the category.

- We add deposits and other credits to your balance.

- Then, we subtract from your balance in date and time order the other types of debits listed in this paragraph, when our systems receive date and time information. If our systems do not receive date and time information, then we subtract the remaining debits in this category from your balance in order from the highest to lowest dollar amount.

  Common debits in this category include:

  - one-time and recurring debit card transactions;

  - withdrawals made at our tellers and ATMs;

  - one-time transfers made at ATMs, through our tellers, by telephone, and through Online Banking and Mobile Banking;

  - checks you wrote that are cashed at our tellers; and

  - wire transfers.

- Then, for other checks you wrote, we subtract from your balance checks with check numbers sequentially in check number order when our systems can read the check number. Next, checks without a check number that our systems can read are subtracted in order from highest to lowest dollar amount.

  As an example, on the same business day we receive five checks that you wrote and were not cashed at a teller. Our systems can read three of the check numbers, which are #105, #112, and #115. The other two checks do not have check numbers that our systems can read. We subtract check #105 first, then #112, and then #115. Then, we subtract the two remaining checks in order from the highest to lowest dollar amount.

- Then, we subtract from your balance many other types of electronic debits in order from the highest to lowest dollar amount. These debits include: scheduled transfers, preauthorized or automatic payments that use your deposit account number (generally referred to as automated clearing house (ACH) debits), and Online Banking and Mobile Banking bill payments.

- Then, we subtract from your balance most fees (such as monthly maintenance fees, overdraft item fees, returned item fees, and ATM fees) in order from highest to lowest dollar amount. Some fees may show as "processing" until the next day.

## Changing Posting Orders

You agree that we may determine in our discretion the orders in which we post transactions to your account.

You agree that we may determine in our discretion the transactions within a category, the order among categories, and the posting orders within a category. We sometimes add or delete categories, change posting orders within categories and move transaction types among categories. You agree that we may in our discretion make these changes at any time without notice to you.

## Posting Orders Determined at End of Day

We receive credits, debits and holds throughout the day. Regardless of when during the day we receive transactions for your account, you agree that we may treat them as if we received all transactions at the same time at the end of the business day.

During the day, we show some transactions as processing. As an example, we show some transactions as processing on the Account Details screen in Online Banking. Please note that transactions shown as processing have not been posted yet. The posting order for these transactions is determined at the end of the day, with the other transactions we receive for that day.

You should note that often we do not receive debits on the same day that you conduct them. As an example, when you use your debit card to pay for a purchase at a merchant and sign for the transaction, we usually receive an authorization request from the merchant the same day, but we might not receive the final debit card transaction for payment and posting until several days later. We generally post credits and debits to your account, and report them on your statement, in a different order than the order in which you conduct them or we receive them.

## Overdraft Fees

We generally determine at the time we post a debit to your account whether it creates an overdraft and whether an overdraft or returned item fee applies. You should note that sometimes we authorize a transaction at a time when you have enough available funds to cover it, but because other transactions post before it and reduce your balance, the transaction creates an overdraft when we post it to your account. You can avoid fees for overdrafts and returned items by making sure that your account always contains enough available funds to cover all of your transactions. When your account balance includes some funds that are subject to a hold, dispute or legal process, you should note that those funds are not available to cover your transactions.

We offer services to help you manage and keep track of your finances, such as Online Banking and Online Alerts. Please see "How to Get Started" at the beginning of this agreement.

Our posting orders can impact the number of overdraft fees we charge you when you do not have enough available funds to cover all of your transactions. When several debits arrive the same business day for payment from your account and you do not have enough available funds in your account to cover all of the debits we receive for that day, you understand that some posting orders

can result in more overdrafts, and more fees for overdraft items and returned items, than if we had used other posting orders. You agree that we may in our discretion choose our posting orders, and also change them from time to time, regardless of whether additional fees may result.

When your account balance includes some funds that are not available at the time that we post a debit, and you do not have enough available funds in your account to cover the debit, the debit results in an overdraft and we generally charge you an overdraft item fee or returned item fee for the debit. You should note that we do not show holds, or distinguish between available and unavailable funds in your account balance, on your statement so when you review your statement later, it might appear that you had enough available funds in your account to cover a debit for which we charged you a fee.

## Certain Transactions Made After Business Day Ends

During processing, we generally include in your account balance some transactions that you make after the business day cut-off, but before the end of the calendar day. These transactions are described below. This can impact fees that apply to your account. The credits can help you avoid overdrafts, returned items, and related fees. However, the debits can cause you to incur overdrafts, returned items, and related fees. You should note that we show these transactions on your statement as posting to your account on our next business day.

Credits. We generally add to your account balance the following credits, when the transaction occurs after the cutoff time for the business day, but during the same calendar day:

- Cash deposited at one of our ATMs or financial centers, and
- Transfers to your account from another deposit account with us made at one of our ATMs or financial centers, through Online Banking, Mobile Banking, or by calling customer service.

Debits. We generally subtract from your account balance the following debits, when the transaction occurs after the cutoff time for the business day, but during the same calendar day:

- Cash withdrawals made at one of our ATMs or financial centers, and
- Transfers from your account made at one of our ATMs or financial centers, through Online Banking, Mobile Banking, or by calling customer service.

# Processing Deposits and Cashed Items

We may forward deposits, cashed items and other transaction requests for an account to one of our processing centers. We may use the date that our processing center receives the transaction as the effective date of the transaction.

## Cashing Items or Accepting Items for Deposit

We may accept, accept for collection only, refuse, or return all or part of any deposit. If we accept checks or other items for deposit to your account or cash them, you are responsible for the checks and other items if there is a subsequent problem with them.

- If we cash a check or other item for you or credit it to your account and it is not paid for any reason, we may charge your account for the amount of the check or other item, even if this causes your account to become overdrawn.

- We may accept a check or other item for deposit to your account from anyone. We do not have to question the authority of the person making the deposit.

- If your account is overdrawn, we may use the deposit to pay the overdraft and any fees you owe us.

- We may adjust your account for any deposit errors, even if you have already withdrawn all or part of the deposit, though we reserve the right not to do so in every case.

- We may refuse to accept for deposit to your account items payable to another person.

- In receiving checks or other items for deposit or collection, we act only as your collecting agent and assume no responsibility beyond the exercise of ordinary care. We are not responsible for errors and delays made by others in the collection process.

- We may assess a charge for processing cash in a deposit.

- If you give us cash that we later determine to be counterfeit, we may charge your account for the amount we determine to be counterfeit.

- You will not knowingly deposit items into your account that do not have either a true original signature of the person on whose account it is drawn or an authorized mechanical reproduction of that person's signature.

- We may require ID or impose other conditions before accepting a deposit.

- An electronically created item (ECI) is an electronic image that has all the attributes of an electronic check but is not originally derived from a paper check. You agree not to deposit an ECI. You warrant that any item you deposit–including by means of mobile banking– has been created from a paper check, was authorized by the account holder, and will not be presented more than once. If you deposit or create for deposit an ECI, you agree to indemnify the Bank for any liability or loss resulting from a breach of any of these warranties and to fully reimburse the Bank for all losses incurred, including any loss due to the item not being derived from paper.

**Deposit Slips** You should always use our personalized deposit slips with your preprinted name and account number. If you use a blank personalized deposit slip from one of our financial centers, rather than your personalized deposit slip, we are not liable to you for errors that may result from your or our hand encoding the account information.

**Checks, Cashier's Checks, and Similar Items** We cannot generally verify that checks, money orders, cashier's checks or similar items are authentic and valid at the time you ask us to cash them or accept them for deposit. If we cash, or accept for deposit, a check, money order, cashier's check or similar item and we later learn that the item is fraudulent, counterfeit or invalid for some

other reason, we may charge your account for the amount of the item. This may occur even if we previously made the funds available to you, or this causes your account to become overdrawn.

**Foreign Items** You should be especially cautious about accepting items drawn on banks located outside of the United States. See *Foreign Items and Foreign Currency.*

## Checks Lost in the Collection Process

When we cash a check for you or accept a check for deposit to your account, we are acting as your agent in collecting the check. We are not responsible if the check is lost or delayed in the collection process. We may charge your account for the amount of the check, even if this causes your account to become overdrawn, if a check is lost during the collection process or if the financial institution on which the check is drawn gives us a photocopy of the check or a debit slip representing the check.

A check that was lost may not be returned to us for some time. Despite any delay, we may charge your account when we receive either the returned check, a copy of the check, or a notice of return.

## Collection Items

We may accept certain items — such as certain securities and checks payable in foreign currencies or at foreign locations — on a collection basis only. We route and process collection items separately. We normally credit your account for collection items only after we receive payment for them. But if we do credit your account and then do not receive payment, we may debit your account for the amount of the item, even if this causes your account to become overdrawn.

We charge fees for processing collection items. Financial institutions in the collection process and the financial institution on which the collection item is drawn may also charge fees. If a financial institution requires payment of a fee before that institution will process the collection item, we may pay the fee and charge your account. A financial institution may subtract its fee from the amount of the payment we receive. You have to pay these fees even if the collection item is returned unpaid.

For our current collection fees, call us at the number for customer service shown on your statement, or ask a financial center associate.

## Demand Drafts and Remotely Created Checks

If you deposit a demand draft or remotely created check (an unsigned draft or a preauthorized draft) into your account, you warrant and guarantee that the draft or remotely created check is authorized according to the terms on its face by the person identified as drawer. You agree to indemnify us from all loss, expense and liability related to a claim that such draft or check was not authorized by the persons on whose accounts it was drawn.

## Deposit Preparation and Acceptance

When you make deposits through our financial centers, including lobby boxes, ATMs, night depositories and other automated depositories, or by mail, we may use the method of delivery to our branch or processing center to determine when we accept the deposit, when you receive credit for the deposit, and whether deposit fees apply.

If we credit your account for a deposit and provide you with a receipt, we may use the amount shown on the deposit slip or otherwise specified by you. The amount of the credit is subject to subsequent verification by us and, after review, we may adjust your account for any errors, though we reserve the right not to do so in every case.

Any of our employees or authorized agents may open and count any deposit that a teller did not count in front of you, including coin deposits, cash deposits, and each deposit made through the mail, a lobby box, a night depository, or other automated depository. You agree not to dispute that employee or agent's determination of the amount you delivered. The funds will be accepted for

deposit after the counting has been completed and we have verified the amount, if we opt to do so. The funds will be made available to you in accordance with our funds availability schedule at that time.

If you make your deposit through a mechanical or automated depository such as an ATM or night depository, you agree to exercise due care in opening, closing and properly securing the depository. If your deposit includes items that we do not accept for deposit, we may hold those items until claimed by you.

**Deposit Error Correction**

When we accept your deposits, we may provisionally credit your account for the amount declared on the deposit slip. You must ensure that that amount declared on the deposit slip is correct even if you did not prepare the deposit slip. If later we determine that the amounts declared on the deposit slip are incorrect, we may adjust (debit or credit) your account, though we reserve the right not to do so if the error in completing the deposit slip was apparently inadvertent and is less than our standard adjustment amount. In that case, we may not adjust the deposit unless you notify us of the error within one year of the date of your periodic statement that shows the deposit. After this notice period has passed without your bringing an error to our attention, the deposit amount indicated on the statement will be considered finally settled. That is, if the actual amount deposited was less than the amount declared on the deposit slip, the difference will become your property and if the actual amount deposited was more than the amount declared on the deposit slip, the difference will become our property. We may change our standard adjustment amount from time to time without notice to you.

**Encoding Deposits**

If you are a business client, you may ask us for permission to encode the MICR (Magnetic Ink Character Recognition) line of an item you deposit with us. If we permit this, you agree to follow the instructions we give you for preparing and encoding your deposits. If you make an encoding mistake that results in costs, losses or damages to us, you agree to reimburse us for our costs, losses and damages, including attorneys' fees. We may charge them to your account. We are not liable for any claims, costs, losses, or damages you may incur when you encode your own items. If our equipment is unable to read what we consider a significant number of your encoded items, we may refuse to accept some or all of your items and we may charge you fees for each item we do accept.

You must provide us with a replacement or a copy of each original check if the deposit is lost or destroyed. We are not liable to you if you are unable to do so.

**Endorsing Checks**

We may endorse and/or collect items deposited to your account without your endorsement but may, at our option, require your personal endorsement prior to accepting an item for deposit. If you deposit items which bear the endorsement of more than one person or of persons who are not signers on the account, we may refuse the item or may require you to have their endorsement guaranteed before we accept an item.

We may accept for deposit checks payable to any signer on your account when endorsed by any other signer.

When you endorse checks that you ask us to cash or deposit, you must endorse checks in the area that extends 1 1/2 inches from the trailing edge of the back of the check. You must also confine information that you place or have preprinted on the back of your checks to the same area. Otherwise, it may overlap into the area reserved for the banks' endorsements. The trailing edge is the left side of the check when you look at it from the front.

If you endorse a check outside of that area, mark or otherwise obscure the other area or a prior endorsement or make an endorsement that is illegible or incomplete, we may refuse the item or we may accept such nonconforming endorsement and you agree to hold us harmless from any loss, delay, liability, claim or damage which may arise as a result.

If it becomes necessary for us to return one of your checks, your endorsement or information placed on the back of the check may interfere with the bank endorsements and cause delays in returning the item. You are liable for and agree to reimburse us for all claims, costs, losses and damages that result from late return of a check due to material entered on the back of the check that obscured or interfered with the depository or another bank's endorsement.

**Identifying the Account for Your Deposit**

You must correctly identify the account to which you want funds deposited. We may credit a deposit to an account based solely on the account number listed on the deposit slip or other instruction to credit an account, even if the name on the deposit slip or other instruction differs from the name on the account.

You are responsible for any claim, cost, loss or damage caused by your failure to properly identify the account to which a deposit is made or intended to be made.

**Overpayments and Reversals**

If funds to which you are not entitled are deposited to your account by mistake or otherwise, we may deduct these funds from your account, even if this causes your account to become overdrawn. If the funds were transferred from your account, we may reverse the transfer. We can do this without giving you any prior notice or demand.

**Returned Items**

This section applies to items that you deposit or that we cash for you (a "cashed or deposited item") and includes items drawn on us as well as items drawn on other financial institutions. You are responsible for returned items.

If a cashed or deposited item is returned to us at any time for any reason by the bank on which it is drawn or any collecting bank, we may accept that return, pay the claiming party, and charge the item to your account without regard to whether we or the other bank finally paid the item or returned the item in accordance with any applicable midnight deadline or clearinghouse rule. We may also deduct from your account any interest you may have provisionally earned on the item. We may charge you a fee for each returned item. Different fees may apply to domestic and foreign items. We may debit your account for a returned item at any time on or after the day it is returned to us by electronic, automated clearinghouse ("ACH") or other means or on the day we receive notice that the item is being returned to us - whichever is earlier.

As an example: if an item deposited in your account has been paid by the bank on which it is drawn (including on us) and that item is later returned to us with a claim that the item was altered, forged, unauthorized, bears a forged or missing endorsement or should not have been paid for any reason, we may at our discretion charge the item against your account or place a hold on the amount of that item against your account until the claim is finally resolved. We may take these actions without prior notice to you and regardless of whether settlement with respect to such item is considered final.

We are not obligated to question the truth of the facts that are asserted, to assess the timeliness of the claim, to take any action to recover payment of a returned item, or to assert any defense. We do not need to notify you in advance of our actions related to the claim. If you do not have sufficient available funds to cover a returned item, we may overdraw your account. We are not liable to you if there are insufficient funds to pay your item because we withdraw funds from your account or in any way restrict your access to funds due to a hold or debit to your account in

connection with a returned item. You agree to repay immediately an overdraft caused by a return of a cashed or deposited item.

In some cases, the financial institution on which the returned check or other item is drawn may send us an electronic notice of return, an indemnified copy of the original, an image replacement document ("IRD") or an image, instead of returning the item. We may act on, and you agree to be bound by, the electronic notice of return, or indemnified copy or IRD just as if the original item had been returned.

We may send the unpaid item back for collection a second time before notifying you, but we are not obligated to do so. You waive notice of dishonor and protest. You agree that we will have no obligation to notify you of any item that is being returned. However, if we receive advance notice from another financial institution that it is returning to us unpaid a check of $2,500 or more, we may send you a notice. We do not send a notice about returned checks of less than $2,500.

## Substitute Checks

You agree that you will not cash or deposit "substitute checks" as defined by federal law or Image Replacement Documents ("IRD") that purport to be substitute checks and have not been previously endorsed by a bank. If you cash or deposit such an item, you give us the same warranties and indemnities that we, as a reconverting bank, would give under applicable law or regulation and you agree to reimburse us for claims, losses, costs and damages we may incur. If you provide us with an electronic representation of a substitute check for deposit into your account instead of an original check, you agree to reimburse us for all claims, losses, costs and damages we incur because the substitute check resulting from the electronic representation does not meet applicable substitute check standards or causes duplicate payments.

## Third-Party Endorsements

We may require that checks and other items you want to deposit or cash be endorsed by all parties to whom the items are payable. We may require verification of any endorsement through either an endorsement guarantee or personal identification.

# When Funds are Available for Withdrawal and Deposit Holds

Our general policy is to make funds from your cash and check deposits available to you no later than the first business day after the day of your deposit. However, in some cases we place a hold on funds that you deposit by check. A hold results in a delay in the availability of these funds.

When we place a hold, you will have to wait a few days before being able to use the funds. When we decide to place a hold at the time you make your deposit, the teller or ATM gives you a notice that lets you know funds are on hold. For ATM deposits, the hold notice is usually included on the ATM receipt. The hold notice will let you know the date and the time when the funds will be available for you to use. In some cases, you will not get the hold notice from the teller or ATM, but later by mail. You can avoid holds by using direct deposit or wire transfer.

In many cases, we make funds from your deposited checks available to you sooner than we are able to collect the checks. This means that, from time to time, a deposited check may be returned unpaid after we made the funds available to you. Please keep in mind that even though we make funds from a deposited check available to you and you withdraw the funds, you are still responsible for problems with the deposit. If a check you deposited is returned to us unpaid for any reason, you will have to repay us and we may charge your account for the amount of the check, even if doing so overdraws your account.

While we generally apply our funds availability policy to deposits you make to savings accounts (including money market savings accounts), and to deposits you make using a mobile device, please note that our funds availability policy does not apply to these deposits, and we may delay availability of funds from these deposits.

## Your Ability to Withdraw Funds

Our general policy is to make funds from your cash and check deposits available to you no later than the first business day after the day we receive your deposit. Our policy is to make funds from electronic direct deposits made through the automated clearing house (ACH) and incoming wire transfers available to you on the day of the deposit. Once they are available, you can withdraw the funds in cash and we will use the funds to pay checks that you have written.

For determining the availability of your deposits, every day is a business day, except Saturdays, Sundays, and federal holidays.

If you make a deposit on a business day that we are open at one of our financial centers before 2:00 p.m. local time, or at one of our ATMs before 5:00 p.m. local time in the state where we maintain your account, we consider that day to be the day of your deposit. However, if you make a deposit after such times, or on a day when we are not open or that is not a business day, we consider that the deposit was made on the next business day we are open. Some locations have different cutoff times.

## Longer Delays May Apply

In some cases, we will not make all of the funds that you deposit by check available to you by the first business day after the day of your deposit. Depending on the type of check that you deposit, funds may not be available until the second business day after the day of your deposit. The first $200 of your deposits, however, may be available no later than the first business day after the day of your deposit.

If we are not going to make all of the funds from your deposit available by the first business day after the day of your deposit, we generally notify you at the time you make your deposit. We also tell you when the funds will be available. If your deposit is not made directly to one of our

employees, or if we decide to take this action after you have left the premises, we mail you the notice by the next business day after we receive your deposit. If you need the funds from a deposit right away, you should ask us when the funds will be available.

In addition, we may delay the availability of funds you deposit by check for a longer period under the following circumstances:

- We believe a check you deposit will not be paid.
- You deposit checks totaling more than $5,000 on any one day.
- You redeposit a check that has been returned unpaid.
- You have overdrawn your account repeatedly in the last six months.
- There is an emergency, such as failure of communications or computer equipment.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the seventh business day after the day of your deposit.

## Special Rules for New Accounts

If you are a new customer, the following special rules may apply during the first 30 days the account is open. Funds from electronic direct deposits to your account are available on the day we receive the deposit. Funds from deposits of cash, wire transfers, and the first $5,000 of a day's total deposits of cashier's, certified, teller's, traveler's, and federal, state and local government checks are available no later than the first business day after the day of your deposit if the deposit meets certain conditions. For example, the checks must be payable to you and deposited in person to one of our employees. The excess over $5,000 is available by the fifth business day after the day of your deposit. If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,000 will not be available until the second business day after the day of deposit. Funds from all other check deposits are generally available by the fifth business day after the day of your deposit.

However, we may place longer holds on certain items for other reasons, such as large deposits (see *Longer Delays May Apply* above).

## Government Checks, Cashier's Checks and Other Special Types of Checks

Our policy is to make funds from U.S. Treasury checks that are payable to you available no later than the first business day after the day of the deposit.

If you make the deposit in person to one of our employees, and meet the other conditions noted below, our policy is to make funds from the following types of deposits available no later than the first business day after the day of your deposit:

- State and local government checks that are payable to you and are deposited in an account in the same jurisdiction that issued the check.
- Cashier's, certified and teller's checks that are payable to you.
- Federal Reserve Bank checks, Federal Home Loan Bank checks and U.S. Postal Service money orders that are payable to you.

If you do not make your deposit in person to one of our employees (for example, if you mail the deposit), our policy is to make funds from these deposits available no later than the second business day after the day of your deposit.

However, we may place longer holds on certain items for other reasons, such as large deposits (see *Longer Delays May Apply* above).

## Cash-Withdrawal Limitation

If we delay availability of your deposit, we place certain limitations on withdrawals in cash or by similar means. In general, $200 of a deposit is available for withdrawal in cash or by similar means no later than the first business day after the day of deposit. In addition, a total of $400 of other funds becoming available on a given day is available for withdrawal in cash or by similar means at or after 5:00 p.m. on that day. Any remaining funds will be available for withdrawal in cash or by similar means on the following business day.

Similar means include electronic payment, issuance of a cashier's or teller's check, certification of a check, or other irrevocable commitment to pay, such as a debit card transaction.

## Holds on Other Funds

If we cash a check for you that is drawn on another financial institution, we may withhold the availability of a corresponding amount of funds that are already in your account. If we accept for deposit a check that is drawn on another financial institution, we may make funds from the deposit available for withdrawal immediately but delay your ability to withdraw a corresponding amount of funds that you have on deposit in another account with us. In either case, we make these funds available in accordance with our policy described above for the type of check that was cashed or deposited.

# Processing Withdrawals

We may forward withdrawals and other transaction requests for an account to one of our processing centers. We may use the date that the processing center receives the transaction as the effective date of the transaction.

## Cashing Checks for You

Check cashing services may not be available at some financial centers. We may occasionally refuse to cash a check written to you. If we do cash such a check and it is returned to us unpaid for any reason at any time, we may deduct the amount of the check from your account, even if this causes your account to become overdrawn, and we may charge you a fee.

We may cash checks payable to any signer on your account when endorsed by any other signer.

If you ask us to cash a check or other items for you, we may apply the proceeds of the check or other item to fees, overdrafts and other amounts you owe us.

## Cashing or Accepting Your Checks for Others

When a check with a check or other than on your account asks us to cash it or accept it for deposit, we may require identification satisfactory to us and their fingerprint. We may also impose additional requirements. We may refuse to cash a check for a person who is not our loan or deposit customer.

If the person with your check fails or refuses to satisfy our requirements, we may refuse to cash the check or accept it for deposit.

When we cash your check, or accept it for deposit, we may do so without reviewing your account at that time to see whether you have enough available funds to cover the check. We may charge that person cashing a check or other item a fee for cashing the check or other item if that person is not a customer of Bank of America.

We are not liable to you for refusing to cash or accept the check, or for charging a check cashing fee.

## Checks with Legends or Restrictions

Some customers print or write legends or restrictions on their checks. Sometimes the person to whom the check is payable prints or writes a legend or restriction on the check. Legends and restrictions include conditions, special or restrictive instructions, and other notations. Some examples are: "not valid after 60 days", "not valid over $1,000" or "paid in full". We may disregard legends and restrictions. We may pay the item even if the legend or restriction has not been met. We are not liable to you for any claims, costs, losses or damages that result from the placement of these legends or restrictions on your checks, or from our failure to abide by them.

## Collection Items

When another financial institution submits to us for collection an item drawn on your account, we may charge the other financial institution a fee. When you do not have enough funds in your account for us to process a collection item drawn on your account, we may charge you an overdraft or returned item fee.

## Check Stock and Ink

You agree to bear the risk of loss if you use check stock that contains defects, such as printing inaccuracies, faulty magnetic ink, faulty encoding, or duplicate serial numbers.

Checks you write may be converted into electronic images (truncated) during the check collection and return process. You also agree to bear the risk of loss if: you elect to have your checks printed

by a vendor that has not been approved by us; you use check stock or features (such as security features) that cause critical data to disappear or be obscured upon truncation; or you make your check out in a way (such as, using a lightly colored ink) that causes critical data to disappear or be obscured upon truncation.

## Converting Checks to Electronic Debits

Some businesses convert checks that you give them into electronic debits (sometimes referred to as an electronic check) and then sends us an electronic debit for the transaction amount. When we receive the electronic debit, we charge it to your account. We may receive the electronic debit to your account immediately after the business enters the transaction, so you may have a reduced right to stop payment and you may incur an overdraft if you do not have sufficient funds in your account to cover the amount of the check at the time you write the check or authorize the transaction. Since the check is not sent to us, we do not have a copy of your check. We list these electronic debits on your account statement. If the business uses your check to initiate an electronic debit at the point of sale, the business should give you notice of the conversion and return the voided check to you. You should treat the voided check with care because someone else who obtains possession of it could use the information to initiate additional debits against your account. A business that receives your check by mail and converts it to an electronic debit may give you notice of the conversion and destroy the original check.

## Examining Checks

We receive checks in great volume. This and compliance with expedited funds availability laws require us to use automated check processing procedures. Although we may visually review a sample of checks and other items from time to time, reasonable commercial standards do not require us to do so.

We select some checks for review based on certain criteria that change from time to time. This means that most checks are processed on the basis of the MICR (Magnetic Ink Character Recognition) line printed along the bottom edge of the check, and are not individually examined for dates, maker signatures, legends or endorsements. You agree that we will have exercised ordinary care if we examine only those items that we have identified according to the criteria that we may establish in our discretion for inspection.

If we do visually review any check or other item, we may disregard any restrictive instructions or notations, such as an instruction to permit withdrawals only upon more than one signature. We may return the item unpaid if, in our opinion, it does not bear a signature matching any specimen signature we have on file for your account. You agree, however, that we will not be liable to you for honoring any check or other item bearing a signature that, in our sole opinion, resembles the specimen signature on file with us.

Since we do not individually examine most checks, it is critical for you to take care of your checks, promptly review your account statement, and immediately report any suspicious or unauthorized activity to us. You agree that automated processing of your checks is reasonable and that you accept responsibility for preventing and reporting forgeries, alterations, and other unauthorized uses of your checks or accounts. You agree that the exercise of ordinary care will not require us to detect forgeries or alterations that could not be detected by a person observing reasonable commercial standards.

Since some types of check fraud have become more difficult to detect, we may elect in some cases to make further inquiries about certain checks or other items that are presented for payment against your account. If we are unable to contact you, or take other steps, to determine with reasonable certainty that you authorized these payments, we may either pay the checks and other items or return them unpaid without any liability to you.

## Substitute Checks and Your Rights

The following provisions help explain some of the rights a consumer has under a federal law commonly referred to as Check 21. Check 21 was enacted to increase the efficiency of the U.S. check clearing system. The clearing system relies heavily on the physical transport of checks between banks. Check 21 allows banks to create substitute checks and present them to other banks instead of the original checks. This reduces the transport of checks among banks and helps enable the electronic collection of checks.

### What is a substitute check?

To make check processing faster, federal law permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check.

Some or all of the checks that you receive back from us may be substitute checks. This notice describes rights you have when you receive substitute checks from us. The rights in this notice do not apply to original checks or to electronic debits to your account. However, you have rights under other law with respect to those transactions.

### What are my rights regarding substitute checks?

In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a substitute check is posted to your account (for example, if you think that we withdrew the wrong amount from your account or that we withdrew money from your account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your account and fees that were charged as a result of the withdrawal (for example, bounced check fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You also are entitled to interest on the amount of your refund if your account is an interest bearing account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other law.

If you use this procedure, you may receive up to $2,500 of your refund (plus interest if your account earns interest) within 10 business days after we received your claim and the remainder of your refund (plus interest if your account earns interest) not later than 45 calendar days after we received your claim.

We may reverse the refund (including any interest on the refund) if we later are able to demonstrate that the substitute check was correctly posted to your account.

### How do I make a claim for a refund?

If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your account, please contact us at the telephone number listed on your account statement, or write to us at:

Bank of America
Attn: Research and Adjustments
P. O. Box 655961
Dallas, TX 75265-5961

You must contact us within 40 calendar days of the date that we mailed (or otherwise delivered by a means to which you agreed) the substitute check in question or the account statement showing that the substitute check was posted to your account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances.

## Items Resulting from Voluntary Disclosure

If you voluntarily disclose your account number to another person orally, electronically, in writing or by other means, you are deemed to authorize each item, including electronic debits, which result from your disclosure. We may pay these items and charge your account.

### Large Cash Withdrawals

We may require reasonable advance notice for large cash withdrawals. We may also refuse to honor a request to withdraw funds in cash from your account or to cash a check (including a cashier's check or other official item) at a financial center if we believe that the amount is unreasonably large or that honoring the request would cause us an undue hardship or security risk. We may require that such withdrawals be made at one of our cash vaults by an armored courier, acceptable to us and at your sole risk and expense. We are not responsible for providing for your security in such transactions.

### Paying Checks and Other Items

We may debit your account for a check or other item drawn on your account either on the day it is presented to us for payment, by electronic or other means, or on the day we receive notice that the item has been deposited for collection at another financial institution — whichever is earlier. If you do not have sufficient available funds to cover the item, we decide whether to return it or to pay it and overdraw your account.

We may determine your balance and make our decision on an insufficient funds item at any time between our receipt of the item or notice and the time we must return the item. We are required to determine your account balance only once during this time period.

When you deposit checks or other items that are drawn on another account with us, we may treat such items as presented to us for payment on the business day that they are received by our office that processes checks drawn on the other account.

### Stale-Dated and Postdated Checks

If a stale-dated check — that is, a check dated more than six months in the past — is presented for payment against your account, we may pay the check and charge it to your account. If a postdated check — a check dated in the future — is presented for payment, we may pay the check and charge it to your account even if it is presented for payment before the date stated on the check. If you do not want us to pay a stale-dated or postdated check, you must place a stop payment order on it. See the Stop Payment Orders and Postdating Orders section.

### Substitute Checks, Indemnified Copies, Images and Image Replacement Copies

In some cases, we may be sent an indemnified copy of your original check, an image replacement document (IRD), a substitute check or an image of your check, instead of the original item. We may act upon presentment of an IRD, indemnified copy, substitute check, or image of your check and pay these items against your account, just as if the original item had been presented.

### Unpaid Items

If we decide not to pay a check or other item drawn on your account, we may return the original, an image or a copy of the item or we may send an electronic notice of return and keep either the original, an image or a copy of the item in our records. If we send an electronic notice of return, you agree that any person who receives that electronic notice may use it to make a claim against you to the same extent and with the same effect as if we had returned the original item.

Your claim must include—

- A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect);
- An estimate of the amount of your loss;
- An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss; and
- A copy of the substitute check or the following information to help us identify the substitute check: your account number, the check number, the name of the person to whom you wrote the check, the amount of the check and the date of the check.

# Notices, Statements and Other Communications

## General Terms for Notices, Statements and Other Communications

Please review promptly all notices, statements and other communications we send you. In this section "communications" means all notices, statements and other communications we send you.

We may provide communications in English. Many communications will be notices of change affecting your rights and obligations. If you have questions about any of them or difficulty reading English, please call us at the number for customer service on your statement.

We may:

- address communications to one account owner;
- provide communications in English, even though we may have given you account opening documents and disclosures in a language other than English;
- destroy communications that are sent to you and returned to us as being undeliverable, along with any accompanying checks and other items;
- authorize the Post Office or an agent to destroy communications, along with accompanying checks and other items, that the Post Office informs us are undeliverable; and
- stop sending communications to you until a new address is provided to us if one or more communications that we mail to you are returned to us as being undeliverable.

We are not responsible for communications, or for any checks or other accompanying items, lost while not in our possession.

If we receive communications that we sent you at a financial center, they are deemed to have been delivered to you at the time that they are available to you at the financial center.

**Electronic delivery of communications** We recommend that you use our Online Banking service and receive your communications electronically. When you use electronic or paperless delivery, we deliver communications to you by placing them in Online Banking. You can find your account statements, notices, and other eligible documents in Online Banking within the statements and documents area of your account details page. Communications currently available for electronic delivery are listed in the statements and documents area of Online Banking.

## Notices

When we inform you of changes affecting your rights and obligations, we do so by delivering or otherwise making a notice available to you. In some cases, we may post a notice of a change in our banking offices or on our website. Otherwise, we mail the notice to you at the address we currently show for your statement or, if we have agreed on this method, we provide it to you electronically. We may provide a notice as a message on your statement or as an insert with your statement.

If a notice of a change to this Agreement is returned to us as being undeliverable or if we stop sending notices or statements to you because we consider your account dormant or because notices or statements we previously sent you were returned to us as being undeliverable, you understand that the notices are available to you through our financial centers. You agree to that method of delivery and that changes covered in these notices are still effective and binding on you.

A notice sent to any one owner is deemed notice to all account owners and is effective for all account owners.

## Statements

We provide you with a single statement when there is activity on your checking or savings account. When there is no activity on your account, we may choose not to provide a statement. You may generally obtain an additional copy of your statement for a fee.

We recommend that you use our Online Banking service and receive your statements electronically.

If your statement is received at one of our offices, we may mail it to you or destroy it, along with any accompanying checks and other items.

**For checking, money market savings and business savings accounts,** we provide you with a monthly statement. Statement cycles generally vary from 28 to 33 days and may end on different days during the month. A statement cycle can be shorter than monthly. As examples, a statement cycle may only be a few days in length for the first statement cycle after an account is opened or when a statement date is changed to link accounts for combined statements. If you want to know the date your statement cycle ends, call us at the number for customer service on your statement.

**For Regular Savings accounts,** we provide you with a quarterly statement. If you have an electronic fund transfer (such as a direct deposit or an ATM withdrawal) to or from your account during any month, we provide a statement for that month.

**For analyzed business checking accounts,** you can elect to receive an additional monthly account analysis statement. This statement includes balance and float information, quantity of services used during the period, fees and charges for these services and the earnings allowance, if any.

For IRAs, we provide you with a quarterly statement.

**Combined Statements** With combined statement service we provide a single statement that reports activity for all accounts linked for this service, instead of separate statements for each linked account.

Accounts with at least one common owner may be linked and reported on a combined statement, either automatically or at your request. When accounts are reported on a combined statement, you understand and agree that each owner and each signer of any linked account can review information about all linked accounts. As an example: If you own a checking account jointly with others and you link your individual savings account to this checking account for combined statement service, then each of the other owners and signers of the joint checking account can review information about both the checking account and your individual savings account. You should not link accounts for combined statement service that you do not want others to see.

You must generally request combined statement service and tell us what accounts you want us to link and report on a combined statement. In some cases, however, we may automatically send you a combined statement. As an example: we may automatically link accounts that have the same owners and provide a combined statement for those accounts.

We may restrict what accounts can be linked for a combined statement. Please note that combining accounts on a single statement does not mean they are also linked for pricing. To determine which accounts can be linked, or to link accounts, for combined statements or for combined balances (pricing), please call us.

# Actions You Can Take to Help Protect Your Account

Your role is extremely important in helping to prevent the wrongful use of your account. Please consider the measures below to help you protect your account.

**Stay Informed** We offer several services you can use to help you keep track of your account on a daily basis. You can use our Online Banking service to review your accounts and Online Alerts to receive notice of account balances and activity. Please see the information about these services in *How to Get Started.*

**Be Cautious about Giving Out Your Personal Information** We will not send you e-mails requesting personal information. If you receive an email that seems to come from us and requests personal information, do not answer it. Instead, please contact us immediately at the number on your statement.

**Be Cautious about Accepting Checks, Money Orders and Cashier's Checks, especially from Strangers** You should be cautious about accepting checks, money orders and cashier's checks (especially, foreign checks) from strangers. Sometimes they are fraudulent or counterfeit. We cannot verify that a check, money order or cashier's check that purports to be issued by another company or financial institution is authentic, or has any value at all, when you give it to us and ask us to cash or deposit it.

We ordinarily make funds from a check you deposit (or we cash for you) available to you sooner than we are able to collect the check or determine whether the check is any good. If the check is returned to us unpaid for any reason, you are still responsible for the check. We charge your account for, and you will have to repay us, the full amount of the returned check. A check may be returned because it "bounces" or because the check is fraudulent, counterfeit or invalid for some other reason.

One way to help protect yourself is to take the check to the bank, company (such as Western Union) or service (such as the U.S. Postal Service) that issued it and redeem the check for cash. For more information on how to avoid being a victim of fraud, visit bankofamerica.com, or consult trusted organizations such as your local Better Business Bureau or the Federal Citizen Information Center. The following website is also a good resource - www.fakechecks.org.

**Review Statements and Report Suspected Problems Immediately** You must promptly review the notices, statements and other communications, along with any accompanying checks and other items, we send you. You must also report problems or unauthorized transactions to us immediately, by calling the number for customer service on your statement. See *Reporting Problems.*

**Identity Theft** Identity theft occurs when someone uses your personal information without your permission to take over your existing account or to open new accounts in your name. Identity theft often begins with the loss or theft of a wallet or purse. Criminals can also obtain your personal information by stealing records from your trash or sending fraudulent emails to you requesting your information.

You should destroy or shred account statements, checks, deposit slips and other documents with your personal information before you throw them away.

**Other Actions You Can Take**

Here are some other actions you can take to help control your risk. This is by no means a complete list of preventive measures. You may want to take other or additional actions.

- Do not share your passwords, user numbers or Personal Identification Number (PIN) for Online Banking or your ATM or debit card.

---

## Check Image, Safekeeping and Enclosure Services

For most accounts, we offer the following options regarding your canceled checks.

**Check Image Service** We provide with your statement an image of the front of each of your canceled checks that we post to your account during the statement cycle. We print images of your checks up to 10 images on a page. We do not return your canceled checks. In some states and for some business accounts we provide an image of the front and back of your canceled checks. When you use this service, checks are deemed to be made available to you at the same time your statement is made available.

We store copies of your canceled checks (usually on microfilm or as a digital image) and then destroy the checks. Copies of checks are generally available for seven years from the date the checks are paid. See *Check Copies* in *Other Terms and Services.*

**Check Safekeeping Service** We report on your statement information about canceled checks (check number, amount and date posted) that posted to your account during the statement cycle. You do not receive your canceled checks with your account statement. When you use this service, checks are deemed to be made available to you at the same time your statement is made available.

If your statements are returned to us, you automatically receive check safekeeping service. If you usually receive your checks with your statement but we are unable to return them because of circumstances beyond our reasonable control, we may convert your account to check safekeeping service.

We store copies of your canceled checks (usually on microfilm or digital image) and destroy the checks. Copies of the checks are generally available for seven years from the date the checks are paid. See *Check Copies* in *Other Terms and Services.*

If you use our check safekeeping service, we cannot provide a copy of a check that posted to your account, and you lose money as a result, we may cover the loss up to the amount of the check. However, we are not liable to you for consequential loss or damage of any kind.

**Check Enclosure Service** *This service is no longer available for most accounts.* We return with your statement canceled checks that we received and posted to your account during the statement cycle. We may also provide you with images of your canceled checks.

We may not return some of your canceled checks. For example, if a check that you write is converted into an image or electronic debit during the check collection process, your check is not sent to us and, as a result, we cannot return the check to you. In some cases, we may receive a substitute check (also called an image replacement document) instead of your check. We do not return substitute checks with your statement.

## Your Address and Change of Address

We may send notices, statements and other communications regarding your account to you at the electronic or street address we have in our records for your account.

You agree to notify us if you change your address. If the United States Post Office or one of its agents tells us that your address has changed:

- we may change your address on our records to the address specified by the Post Office; and
- we may send notices, statements and other communications regarding your account to that new address.

- Call us if your new check order or debit card does not arrive within 14 business days.

- Be cautious about giving someone your account number. If you give your account number to a third person and authorize that third person to initiate one or more transactions on your account, you may be liable for all transactions initiated by the third person even if you did not intend to authorize a particular transaction.

- Do not give anyone a pre-signed blank check. Do not give anyone permission to sign your name on a check.

- Do not preprint your driver's license or Social Security Number on your checks.

- Write checks in a dark colored permanent ink and fill in all lines. Make sure the written and numeric amounts match, are readable and begin on the far left of the line so additional numbers or words cannot be added.

- Write and sign your checks clearly, because illegible checks are easier to forge.

- Use tamper resistant checks. If you do not order checks through us, ask your check vendor about tamper resistant checks.

- Store blank checks, deposit slips and statements in a safe place and audit your check stock frequently. When discarding, destroy them by shredding or other means so they cannot be copied or used. Call us immediately if any of these items are lost, stolen or missing.

- Use the same precautions that apply to your checks to your endorsement and signature stamps.

- Do not leave outgoing mail in an unlocked collection box or in your residence mailbox. Deposit outgoing mail in a locked Postal Service mail deposit box.

- Keep accurate records of your transactions and reconcile your statements as soon as they are made available to you. Pick up your mail every day. When reviewing your statements, watch for:
  - Checks cashed out of sequence or made payable to cash
  - Use of a check number from a previously cleared item
  - Balance discrepancies or unexpected fluctuations

- Reconcile your account yourself. If you have authorized someone else to transact on your account and you do not reconcile your account yourself, someone other than an authorized signer should reconcile your accounts.

- Business customers should assign to different individuals responsibilities for: opening mail, reconciling bank statements, endorsing incoming checks, making deposits, reconciling accounts payable checks with vendor invoices, reconciling incoming checks against outstanding receivables and issuing checks.

# Reporting Problems

If you find that your records and ours disagree, if you suspect any problem or unauthorized transaction on your account or you do not receive a statement when expected, call us immediately at the number for customer service on your statement. If you fail to notify us in a timely manner, your rights may be limited.

This section does not apply to electronic fund transfers that are subject to Regulation E. If we have a specific agreement with you for a service or this Agreement has specific provisions for a service (such as the *Funds Transfer Services* section), these provisions supplement the specific agreement and provisions to the extent they are not inconsistent.

## Your Responsibility

You must exercise reasonable control over your statements, checks, deposit slips, endorsement and signature stamps, debit and ATM cards, Personal Identification Numbers and other access devices. It is your responsibility to keep them safe and secure and to promptly discover and report if any of them are missing in time to prevent misuse. You assume full responsibility for monitoring and reviewing the activity of your account, the work of your employees, agents and accountants, and any use they make of your account.

We may deny a claim for losses due to forged, altered or unauthorized transactions, items or signatures if you do not guard against improper access to your checks, statements, deposit slips, endorsement and signature stamps, and account information. We may also deny your claim if you do not monitor your account and report problems as provided in this section. Please review this *Reporting Problems* section carefully.

In some states we offer certain fraud prevention and detection products and services to business customers. If we have offered you one or more of these services, and you decline to use them or fail to implement them, or you fail to follow the procedures necessary for proper use of these products or services, or you fail to follow other precautions reasonable for your particular circumstances, you are precluded from asserting any claims against us for paying any unauthorized, altered, counterfeit or other fraudulent item that such product, service, or precaution was designed to detect or deter, and we will not be required to re-credit your account or otherwise have any liability for paying such items.

## What Are Problems and Unauthorized Transactions

Problems and unauthorized transactions include suspected fraud; missing deposits; unauthorized electronic transfers; missing, stolen, or unauthorized checks or other withdrawal orders; checks or other withdrawal orders bearing an unauthorized signature, endorsement or alteration; illegible images; encoding errors made by you or us; and counterfeit checks. This is not a complete list.

## Reviewing Your Account Statements

Your review of your statements, checks and other items is one of the best ways to help prevent the wrongful use of your account. You agree:

- to review your statements, checks and other items and reconcile them as soon as they are made available to you;

- that our statements provide sufficient information to determine the identification and authenticity of any transaction including without limit, whether any are forged, altered or unauthorized if the statement includes the item number, amount and the date the item posted to your account;

- to report any problems or unauthorized transactions as soon as possible; and

- that 60 days after we send a statement and any accompanying items (or otherwise make them available) is the maximum reasonable amount of time for you to review your statement or items and report any problem or unauthorized transaction related to a matter shown on the statement or items. There are exceptions to this 60-day period. For forged, unauthorized or missing endorsements, you must notify us within the period specified by the state law applicable to your account. For substitute checks, you must notify us within 40 days to qualify for an expedited recredit. See section titled *Substitute Checks and Your Rights*.

## We Are Not Liable If You Fail To Report Promptly

Except as otherwise expressly provided elsewhere, if you fail to notify us in writing of suspected problems or unauthorized transactions within 60 days after we make your statement or items available to you, you agree that:

- you may not make a claim against us relating to the unreported problems or unauthorized transactions, regardless of the care or lack of care we may have exercised in handling your account; and

- you may not bring any legal proceeding or action against us to recover any amount alleged to have been improperly paid out of your account.

Except as otherwise expressly provided elsewhere in this agreement, we are not liable to you for subsequent unauthorized transactions on your account by the same person if you fail to report an unauthorized transaction on your account within 30 days (or such lesser period as is specified in the state law applicable to your account) following the closing date of the statement containing information about that first unauthorized transaction.

For business deposit accounts, also see *Electronic Banking Disclosures* in the *Electronic Banking Services* section and *ACH Debits and Credits* in the *Funds Transfer Services* section.

## Written Confirmation and Other Assistance

If you report to us that an unauthorized transaction has occurred on your account, we may require you to confirm your report in writing. We may also require that you give us a statement, under penalty of perjury, about the facts and circumstances relating to your report and provide such other information and proof as we may reasonably request.

If you assert a claim regarding a problem, you must cooperate with us in the investigation and prosecution of your claim and any attempt to recover funds. You also agree to assist us in identifying and in seeking criminal and civil penalties against the person responsible. You must file reports and complaints with appropriate law enforcement authorities.

If you fail or refuse to do these things, we will consider your failure or refusal to be your ratification of the defect in the statement or item, unauthorized transaction or other problem and your agreement that we can charge the full amount to your account.

## Our Investigation and Maximum Liability

We may take a reasonable period of time to investigate the facts and circumstances surrounding any claimed loss. We do not have to provisionally credit your account while we investigate.

Our maximum liability is the lesser of your actual damages proved or the amount of the missing deposit or the forgery, alteration or other unauthorized withdrawal, reduced in all cases by the amount of the loss that could have been avoided by your use of ordinary care.

We are not liable to you for special or consequential losses or damages of any kind, including loss of profits and opportunity or for attorneys' fees incurred by you.

## Business Insurance

If your claim relates to a business account, you agree to pursue all rights you may have under any insurance coverage you maintain before making a claim against us in connection with any transaction involving your accounts. You will provide us with all reasonable information about your coverage, including the name of your insurance carrier, policy number, policy limits and applicable deductibles. Our liability is reduced by the amount of all insurance proceeds you receive or are entitled to receive. At our request, you agree to assign to us your rights under your insurance policy.

## Opening a New Account

If you or we suspect that your account is or may be compromised, we may recommend that you close your account and open a new account. If there are any unauthorized transactions on your account, we recommend that you close your account and open a new one. If we recommend that you close your account and you do not do so, we are not liable to you for subsequent losses or damages on the account due to unauthorized transactions. When you open a new account, you are responsible for notifying any third parties that need to know your new account number.

# Foreign Items and Foreign Currency

## What is a Foreign Item

A foreign item is a check or other item in any currency (including United States dollars) that is drawn on a bank or branch of a bank located outside of the United States. A foreign currency is any currency other than United States dollars. Some foreign items are payable in United States dollars. Some are payable in a foreign currency.

## Be Cautious About Accepting Foreign Items

You should be cautious about accepting foreign items because foreign items are not subject to United States laws or regulations. A foreign item may be returned unpaid much later (sometimes many months later) than checks or other items that are drawn on banks located in the United States. If a foreign item is returned to us unpaid or there is some other problem with the foreign item, you are responsible for the item and you may incur a loss.

## Currency Exchange Rates

We may receive transactions related to your account or relationship with us for which we determine that it is appropriate to convert the transaction from one currency to another currency. As an example, we receive a wire denominated in a foreign currency for credit to your account. When we decide to convert a transaction, we may determine in our discretion the currency exchange rate and then assign that currency exchange rate to your transaction without notice to you. You agree to this procedure and accept our determination of the currency exchange rate.

If we assign an exchange rate to your foreign exchange transaction, that exchange rate will be determined by us in our sole discretion based upon such factors as we determine relevant, including without limitation, market conditions, exchange rates charged by other parties, our desired rate of return, market risk, credit risk and other market, economic and business factors. Exchange rates fluctuate at times significantly, and you acknowledge and accept all risks that may result from such fluctuations. You acknowledge that exchange rates for retail and commercial transactions, and for transactions effected after regular business hours and on weekends, are different from the exchange rates for large inter-bank transactions effected during the business day as may be reported in *The Wall Street Journal* or elsewhere. Exchange rates offered by other dealers, or shown at other sources (including online sources) may be different from our exchange

rates. The exchange rate you are offered may be different from, and likely inferior to, the rate paid by us to acquire the underlying currency.

We provide all-in pricing for exchange rates. The price provided may include profit, fees, costs, charges or other mark ups as determined by us in our sole discretion. We do not accept any liability for our exchange rates.

In connection with our market making and other activities, we may engage in hedging, including pre-hedging, to facilitate customer transactions and hedge the associated market risk. Such trading may include trading ahead of order execution. These transactions will be designed to be reasonable in relation to the risks associated with the potential transaction with you. These transactions may affect the price of the underlying currency, and consequently, your cost or proceeds. You acknowledge that we bear no liability for these potential price movements. When our pre-hedging and hedging activity is completed at prices that are superior to the agreed upon execution price or benchmark, we will keep the positive difference as a profit in connection with the transactions. You will have no interest in any profits.

We also may take proprietary positions in certain currencies. You should assume we have an economic incentive to be a counterparty to any transaction with you. Again, you have no interest in any profit associated with this activity.

You acknowledge that the parties to these exchange rate transactions engaged in arm's length negotiations. You are a customer and these transactions do not establish a principal/agent relationship or any other relationship that may create a heightened duty for us.

You acknowledge that any and all liability for our exchange rates is disclaimed, including without limitation direct, indirect or consequential loss, and any liability if our exchange rates are different from rates offered or reported by third parties, or offered by us at a different time, at a different location, for a different transaction amount, or involving a different payment media (including but not limited to bank-notes, checks, wire transfers, etc.).

## Wires Sent to a Foreign Currency Account

When you send a wire denominated in United States dollars to an account denominated in a foreign currency, an intermediary bank or the receiving bank may convert your wire into the applicable foreign currency and we may receive compensation in connection with any such conversion. When this occurs, the intermediary bank or the receiving bank determines in their discretion the currency exchange rate. We are not responsible for the exchange rate set by an intermediary bank or the receiving bank.

## You May Not Write Foreign Currency Checks

You may not write checks or give other withdrawal orders on your account, which order payment in a foreign currency. If we receive such a check or order, we may refuse to accept or process it without any liability to you.

## Processing and Collecting Foreign Items

We may refuse to accept a foreign item for deposit or collection. If we accept a foreign item for deposit or collection, you assume all the risks relating to or arising from: the collection process, a late return and changes in currency exchange rates.

If we accept a foreign item for deposit or collection, we may decide not to credit the value of the foreign item to your account until we receive the proceeds in cleared funds from the paying bank. However, if we do credit your account, the credit is provisional and we may reverse the credit at any time.

If we accept an item for deposit which we later determine to be a foreign item, we may decide that the item needs to be sent for collection. If so, we may reverse any credit given for the item and mail the foreign item to you at the address we have for your account statement. You may ask us to send the item for collection.

When we send a foreign item for collection, you understand that the foreign item is sent solely for you and at your risk and that we are not liable for any event in the collection process which is beyond our control. As examples, we are not liable for a default by any bank or agent involved in the collection process or for the loss of the foreign item in transit. We may send the foreign item through a correspondent bank or directly to the paying bank. We may deduct our fees and the fees and charges assessed by the paying bank and any agents involved in the collection process from any amount collected or from your account.

If you request, we will try to determine the status of a collection. You agree to pay all fees and charges related to such a request. We may refuse your request if less than 30 business days have passed since we first processed the collection.

If a foreign item is returned to us unpaid for any reason at any time or is initially paid but then subsequently returned unpaid, we may charge your account for the foreign item and mail the foreign item to you at the address we have for your account statement. Even though the item is returned unpaid, we may charge you for our collection fees and for fees and charges assessed by the paying bank and any agents involved in the collection process.

When we credit your account for a foreign item, we use our applicable currency exchange rate on the day we credit the item to determine the amount of the credit. When we reverse a credit for a foreign item, we use our applicable currency exchange rate on the day we reverse the credit to determine the amount of the debit. Currency exchange rates are highly volatile and our rate on the day of the credit is likely to be different (sometimes very different) than our rate on the day of the debit. You understand and agree that this may result in a currency exchange loss to you.

# Other Terms and Services

## Account Changes

You must notify us of any change to your name or address. If you do not provide notice of change of address, we may send notices, statements and other correspondence to you at the address maintained on our records for your account and you agree to indemnify us and hold us harmless for doing so.

You agree to notify us in writing of any change in ownership or authorized signers of your account or if an owner or authorized signer on the account dies or is adjudicated incompetent.

If there is more than one owner and/or authorized signer on the account, any one account holder or authorized signer may request the account be closed without consent of any other account holder or authorized signer. Further, any one account holder may request, and we may, at our option, permit removal of any account holder or authorized signer without consent of any other account holder or authorized signer on the account.

You acknowledge that we may, but need not, require a new signature card to be completed before any change in ownership or authorized signers becomes effective and each time you open a new account, we may require a Taxpayer Identification Number certification(s). You also acknowledge that we may require you to close your account in the event of any change in ownership or change in the authorized signers.

After we receive notice of a change and all documents we require regarding the change, we may take a reasonable period of time to act on and implement the change to your account.

## Automatic Transfer Service

You may have funds transferred automatically from most Bank of America checking or savings accounts to another Bank of America checking or savings account or to pay a Bank of America loan or credit card account or safe deposit rental fee.

Federal regulation and this Agreement place limits on the number of automated transfers you may make from savings accounts each month. Please see *Limits on Withdrawals and Transfers from Savings Accounts". Certain other restrictions apply.

You must schedule transfers to pay a Bank of America loan for the due date each month. In most other cases, you may schedule transfers periodically on the dates and for the amounts that you specify. Transfers can only be made on a business day. If a scheduled transfer date falls on a weekend or bank holiday, we may make the transfer on the next business day. If we are unable to complete a transfer because you do not have enough available funds in your account, we may cancel this service.

## Check and Deposit Slip Forms

We offer checks, withdrawal forms and deposit slips in a number of styles and at various prices. We recommend that you use checks and other forms that we provide.

You are responsible for verifying the accuracy of all information on your checks and other forms, whether obtained through others or us. Our liability, if any, for any printing errors on checks or other forms obtained through us is limited to the cost of replacing the forms. We are not liable for any claims, costs, losses or damages you may incur when you use checks or other forms not obtained through us. Check deposits with a retired routing number will be returned unpaid.

We may refuse to accept checks or other forms that you create or someone else provides that do not meet our then current specifications, even if they met our specifications at the time they were initially drawn. You may obtain a copy of our printing specifications by calling the telephone number on your statement or asking your account representative. These specifications include

the magnetically encoded numbers, the size of the check and the weight, color and type of paper. If you create or obtain checks or other forms from someone else and our automated check processing systems are unable to read or process them, we may refuse to accept them and we may charge you a fee for each check or other item that we are unable to read or process through our automated systems.

## Check Copies

We generally keep a copy of each check we post to your account for seven years from the date the check posts to your account. We have no obligation to retain the original check. We typically keep the copies on microfilm or as a digital image. If a copy is unavailable or of poor quality, we are not liable to you for any claim, cost, loss or damage of any kind. After seven years, we may destroy the copies.

**Requesting Copies** You may request a copy of a canceled check by calling us at the number for customer service on your statement. To produce a copy, we need the account number, check number, exact amount of the check, and date the check was paid. This information is on your statement. Generally, we mail or make a copy available within seven business days. If we need more time, we will tell you. A fee may apply to each check copy. Please see the *Schedule of Fees* for your account.

If a check that you wrote was converted to an electronic debit, then the check was not sent to us for processing so we do not have a copy. We list these electronic debits on your account statement.

## Compliance

You agree to comply with applicable laws and regulations. You may not use your account or related services for any illegal transactions or activity, for example those prohibited by the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. Section 5361 et. seq. You agree to indemnify us from every action, proceeding, claim, loss, cost and expense (including attorney's fees) suffered or incurred by us due to any U.S. or foreign government entity seizing, freezing or otherwise asserting or causing us to assert control over any account or funds in an account of yours (or ours) when purportedly caused by, or arising out of, your action or inaction. This will apply whether or not such action is ultimately determined to be authorized under the laws of the U.S. or its territories, or of any foreign jurisdiction. We are not required to inquire or determine the authority of any action taken by the U.S. or foreign government entity prior to acceding to any legal process initiated by it.

Please note that your agreement to comply with applicable laws and regulations includes United States economic sanctions laws and regulations, including regulations issued by the Office of Foreign Assets Control (OFAC) of the U.S. Department of the Treasury, and Executive Orders issued by the President of the United States.

## Conflicting Demands and Disputes

We are not required to make payment from an account to a signer, a payee, a beneficiary of a trust account or Payable on Death (POD) account, or to any other person claiming an interest in any funds in the account:

- If we have actual knowledge of, or otherwise believe in good faith that there may be a bona fide dispute between the signers, beneficiaries, payees, or other persons concerning their rights to the account proceeds or

- If we are otherwise uncertain as to who is entitled to the account funds.

We may notify all signers, beneficiaries, payees, and other persons claiming an interest in the account of the dispute or uncertainty without liability to you.

We also may, at our option and without liability to you, take one or more of these actions:

- continue to rely on current signature cards and other account documents;
- honor the competing claim upon receipt of evidence we deem satisfactory to justify such claim;
- freeze all or part of the funds until the dispute is resolved to our satisfaction;
- close the account and distribute the account balance, subject to any bank claims, to each claimant payable jointly, or payable individually in equal shares to each claimant;
- pay the funds into an appropriate court for resolution; or
- refuse to disburse any funds in the account to any person until such time as: all persons claiming an interest in the account consent in writing to a resolution of the dispute; or a court of proper jurisdiction authorizes or directs the payment; or the person with a conflicting claim withdraws his or her claim in writing.

You are liable for all expenses and fees we incur, including attorneys' fees, and we may charge them to your account.

## Converting an Account

We may convert your account to another type of account, revoke privileges or close your account:

- if you make frequent transactions on a savings account;
- if your account frequently has debits against uncollected funds;
- if your account has excessive deposit activity;
- if you use a personal account for business purposes; or
- when we consider it appropriate or necessary to do so.

If we discontinue your type of account, we may convert your account to another type of account. We may also convert your account to another type of account based on our evaluation of how you use the account. If we convert your account, we will send you information about your new account.

## Cutoff Time for Receipt of Orders

Our cutoff time for receipt at a financial center of an order relating to your account is 10:00 a.m. local time or, if later, one hour after the financial center opens each business day. Orders include a stop payment order or postdating order, restraining order, writ of attachment or execution, levy, garnishment and any similar order.

The cutoff time relates to our obligation to pay or return checks and other items. If we receive an order before this cutoff time, we may review items presented for payment against your account on the previous business day to determine whether we need to return any of them to comply with the order. If we receive the order after the cutoff time, we may not review items presented on the previous business day.

For example, if you give us a stop payment order after our cutoff time and the item you want to stop was previously presented for payment or otherwise before we have the opportunity to act on your order, your order comes too late to stop payment on the item. Or, if we receive a levy before the cutoff time and you do not have enough funds in your account to cover both the levy and all items presented against your account the previous business day, we may return one or more items and apply the funds to the levy.

## Death or Incompetence

You agree to notify us promptly if any owner or authorized signer on your account dies or is declared incompetent by a court. Until we receive a notice of death or incompetency, we may act with respect to any account or service as if all owners, signers or other persons are alive and competent and we will not be liable for any actions or inactions taken on that basis.

If you give us instructions regarding your account, and you or another owner of the account subsequently dies or is declared incompetent, we may act on the instructions unless we receive written notice of death or incompetency prior to honoring such instructions.

When we receive a notice that an owner has died or been declared incompetent, we may place a hold on your account and refuse to accept deposits or permit withdrawals. We may hold any funds in your account until we know the identity of the successor.

If a deposit — including salary, pension, Social Security and Supplemental Security Income (SSI) — payable to the deceased owner is credited to the account after the date the deceased owner died, we may debit the account for the deposit and return it to the payer.

We may accept and comply with court orders, and take direction from court appointed personal representatives, guardians, or conservators from states other than where your account was opened or where the account, property or records are held. We reserve the right to require U.S. court documents for customers who reside outside of the U.S. at time of incompetence or death.

## Facsimile Signature

A facsimile signature can be a convenient method for signing or endorsing documents and other items. If you use a facsimile signature, you are responsible for any withdrawal from your account that bears or appears to us to bear a facsimile signature that resembles or purports to be the signature of a person authorized to withdraw funds. We will not be liable to you if use of the facsimile device (or similar device utilized to affix your signature) was unauthorized. You are responsible even if the size, or color of the facsimile signature is different from that of any signature previously presented to us. We may pay the withdrawal and may charge your account for it. You agree to reimburse us (and we may charge your account) for all claims, costs, losses and damages, including attorneys' fees, that result from our payment of a withdrawal bearing either a facsimile that resembles or purports to bear your signature or a facsimile that we believe you authorized.

## Deposit Bank Assessment

For some business accounts, Bank of America may, at our discretion, charge you a Deposit Bank Assessment on your average positive ledger balances. The assessment rate is variable and we may change it at any time without notice.

## Fingerprint

If a person to whom you gave your check asks us to cash the check, we may require them to place their fingerprint on the check. If they refuse to provide their fingerprint, we may refuse to cash the check. We have no liability to you for refusing to cash the check.

## "Freezing" Your Account

If we decide to close your account, we may freeze it. If we do this, we may in our discretion either accept or return deposits, checks and other items that we receive after we freeze your account without being liable to you.

If at any time we believe that your account may be subject to irregular, unauthorized, fraudulent or illegal activity, we may, in our discretion, freeze some or all of the funds in the account and in

other accounts you maintain with us, without any liability to you, until such time as we are able to complete our investigation of the account and transactions. If we do freeze your account funds, we will provide notice to you as soon as reasonably possible. Notice may be made by mail or verbally or provided by other means such as via Online Banking or text alerts as permitted by law or by updated balance information. We may not provide this notice to you prior to freezing the account if we believe that such notice could result in a security risk to us or to the owner of the funds in the account.

## Indemnification and Limitation of Liability

You agree to reimburse us for all claims, costs, losses and damages (including fees paid for collection) we may incur with respect to overdrafts or returned deposits in connection with your account.

We are not liable to you for errors that do not result in a financial loss to you. We may take any action authorized or permitted by this Agreement without being liable to you, even if such action causes you to incur fees, expenses or damages.

We are not liable to you for any claim, cost, loss or damage caused by an event that is beyond our reasonable control. In particular, we are not liable to you if circumstances beyond our reasonable control prevent us from, or delay us in, performing our obligations for a service, including acting on a payment order, crediting a funds transfer to your account, processing a transaction or crediting your account. Circumstances beyond our reasonable control include: a natural disaster; emergency conditions, such as fire, theft or labor dispute; a legal constraint or governmental action or inaction; the breakdown or failure of our equipment for any reason, including a loss of electric power; the breakdown of any private or common carrier communication or transmission facilities, any time-sharing supplier or any mail or courier service; the potential violation of any guideline, rule or regulation of any government authority; suspension of payments by another bank; or your act, omission, negligence or fault.

Except as prohibited by applicable law, we are not liable for special, incidental, exemplary, punitive or consequential losses or damages of any kind.

Our liability for a claim will be limited to the face value of an item or transaction improperly dishonored or paid or the actual value of any deposits not properly credited or withdrawals not properly debited.

You agree that the amount of any claim you have against us in connection with any account or transaction with us, whether brought as a warranty, negligence, wrongful dishonor or other action, is subject to reduction to the extent that: 1) negligence or failure to use reasonable care on your part, or on the part of any of your agents or employees, contributed to the loss which is the basis of your claim; and 2) damages could not be avoided by our use of ordinary care.

Any loss recovery you obtain from third parties on a particular claim will reduce the amount of any obligations we may have to you on that claim and you will immediately notify us of any such recovery. You agree to pursue all rights you may have under any insurance policy you maintain in connection with any loss and to provide us information regarding coverage. Our liability will be reduced by the amount of any insurance proceeds you receive or are entitled to receive in connection with the loss. If we reimburse you for a loss covered by insurance, you agree to assign us your rights under the insurance to the extent of your reimbursement.

## Legal Process – Subpoena and Levy

"Legal process" includes a writ of attachment, execution, garnishment, tax withholding order, levy, restraining order, subpoena, warrant, injunction, government agency request for information, search warrant, forfeiture or other similar order.

We may accept and comply with legal process: served in person, by mail, by facsimile transmission, or by other means; or served at locations other than the location where the account, property or records are held. You direct us not to contest the legal process. We may, but are not required to, send a notice to you of the legal process. We do not send a notice if we believe the law prohibits us from doing so.

We may hold and turn over funds or other property to the court or creditor as directed by the legal process, subject to our right of setoff and any security interest we have in the funds or other property. We do not pay interest on the funds during the period we hold them pursuant to legal process. If we hold or turn over funds, we may without any liability to you return checks and other items unpaid and refuse to permit withdrawals from your account. If the legal process applies to a time deposit account, we may charge the applicable early withdrawal penalty for funds taken from the time deposit.

We may charge your account a fee for each legal process. You agree to pay us for fees and expenses (including administrative expenses) that we incur in responding to any legal process related to your account, such as expenses for research and copying of documents. The fees and expenses may include attorneys' fees. We may deduct these fees and expenses from any of your accounts without prior notice to you.

If the legal process directs us to release information about one or more, but not all, accounts that are reported on a combined statement, we may release the entire combined statement, even though other accounts reported on the combined statement are not covered by the legal process. If the legal process requests information about one or more, but not all, account owners or signers, we may release information about all co-owners or signers on the account, even though some of the other co-owners or signers are not covered by the legal process.

We may produce documents held at, or provide access to property that is located in, any of our facilities or any facility operated by a third party on our behalf, even if the facility is not designated as the place to be searched in the legal process.

We have no liability to you if we accept and comply with legal process as provided in this section or by law.

## Multiple Signatures Not Required

We may act on the oral or written instructions of any one signer on the account. Each signer may make withdrawals, write checks, transfer funds, stop payments, obtain ancillary services (e.g., electronic fund transfer services or wire transfers), and otherwise give us instructions regarding your account. We may require written authorization for some actions.

We do not assume a duty to enforce multiple signature requirements that you may agree upon among yourselves. If you indicate on your checks or signature card or other account documents that more than one signature is required for withdrawal, this indication is for your own internal procedures and is not binding on us.

We may disregard any instructions to permit withdrawals only upon more than one signature with respect to checks, electronic fund transfers or other debit/withdrawal requests. We may pay out funds from your account if the check, item, or other withdrawal or transfer instruction is signed or approved by any one of the persons authorized to sign on the account. We are not liable to you if we do this.

## Notice of Withdrawal

Federal regulations require us to retain the right to require all savings and all NOW account depositors to give seven days' written notice before making a withdrawal. It is unlikely, however, that we would require this notice.

## Powers of Attorney/Appointment and Payment to Agents

You may decide to appoint someone to act for you as your agent or attorney-in-fact ("agent") under a power of attorney. Please note that the form must be satisfactory to us in our discretion and unless prohibited by law, we may refuse, with or without cause, to honor powers of attorney that you grant to others.

For our customers' convenience we have a banking power of attorney form, which is available at many of our financial centers. If your state has a statutory form power of attorney, we also generally accept that form. We may, however, accept any form that we believe was executed by you and act on instructions we receive under that form without any liability to you. You agree to reimburse us for all claims, costs, losses and damages that we incur in accepting and acting on any power of attorney form that we believe you executed.

We may pay funds deposited in your account to your agent or upon the order of your agent. When we accept a power of attorney, we may continue to recognize the authority of your agent to act on your behalf without question until we receive written notice of revocation from you or notice of your death or incapacity and have had a reasonable time to act upon it. We will not be liable for action in accordance with the most current documentation if we have not received such notice.

We may require a separate form for each agent and for each account for which you want to grant power of attorney. We may require your agent to present the original form and refuse to act on a copy. In some cases, we may require that your agent confirm in an affidavit that the power has not been revoked or terminated or that you register the power with the appropriate recording authorities. We may restrict the types or sizes of transactions we permit your agent to conduct.

The authority of your agent to receive payments, transact on or otherwise make changes to your account generally terminates with your death or incapacity, unless the document creating such agency provides, in accordance with applicable law, that the agent's powers continue in spite of your incapacity.

## Records

We may in our discretion retain records in any form including, without limit, paper, film, fiche, digitalized or other electronic medium. If we are not able to produce the original or a copy of your signature card or any other document relating to your account or service, our records (including our electronic records) will be deemed conclusive. If there is a discrepancy between your records and our records, our records will be deemed conclusive.

## Right of Setoff

We may take or setoff funds in any or all of your accounts with us and with our affiliates for direct, indirect and acquired obligations that you owe us, regardless of the source of funds in an account. This provision does not apply to IRA or tax-qualified retirement accounts, to consumer credit card obligations or where otherwise prohibited by law. Your accounts include both accounts you own individually and accounts you own jointly with others. Our setoff rights are in addition to other rights we have under this Agreement to take or charge funds in your account for obligations you owe us.

If the law imposes conditions or limits on our ability to take or setoff funds in your accounts, to the extent that you may do so by contract, you waive those conditions and limits and you authorize us to apply funds in any or all of your accounts with us and with our affiliates to obligations you owe us.

We may use funds held in your joint accounts to repay obligations on which any account owner is liable, whether jointly with another or individually. We may use funds held in your individual accounts to repay your obligations to us, whether owed by you individually or jointly with another, including; obligations owed by you arising out of another joint account of which you are a joint

owner, even if the obligations are not directly incurred by you; obligations on which you are secondarily liable; and any amounts for which we become liable to any governmental agency or department or any company as a result of recurring payments credited to any of your accounts after the death, legal incapacity or other termination of entitlement of the intended recipient of such funds. If you are a sole proprietor, we may charge any of your personal or business accounts.

If we take or setoff funds from a time deposit account, we may charge an early withdrawal penalty on the funds withdrawn.

We may take or setoff funds from your account before we pay checks or other items drawn on the account. We are not liable to you for dishonoring items where our action results in insufficient funds in your account to pay your checks and other items.

Some government payments may be protected from attachment, levy or other legal process under federal or state law. If such protections may apply, to the extent that you may do so by contract, you waive these protections and agree that we may take or setoff funds, including federal and state benefit payments, from your accounts to pay overdrafts, fees and other obligations you owe us.

This section does not limit or reduce our rights under applicable law to charge or setoff funds in your accounts with us for direct, indirect and acquired obligations you owe us.

## Sample of Your Signature

To determine the authenticity of your signature, we may refer to the signature card or to a check or other document upon which your signature appears. We may use an automated process to reproduce and retain your signature from a check upon which your signature appears.

If you create your own checks, or obtain them from someone else, and we cannot accurately verify your signature on a check by comparing it with a check that posted to your account, you are responsible for any losses that may result from our inability to use that check to verify your signature.

## Stop Payment Orders and Postdated Orders

**Acceptance of Stop Payment Orders** If we have not already paid a check or other item that is drawn on your account, then at your request and risk we may accept a stop payment order on it. If you request a stop payment on a check or other item in a financial center, we may require identification such as a Bank of America debit card with photo and a secondary form of identification. You may not stop payment on a point of sale transaction or an ATM withdrawal or transfer.

**Postdated Orders** If you write a postdated check (that is — you put a future date on the check), you may ask us not to pay the check before its date by giving us a stop payment order. Otherwise, we may pay it and deduct the amount from your account even if it is presented for payment before its date.

If we receive a postdated check that is subject to a stop payment order, we may return the check "payment stopped," "refer to maker," or with a similar designation.

**Placing A Stop Payment Order** We may accept a written or oral stop payment order from any person who has a right to withdraw funds from the account. We may require you to complete a form authorizing the order. You must give us sufficient notice and information so that we have a reasonable opportunity both to verify that the item is unpaid and to act on your request. We may charge you a fee for each stop payment order and each renewal of the order.

We use a computer system to identify items. Therefore, to place a stop payment order on a check or draft, we need specific information to process the request, such as the account number, the routing number, the name of the party to whom the item was made payable, the item number

and the exact amount of the item — in dollars and cents. If you give us the wrong amount (even one penny off) or the wrong item number, we may pay the item. We may also require the date of the item, the name of the person who signed or authorized the item, and the name of the party to whom the item was made payable. We may use only a portion of the required information to identify an item. Please see the *Additional Information about Stop Payments for Preauthorized (Recurring) Electronic Funds Transfers* section for information about how to stop those types of payments.

In some cases, we may pay an item even if an order is in effect. For example, if one of our financial centers, without notice of your request, pays a check that you have asked us to stop, we may still pay the check.

A stop payment order generally expires after twelve months. However, we may, in our sole discretion, elect to honor a stop payment order for a longer period of time without notice to you. If you want the order to continue after twelve months, you must ask us to renew the order. Each request for a renewal is treated as a new order. If you want the order to expire in less than twelve months, you must ask us to cancel the order on or after the date you want it to expire. We may accept a written or oral instruction to cancel the order. Your request to cancel the order is not effective until we have a reasonable opportunity to act on it. We cancel the order automatically when the account on which the item is drawn is closed. If the item is presented to us for payment after the stop payment order expires, we may pay the item.

If we pay an item subject to a valid and timely stop payment order, we may be liable to you if you had a legal right to stop payment and you establish that you suffered a loss because of the payment. Our liability, if any, is limited to the actual loss suffered, up to the amount of the item. You must prove the loss to our satisfaction. We are not liable to you for any special, incidental or consequential loss or damage of any kind.

**Additional Information about Stop Payments for Preauthorized (Recurring) Electronic Funds Transfers** If you have told us in advance to make regular payments out of your account (such as recurring debit transactions) or if you have authorized someone else to debit your account through the ACH system, you can stop these payments.

Here's how: Call us at 1.800.432.1000 or write us at Bank of America Customer Service, P.O. Box 25118, Tampa, FL 33622.

You must notify us in time to receive your request at least three business days before the payment order is scheduled to be made. If you call us to stop the payment, we may require you to confirm the request in writing. If you do not notify us in writing, we may remove the stop payment after 14 days. We may charge you a fee for each stop payment order you give.

Stop payment orders for preauthorized (recurring) payments do not expire without action on your part, including recurring debit card and ACH transactions. Should your debit card number change, please contact us to place a new stop payment on the transaction on your new card.

To place a stop payment order on an ACH debit, we may require you to provide your name and telephone number, the type of account (checking or savings), and the exact company name used by the sender of the ACH debit, and some of the other information listed under *Placing a Stop Payment Order*. You can obtain the company name used by your sender from your statement by looking at a prior ACH debit from this sender that posted to your account.

If you do not know the amount of the ACH debit, we may still be able to place the stop payment order based on the company name of the sender, but this may stop all ACH items from this sender. If you give us the wrong company name or if the sender changes the company name, we may pay the item.

To place a stop payment on other preauthorized (recurring) transactions, you must give us the identifying information we request. You may be able to give us a specific expiration date for certain stop payment orders if you choose to do so.

You must notify the payee that you have withdrawn your authorization for any preauthorized (recurring) transaction.

*Notice of Varying Amounts*

If these regular payments may vary in amount, the person you are going to pay will tell you, 10 days before each payment, when it will be made and how much it will be. You may choose instead to receive this type of notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.

*Liability for Failure to Stop Payment*

If you order us to stop a preauthorized payment three business days or more before the transfer is scheduled, and you have given us all of the information we requested, and we do not stop the payment, we will be liable for your losses or damages directly caused by our failure to stop the payment.

## Subaccounts

For regulatory accounting purposes, we may classify checking accounts as two subaccounts: a checking subaccount and a savings subaccount. For interest bearing checking accounts, we calculate and pay interest at the same rate and in the same way on both subaccounts. For non-interest bearing checking accounts, we do not pay interest on either subaccount. We may transfer funds between these subaccounts. We record the subaccounts and any transfers between them on our internal accounting records only. Otherwise, the subaccounts are subject to the same terms as the checking and savings accounts described in this Agreement.

## Unclaimed Property – Accounts Presumed Abandoned or Inactive

State and federal law and our policy govern when accounts are considered abandoned. The applicable state law is generally the state listed in the address for your account statement.

Your account is usually considered abandoned if you have not performed at least one of the following activities for the period of time specified in the applicable state's unclaimed property law: made a deposit or withdrawal, written to us about the account, or otherwise shown an interest in the account, such as asking us to keep the account active. You usually need to perform the activity. Therefore, bank charges and interest payments, and automatic deposits and withdrawals, are usually not considered activity.

We are required by the unclaimed property laws to turn over accounts considered abandoned to the applicable state. Before we turn over an abandoned account, we may send a notice to the address we currently show for the account statement. We may not send this notice if mail we previously sent to this address was returned. Unless prohibited by the applicable state law, we may charge to the account our costs and expenses of any notice, advertisement, payment and delivery of the account to the applicable state agency.

After we turn the funds over to the state, we have no further liability to you for the funds and you must apply to the appropriate state agency to reclaim your funds.

If we consider your account inactive, then (unless prohibited by federal law or the law of the state where we maintain your account) we may:

- charge dormant account fees on the account in addition to regular monthly maintenance and other fees,
- stop sending statements,

- if the account received interest, stop paying interest on the account; and

- refuse to pay items drawn on or payable out of the account.

If you re-establish contact with us, we do not have to reimburse you for these fees and we are not liable to you for any interest that would otherwise have accrued on your account.

## Verification of Transactions and Right to Reverse Transactions

Transactions, including those for which we provide a receipt, may be subject to subsequent verification and correction, though we reserve the right not to do so in every case. We do not verify a deposit at the teller window so the receipt that you receive at the time of your deposit is not evidence that your deposit has been verified. We may reverse or otherwise adjust any transaction (both credit and debit) that we believe we erroneously made to your account at any time without prior notice to you, if we opt to do so.

## Waiver, Severability, and Change of Law by Agreement

**Waiver** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. No delay in enforcing our rights will affect your obligation to pay us fees and other amounts you owe us under this Agreement. If we waive a provision of this Agreement, the waiver applies only in the specific instance in which we decide to waive the provision and not to future situations or other provisions regardless of how similar they may be.

**Severability** A determination that any part of this Agreement is invalid or unenforceable will not affect the remainder of this Agreement.

**Change of Law by Agreement** If any part of this Agreement is inconsistent with any applicable law, then to the extent the law can be amended or waived by contract, you and we agree that this Agreement governs and that the law is amended or waived by this Agreement.

# Electronic Banking Services

We offer a variety of electronic banking services for use with your deposit accounts. We describe some in this section and also provide certain disclosures that apply to use of an electronic banking service with personal deposit accounts. We provide separate agreements to you that govern the terms of some services, including separate agreements for ATM and debit cards and Online and Mobile Banking services. Please review the following provisions and the separate agreement for the service.

## Types of Electronic Banking Services

### ATM and Debit Cards

We may issue you an ATM or debit card (either is called a "card") and a personal identification number (PIN) when you open your account. The terms that govern this service are in a separate agreement that you receive with your card. Please review that agreement carefully.

There are daily dollar limits for withdrawals and purchases. We provide your card limits to you as part of the separate agreement for card amounts. We may occasionally decide not to issue a card or code to a customer. We may suspend or terminate a card or code at any time without cause or notice.

The following information is a summary of how you can use your card. Some of these uses may not be available with every card or at every ATM or other terminal.

**At ATMs** You can use your card with linked accounts at participating ATMs to withdraw cash, transfer funds, and find out balances. At most ATMs that are prominently branded with the Bank of America name and logo, you can also use your card and PIN with linked accounts to make deposits and make payments to qualifying Bank of America credit cards and loans.

**At participating merchants** You can use your card with linked accounts at participating merchants to purchase goods and services. Some merchants may also permit you to withdraw cash from your checking account while making a purchase.

**At participating financial institutions** You can use your card with linked accounts at participating financial institutions to obtain a cash withdrawal from a teller.

**Payments, Credits, and Transfers** You can send or receive electronic transfers from or to your accounts. We may do this by ACH (as a member of a national or local automated clearinghouse association) or other similar networks. Electronic transfers may take various forms, such as:

- Automatic electronic deposits to your account, such as payroll or benefits payments;

- Automatic one-time or repeating charges to your account for bill payments, sent by a merchant or other payee with your authorization. The merchant or payee may ask you for bank number and account information from your check or a canceled check to create these orders; and

- A "check conversion" transfer, where a merchant or other payee uses a check that you have written to create an electronic transfer from your account. The merchant may either keep the check you wrote or return it to you.

**Online and Mobile Banking** Online and Mobile Banking services are governed by a separate agreement. You receive the agreement for the service at the time you enroll. You can use these services with linked accounts to view your account information, make deposits, transfer funds between your accounts and to the accounts of others, pay qualifying loans or credit cards, and make payments from your account to third parties. You can enroll for these services on our website bankofamerica.com.

**Telephone Banking** You may use our automated customer service system with an Access ID or speak to a telephone banker to get your account information, transfer funds between your accounts with us, and pay qualifying loans or credit cards.

## Access ID

An Access ID is a numeric code which, when used with a separate PIN number or passcode (plus, in some circumstances, another piece of identifying information called a "verbal verification code"), enables consumer and small business customers to do the following through our automated telephone system or in person at a financial center:

- obtain information about deposit and credit accounts that are linked to the Access ID
- transfer funds and make payments between linked accounts, and
- obtain other services such as stop payments, check reorders, and copies of checks and statements

You may request an Access ID and related security codes by calling customer service or at any financial center. Please note that Access IDs may not be available to customers in all states. In some states, individual account numbers, combined with additional security codes, may be required to obtain account information and transact other business.

Two activity levels are available for most accounts linked to your Access ID:

(1) Inquiry: Allows you to obtain account balances and transaction information.
(2) Financial: Allows you to obtain account information, transfer funds among accounts linked to the Access ID, and obtain certain other banking services.

When you first choose your Access ID, and when you subsequently open any new accounts, we will link all your Bank of America accounts that are eligible, and assign the financial activity level to all accounts for which that activity level is available, unless you tell us otherwise. We may establish certain limits on the accounts that can be linked to your Access ID and that can have the financial activity level.

If you permit another person to use your Access ID or account number(s) and related code(s), you are responsible for all transactions conducted by that person (even if he or she exceeds your authorization), until you notify us that the person is no longer authorized so that we may block the codes and issue new ones.

You must review your periodic statements and promptly report to us any unauthorized funds transfers initiated through the use of your security codes or otherwise. You must also promptly notify us of any suspected loss or theft of your security codes. Failure to take these actions may affect the extent of your liability for any unauthorized transfers under federal banking regulations or other applicable laws.

**Small Business Access IDs** If you are a small business customer, to uniquely identify each person who initiates a request for banking services, you should establish a separate Access ID and related security codes for each person who you determine needs access to your accounts. Your authorization (whether express or implied) for any individual to establish an Access ID shall constitute your authorization for the bank to provide account information to such individual and (unless inquiry only access is selected) to transfer funds and conduct other banking transactions upon that person's request. Such authorization supersedes any resolution, signature card or other document filed with the bank that purports to limit authority over any of your accounts, whether currently on file or submitted or modified in the future, unless the Access ID authorization is expressly modified or revoked.

# Electronic Banking Disclosures

**Personal deposit accounts** Our *Personal Schedule of Fees* describes our personal deposit accounts. This *Electronic Banking Disclosures* section explains provisions that apply to electronic fund transfers to or from personal deposit accounts (sometimes referred to as "consumer deposit accounts").

These Transfers are governed by Regulation E, which implements the federal Electronic Fund Transfer Act. A personal deposit account is an account that is owned by a natural person and that is established primarily for personal, family, or household purposes.

**Business deposit accounts** Our *Business Schedule of Fees* describes our business deposit accounts. Business deposit accounts are accounts that are established primarily for business purposes.

When you open one of our business deposit accounts, you represent and agree to that you are establishing it primarily for business purposes. Provisions below that explain a consumer's liability for unauthorized transfers do not apply to business deposit accounts, although as a matter of practice we generally follow the error resolution procedures described in this *Electronic Banking Disclosures* section for business-purpose accounts. Please note that we are not required to follow these procedures for business accounts and that we may change our practice at any time without notice.

## Consumer's Liability for Unauthorized Transfers

Tell us AT ONCE if you believe your card or your personal identification number (PIN) or other code has been lost or stolen. Also, tell us AT ONCE if you believe that an electronic fund transfer has been made without your permission using information from your check. The best way to keep your possible losses down is to call us immediately.

Your losses could include all of the money in your account plus, if you have an overdraft protection plan linked to your account, any transfers from another account or any advances on a credit line.

If you tell us within two business days after you learn of the loss or theft of your card or code, you can lose no more than $50 if someone uses your card without your permission.

If you do NOT tell us within two business days after you learn of the loss or theft of your card or code, and we can prove we could have stopped someone from using your card or code without your permission if you had told us, you could lose as much as $500.

Also, if your statement shows transfers that you did not make, including those made by card, code or other means, tell us at once. If you do not tell us in writing within 60 days after the statement was mailed to you, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had told us in time. If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the time periods.

**Note:** *These liability rules are established by Regulation E, which does not apply to business deposit accounts. For personal deposit accounts, our liability policy regarding unauthorized debit card or ATM card transactions, and unauthorized Online Banking transactions may give you more protection, provided you report the transactions promptly. Please see the agreement you receive with your ATM or debit card and the Online Banking agreement.*

You should never write your PIN on your card or carry the PIN with you. This reduces the possibility of someone using your card without your permission if it is lost or stolen.

If you give, or make reasonably available, your card, PIN or other access device or code to anyone, you may be liable for any use made of such until you advise us that such person is not authorized to use them.

Also, the state law applicable to your account may give you more time to report an unauthorized transaction or may give you more protection. For example, in Massachusetts, the two day and 60 day time limits for reporting unauthorized transactions do not apply and the $500 limit does not apply.

**Contact in Event of Unauthorized Transfer; and Lost or Stolen Card, PIN or Other Code**

If you believe your card, PIN or other code is lost or stolen, or learned by an unauthorized person, or that someone has transferred or may transfer money from your account without your permission, notify us immediately by calling the number listed below.

*Telephone:* 1.800.432.1000

*You can also write to us at:* Bank of America, P.O. Box 53137, #7405, Phoenix, AZ 85072-3137

You should also call the number or write to the address listed above if you believe a transfer has been made using the information from your check without your permission.

If unauthorized activity occurs, you agree to cooperate during the investigation and to complete a Lost/Stolen Card and Fraud Claims Report or similar affidavit.

**Business Days** For purposes of these electronic banking disclosures, our business days are Monday through Friday. Weekends and bank holidays are not included.

**Documentation of Transfers**

*Receipts* You can usually get a receipt at the time you make any transfer to or from your account at an ATM or point of sale terminal. You may not get a receipt for small dollar transactions. Transactions may be verified by us though we reserve the right not to do so in every case, so the receipt is not final and our records will control if there is a conflict.

*Preauthorized Credits* If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you can call us at 1.800.432.1000 to find out whether or not the deposit has been made.

*Periodic Statements* We send you a monthly account statement unless there are no electronic fund transfers in a particular month. In any case, we send you a statement at least quarterly unless we consider your account inactive.

**Preauthorized Payments**

Please see the *Additional Information about Stop Payments for Preauthorized (Recurring) Electronic Funds Transfer* section in the *Stop Payment Orders and Postdated Orders* section of the Agreement.

**Liability for Failure to Make Transfers**

If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:

• If, through no fault of ours, you do not have enough money in your account to make the transfer.

• If the transfer would go over the credit limit on your overdraft line.

• If the ATM where you are making the transfer does not have enough cash.

• If the ATM, terminal or system was not working properly and you knew about the breakdown when you started the transfer.

• If circumstances beyond our control (such as power outages, equipment failures, fire or flood) prevent the transfer, despite reasonable precautions that we have taken.

• If the funds are subject to legal process or other encumbrance restricting the transfer.

• If we consider your account to be inactive or dormant.

• If your card or code has been revoked due to inactivity or at our discretion.

There may be other exceptions stated in our agreement with you or permitted by law.

**Confidentiality - Account Information Disclosure** We will disclose information to third parties about your account or transfers you make as stated in the *Information about You and Your Account* section near the front of this Agreement.

**Fees**

*ATM Fees* When you use an ATM that is not prominently branded with the Bank of America name and logo, you may be charged a fee by the ATM operator or any network used and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer. We may also charge you fees.

*Other Fees* For other fees that apply to electronic banking services, please review the *Schedule of Fees* for your account and each agreement or disclosure that we provide to you for the specific electronic banking service, including the separate agreement for Online and Mobile Banking services and the separate agreement for ATM and debit cards.

**In Case of Errors or Questions about your Electronic Transfers You May Sign into Online Banking to Report the Error Promptly, or** Call or write us at the telephone number or address below, as soon as you can, if you think your statement or receipt is wrong, or if you need more information about a transfer listed on the statement or receipt.

Call us at 1.800.432.1000 during normal Claims Department business hours or write us at Bank of America, P. O. Box 53137, #7405, Phoenix, AZ 85072-3137.

We must hear from you NO LATER than 60 days after we sent you the FIRST statement on which the error or problem appeared. Please provide us with the following:

• Tell us your name and account number;

• Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information;

• Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send your complaint or question in writing within 10 business days.

We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account.

For errors involving new accounts, point of sale, or foreign-initiated transactions, we may take up to 90 days (instead of 45) to investigate your complaint or question. For new accounts we may take up to 20 business days to credit your account for the amount you think is in error.

We will tell you the results within 3 business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation.

**Notice:** As part of the security system to help protect your card and PIN, we may use hidden cameras and other security devices to determine who is using a card at an ATM. You consent to this.

*Additional Information for Massachusetts customers:* Any documentation provided to you which indicates that an electronic fund transfer was made shall be admissible as evidence of the transfer and shall constitute prima facie proof that the transfer was made. And the initiation by you of certain electronic fund transfers from your account will effectively eliminate your ability to stop payment of the transfer. **UNLESS OTHERWISE PROVIDED IN THIS AGREEMENT, YOU MAY NOT STOP PAYMENT OF ELECTRONIC FUND TRANSFERS. THEREFORE, YOU SHOULD NOT EMPLOY ELECTRONIC ACCESS FOR PURCHASES OR SERVICES UNLESS YOU ARE SATISFIED THAT YOU WILL NOT NEED TO STOP PAYMENT.**

# ATM Safety Tips

The suggestions that follow offer some simple tips on protecting your card and PIN and exercising care when using an ATM.

## Protect Your ATM Card and Personal Identification Number (PIN)

- Always protect your card by keeping it in a safe place. If your card is lost or stolen, contact us immediately.
- Memorize your PIN. Do not write it on your card, keep it in your wallet or give it to anyone.
- If you choose your own PIN, avoid using numbers for your PIN that are easily identifiable (such as birth dates, telephone numbers, addresses, etc.)
- Never give information about your card or PIN over the telephone, email or the Internet, unless to a trusted merchant in a call or transaction initiated by you. If someone is asking for this information, refuse and immediately contact us.
- Carefully review your account statements and report any fraudulent transactions immediately.

## Be Aware of Your Surroundings at ATMs

- Be aware of people and your surroundings before, during and after you use an ATM, particularly at night. If you think it is unsafe, leave immediately and visit another ATM.
- If you must visit an ATM at night, take someone with you.
- When using an ATM with a door that requires card access, close the door completely upon entering and exiting and do not open the door to anyone you don't know.
- When you use a drive-up ATM, keep your engine running, doors locked and only the driver's window open during the transaction.
- The activity around Bank of America ATMs may be monitored or recorded by surveillance cameras.

## Protect Your Privacy

- Shield the key pad with your hand or body while entering your PIN at an ATM.
- Put your card and receipt away immediately after completing your transaction. Do not count your cash at the ATM.
- Do not leave your transaction record at the ATM. Keep your transaction record in a safe place, so you can compare it to your statement.

## Request Emergency Assistance

- If you need emergency assistance, call 911 from the nearest telephone. If you have a complaint about the security of a Bank of America ATM, call our Corporate Security Department at 1.800.222.7511.
- Report all crimes immediately to law enforcement. If you think you're being followed from an ATM, go to a busy area and immediately contact the police.

# Funds Transfer Services

The following provisions apply to funds transfers you send or receive through us, but do not apply to electronic fund transfers governed by Regulation E, Subpart A of the Consumer Financial Protection Bureau. We provide separate agreements to you that govern the terms of some funds transfer services, including separate agreements for Online and Mobile Banking, telephone transfers, and funds transfers in the financial centers. If you have a specific agreement with us for these services, these provisions supplement that agreement to the extent these provisions are not inconsistent with the specific agreement.

The Uniform Commercial Code includes provisions relating to funds transfers. These provisions define the following terms: funds transfer, payment order and beneficiary. These terms are used here as they are defined in Article 4A of the Uniform Commercial Code – Funds Transfers as adopted by the state whose law applies to the account for which the funds transfer service is provided. In general: A funds transfer is the process of carrying out payment orders that lead to paying a beneficiary. The payment order is the set of instructions given to us to transfer funds. The beneficiary is the person or business who receives the payment.

In addition, funds transfers sent outside of the United States that are initiated by consumers primarily for personal, family or household purposes are governed by federal law (Remittance Transfers) (see below). Effective as of the date set forth in the final rules implementing EFTA (defined below), federal law may provide rights with respect to Remittance Transfers that may vary in certain ways from the terms and conditions set forth herein. Your rights with respect to Remittance Transfers, including disclosure, error resolution and cancellation rights, will be explained to you contemporaneously with each Remittance Transfer transaction you initiate, either orally or in writing.

In general, your and our rights and obligations under this Agreement are governed by and interpreted according to federal law and the law of the state where your account is located. However, Remittance Transfers shall be governed by federal law and, as applicable, the law of the State of New York. Funds transfers to your account or funded from your account or otherwise funded by you may involve one or more funds transfer systems, including, without limitation, Fedwire or Clearing House Interbank Payments System (CHIPS). Accordingly, notwithstanding any choice of law that may be provided elsewhere in this agreement, such transfers will be governed by the rules of any funds transfer system through which the transfers are made, as amended from time to time, including, without limitation, Fedwire, the National Automated Clearing House Association, any regional association (each an "ACH"), and CHIPS. Funds transfers through Fedwire will be governed by, and subject to, Regulation J, Subpart B, and Uniform Commercial Code Article 4A incorporated by reference thereunder. Funds transfers through CHIPS are governed by, and subject to, CHIPS Rules and Administrative Procedures and by the laws of the State of New York, including Article 4A of the New York Uniform Commercial Code, regardless of whether the payment message is part of a transfer that is a Remittance Transfer, except that in the case of an inconsistency between New York law and EFTA, EFTA shall govern.

We may charge fees for sending or receiving a funds transfer. We may deduct our fees from your account or from the amount of the transfer. Other financial institutions involved in the funds transfer may also charge fees. For current fees, call us at the number for customer service on your statement or ask a financial center associate.

## Remittance Transfers

The Bank may execute certain payment orders for you known as Remittance Transfers. A Remittance Transfer is a wire transfer initiated by a consumer primarily for personal, family or household purposes to a designated recipient in a foreign country. Effective as of the date set forth in the final rules implementing EFTA (defined below), federal law may provide certain rights

and obligations related to Remittance Transfers that may differ from rights and obligations that apply to other types of payment orders, including disclosure, cancellation and error resolution rights. To the extent the provisions of this Agreement are inconsistent with the oral or written disclosures provided to you for a Remittance Transfer governed by section 919 of the Electronic Fund Transfer Act (EFTA), 15 U.S.C. section 1693o-1, the terms of the disclosures provided at the time of the Remittance Transfer shall govern. Notwithstanding anything to the contrary contained herein, rights and obligations that apply to Remittance Transfers are set forth in EFTA and, as applicable, as set forth in New York law.

## Sending Funds Transfers

You subscribe to certain services we offer or you may give us other instructions to pay money or have another bank pay money to a beneficiary. This *Sending Funds Transfers* section applies to wire transfers (excluding Remittance Transfers) and transfers we make between your Bank of America accounts. It does not apply to automated clearing house (ACH) system funds transfer services.

You may give us payment orders for ACH system funds transfers only if you have a separate agreement with us for those services.

**Cutoff Times for Payment Orders** We have cutoff times for processing payment orders. Cutoff times vary depending on the particular office of our bank and the type of payment order. We may treat payment orders we receive after a cutoff time as if received the next business day. We tell you our cutoff times upon request.

**Amending or Canceling Payment Orders** You may not amend or cancel a payment order after we receive it. If you ask us to do this, we may make a reasonable effort to act on your request. But we are not liable to you if, for any reason, a payment order is not amended or canceled. You agree to reimburse us for any costs, losses or damages that we incur in connection with your request to amend or cancel a payment order.

**Inconsistency of Name or Number** The beneficiary's bank may make payment to the beneficiary based solely on the account or other identifying number, even if the name on the payment order differs from the name on the account. We or an intermediary bank may send a payment order to an intermediary bank or beneficiary's bank based solely on the bank identifying number, even if the payment order indicates a different bank name.

**Sending Payment Orders** We may select any intermediary bank, funds transfer system or means of transmittal to send your payment orders. Our selection may differ from that indicated in your instructions.

**Notice of Rejection** We may reject payment orders. We notify you of any rejection orally, electronically or in writing. If we send written notices by mail, we do so by the end of the next business day.

We are not liable to you for the rejection or obligated to pay you interest for the period before you receive timely notice of rejection.

**Errors or Questions About Your Payment Orders** We notify you about certain funds transfers by listing them on your account statement. In some cases, we also may notify you electronically, in writing or by a report produced through one of our information reporting services.

You must notify us at once if you think a funds transfer shown on your statement or notice is incorrect. You must send us written notice, including a statement of relevant facts, no later than 14 days after the date you receive the first notice or statement on which the problem or error appears.

If you fail to notify us within this 14-day period, we are not liable for any loss of interest because of an unauthorized or erroneous debit or because your statement or notice is incorrect. We are not

required to compensate you, and we are not required to credit or adjust your account for any loss of interest or interest equivalent.

**Calculations** Unless otherwise provided by law, if we are obligated to pay for loss of interest that results from our error or delay regarding your payment order, we calculate compensation as follows. With an analyzed checking account, we credit the account to reflect the applicable value date or otherwise adjust the account under our account analysis procedure, to recalculate earnings credits for the period involved. With a non-analyzed, non-interest bearing account, we use a rate equal to the average of the Federal Funds rates set by the Federal Reserve Bank of New York, less a reserve factor. With a non-analyzed, interest bearing account, we use the rate applicable to the account. If we have a separate agreement with you specifying a different calculation method, we use that method instead.

## Receiving Funds Transfers

We may receive instructions to pay funds to your account. We may receive funds transfers directly from the sender, through a funds transfer system or through some other communications system. This includes wire transfers, ACH transfers that may be sent through an ACH system or processed directly to an account with us, and transfers between Bank of America accounts.

**ACH Provisional Payment Rule** Under ACH rules, funds transfers sent through an ACH are provisional and may be revoked prior to final settlement. You agree to these rules. If the funds transfer is revoked before final settlement, we may charge your account for the amount credited. The person who sent the payment order is considered not to have paid you. If this happens, we do not send a separate notice; we report the information on your account statement.

**Notice of Funds Transfer** We notify you that we have received funds transfers by listing them on your account statement. We provide statements to you by mail or through Online Banking if you selected paperless delivery through Online Banking for your deposit account documents. If you use one of our information reporting services, you may receive notice through that service.

We are not obligated to send you a separate notice of each incoming funds transfer. While we generally do not provide such separate notices, we may do so on occasion, in which case we send the notice within two business days after we credit your account.

We are not obligated to pay you interest for the period before you receive notice.

If you are expecting a funds transfer and want to find out if it has been credited to your account, call us at the number for customer service on your statement.

**Posting Your Customers' Payments** We credit to your account electronic payments (such as bill payments) that we receive from your customers. If you do not apply a payment to an account of your customer, you must promptly return the payment to us.

## ACH Debits and Credits

From time to time, originators may send automated clearing house (ACH) credits or debits for your account. For each ACH transaction, you agree that the transaction is subject to the National Automated Clearing House Association (NACHA) Operating Rules and any local ACH operating rules in effect. You agree that we may rely on the representations and warranties contained in these operating rules and either credit or debit your account, as instructed by the originator of the ACH transaction.

You should be careful about giving someone your account number to help prevent unauthorized transactions on your account. You must notify us immediately of unauthorized activity.

For information about stopping payment of an ACH transaction, see *Stop Payment Orders and Postdating Orders* in the *Other Terms and Services* section.

**Business deposit accounts** You acknowledge and agree that if you request us to transmit an ACH return transaction in connection with any problem, including a claim of erroneous or unauthorized ACH debit posted to your account, the related originating depository financial institution has no obligation to accept that return transaction if the return request is not made within the applicable time frame set forth in the NACHA Operating Rules. We will respond to your reported problem and attempt to pursue your request with the originating depository financial institution as long as you report the problem to us in writing within 60 days after the statement first reflecting the transaction was mailed to you; however, we do not guarantee that we will be able to recover your funds if you notify us of the problem beyond NACHA time frames. In some cases, depending on the facts, your claim may not be honored and you could incur a loss.

# Tax Information

Generally, we are required to report annually to you and to the Internal Revenue Service (IRS) interest payments that total $10 or more during the year on your deposit account with us. We may also be required to report this information to the appropriate state revenue authority.

When you open an account, we are required to obtain — and each U.S. citizen or resident alien must give us — a certified U.S. Taxpayer Identification Number (TIN) and information regarding your backup withholding status. When you apply for an account, you certify that you have provided the correct TIN for the account holder and the correct backup withholding status.

For individual accounts, the TIN is your Social Security Number (SSN). For individual accounts with more than one owner, we report taxpayer information for the person listed first in our records. Resident aliens who do not qualify for Social Security should provide their Individual Taxpayer Identification Number (ITIN). For other accounts, the TIN is the owner's Employer Identification Number (EIN). If you do not give us a certified name and TIN, if the IRS notifies us that the name and TIN you gave us is incorrect, or if the IRS notifies us that you failed to report all your interest and dividends on your tax return, we are required to backup withhold at the current backup withholding rate on interest paid to your account and pay it to the IRS. In some cases, a state and local tax authority may also require that we pay state and local backup withholding on interest paid to your account when we are required to pay backup withholding to the IRS. Backup withholding is not an additional tax. If you are subject to backup withholding, we are required to report to you and to the IRS regardless of the amount of the interest payment. You may claim amounts withheld and paid to the IRS as a credit on your federal income tax return.

If you are a certified nonresident alien individual, you are generally exempt from backup withholding on interest but may be subject to information reporting if you reside in a country in which we are required to report. If you are a certified foreign entity, you are generally exempt from backup withholding and information reporting for interest payments. Deposit interest income that is effectively connected with the conduct of a trade or business in the United States is subject to information reporting.

You must renew your status as an exempt foreign person or entity prior to the end of the third calendar year following the year in which you last certified your status. If you fail to renew your status by the last day of the fourth calendar year, your interest payments will be subject to backup withholding. If you become a U.S. citizen or resident after opening your account, you must notify us within 30 days and provide us with your certified name and TIN.

We comply with Foreign Account Tax Compliance Act (FATCA) as mandated by U.S. federal tax law. We will withhold on certain payments when required by such law.

For more information or to determine how this information applies to you, consult your U.S. tax advisor.

# Resolving Claims

If you and we are not able to resolve a claim ourselves, then you and we agree that the claim will be resolved as provided in this *Resolving Claims* section. This is a dispute resolution provision. Please read it carefully.

## What does "Claim" Mean?

Claim means any claim, dispute or controversy (whether under a statute, in contract, tort, or otherwise and whether for money damages, penalties or declaratory or equitable relief) by either you or us against the other, or against the employees or agents of the other, arising from or relating in any way to this deposit agreement (including any renewals, extensions or modifications) or the deposit relationship between us.

Claim does not include provisional or ancillary remedies from a court of competent jurisdiction, which either you or we may exercise without waiving the right to arbitration or reference.

## How Claims on Personal Accounts will be Resolved

You and we both agree that all Claims relating to a personal account will be resolved in court by a judge without a jury, as permitted by law.

## JURY TRIAL WAIVER FOR PERSONAL ACCOUNTS

**FOR PERSONAL ACCOUNTS, AS PERMITTED BY LAW, YOU AND WE AGREE AND UNDERSTAND THAT YOU AND WE ARE BOTH GIVING UP THE RIGHT TO TRIAL BY JURY. THIS IS A JURY TRIAL WAIVER.**

## How Claims on Business Accounts will be Resolved

You have the right to compel us at your option, and we have the right to compel you at our option, to resolve a Claim relating to a business account by binding arbitration. If neither you nor we decide to compel arbitration, then the Claim will be resolved in court by a judge without a jury, as permitted by law. There is an exception for Claims brought in a California state court. If a Claim relating to a business account is brought in a California state court, either you or we can seek to compel the other to have the Claim resolved by general reference to a judicial referee under California Code of Civil Procedure (C.C.P.) Section 638, as provided below. Both parties may also agree to resolve their disputes through judicial reference. The arbitration, judicial reference or trial by a judge will take place on an individual basis without resort to any form of class or representative action.

## CLASS ACTION AND JURY TRIAL WAIVER FOR BUSINESS ACCOUNTS

**FOR BUSINESS ACCOUNTS, YOU AND WE AGREE AND UNDERSTAND: (1) THAT YOU AND WE ARE BOTH GIVING UP THE RIGHT TO TRIAL BY JURY, AND (2) THAT THIS SECTION PRE-CLUDES YOU AND US FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION OR JOINING OR CONSOLIDATING CLAIMS OF OTHER PERSONS. THIS IS A CLASS ACTION WAIVER AND JURY TRIAL WAIVER.**

## Judicial Reference

A case sent to judicial reference is heard by a neutral individual (a "judicial referee"), but remains in the court system subject to the same rules of procedure, discovery and evidence and appeal as any court case. The judicial referee will be an active or retired judge or attorney with more than 10 years of experience, chosen by mutual agreement of you and us.

If you and we are unable to agree on a judicial referee, then the judicial referee will be appointed according to the procedure for appointment of a referee under California C.C.P. Section 640.

The judicial referee, sitting alone without a jury, will decide questions of law and fact and will resolve the Claim. This includes the applicability of this *Resolving Claims* section and the validity of the deposit agreement.

Judicial reference will be governed by California C.C.P. Section 638 et seq, and the judicial referee will determine all issues in accordance with federal California law and the California rules of evidence. The referee is empowered to provide all temporary or provisional remedies and rule on any motion that would be authorized in pretrial or trial proceedings in court, including motions for summary judgment or summary adjudication. The award that results from the decision of the referee will be entered as a judgment in the court that appointed the referee, in accordance with the provisions of California C.C.P. Sections 644(a) and 645. You and we both reserve the right to seek appellate review of any judgment or order to the same extent permitted in a court of law.

## Arbitration

This section on arbitration applies to business accounts and is subject to the provisions of the *Limitation and Non-Severability* section below.

Arbitration is a method of resolving disputes in front of one or more neutral individuals, instead of having a trial in court in front of a judge and/or jury. The arbitrator will be an active or retired judge or attorney with more than 10 years of experience, chosen by mutual agreement of you and us.

If you and we are unable to agree on an arbitrator, then you agree to choose one of the following Administrators within 10 days of our written notice that an agreement cannot be reached.

- JAMS Resolution Center
  1920 Main St., Suite 300
  Irvine, CA 92614
  www.jamsadr.com
  (800) 352-5267

- American Arbitration Association ("AAA")
  1633 Broadway, 10th Floor
  New York, NY 10019
  www.adr.org
  (212) 716-5800

If you do not choose the Administrator on a timely basis, we will select the Administrator and the Administrator will select the arbitrator using the Administrator's rules. If an Administrator cannot hear or refuses to hear the arbitration, then the arbitration will be handled by the alternative Administrator.

The arbitrator, sitting alone without a jury, will decide questions of law and fact and will resolve the Claim. This includes the applicability of this *Resolving Claims* section and the validity of the deposit agreement, except that the arbitrator may not decide or resolve any Claim challenging the validity of the class action and jury trial waiver. The validity of the class action and jury trial waiver will be decided only by a judicial referee or a court.

After a decision is given by an arbitrator, and where the amount of the Claim exceeds $200,000, either you or we can appeal the arbitrator's decision to another arbitrator. If the amount of the Claim exceeds $1,000,000, either you or we can appeal the arbitrator's decision to a panel of three arbitrators. No decision may be appealed under this paragraph, unless the arbitrator that heard the matter first makes a finding that the Claim could reasonably have exceeded either $200,000 or $1,000,000. Any arbitrator who hears an appeal under this paragraph will be selected according to the rules of the Administrator.

The arbitration of any matter involves interstate commerce and is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (the "FAA"). The arbitrator will follow applicable substantive law to the extent consistent with the FAA. The arbitrator will give effect to the applicable statutes

of limitation and will dismiss barred claims. Arbitrations will be governed by the rules of the Administrator to the extent those rules do not conflict with this *Resolving Claims* section. In addition, you or we may submit a written request to the arbitrator to expand the scope of discovery normally allowable. At the timely request of either you or us, the arbitrator must provide a brief written explanation of the basis for the award.

Judgment upon the award given by the arbitrator may be entered in any court having jurisdiction. The arbitrator's decision is final and binding, except for any right of appeal provided by the FAA or under this Agreement.

## Limitation and Non-Severability

**For both personal and business accounts.** Regardless of anything else in this *Resolving Claims* section, you and we both acknowledge and agree that the validity and effect of the class action and jury trial waiver for business accounts and the jury trial waiver for personal accounts may be determined only by a court or judicial referee and not by an arbitrator. You and we both have the right to appeal the limitation or invalidation of the waiver.

**For business accounts.** Regardless of anything else in this *Resolving Claims* section, you and we both acknowledge and agree that the class action and jury trial waiver is material and essential to the arbitration of any disputes between you and us and is non-severable from the agreement to arbitrate Claims. If the class action and jury trial waiver is limited, voided or found unenforceable, then the agreement to arbitrate (except for this sentence) will be null and void with respect to such proceeding and this *Resolving Claims* section will be read as if the provisions regarding arbitration were not present. You and we both have the right to appeal the limitation or invalidation of the class action and jury trial waiver. You and we acknowledge and agree that under no circumstances will a class action be arbitrated.

## Rules of Interpretation

Except as provided in the *Limitation and Non-Severability* section above, if any portion of this *Resolving Claims* section is determined to be invalid or unenforceable, it will not invalidate the remaining portions of this section. If there is a conflict or inconsistency between this *Resolving Claims* section and other terms of this deposit agreement or the applicable rules of the Administrator, this *Resolving Claims* section will govern. If there is any conflict between this *Resolving Claims* section and any other dispute provision (whether it be for arbitration, reference or any other form of dispute resolution), this *Resolving Claims* section will prevail for Claims arising out of this deposit agreement or transactions contemplated by this deposit agreement.

## Jurisdiction and Venue

Any action or proceeding regarding your account or this deposit agreement must be brought in the state in which the financial center that maintains your account is located. You submit to the personal jurisdiction of that state. Note that any action or proceeding will be governed by and interpreted in accordance with the *Governing Law* section of this agreement.

If a Claim is submitted to arbitration and the state where that financial center is located is not reasonably convenient for you, then you and we will attempt to agree on another location. If you and we are unable to agree on another location, then the location will be determined by the Administrator or arbitrator.

# EXHIBIT 2



2300114

O'NEILL BRAGG & STAFFIN CUS
ESCROW ACCOUNT
ATTORNEY TRUST ACCOUNT
SUITE 500
531 PLYMOTH ROAD
PLYMOUTH MEETING, PA 19462



Important updates to your
analyzed business accounts.

June 3, 2005

A little over a year ago when we expanded in communities throughout the Northeast, we made a promise: with the change in name to Bank of America comes a dedication to higher standards. We look forward to offering you more banking flexibility and the financial resources to meet your company's needs.

This summer, as we integrate many of our banking networks, you will have the benefit of unmatched financial expertise and convenience. As always, we want to keep you informed about updates to your accounts and services that may impact your banking relationship with us. Most updates included in this letter will be effective by July 22, 2005, with some beginning shortly before then.

**Please review the enclosed pages carefully.** You will find an Account Updates summary with details about updates to analyzed business deposit accounts and the dates they will apply. For your convenience, we have also included a Checklist of items that need your special attention. If you have other accounts not mentioned within this mailing, such as business loans or personal accounts, please watch for additional information under separate cover.

**The success of your business is something we take seriously.** We are committed to listening to you and understanding your needs. That is why you will continue to have a team of business professionals who can help you with everything from simplifying vendor payments to accelerating receivables and getting the funds to revamp your technology infrastructure. And as we move forward, we will keep you informed of any new services and products available to you.

**We are here for you.** Your banking representatives are available to respond to your questions and to make sure that the updates are completed as smoothly as possible. If you need assistance, please contact us or call Global Client Services at **1.866.735.9202** between the hours of 8 a.m. and 5 p.m. Eastern, Monday through Friday.

Thank you for banking with us. We value your business and we are here to support your company's success, now and in the future.

Sincerely,

*Gene Taylor*

Gene Taylor
President, Global Business and Financial Services

---

Inside this
package you
will find:

- Details of how
  the transition
  will affect
  your accounts

- Account
  agreements

For questions
about the merger
or this mailing:

- Contact your
  banking
  representatives
  or call us at
  1.866.735.9202

Look for this
arrow for items
that need
your special
attention.

BLHA

2ACM1D

Codes:
   LT: 2ACM1D
   PM: A10120
   SM: ANLDP@
   TM: TMSWIR
   CL: CTA029



Bank of America, N.A. and Fleet National Bank intend to merge on June 13, 2005. After these banks merge, the deposits at each bank will continue to be separately insured by the FDIC for six months. After that six-month period ends on December 13, 2005, all Bank of America, N.A. and Fleet National Bank deposits will be counted together for the purposes of applying FDIC insurance limits.

If you have CDs that were opened or renewed before June 13, 2005, they will continue to be separately insured until maturity. If you have CD accounts that mature between June 13, 2005, and December 13, 2005, and renew for the same amount and term (with or without accrued interest), separate FDIC coverage continues until the maturity date of the renewed term. For CDs that mature before December 13, 2005, and do not renew for the same amount and term, separate FDIC coverage will end on December 13, 2005. Please do not hesitate to contact us should you need further clarification.

Fleet National Bank, a Bank of America company.   Member FDIC.  ☎ Equal Housing Lender
© 2005 Bank of America Corporation. All rights reserved.

BLBC

Account Updates

Below you will find a complete listing of all of the updates to your accounts and services. Since all of this information is important, please read through everything carefully. These updates will be effective by July 22, 2005, unless otherwise indicated.

 Please carefully review any items marked with an arrow, as they may require special attention on your part

If you have any questions regarding this information, please do not hesitate to contact us using the phone number listed on your letter.

As always, we will keep you informed about anything that may impact your banking relationship with us. This mailing reflects the specific account information we had on record as of March 17, 2005. If you have other account relationships not mentioned within this mailing, such as personal banking accounts or loan accounts, you will receive additional information under a separate cover.

If you have additional checking, savings or Certificate of Deposit accounts in Florida, Maine, Massachusetts, New Hampshire or Rhode Island, you should have received a separate letter in early May about those accounts.

## Checking Account Updates

| Your Current Product Name & Account Number<br>(Account information as of March 17, 2005) | Your Product Name & Account Number<br>as of July 22, 2005 |
|---|---|
| Escrow Control Attorney<br>xxxxxx1003 | Full Analysis Business Checking<br>00xxxxxx1003 |

Your account will have a new name — Full Analysis Business Checking.

Pricing updates:
- Your Escrow Management Service account will continue to be free of service charges.

Statement updates:
- You will continue to receive Escrow Management Service statements.

Additional information:
- Your Escrow Management Service account will continue to operate as it does today.
- Your account will retain its existing Escrow product type within the Escrow Management System database.
- Your account will continue to be serviced by Escrow Management Customer Service in Scranton, PA.

# Analyzed Deposit Account Updates

Below you will find updates to your analyzed business deposit accounts. Each section is clearly labeled so you can identify the updates that are most pertinent to your business accounts. If you need further information, please contact your banking representative.

## Account numbers, billing and effective dates:

- Your checking and savings account numbers will remain the same, with the exception of added leading zeros, updating them to 12 digits. You can continue using your checks, and you do not need to do anything as a result of this change. The leading zeros will be added to your account number when you reorder checks. Your automatic debits and credits will continue without any interruption.
- Updates to your analyzed deposit accounts will be effective as of July 22, 2005.
- Changes to your balance calculations and method of billing will be effective as of July 1, 2005. You will see these in the first demand deposit and account analysis statements you receive on or after July 22, 2005.

## Important updates to your statements:

- Checking account statements will begin to reflect transaction activity by category, rather than by date posted. To help you understand the changes in your checking and savings account statements, you will receive a *How to Read Your New Analyzed Business Deposit Account Statement* insert in the first statement dated on or after July 22, 2005.
- If statements are returned due to an "unknown address," they will be suppressed after the first occurrence.
- There may be expanded descriptions for ACH transactions on your checking and savings account statements.
- Checking account statements may not include location numbers for all checking account deposits. If you wish to maintain this detail, please contact your banking representative.
- If you currently have summarized debits posting to your deposit statement and you are not using Account Reconciliation services, you will begin to see individual checks posting. Please contact your banking representative for information on Account Reconciliation if you are interested in these services.

## Important updates regarding returns:

- Due to multiple return-item processing sites, you may receive more than one return-item debit advice per day.
- Returned items will now be consolidated and debited for the total of each advice produced, rather than individually debited to your checking account. If you require individual debits, you can request this as a special-instructions option for your account.
- If any large-dollar items are returned, you may receive a letter of notification.
- You will receive a new format for your return-item advice, but the information it contains will be the same.

## Important information regarding funds availability:

- Our general policy is to make funds from deposited checks available to you no later than the first business day after the day we receive your deposit. If we need to delay the availability of a deposit made with a teller, we will usually inform you at the time of the transaction. For details and other changes to our funds availability policy, see the section entitled "When Funds Are Available For Withdrawal" in the enclosed *Deposit Agreement and Disclosures* booklet.

## Other important deposit account updates:

- You can now receive image services without subscribing to Account Reconciliation services. You can also request daily, weekly or monthly file transmissions of images and receive images of deposit slips on CD-ROM or bulk-file transmissions. Please contact your banking representative for more information on these services.
- Currency and coin deposits will now be charged per $100. Currency orders will now be charged per $100. Coin orders will continue to be charged per roll or per box.
- Per-item and daily aggregate check-cashing limits will no longer apply to checks presented in our banking centers. Checks presented will be cashed in accordance with banking center check-cashing procedures.
- As you run low on existing pre-encoded deposit supplies (batch tickets, batch headers, error correction labels, document carriers, etc.), you can order more by contacting your banking representative. There may be fees associated with these supplies. Please allow six weeks for processing of all orders.

# Analyzed Deposit Account Updates (continued)

**Information on settling disputes:**
- Effective July 22, 2005, your accounts will be bound by a new deposit agreement. We have enclosed a new *Deposit Agreement and Disclosures* booklet. Please read it carefully. In the *Deposit Agreement and Disclosures* booklet, you will find information about how disputes between you and the bank can be resolved by arbitration or judicial reference. Either one of us may elect to resolve disputes without a jury trial and without participating in any form of class action.

**Scheduled transfers updates:**
Please review the following updates for scheduled transfers that have been set up between deposit accounts at Bank of America. These updates do not include those transfers you have set up directly through Small Business Online Banking or ACH (transfers to/from accounts not at Bank of America):
- You will have the option to set up scheduled transfers on a daily, weekly, monthly or quarterly basis.
- Please review your scheduled transfers. You will have the option to make a maximum of eight scheduled transfers per month, per account. If you have nine or more, please contact us.
- Bank of America transfers will be processed even if sufficient funds are not available. Please note that overdraft fees will not apply.

**Combined statement updates:**
- If you have accounts in Florida, after June 17, 2005, these accounts will no longer be available on a combined statement. Each business account in Florida will receive an individual statement.
- Personal and business accounts will no longer be included in a single combined statement. Instead, you will receive separate combined statements for your personal and business accounts.

**Master Funds Account updates:**
- Customers who currently initiate funds transfers through the Master Funds Servicing Department will now initiate such transfers through a banking center.
- The format for Master Funds Account statements will appear more consolidated and will no longer include page breaks between sub-account descriptions.
- The enclosed *Deposit Agreement and Disclosures* booklet now replaces the *Master Funds Account Service Agreement and Service Guide*.

**Overdraft Protection service updates:**
- For additional convenience, beginning July 22, 2005, you will be able to use your Bank of America credit card for Overdraft Protection service.
- Beginning on July 22, 2005, all Overdraft Protection transfers will be made in increments of $100 when funds are available. If sufficient funds are not available, the remaining available balance in the funding account will be transferred.

We recognize the importance of having the peace of mind provided by your Overdraft Protection service. In May, you may have received a letter regarding ineligible Overdraft Protection accounts. If any of the following situations apply to your accounts, please contact us before July 22, 2005, for assistance.
- If you have an account that is currently both a provider and receiver of overdraft protection, this account will no longer be able to support both actions. Bank of America will attempt to preserve the ability of your account to provide overdraft protection to an eligible recipient. If this is not possible, then your account may continue to be able to receive overdraft protection, if eligible and if provided by an eligible account. Please call if you'd like to discuss other options that may better suit your needs.
- A checking account can no longer be used as the overdraft funding source for another checking account. You may use a savings account, line of credit account, or credit card as an Overdraft Protection funding source.
- Funding for Overdraft Protection must now come from a single source. If your funding currently comes from multiple sources such as a savings account and a Cash Reserve creditline, only your first eligible funding source will be used for Overdraft Protection.
- Please note that business accounts will no longer be linked to personal accounts to receive or provide funds for Overdraft Protection.

## Analyzed Deposit Account Updates (continued)

**Account Analysis updates:**

Listed below are some Account Analysis updates. They are organized by section, so you can easily review them.

**Important information about fee updates and schedules:**
- The Reserve Requirement is the portion of your balances that is maintained with the Federal Reserve. Reserves are calculated using your average positive collected balance, multiplied by the current reserve rate (10%) as established by the Federal Reserve.
- A per-item insufficient funds fee for ledger overdrafts will be assessed for each item whether the item is returned or paid.
- Collected overdraft interest charges will be based on a 360-day year. The standard rate is based on the average Bank of America prime rate for the effective month plus 3%.
- Account Analysis charges will be debited to the designated billing demand deposit account on the 15th of the month or the next business day if the 15th falls on a non-business day.
- The FDIC fee and Financing Corporation (FICO) assessments will now be charged monthly through Account Analysis and will be based upon the ledger balance on the last day of the month. The FDIC assessment may include deposit insurance charges, FICO assessments and other charges permitted by law. This pass-through charge can be offset with an earnings credit on eligible collected balances.

**Important statement information:**
- If you receive an Account Analysis statement, you will notice a new statement format providing additional detail for your convenience. *A Guide to Reading Your Account Analysis Statement* will be included in the first statement you receive dated on or after July 22, 2005, that illustrates these updates.
- Charges that cannot be offset by an earnings credit in an Account Analysis relationship will be debited from your designated accounts according to your regular statement frequency and settlement method.
- The year-to-date Account Analysis statement option will no longer be offered.
- The Account Analysis statements will not list daily collected balances. However, daily collected balances are available on Information Reporting.

**Other important information regarding your account:**
- The Cash Vault billing cycle will change from a calendar month to a 25th-of-the-month cutoff.
- We are updating our banking networks in two phases. If you have analyzed accounts in Connecticut, New Jersey, New York or Pennsylvania that are currently combined in an Account Analysis relationship with analyzed accounts in Florida, Massachusetts, Maine, New Hampshire or Rhode Island, these will split apart temporarily. In June, you will receive separate Account Analysis statements for individual accounts, though your service charge billing will continue to be combined. When you receive your July Account Analysis statement in August, the grouping of your analyzed deposit accounts will be as they were prior to June. You will receive more information in a separate mailing.

Treasury Management Services Updates

## Wire Services Updates

 For all wire transfer activity, there will be a new ABA number to use: 026009593. This new number will not affect information reporting, ACH transactions (including direct deposits and similar services), or checks and deposit tickets. Please notify your trading partners about using this new ABA number when sending wire payments to your bank accounts.

- The CHIPS Identifier will change to 0959.
- For added security, Inbound Domestic Drawdown Requests will be honored only on accounts that have debit authority on file.
- You can now enjoy a new Voice Response Unit for wire confirmation. The number for this service is 1.800.577.WIRE.

## Your Checklist

Below you will find a helpful summary of the accounts or services that need your attention before July 22, 2005. Any items marked with an arrow require some action on your part, so be sure to read these carefully. Please refer to the prior pages for more detailed information about all of the updates to your accounts.

 **Wire Services**

☐ For all wire transfer activity, there will be a new ABA number to use: 026009593. This new number will not affect information reporting, ACH transactions (including direct deposits and similar services) or checks and deposit tickets. Please notify your trading partners about using this new ABA number when sending wire payments to your bank accounts.

0216-2300114-005-005-0008850-D07751-00

# EXHIBIT 3



# SUMMIT BANK

Member FDIC

## ESCROW CONTROL ACCOUNT AGREEMENT

**1. ESCROW CONTROL ACCOUNT.** The depositor named below (the "Depositor"), in its capacity as trustee, escrow agent or other fiduciary, hereby designates Summit Bank (the "Bank") as depository for the receipt of funds held by the Depositor in a fiduciary capacity and establishes a master escrow control account (the "Account") for the deposit of such funds. The Account shall consist of a demand account broken down into individual subaccounts for recordkeeping purposes and individual insured money market accounts (the "Subaccounts"). Funds which are to be deposited in interest-bearing accounts shall be deposited in the insured money market accounts and funds which are to be deposited in noninterest-bearing accounts shall be deposited in the demand account.

**2. DEPOSITS.** Deposits to the Account may be made only when accompanied by a deposit slip in the form prescribed by the Bank and such other documents as the Bank may require. Each deposit slip must include the name, address, tax identification number and individual account number of the person on whose behalf the funds are being held, shall indicate whether the funds are to be interest-bearing or noninterest-bearing and, in the case of the initial deposit, must be accompanied by a properly completed substitute Form W-9, Request for Taxpayer Identification Number and Certification, in the form prescribed by the Bank. The Depositor agrees to use its best efforts to insure that the information provided in substitute Form W-9 is correct and that the form has been properly executed. In receiving any check or other item for deposit or collection, the Bank will process the item in order to collect payment; the Bank will not, however, become the owner of the item. In processing the item, the Bank will not be responsible beyond the exercise of ordinary care. All items are credited subject to the Bank's receipt of final payment of the item. If the Bank receives any item payable to the Depositor with a missing endorsement, the Bank may supply the missing endorsement and deposit the item in the Account. Items will be handled in accordance with customary banking practice. Any item received by the Bank after its regular closing hour will be considered to have been received by it on the following business day. In its discretion, the Bank may refuse to accept a deposit, may return a deposit and may close the Account.

**3. WITHDRAWALS AND TRANSFERS.** Withdrawals from the Account may be made by check or other form prescribed by the Bank. Each such check or other form shall include the name and individual account number of the person on whose behalf the funds are being held. The Depositor must maintain a sufficient balance of available funds in each Subaccount to cover all checks written on the Subaccount. An item which has been deposited shall not be considered available until it has been finally paid to the Bank. If a check is presented to the Bank at a time when there is an insufficient balance of available funds in the Subaccount, the Bank, in its discretion, may pay the check or return the check and, in either event, charge the Depositor a service charge. Each check written on an individual insured money market account shall be considered a direction by the Depositor to transfer funds from the insured money market account to the demand deposit account and to make payment from the demand deposit account in accordance with the terms of the check. The Depositor will be permitted 6 such transfers from each individual insured money market account each month, of which no more than 3 may be third-party drafts. The Bank reserves the right to impose a penalty if the Depositor seeks to exceed this limitation. There shall be no limitation on transfers made in person or by mail. However, transfers made by telephone will be subject to the 6-transfer limitation. The Bank will automatically transfer the entire balance in an individual insured money market account to the demand deposit account if the Depositor directs it to close the individual insured money market account. Checks which are received by the Bank after the account has been closed will be considered to have been written on the demand deposit account. The Bank reserves the right to require 7 days written notice of the Depositor's intention to transfer funds from an individual insured money market account. Payment by the Bank without requiring the 7 days notice will not constitute a waiver by the Bank of its right to require such notice.

**4. STOP PAYMENT.** The Depositor may direct the Bank to stop payment of any check, draft or direction to transfer funds orally or in writing. An oral direction must be confirmed in writing within **14** days. Otherwise it will expire. A written direction to stop payment will be effective for **6** months, unless renewed in writing.

**5. INTEREST.** No interest will be payable on amounts on deposit in the demand deposit account. Individual insured money market accounts will bear interest at the rates, at the intervals and on such other terms as the Bank may determine from time to time.

**6. SERVICE CHARGES.** The Bank may impose charges for services performed with respect to the Account in such amounts and on such other terms as are determined by the Bank from time to time.

**7. STATEMENTS.** The Bank will provide the Depositor with a monthly master Account statement and individual Subaccount statements containing a record of all transactions in the Account during the period covered by the statement. The Depositor agrees to examine the statements and any checks or other items promptly upon receipt and to notify the Bank immediately if it discovers any errors or unauthorized transactions.

**8. POSTDATED AND CONDITIONAL CHECKS.** The Depositor agrees not to postdate any check or to place a condition for payment on any check. If a check is presented to the Bank for payment before its date or before a condition placed on the check has been met, the Bank, in its discretion, may pay the check or return it unpaid.

**9. BANKING HOURS.** The Bank will be open for business during hours that are determined by the Bank from time to time.

**10. CHANGE IN ADDRESS.** The Depositor agrees to notify the Bank promptly in writing of any change in address.

**11. INDEMNITY.** If the Depositor requests the Bank to follow instructions that, in the judgment of the Bank, expose it to potential liability under the law, the Bank may refuse to follow such instructions or may require adequate security to protect it from all loss and expense incurred in following such instructions.

**12. LIABILITY.** The Bank shall not be liable to the Depositor for any loss or expense incurred by the Depositor with respect to the Account or this Agreement unless such loss or expense is directly attributable to the gross negligence or willful misconduct of the Bank. In no event shall the Bank be liable to the Depositor for consequential damages.

**13. AMENDMENT.** The Bank may amend this Agreement, may adopt rules and regulations governing the Account and may change service charges imposed pursuant to this Agreement, at any time and in its sole discretion. Each such action will be binding upon the Depositor upon the posting of a notice at the main office of the Bank or upon the mailing of a notice to the Depositor.

**14. WAIVER.** Any waiver by the Bank of any provision of this Agreement on any occasion will not constitute a waiver of the same or any other provisions on any other occasion.

**15. CONTINUING EFFECT.** If any provision of this Agreement is determined by a court of law or other governmental authority to be invalid, the remaining provisions of the Agreement shall continue in effect.

**16. TERMINATION.** This Agreement may be terminated by either party at any time.

Dated: _____

Name of Depositor _____

Authorized Signature of Depositor _____

# EXHIBIT 4

## Mel Staffin

| | |
|---|---|
| **From:** | Mel Staffin |
| **Sent:** | Wednesday, December 06, 2017 5:11 PM |
| **To:** | Gary Bragg |
| **Subject:** | RE: Funding for Midtown Resources |

Me too

Mel Staffin, Esquire
O'Neill, Bragg & Staffin, P.C.
720 Johnsville Blvd., Suite 1220
Warminster, PA 18974
Phone 215.956.2800
Fax 215.956.2838
E-mail: mstaffin@obs-law.com

NOTICE: This e-mail message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by replying to this message or calling O'Neill, Bragg & Staffin, P.C. at (215) 956-2800, and please delete it from your computer.

PLEASE NOTE that all incoming e-mails will be automatically scanned by us to eliminate unsolicited promotional e-mails ("spam"). This could result in deletion of a legitimate e-mail before it is read by its intended recipient at our firm. Please tell us if you have any concerns about this automatic filtering.

Any Federal tax advice contained herein is not intended or written to be used, and cannot be used by you or any other person, for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Code. This disclosure is made in accordance with the rules of Treasury Department Circular 230 governing standards of practice before the Internal Revenue Service. Any written statement contained herein relating to any Federal tax transaction or matter may not be used by any person without the express prior written permission in each instance of an officer of this firm to support the promotion or marketing of or to recommend any Federal tax transaction(s) or matter(s) addressed herein.

**From:** Gary Bragg
**Sent:** Wednesday, December 06, 2017 5:10 PM
**To:** Mel Staffin <mstaffin@obs-law.com>
**Subject:** Re: Funding for Midtown Resources

Tomorrow will be an busy day for me and this needs to be out tomorrow.

Appreciate your help.

**From:** Mel Staffin
**Sent:** Wednesday, December 6, 2017 2:07:56 PM
**To:** Gary Bragg
**Subject:** RE: Funding for Midtown Resources

1



Sounds like an order.

Mel Staffin, Esquire
O'Neill, Bragg & Staffin, P.C.
720 Johnsville Blvd., Suite 1220
Warminster, PA 18974
Phone 215.956.2800
Fax 215.956.2838
E-mail: mstaffin@obs-law.com

NOTICE: This e-mail message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by replying to this message or calling O'Neill, Bragg & Staffin, P.C. at (215) 956-2800, and please delete it from your computer.

PLEASE NOTE that all incoming e-mails will be automatically scanned by us to eliminate unsolicited promotional e-mails ("spam"). This could result in deletion of a legitimate e-mail before it is read by its intended recipient at our firm. Please tell us if you have any concerns about this automatic filtering.

Any Federal tax advice contained herein is not intended or written to be used, and cannot be used by you or any other person, for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Code. This disclosure is made in accordance with the rules of Treasury Department Circular 230 governing standards of practice before the Internal Revenue Service. Any written statement contained herein relating to any Federal tax transaction or matter may not be used by any person without the express prior written permission in each instance of an officer of this firm to support the promotion or marketing of or to recommend any Federal tax transaction(s) or matter(s) addressed herein.

**From:** Gary Bragg
**Sent:** Wednesday, December 06, 2017 5:07 PM
**To:** Mel Staffin <mstaffin@obs-law.com>
**Subject:** Re: Funding for Midtown Resources

Get this done first thing in the morning and email transfer swift copy once completed.


Regards.


Gary


---

**From:** Mel Staffin
**Sent:** Wednesday, December 6, 2017 2:04:08 PM
**To:** Gary Bragg
**Subject:** RE: Funding for Midtown Resources

No time to do this right now. Will have to be tomorrow.

Mel Staffin, Esquire
O'Neill, Bragg & Staffin, P.C.



720 Johnsville Blvd., Suite 1220
Warminster, PA 18974
Phone 215.956.2800
Fax 215.956.2838
E-mail: mstaffin@obs-law.com

NOTICE: This e-mail message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by replying to this message or calling O'Neill, Bragg & Staffin, P.C. at (215) 956-2800, and please delete it from your computer.

PLEASE NOTE that all incoming e-mails will be automatically scanned by us to eliminate unsolicited promotional e-mails ("spam"). This could result in deletion of a legitimate e-mail before it is read by its intended recipient at our firm. Please tell us if you have any concerns about this automatic filtering.

Any Federal tax advice contained herein is not intended or written to be used, and cannot be used by you or any other person, for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Code. This disclosure is made in accordance with the rules of Treasury Department Circular 230 governing standards of practice before the Internal Revenue Service. Any written statement contained herein relating to any Federal tax transaction or matter may not be used by any person without the express prior written permission in each instance of an officer of this firm to support the promotion or marketing of or to recommend any Federal tax transaction(s) or matter(s) addressed herein.

**From:** Gary Bragg
**Sent:** Wednesday, December 06, 2017 5:03 PM
**To:** Mel Staffin <mstaffin@obs-law.com>
**Subject:** Re: Funding for Midtown Resources

From our trust account 49990 51003, sub #728

Thanks.


Gary


**m:** Mel Staffin
**Sent:** Wednesday, December 6, 2017 2:00:44 PM
**To:** Gary Bragg
**Subject:** RE: Funding for Midtown Resources

From which subaccount?

Mel Staffin, Esquire
O'Neill, Bragg & Staffin, P.C.
720 Johnsville Blvd., Suite 1220
Warminster, PA 18974
Phone 215.956.2800
Fax 215.956.2838
E-mail: mstaffin@obs-law.com

3



NOTICE: This e-mail message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by replying to this message or calling O'Neill, Bragg & Staffin, P.C. at (215) 956-2800, and please delete it from your computer.

PLEASE NOTE that all incoming e-mails will be automatically scanned by us to eliminate unsolicited promotional e-mails ("spam"). This could result in deletion of a legitimate e-mail before it is read by its intended recipient at our firm. Please tell us if you have any concerns about this automatic filtering.

Any Federal tax advice contained herein is not intended or written to be used, and cannot be used by you or any other person, for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Code. This disclosure is made in accordance with the rules of Treasury Department Circular 230 governing standards of practice before the Internal Revenue Service. Any written statement contained herein relating to any Federal tax transaction or matter may not be used by any person without the express prior written permission in each instance of an officer of this firm to support the promotion or marketing of or to recommend any Federal tax transaction(s) or matter(s) addressed herein.

From: Gary Bragg
Sent: Wednesday, December 06, 2017 5:00 PM
Mel Staffin <mstaffin@obs-law.com>
Subject: Re: Funding for Midtown Resources

Mel—

I just received Midtown Resources investment wiring instrcutions in Hong Kong see below.


* Bank Name: Bank Of China Hk Ltd
* Bank Address: 774 Nathan Road Hong Kong
*Swift: BKCHHKHH
* Account Name: Cochen International Ltd
*Account#: 012-692-92-08439-8

* Reference: Midtown Resources Eagle Funding

ase transfer from our trust account, they need a swfit copy once the wire is sent, email that to me once you take care of this.

Thanks in advance.

Thanks.


Regards.


Gary

4



**From:** Mel Staffin
**Sent:** Wednesday, December 6, 2017 1:38:30 PM
**To:** Gary Bragg
**Subject:** RE: Funding for Midtown Resources

I am in tomorrow

Mel Staffin, Esquire
O'Neill, Bragg & Staffin, P.C.
720 Johnsville Blvd., Suite 1220
Warminster, PA 18974
Phone 215.956.2800
Fax 215.956.2838
E-mail: mstaffin@obs-law.com

_____

NOTICE: This e-mail message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by replying to this message or calling O'Neill, Bragg & Staffin, P.C. at (215) 956-2800, and please delete it from your computer.

PLEASE NOTE that all incoming e-mails will be automatically scanned by us to eliminate unsolicited promotional e-mails ("spam"). This could result in deletion of a legitimate e-mail before it is read by its intended recipient at our firm. Please tell us if you have any concerns about this automatic filtering.

Any Federal tax advice contained herein is not intended or written to be used, and cannot be used by you or any other person, for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Code. This disclosure is made in accordance with the rules of Treasury Department Circular 230 governing standards of practice before the Internal Revenue Service. Any written statement contained herein relating to any Federal tax transaction or matter may not be used by any person without the express prior written permission in each instance of an officer of this firm to support the promotion or marketing of or to recommend any Federal tax transaction(s) or matter(s) addressed herein.

**From:** Gary Bragg
**Sent:** Wednesday, December 06, 2017 4:38 PM
**To:** Mel Staffin <mstaffin@obs-law.com>
**Subject:** Funding for Midtown Resources

Hi Mel—

Are you going to be in the office tomorrow?

I have wire for $580,000 to send to Midtown Resources for an Eagle Funding loan to them but this is going to Midtown Resources investment account in Hong Kong.

Let me know so i can forward the wiring instructions to you first tomorrow, as tomorrow will be an busy day for me.


Thanks.

5



Regards,

Gary

Gary

Gary L. Bragg, Esq.
O'Neill, Bragg & Staffin, P.C.
720 Johnsville Blvd., Suite 1220
Warminster, PA 18974
Office Phone 215.956.2800
Office Fax 215.956.2838
Cell Phone 484.432.7757
E-mail: gbragg@obs-law.com

# EXHIBIT 5

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

O'NEILL, BRAGG & STAFFIN, P.C.: :
GARY L. BRAGG, ESQUIRE and : :
ALVIN M. STAFFIN, ESQUIRE : :
             Plaintiffs, : CIVIL ACTION
             :
vs. : Case No.
             :
BANK OF AMERICA :
CORPORATION :
             Defendant. :

## AFFIDAVIT OF ALVIN M. STAFFIN, ESQUIRE

I, Alvin M. Staffin, declare under penalty of perjury that the following facts are true and correct to the best of my information and belief:

1.     I am an adult individual residing in Newtown, Pennsylvania, and I make these statements based upon my personal knowledge and experience.

2.     I am a plaintiff in the above-captioned case.

3.     I make this Affidavit to detail the sequence of events relating to contacts made on December 6-7, 2017 with Bank of America Corporation (the "Bank") the defendant in the above-captioned case.

4.     I have been a practicing attorney in good standing with the bar of the Commonwealth of Pennsylvania from 1982 to the present.

5.     I am a shareholder in and the Vice President of O'Neill, Bragg & Staffin, P.C. ("OBS"), a plaintiff in the above-captioned case.

6.     On behalf of OBS, and in concert with my law partner and co-plaintiff, Gary L. Bragg, Esquire ("Bragg"), I long ago established an IOLTA

{00925260;3}

account at one of the Bank's predecessors-in-interest, along with IOLTA sub-accounts in which each OBS client's funds were segregated.

7.   OBS has a client, Eagle Funding, which is serviced by Bragg.

8.   I was aware that Eagle Funding was an OBS client, and that Bragg was providing legal counsel to Eagle Funding with respect to its lender relationship with Midtown Resources, but I was not directly involved in the representation of Eagle Funding.

9.   I was aware that loan funds were transferred from Eagle Funding to Midtown Resources in May 2017 and in August 2017.

10.   On the evening of December 6, 2017, I received an e-mail communication purporting to be from Bragg, who at that time was in Washington State.

11.   In that communication, attached as "Exhibit 4" to the Complaint in this matter, a computer hacker posing as Bragg instructed me to effectuate a $580,000 transfer from Eagle Funding's IOLTA sub-account to Midtown Resources' account at a bank in Hong Kong.   A series of e-mail exchanges between the hacker (posing as Bragg) and me ensued.

12.   Throughout that e-mail exchange, the hacker's communications contained a variety of references which signaled to me that they were sent by Bragg.   The e-mails addressed me by my nickname, "Mel," indicated familiarity with both Eagle Funding and Midtown Resources, recited the law firm's IOLTA account number and the IOLTA sub-account number assigned to Eagle Funding. I was in the office, and was aware that Bragg was not in the office and could not effectuate the transfer himself.

13.   After initiating the wire transfer, I left my office and got into my car.

14.   At approximately 6:45pm on December 6, 2017, I called Bragg while driving my car.

15.   During that call, I learned that the e-mail directing the $580,000 transfer was fraudulent and had not been sent by Bragg.

16.    I instructed Bragg to immediately call the Bank; he did so, speaking with a representative named Christian Rios from the Bank's Check Fraud Claims team at approximately 6:55 p.m. EST.

17.    I turned my car around and headed back to the office.

18.    Once at the office, I called the Bank from my office land line at approximately 7:07p.m. EST, and spoke to a representative on the Bank's Wire Operations team named Jason, who would not furnish his last name.

19.    I identified the wire transfer to Jason, explained the fraudulent e-mail instructions, and requested that the wire transfer be stopped.

20.    Jason indicated surprise that the $580,000 transfer was not automatically flagged or stopped by the Bank's Risk Area because the Eagle Funding IOLTA sub-account held less than $2,000.

21.    Jason confirmed that no money had left the Eagle Funding sub-account.  However, he stated that the wire "instructions" were transmitted and there was nothing he could do to stop the wire transfer from consummating. Jason suggested I request a wire recall from the receiving bank the following morning.

22.    At the same time, I called Bragg from my cell phone, and was conferenced in to his call with Christian Rios.  Bragg and I were instructed by Rios to check the Eagle Funding IOLTA sub-account the following morning to determine whether the wire transfer was successfully stopped.  Rios also noted that the balance in the Eagle Funding IOLTA sub-account was less than $2,000.

23.    On December 7, 2017, I arrived at the office at 6:00 a.m. EST.

24.    At 8:00am that morning, I started calling the Bank's Wire Operations team to determine whether the wire transfer was stopped.  At 8:35 a.m. EST, someone on the Wire Operations team answered the phone, and I learned that the wire transfer had not been stopped.

25.    At that point, I instructed the Bank to initiate a wire recall from the Bank of China, the receiving bank.

26.     That morning, I also received a call from a member of the Bank's Fraud Monitoring team named Tammy, who would not provide her last name.

27.     Tammy confirmed my wire recall request, and told me that a member of the Bank's "team" assigned to OBS named Adam Lewinski would be following up with me by telephone regarding the status of my wire recall request.

28.     I did not hear from Adam Lewinski, and instead called the Bank several times over the ensuing hours and days in order to track the status of my (ultimately unsuccessful) wire recall request.

29.     I left several voicemails for Adam Lewinski, seeking his assistance in changing OBS's IOLTA account number at the Bank in order to protect OBS's client's funds from any further fraudulent activity.

30.     Adam Lewinski finally returned my calls approximately one week later, and informed me that the Bank would not set up a new IOLTA account and could not close OBS's existing IOLTA account because my request was oral, not written.

31.     I immediately provided the Bank with a written request to close OBS's IOLTA account.

I hereby swear or affirm that the statements contained herein are true to the best of my knowledge and belief. I am aware that if any statements contained herein are knowingly false, I may be subject to punishment.

Date:  May 18th, 2018          _____
                                        Alvin M. Staffin, Esquire

Sworn to and subscribed before me this _18_ day of May, 2018.

_Barbara Lerman_
Notary Public

My Commission Expires: _10/24/2020_



{00925260;3}

# EXHIBIT 6

Plaintiff<br>
Affidavit<br>
Alvin Mark Staffin<br>
.12.2017

HCA        / 2017

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

ACTION NO.            OF 2017

—————————

BETWEEN

O'NEILL, BRAGG & STAFFIN, P.C.                    Plaintiff

and

COCHEN INTERNATIONAL LIMITED              Defendant

—————————

**AFFIDAVIT OF ALVIN MARK STAFFIN**

—————————

I, Alvin Mark Staffin (also known as Mel Staffin), of 720 Johnsville Blvd., Suite 1220, Warminster, PA 18974, United States of America, make oath and say as follows:

1.      I am a Partner of O'Neill, Bragg, Staffin, P.C. ("**OBS**"), the Plaintiff in this matter.  It is in this capacity that I am authorised to make this Affidavit on behalf of the Plaintiff.  The facts and matters to which I depose are within my own knowledge and are true or have been derived by me through discussions with my partner, Mr. Gary L. Bragg ("**Mr Bragg**") and information received in the conduct of this investigation and are true to the best of my knowledge information and belief.

**The Plaintiff**

2.      OBS is the victim of an identity theft fraud, pursuant to which on 6 December 2017 US$580,000 (approximately HK$4.5million) ("**Stolen Monies**") was misappropriated from

its accounts and paid to an account maintained by the Defendant with Bank of China (Hong Kong) Limited ("**BOC**") numbered 012-692-92-08439-8 in Hong Kong ("**Account**").

3.     I make this affirmation in support of OBS's applications for a Mareva Injunction to issue against the Defendant, and for a Disclosure Order to be made against BOC as the bank custodian of the Account.  The purpose of the intended orders is to facilitate the preservation and recovery of that part of the Stolen Monies as may remain in the Account, the tracing and recovery of such of the Stolen Monies as have been transferred from the Account, and the identification of the as yet unidentified persons who own and/or are responsible for operating the Account.

**The Defendant**

4.     The Defendant is a company incorporated in Hong Kong, and has been used as the vehicle for the collection of the proceeds of the fraud that forms the subject matter of this application.

5.     On my instructions, OBS's solicitors Tanner De Witt ("**TDW**") have conducted a company search of the Defendant, Cochen International Limited. A copy of the index of Companies Registry search against the Defendant is at page 1 of "**AMS-1**". The Court will see that the latest Annual Return filed by the Defendant was dated 15 November 2012 (at pages 2 – 9 of "**AMS-1**"), and it applied for deregistration on 11 August 2016 (at pages 10 – 14 of "**AMS-1**"). The Defendant applied for discontinuation of the deregistration procedure on 5 May 2017 (at page 15 of "**AMS-1**"). On 24 November 2017, Mr. Zeng Yongqiang resigned as the sole director of the Defendant, and a Mr. Nicolae Lazar was appointed as director of the Defendant (at pages 16 – 20 of "**AMS-1**"). I confirm that on my instructions TDW have also conducted internet searches using Google and have confirmed that the Defendant has no substantial internet presence (beyond confirmation that it is a Hong Kong company).

6.     I further confirm that I have checked OBS's records and that prior to the payments made to the Defendant on 6 December 2017 neither the Defendant, Mr. Zeng Yongqiang nor Mr Lazar Nicolae were known to OBS. OBS has had no business or dealings with the Defendant other than those identified in this affirmation, and I confirm that there is no reason known to me which would justify OBS making any payments to the Defendant, in the manner described below, or, indeed, at all.

**The Fraud**

7.  On 6 December 2017, I received an email ostensibly from Mr. Bragg requesting that I transfer the sum US$580,000 regarding a loan transaction handled by Mr. Bragg in August 2017. Mr. Bragg stated that the funds would be transferred to the target's investment account in Hong Kong, and subsequently provided me with instructions to transfer the monies to the Account held with BOC, and insisted that the monies *"needs to be out tomorrow"*. True copies of these emails appear at pages 21 – 26 of "AMS-1". Mr. Bragg was travelling in Seattle, Washington at the time and there was no reason for me to query the authenticity of these emails in circumstances where, not only was the email sent from an email account bearing Mr. Bragg's name, the sender also appeared to have sound and accurate knowledge of the names involved in the August 2017 loan transaction and also the details of the client account (a sub-account numbered 728) of the firm's trust account where OBS kept funds belonging to clients of the firm.

8.  On the basis of Mr. Bragg's email requests, and believing them to be true, on 6 December 2017 I instructed Bank of America to transfer US$580,000 from OBS's trust account to the Account. Exhibited at page 27 of "AMS-1" is a copy of the transfer order.

**Discovery of the fraud**

9.  On 6 December 2017, shortly after I instructed Bank of America to make the transfer, I called Mr. Bragg to discuss the matter. Mr. Bragg confirmed that he had never made or heard of any such transfer request and that he knew nothing of it. I immediately realised that the OBS has become a victim of an identity theft fraud.

10.  On 7 December 2017, I received a further email from Mr. Bragg requesting that I confirm the amount left in the client account after the previous transfer, and to arrange a further US$980,000 to be transferred. I realized that was likely another fraudulent request made in the guise of Mr. Bragg, however, in order not to alert the fraudsters that we were already aware of the earlier fraud to prevent dissipation of the monies, I appeared to be co-operative to the request. I however did not receive further correspondence on this matter. Exhibited at pages 28 – 31 of "AMS-1" is a copy of the correspondence referred to in this paragraph.

11.  Upon investigating the fraud, we discovered that Mr. Bragg's Microsoft Exchange email account had been hacked by unknown persons, and that previous email exchange between Mr. Bragg and I were re-routed away from Mr. Bragg's real account. We also discovered that (as shown in the 7 December 2017 emails) that the fraudsters used a fake email address

gbragg@0bs-law.com, which looked very similar to Mr. Bragg's genuine email address gbragg@obs-law.com.

**Notifying the Banks**

12.     Upon discovery of the fraud, I immediately called Bank of America on 6 December 2017 and notified it of the fraud, and requested that the transfer be stopped and the funds restored to OBS's account. I was informed that there was nothing that the bank could do although the monies had not yet been transferred out of OBS's account. The online bank account of OBS showed that the transfer was *"processing"* as at 6 December 2017, and was only completed on 7 December 2017 morning. It also became apparent that the client sub-account only had a balance of approximately US$1,900 at the time of the wire transfer of US$580,000 and Bank of America withdrew monies from other sub-accounts held by the Plaintiff with Bank of America in the names of other clients of Plaintiff to fund the transfer. Exhibited at pages 32 – 33 of "AMS-1" is a copy of OBS's letter to Bank of America dated 8 December 2017. I was subsequently informed by Bank of America over the telephone that a notice to recall the wire transfer had been sent to BOC, but BOC refused to return the funds.

13.     On 10 December 2017, OBS wrote to BOC to provide notice of the fraud and to request that the Defendant's account be frozen. BOC responded on 18 December 2017 confirming that it would co-operate with the Police. Exhibited at pages 34 – 37 of "AMS-1" is a copy of OBS's correspondence with BOC.

**Notifying Regulators**

14.     On 7 December 2017, I reported the fraud to the United States Federal Bureau of Investigation ("FBI") through its internet crime telephone hotline. Several days later I was contacted by an FBI agent to whom I gave all the information he requested concerning the fraud, including copies of the e-mails the fraudsters sent, my e-mail responses, wire confirmation from Bank of America and, notice OBS sent to BOC and its response. I am advised that the FBI has opened a criminal investigation of the fraud.

15.     On 10 December 2017, following the recommendation of the FBI, Mr. Bragg made a Cyber Crime report to the Hong Kong Police. The Hong Kong Police acknowledged receipt of the Cyber Crime report by way of email dated 12 December 2017, and informed us that the case had been assigned to Investigation Team 5 in the Wong Tai Sin Police District. Exhibited at pages 38 – 39 of "AMS-1" is a copy of the Cyber Crime report and the Hong Kong Police's

email correspondence.   The Hong Kong Police has not advised us yet as to:- (i) the current status of their investigations; (ii) whether they have notified the bank; (iii) whether they have issued a *"letter of no consent"*; (iv) or whether any monies remain in the Account.

**Urgency**

16.     The Plaintiff is concerned that unless restrained by this Honourable Court, the monies paid to the Account with BOC may be transferred from it, and sent to other accounts, possibly in China, where it would be significantly more difficult for the Plaintiff to trace and recover its monies. The Plaintiff's monies were transferred from the United States on 6 December 2017 and the Plaintiff is hopeful that some or all of the monies may remain in the account. The Plaintiff is concerned, however, that in light of the audacity of the fraudsters in hacking into Mr. Bragg's email account and pretending to be Mr. Bragg, and issuing instructions to me to transfer the Plaintiff's funds to the Defendants benefit, if the monies are not restrained, they will be very quickly transferred out of the Account.

**Disclosure**

17.     In seeking to recover our monies from the Defendant, the Plaintiff will need to identify as Defendant in its recovery action the beneficial owners of the Defendant's Account, and those with authority to transfer monies to and from the Account.  In the event that its monies have already been onward transferred, OBS will also need to know to whom and to which accounts its monies have been transferred. This information is available to BOC, but would not otherwise be available to the Plaintiff.  The Plaintiff therefore seeks disclosure relief against BOC.

**Full and Frank Disclosure**

18.     I should specifically draw this Honourable Court's attention to the following matters:

(a)     The Plaintiff's instructions are necessarily limited by the information that is available to it at this time, but I trust that my evidence is sufficient to demonstrate that the Plaintiff is a victim of a major fraud.

(b)     The draft order includes a request that the Plaintiff be at liberty to use information and documents disclosed in this matter in civil and criminal actions in other jurisdictions should it be appropriate to do so in pursuing its tracing and recovery of funds.

(c)    It is possible that the Plaintiff's monies may already have been transferred from the Account.

(d)    We have reported this matter to the Hong Kong police, and whilst I do not yet know who is responsible for the fraud, I confirm that I intend to assist the police and regulatory authorities in any way I can to progress OBS's recovery efforts and to apprehend the wrongdoers.

**Undertaking**

19.    I have been advised by Mr. Lane of Tanner de Witt, solicitors to the Plaintiff in this matter, that it is a requirement of the Courts in Hong Kong that any application for an injunction must be supported by an undertaking in damages. I confirm that on behalf of the Plaintiff I offer such an undertaking, and confirm that notwithstanding the fraud the Plaintiff is prepared to and has sufficient means to honour it in full.

**Submission**

20.    On behalf of the Plaintiff, I submit that the available evidence shows a clear case of fraud, and invite this Honourable Court to grant orders in terms of the draft orders exhibited to the hearing bundle.

Sworn by Alvin Mark Staffin    )
at *Bucks County*    )
*Commonwealth of PA*    )
on 24 December 2017    )    _____
    Alvin Mark Staffin

Before me,

*Barbara Lerman*

Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
BARBARA LERMAN, Notary Public
Warminster Township, Bucks County
My Commission Expires October 24, 2020

Plaintiff
Affidavit
Alvin Mark Staffin
.12.2017

HCA          / 2017

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

ACTION NO.                OF 2017

---------------------

BETWEEN

O'NEILL, BRAGG & STAFFIN, P.C.          Plaintiff

and

COCHEN INTERNATIONAL LIMITED          Defendant

---------------------

---------------------------------------------

**AFFIDAVIT OF ALVIN MARK STAFFIN**

Dated this          day of December 2017

Filed this          day of December 2017

**Tanner De Witt**
Solicitors for the Plaintiff
1806-8 Tower Two
Lippo Centre
89 Queensway
Hong Kong

Tel: 2573 5000
Fax: 2802 3553

(Ref: JHL/new)

EXHIBIT 7

TO  12159562833          FROM BANK OF AMERICA     6Dec17      0552 EST          99115512S          PAGE  1 of 1

**Bank of America** 🇺🇸

```
Bank of America, N.A.
Wire Transfer Services

Date:  6-DEC-2017
Time Wire Completed:  17:52 ET
Account:  XXXXXXXX1003

        O'NEILL, BRAGG & STAFFIN,  CUS
        ESCROW ACCOUNT ATTORNEY TRUST ACCT
        720 JOHNSVILLE BLVD STE 1220
        WARMINSTER, PA          18974-3547
        Attn: MEL STAFFIN
```

Please contact us at 800.729.9473 Option 2 if you have any questions about
this wire transfer.  Thank you for using Bank of America Wire Transfer
Services.

The following wire was debited today in the amount of USD: 580,000.00
-------------------------------------------------------------------------

```
Value Date:        12/06/2017
Transaction Ref:   201712060040G313
Bene's Ref:        SUB AC 720
Service Ref:       970868

Beneficiary's Bank:  BANK OF CHINA  (HONG KONG) LTD.    ID: D/XXXXXX0380
                     1 GARDEN ROAD
                     BANK OF CHINA TOWER
                     HONG KONG, HONG KONG
Beneficiary:         COCHEN INTERNATIONAL LTD            ID: 01269292084398
                     774 NATHAN ROAD HONG KONG

Payment Details:     MIDTOWN RESOURCES EAGLE FUNDING
                     /POP/ MIDTOWN RESOURCES EAGLE
                     FUNDING
```

CONFIDENTIALITY NOTICE:  This fax transmittal is a confidential communication.  If
the reader of this message is not the intended recipient or an agent responsible for
delivering it to the intended recipient, you are hereby notified that you have received
this document in error and that any review, dissemination, distribution or copying of
this transmittal is strictly prohibited.  If you have received this communication in
error, please notify this office and immediately delete this message and all of its
attachments, if any.



# EXHIBIT 8

Legal Department

December 21, 2017

O'Neill, Bragg, Staffin, P.C.
720 Johnsville Blvd., Suite 1220
Warminster, PA. 18974

Account Number: XXX XXX 1003

Attention: Gary L. Bragg and Alvin M. Staffin,

Pursuant to your request, please find below information regarding a Wire Transfer processed on
December 6, 2017 in the amount of $580,000.00 against the account of O'NEILL, BRAGG &
STAFFIN held with Bank of America, N.A. per the request of Alvin Staffin on December 6,
2017.

- 12/06/2017 (5:22p): Alvin Staffin initiated a telephone wire request for $580,000.00 to be
  sent to Cochen International LTD, account# 01269292084398, and taken out of sub
  account "728."
- 12/06/2017 (5:50p): Bank of America called Alvin Staffin to validate the outgoing
  telephone wire request via telephone wire pin; Alvin Staffin confirmed the wire
  instructions.
- 12/06/2017 (7:07p): Alvin Staffin contacted the Wire Operations team to report wire
  fraud (although it was an authorized transfer of funds) and spoke to Jason who confirmed
  that the outgoing wire couldn't be stopped or cancelled as the wire instructions had
  already been sent. Jason also indicated that a wire recall can't be initiated until the funds
  are actually sent. Once the funds are sent the next day, a wire recall may be requested.
  Mr. Staffin asked if the funds were available to cover the outgoing wire. Jason indicated
  that he didn't see any indication that the payment was stopped by the Risk area.
- 12/06/2017 (7:49p): Gary Bagg and Alvin Staffin contacted the Check Fraud Claims
  team to report the wire fraud and spoke to Christian Rios. Christian indicated that he
  could request the funds back, but the client would need to check their account the next
  day to see if the attempt was successful. If unsuccessful, the client may call the Money
  Movement team between 8a- 8p ET.
- 12/07/2017 (8:35a): Alvin Staffin contacted the Wire Operations team to initiate a wire
  recall request.
- 12/07/2017 (8:47a): Wire recall request was initiated.
- 12/07/2017 (9:31a): Executive Escalations was engaged to manage the wire fraud event.

Bank of America, NC1-027-20-05
214 N Tryon Street, Charlotte, NC 38255

**Bank of America**

O'Neill, Bragg & Staffin, P.C.
December 21, 2017
Page 2

- 12/08/2017: Swift response was received from the Bank of China stating: "WE COULD ONLY ARRANGE THE REFUND PURSUANT TO A HONG KONG COURT ORDER
- BINDING ON US AND WHEN THERE IS SUFFICIENT CREDIT BALANCE IN THE CUSTOMER'S ACCOUNT AT THE MATERIAL TIME. WE SUGGEST YOU TO REPORT THE CASE TO AND SEEK ASSISTANCE FROM THE HONG KONG POLICE FORCE"

Bank of America processed the wire as instructed by O'NEILL, BRAGG & STAFFIN. Unfortunately, the funds appear to be unrecoverable per the above mentioned swift response received from the Bank of China, although it may be possible to pursue recovery by engaging the assistance of the Hong Kong police force.

We appreciate your continued relationship.

Sincerely,

Jill A. Smith

Jill A. Smith
Assistant General Counsel

# EXHIBIT 9

## Mel Staffin

| | |
|---|---|
| From: | Gary Bragg <gbragg@0bs-law.com> |
| Sent: | Thursday, December 07, 2017 2:10 PM |
| To: | Mel Staffin |
| Subject: | RE: Confirmation |

Mel—

Okay can you call me at after 1:30 pm.

Please i hope this is not stressful for you,  Can you please wire $980,000 to Midtown Resources for Investment account.

Can you get this out today? I would appreciate you your effort on this.

Thanks.

rds,

Gary

On December 8, 2017 at 12:29 AM Mel Staffin <mstaffin@obs-law.com> wrote:

I'll call you

Mel Staffin, Esquire

O'Neill, Bragg & Staffin, P.C.

720 Johnsville Blvd., Suite 1220

Warminster, PA 18974

Phone 215.956.2800

Fax 215.956.2838

E-mail: mstaffin@obs-law.com

---

NOTICE:  This e-mail message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information.  If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or other use of this message or its attachments is



strictly prohibited. If you have received this message in error, please notify the sender immediately by replying to this message or calling O'Neill, Bragg & Staffin, P.C. at (215) 956-2800, and please delete it from your computer.

PLEASE NOTE that all incoming e-mails will be automatically scanned by us to eliminate unsolicited promotional e-mails ("spam"). This could result in deletion of a legitimate e-mail before it is read by its intended recipient at our firm. Please tell us if you have any concerns about this automatic filtering.

Any Federal tax advice contained herein is not intended or written to be used, and cannot be used by you or any other person, for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Code. This disclosure is made in accordance with the rules of Treasury Department Circular 230 governing standards of practice before the Internal Revenue Service. Any written statement contained herein relating to any Federal tax transaction or matter may not be used by any person without the express prior written permission in each instance of an officer of this firm to support the promotion or marketing of or to recommend any Federal tax transaction(s) or matter(s) addressed herein.

**From:** Gary Bragg [mailto:gbragg@0bs-law.com]
**Sent:** Thursday, December 07, 2017 1:59 PM
**To:** Mel Staffin <mstaffin@obs-law.com>
**Subject:** RE: Confirmation

Mel—

Please can you share how much we have in trust account 49990 51003 as of today after the last wire to Midtown Resources.

Thanks.

Regards,

Gary

On December 8, 2017 at 12:13 AM Mel Staffin <mstaffin@obs-law.com> wrote:

yes

Mel Staffin, Esquire

O'Neill, Bragg & Staffin, P.C.

720 Johnsville Blvd., Suite 1220

Warminster, PA 18974

2



Phone 215.956.2800

Fax 215.956.2838

E-mail: mstaffin@obs-law.com

_____

NOTICE: This e-mail message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by replying to this message or calling O'Neill, Bragg & Staffin, P.C. at (215) 956-2800, and please delete it from your computer.

PLEASE NOTE that all incoming e-mails will be automatically scanned by us to eliminate unsolicited promotional e-mails ("spam"). This could result in deletion of a legitimate e-mail before it is read by its intended recipient at our firm. Please tell us if you have any concerns about this automatic filtering.

Any Federal tax advice contained herein is not intended or written to be used, and cannot be used by you or any other person, for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Code. This disclosure is made in accordance with the rules of Treasury Department Circular 230 governing standards of practice before the Internal Revenue Service. Any written statement contained herein relating to any Federal tax transaction or matter may not be used by any person without the express prior written permission in each instance of an officer of this firm to support the promotion or marketing of or to recommend any Federal tax transaction(s) or matter(s) addressed herein.

**From:** Gary Bragg [mailto:gbragg@Obs-law.com]
**Sent:** Thursday, December 07, 2017 1:39 PM
**To:** Mel Staffin <mstaffin@obs-law.com>
**Subject:** Confirmation

Hi Mel—

Are you in the office ?

Thanks.

3



Regards.

Gary



Gary L. Bragg, Esq.
O'Neill, Bragg & Staffin, P.C.
720 Johnsville Blvd., Suite 1220
Warminster, PA 18974
Office Phone 215.956.2800
Office Fax 215.956.2838
Cell Phone 484.432.7757
E-mail: gbragg@obs-law.com

4

# EXHIBIT 10

## O'NEILL, BRAGG & STAFFIN, P.C.
### ATTORNEYS AT LAW
#### 720 JOHNSVILLE BLVD., SUITE 1220
#### WARMINSTER, PA 18974

————

**(215) 956-2800**
**FAX (215) 956-2838**

GARY L. BRAGG
ALVIN M. STAFFIN*

WILLIAM G. O'NEILL
1926 - 2014

————
*LL.M. IN TAXATION

December 8, 2017

Bank of America
100 North Tryon Street
Charlotte, NC 28255
Attention: Brian Moynihan
          President & CEO

Re:    Fraudulent Wire Transfer of $580,000 from IOLTA Account of O'Neill, Bragg & Staffin,
       P.C. on December 6, 2017

Dear Mr. Moynihan:

We are writing to you to demand that you restore forthwith $580,000 to our law firm IOLTA
account number 49990 51003.

We talked with your Wire Transfer Department about the facts of this matter as early as 6:45
p.m. EST on December 6, 2017 (the "Fraud Notice"), prior to the wire being dispatched to a
purported beneficiary at the Bank of China (Hong Kong). The Fraud Notice was in telephone
requests to Bank of America, specifically, Christian Rios and "Jason" in the Wire Transfer
Services Department (he indicated that he could not give us his last name) at that time, to stop
the wire transfer that had been submitted at or about 5:52 p.m. EST.

We were told that there was nothing they could do although the money had not yet been
transferred. Shortly thereafter, our online banking site indicated that the wire was "processing".
Subsequently, it appeared on our online banking site that the wire transfer was actually
completed early in the morning (at or about 5;00 a.m. EST) on December 7, 2017, even though
the subject account that was charged as directed from sub account #728 (Eagle Funding –
Midtown Resources), only had a balance of $1,900.00 prior to the wire transfer. Bank of
America nonetheless took funds from other sub accounts in the IOLTA account to fund the
fraudulent wire transfer.

O'NEILL, BRAGG & STAFFIN, P.C.

Bank of America                                          December 8, 2017
Attention:  Brian Moynihan, President & CEO                      Page 2

On December 8, 2017, Bank of America Escrow Department called us to report that sub account #728 had been overdrawn, which should have been obvious at the time the fraudulent wire transfer was initiated and not permitted to have been done.

Please advise us by the close of business on Friday, December 15, 2017 that the funds have been restored.  In any event, we reserve all rights against Bank of America in this matter.

Very truly yours,

Gary L. Bragg

Alvin M. Staffin

cc:      Bank of America Wire Transfer Department
         222 Broadway
         New York, NY 10038

         Bank of America Escrow Management Department
         1 Fleet Way (escrow@bankofamerica.com)
         Scranton, PA 18507

OBS/Bank of America Wire Transfer Matter 2017/
Demand Letter to Bank of America 12-8-17

# EXHIBIT 11



# Report Cyber Crime

WSC WAI-AA
HCAG 2.0

PLEASE NOTE: Fields marked with an asterisk (*) are mandatory

## Part I. Particulars of the Informant

| * First Name(English):<br>Gary | * Last Name(English):<br>Bragg | Chinese Name: | Sex:<br>Male ▼ |
|---|---|---|---|
| Date of Birth:<br>06/11/48<br>(dd/mm/yy) | HKID No.: | | Your Nearest Police Station:<br>Central Service Center ▼ |

*Correspondence Address:
720 Johnsville Blvd., Suite 1220, Warminster, PA 18974 USA

| * Contact No.: 4844327757 | Fax No.: 2159562838 |
|---|---|

ail Address: gbragg@obs-law.com

* Mandatory. Please provide a correct email address for follow up.

## Part II. Brief Facts of Case

| Occurrence Date:<br>07/12/17<br>(dd/mm/yy) | Occurrence Time:<br>10:00<br>(hh:mm) | Time Zone: GMT | (e.g. +GMT8) |
|---|---|---|---|

*Type of Crime:
Unauthorized Access (e.g. compromising email account) ▼

Hyperlink of the subject Website(If applicable):

* Brief of the crime / incident:

Suspects made unauthorized access to informant subject's e-mail
account at Microsoft Exchange to send fraudulent e-mail directing
wire transfer of US$580,000 from Bank of America to Bank of China
(Hong Kong) Ltd. account of Cochen International, Ltd.,
#01269292004398.

Details of the suspect(s) or company(ies) (If applicable):

Cochen International, Ltd., 774 Nathan Road, Hong Kong, was the name
and address given with the wire instructions to Bank of America.

Financial loss (If applicable):

US$580,000 direct loss of funds, plus other damages as a consequence.

Other Information (If applicable):

See letter to Bank of China (Hong Kong) Ltd. dated 10 December 2017.

Reset | Print this form | Submit

38

**Mae Lim**

| | |
|---|---|
| From: | ip-sip-dit-5-wtsdist@police.gov.hk |
| Sent: | 12 December 2017 15:09 |
| To: | Gary Bragg |
| Subject: | Re: Cyber Crime Report |
| | |
| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |

Dear Mr. Gary BRAGG,

This is District Investigation Team 5 of Wong Tai Sin Police Station and we are now investigating of your case reported via email to crimeinformation@police.gov.hk dated on 2017-12-11.

In order to furnish the investigation & liaise with the Bank of China to freeze the fraudulent transaction if possible, we would like to take a statement from you regarding this case and its details, so as to confirm the case. It would be highly appreciated if you could inform us that when will you be available to take statement in Hong Kong as soon as possible.
Also, I should be grateful if you could provide more information on the incident (Wire transfer's receipt, the fraudulent email conversation, etc.) through email in advance, please.

Please do not hesitate to contact the investigation officer DSGT 54820 at 3661 6005 for making arrangement or enquiry.

Thank you for your kind attention.

Best Regards,

( LAW Lok-yin Kelvin ) DIP
OC DIT 5 WTSDIST
Tel.: 3661 6042
Fax.: 3661 6065

*** This e-mail message (together with any attachments) is for the designated recipient only. It may contain information that is privileged.
If you are not the intended recipient, you are hereby notified that any use, retention, disclosure, copying, printing, forwarding or dissemination of the message is strictly prohibited. If you have received the message in error, please erase all copies of the message (including attachments) from your system and notify the sender immediately. ***


*** 此電郵訊息(連同任何附件)只發送給指定收件人。訊息可能包含享有特權資料。謹此通知,如你並非預定收件人,嚴禁使用、保留、披露、複製、列印、轉發或發布此訊息。如收到誤發的訊息,請把訊息的所有副本(包括附件)從系統內清除,並立即通知發件人。***

# EXHIBIT 12

# O'NEILL, BRAGG & STAFFIN, P.C.
## ATTORNEYS AT LAW
720 JOHNSVILLE BLVD., SUITE 1220
WARMINSTER, PA 18974

———

**(215) 956-2800**
**FAX (215) 956-2838**

GARY L. BRAGG
ALVIN M. STAFFIN*

WILLIAM G. O'NEILL
1926 - 2014

*LL.M. IN TAXATION

December 10, 2017

<u>Via E-mail: opinion@bochk.com</u>

Bank of China (Hong Kong) Ltd.
Fraud Department
1 Garden Road
Bank of China Tower
Hong Kong

Re:   Bank of China (Hong Kong) Ltd.
      <u>Account #01269292004398 In The Name of Cochen International Ltd.</u>

Dear Sir or Madam:

Please be advised that the subject account at the Bank of China (Hong Kong) Ltd. was used to obtain a fraudulent wire transfer from our law firm escrow account of US$580,000.00 on or about December 7, 2017 at or about 10:00 GMT, which originated from the Bank of America, with a transaction reference of # 2017120600406313, Service Reference # 970868. We understand that despite Bank of America's attempt to recall this fraudulent wire transfer, the Bank of China (Hong Kong) Ltd. refused to return the funds.

The information about this fraudulent transaction has been turned over to the U.S. Federal Bureau of Investigation, and by copy of this letter, a formal complaint is being submitted to the Hong Kong Police.

*Please take all necessary steps to freeze any funds which are now on deposit or in the future are deposited into the subject account, or in any other accounts in the name of Cochen International, Ltd.or those who have authority to draw on such accounts, pending the outcome of the investigations.*



O'NEILL, BRAGG & STAFFIN, P.C.

Bank of China (Hong Kong) Ltd.
Attention: Fraud Department

December 10, 2017
Page 2

Please confirm receipt of and compliance with this letter by e-mail to the undersigned at gbragg@obs-law.com . If any further information is required, please forward the request to me in English at the same e-mail address.

Any assistance you can provide in redressing this fraudulent activity and stopping any future recurrence is appreciated.

Very truly yours,

O'NEILL, BRAGG & STAFFIN, P.C.

By: _____
        Gary L. Bragg, Esq.

cc: Hong Kong Police Department
    (crimeinformation@police.gov.hk)

35

# EXHIBIT 13

**Mae Lim**

| | |
|---|---|
| **From:** | opinion@bochk.com |
| **Sent:** | 18 December 2017 14:46 |
| **To:** | Gary Bragg |
| **Subject:** | RE: Report of Fraudulent Activity (Our Reference: 2017-04893) |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Dear Gary L. Bragg,

We refer to your email of 11 December 2017 regarding a fraudulent remittance with reference number 2017120600406313. We have looked into the matter and would like to furnish you with this reply.

We would like to explain that under normal circumstances, incoming remittance will be processed according to the instruction given by the remitting bank and subject to our bank's normal practice; the remitting bank may cancel the instruction provided that the transfer is not yet processed by the receiving bank. We learnt that you have reported it to the Hong Kong law enforcement authorities, we will give our full cooperation
when we receive instructions from the Hong Kong law enforcement authorities.

Should you have any queries, please contact the undersigned at (852) 3669 3555 or (852) 8206 2389 during office hours.

Yours sincerely,

For and on Behalf of
Bank of China (Hong Kong) Limited

Tang Yuen Man
Customer Care Manager, Customer Relations
*****************************************************************
Customers are reminded NOT to login online banking service through hyperlinks embedded in any emails.
BOCHK will not ask for customers' account number, password or any personal information via emails.
Bank of China (Hong Kong)
A CENTURY OF SERVICES, ALWAYS WITH YOU

Bank of China (Hong Kong) is named "Bank of the Year in Hong Kong" by The Banker for the third time and "The Strongest Bank in Asia Pacific and Hong Kong" by The Asian Banker for four consecutive years (2014-2017).
*****************************************************************
This message contains confidential information which is intended only for the person or entity to which it is addressed. If you are not the intended recipient, you should not read, disseminate, distribute or copy this e-mail. Any opinion contained in this message are those of the author and are not given or endorsed by Bank of China (Hong Kong) Limited, its subsidiaries or affiliates unless otherwise stated in this message and the authority of the author to so bind Bank of China (Hong Kong) Limited, its subsidiaries or affiliates is duly verified. We do not guarantee that this e-mail is virus-free or secure and are not liable in respect of any delay or omission in the transmission of this message.

36

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Save paper, Save the Earth

# EXHIBIT 14a

HCA 3014 / 2017

## IN THE HIGH COURT OF THE
## HONG KONG SPECIAL ADMINISTRATIVE REGION
## COURT OF FIRST INSTANCE
## ACTION NO. 3014 OF 2017

————————

BETWEEN

O'NEILL, BRAGG & STAFFIN, P.C.                    Plaintiff

and

COCHEN INTERNATIONAL LIMITED            Defendant

————————

### INJUNCTION PROHIBITING DISPOSAL OF ASSETS IN HONG KONG

### IMPORTANT NOTICE TO THE DEFENDANT

因這是法律文件，忽視它可帶來嚴重的後果。如有疑問，請儘早向發出文件的法庭登記處(地址)查詢。你亦應考慮聽取律師的意見或是申請法律援助。

This Order prohibits the Defendant from dealing with its assets up to the amount stated.

The Order is subject to the exceptions which are set out in the Order. You should read the whole of this document carefully. You are advised to consult a solicitor as soon as possible. You have the right to ask the court to vary or discharge this Order.

If you disobey this Order you may be found guilty of contempt of Court and you and/or any of your directors may be sent to prison or fined or your assets may be seized.

### BEFORE THE HONOURABLE MR. JUSTICE LI IN CHAMBERS
### (NOT OPEN TO PUBLIC)

### ORDER

1

An application was made on 27th December 2017 by Solicitors for the Plaintiff, to the Judge who read the writ and the affidavit listed in Schedule 1 and accepted the undertakings in Schedule 2 at the end of this Order. After hearing the application the Judge made the following Order.

**IT IS ORDERED** that:

*Restriction on disposal of assets*

1.      The Defendant must not —

    (1)      remove from Hong Kong any of its assets which are within Hong Kong, whether in its own name or not, and whether solely or jointly owned, up to the value of US$580,000 (or its equivalent sum in Hong Kong dollars); or

    (2)      in any way dispose of or deal with or diminish the value of any of its assets, which are within Hong Kong, whether in its own name or not, and whether solely or jointly owned, up to the value of US$580,000 (or its equivalent sum in Hong Kong dollars). This prohibition includes the following assets in particular:

        (i)      any monies in the bank account maintained by the Defendant numbered 012-692-92-08439-8 and all other accounts maintained by the Defendant with Bank of China (Hong Kong) Limited ("**BOC**");

        (ii)      any money in any other accounts held by the Defendant at any other bank in Hong Kong.

If the total unencumbered value of the Defendant's assets in Hong Kong exceeds US$580,000 (or its equivalent sum in Hong Kong dollars), the Defendant may remove any of those assets from Hong Kong or may dispose of or deal with them so long as the total unencumbered value of its assets still in Hong Kong remains above US$580,000 (or its equivalent sum in Hong Kong dollars).

*Disclosure of information*

2.      The Defendant must:

(1)     inform the Plaintiff in writing within 5 working days of service of this Order of all of its assets of an individual value of HK$8,000 or more in Hong Kong, whether in its own name or not, and whether solely or jointly owned, giving the value, location and details of all such assets.  The Defendant may be entitled to refuse to provide some or all of this information on grounds that to do so may incriminate it.

(2)     This information must be confirmed in an affidavit which must be served on the Plaintiff's Solicitors within 14 days after this Order has been served on the Defendant.

## *Preservation of Documents Relating to Assets*

3.      The Defendant must not destroy, tamper with, cancel or part with possession custody or control of any documents which relate to the value, location and details of its assets otherwise than in accordance with the terms of this Order.

## *Non Disclosure of the Terms of this Order*

4.      Until 4pm on 5th January 2017, except for the purpose of obtaining legal advice, the Defendant and anyone else with knowledge or notice of this Order must not directly or indirectly inform anyone of the proceedings in which this Order was made or of the contents of this Order or any evidence given in this action or otherwise warn anyone that proceedings have been or may be brought against them or anyone else by the Plaintiff.

## *Costs*

5.      Costs of this application be reserved.

## DURATION OF THIS ORDER

This Order will remain in force up to and including Friday, 5th January 2018 ("**the return date**"), unless before then it is varied or discharged by a further order of the court. The application in which this Order is made shall come back to the court for further hearing on the return date unless the Defendant pays the sum of US$580,000 into court or makes provision for security in that sum by some other method as provided for in this Order and serves notice that it does not require the application to come back to court.

## EXCEPTIONS TO THIS ORDER

(1)     The Defendant may agree with the Plaintiff's Solicitors that this Order should be varied in any respect, but any such agreement must be in writing.

(2)     This Order does not prohibit a bank against whom a Garnishee Order Absolute has been made in favour of the Plaintiff from releasing to the Plaintiff monies from bank accounts maintained in the name or for the benefit of the Defendant in order to comply with the terms of the Garnishee Order Absolute.

(3)     This Order shall cease to have effect if the Defendant provides security by paying the sum of US$580,000 (or its equivalent sum in Hong Kong dollars) into court or makes provision for security in that sum by some other method agreed with the Plaintiff's Solicitors or approved by the court.

## USE OF DISCLOSED INFORMATION AND DOCUMENTS

The Plaintiff do have leave to adduce information and documents disclosed by the Defendant in this action in such other criminal and/or civil actions in Hong Kong and in such other jurisdictions as may become necessary in its tracing and recovery of its assets.

## EFFECT OF THIS ORDER

A Defendant which is a corporation and which is ordered not to do something must not do it itself or by its directors, officers, employees or agents, or in any other way.

## THIRD PARTIES

1.      Effect of this Order

        It is a contempt of Court for any person notified of this Order knowingly to assist in or permit a breach of this Order. Any person doing so may be imprisoned, fined, or have their assets seized.

2.      Set off by Banks

This injunction does not prevent any bank from exercising any right of set off it may have in respect of any facility which it gave to the Defendant before it was notified of this Order.

3.      Withdrawals by the Defendant

No bank need enquire as to the application or proposed application of any money withdrawn by the Defendant if the withdrawal appears to be permitted by this Order.

## UNDERTAKINGS

The Plaintiff gives to the court the undertakings set out in Schedule 2 to this Order.

## VARIATION OR DISCHARGE OF THIS ORDER

The Defendant (or anyone notified of this Order) may apply to the Court at any time on 48 hours' notice to the Plaintiff's solicitors to vary or discharge this Order (or so much of it as affects that person).

## NAME AND ADDRESS OF PLAINTIFF'S SOLICITORS

The Plaintiff's Solicitors are:

Tanner De Witt
Solicitors
1806 Tower Two
Lippo Centre
89 Queensway
Hong Kong

Tel: 2573 5000  Fax: 2802 3553

Enquiries should be directed to Mr. J. Lane.

## INTERPRETATION OF THIS ORDER

(1)      In this Order "he", "him" or "his" include "she", "her", "hers" and "it" or "its".

(2)   When there are two or more defendants then (unless otherwise stated):

    (a)   references to "the defendant" mean both or all of them;

    (b)   an order requiring "the defendant" to do or not to do anything requires each defendant to do it or not to do it; and

    (c)   a requirement relating to service of this Order, or of any legal proceedings on "the defendant" means on each of them.

Dated this 27th day of December 2017.

Registrar

## SCHEDULE 1

### Affidavits

The Judge read the following affidavits before making this Order:

(1)     The Affirmation of Anthony Thomas Marrin dated 27th December 2017 together with its exhibits.

(2)     The draft Affidavit of Alvin Mark Staffin together with its exhibits.

## SCHEDULE 2

### Undertakings given to the court by the Plaintiff

(1)     If the Court later finds that this Order has caused loss to the Defendant or any other party and decides that the Defendant or that other party should be compensated for that loss, the Plaintiff will comply with any Order the Court may make.

(2)     As soon as practicable the Plaintiff will serve on the Defendant a sealed copy of the Writ of Summons, a summons to be heard on the return date together with a copy of the affidavit and exhibits containing the evidence relied on by the Plaintiff and a copy of the skeleton argument used at the application for this Order.

(3)     Anyone notified of this Order will be given a sealed copy of it by the Plaintiff's solicitors.

(4)     The Plaintiff will pay the reasonable costs of anyone other than the Defendant which have been incurred as a result of this Order including the costs of ascertaining whether that person holds any of the Plaintiff's assets and if the Court later finds that this Order has caused such a person loss, and decides that such person should be compensated for that loss, the Plaintiff will comply with any Order the Court may make.

(5)     If for any reason this Order ceases to have effect (including in particular where the Defendant provides security of US$580,000, as provided for above), the Plaintiff will take all reasonable steps to inform, in writing, any person or company to whom notice of this Order has been given, or who they have reasonable grounds for supposing may act upon this Order, that it has ceased to have effect.

**PENAL NOTICE**

HCA 3014 / 2017

**IMPORTANT NOTICE TO THE DEFENDANT**

因這是法律文件，忽視它可帶來嚴重的後果。如有疑問，請儘早向發出文件的法庭登記處(地址)查詢。你亦應考慮聽取律師的意見或是申請法律援助。

(1) This Order prohibits you from dealing with your assets up to the amount stated.

(2) The Order is subject to the exceptions which are set out in the Order. You should read the whole of the document carefully. You are advised to consult a solicitor as soon as possible. You have the right to ask the Court to vary or discharge this Order.

(3) If you disobey this Order, you may be found guilty of contempt of Court and you may be sent to prison or fined or your assets may be seized.

Dated this 27ᵗʰ day of December 2017

*[signature]*

**Tanner De Witt**
Solicitors for the Plaintiff

IN THE HIGH COURT OF THE

HONG KONG SPECIAL ADMINISTRATIVE REGION

COURT OF FIRST INSTANCE

ACTION NO. 3014 OF 2017

———————

BETWEEN

O'NEILL, BRAGG & STAFFIN, P.C.                   Plaintiff

And

COCHEN INTERNATIONAL LIMITED          Defendant

———————

**ORDER**

———————

Dated the 27ᵗʰ day of December 2017

Filed on the 28ᵗʰ day of December 2017

**Tanner De Witt**
Solicitors for the Plaintiff
1806-8, Tower Two
89 Queensway
Hong Kong
Tel: 2573 5000
Fax: 2802 3553

Ref: JHL/1700869

# EXHIBIT 14b

DCCJ 764/2018



IN THE DISTRICT COURT OF THE
HONG KONG SPECIAL ADMINISTRATIVE REGION
CIVIL ACTION NO. 764 OF 2018

—————————



BETWEEN

O'NEILL, BRAGG & STAFFIN, P.C.                    Plaintiff

and

YKY LIMITED                                      Defendant

—————————

**FINAL JUDGMENT**

**The 8th day of  May 2018**

No notice of intention to defend having been given by the Defendant herein and the Plaintiff having abandoned his claim for declaration, orders and other reliefs as sought in prayers (2), (3), (5), (6), (7), (8), (9), (10) and (13) of the Indorsement of Claim, IT IS THIS DAY ADJUDGED that the Defendant do pay the Plaintiff:

1.  the sum of US$14,000.00 or the Hong Kong dollar equivalent at the time of payment together with interest thereon at the rate of 8% per annum from 23 February 2018 to the date hereof and thereafter at judgment rate until payment; and

2.  HK$7,130.00 fixed costs.

**Registrar**

DCCJ 764/2018

## IN THE DISTRICT COURT OF THE
## HONG KONG SPECIAL ADMINISTRATIVE REGION
## CIVIL ACTION NO. 764 OF 2018

———————

BETWEEN

O'NEILL, BRAGG & STAFFIN, P.C.      Plaintiff

and

YKY LIMITED      Defendant

———————

---

### FINAL JUDGMENT

---

Dated the 8th day of May 2018

Filed on the 8th day of May 2018

**Tanner De Witt**
Solicitors for the Plaintiff
1806, Tower Two
Lippo Centre
89 Queensway
Hong Kong

Tel: 2573 5000
Fax: 2802 3553

Reference: 1700869/JHL/ATM
1700869_073

# EXHIBIT 14c

DCCJ 763/2018

# IN THE DISTRICT COURT OF THE
# HONG KONG SPECIAL ADMINISTRATIVE REGION
# CIVIL ACTION NO. 763 OF 2018

———————



BETWEEN

O'NEILL, BRAGG & STAFFIN, P.C.                          Plaintiff

and

EXTRADE ELECTRONIC (HK) LIMITED              Defendant

———————

## FINAL JUDGMENT

## The 8th day of May 2018

No notice of intention to defend having been given by the Defendant herein and the Plaintiff having abandoned his claim for declaration, orders and other reliefs as sought in prayers (2), (3), (5), (6), (7), (8), (9), (10) and (13) of the Indorsement of Claim, IT IS THIS DAY ADJUDGED that the Defendant do pay the Plaintiff:

1.  the sum of US$28,000.00 or the Hong Kong dollar equivalent at the time of payment together with interest thereon at the rate of 8% per annum from 23 February 2018 to the date hereof and thereafter at judgment rate until payment; and

2.  HK$7,130.00 fixed costs.

Registrar

DCCJ 763/2018

## IN THE DISTRICT COURT OF THE
## HONG KONG SPECIAL ADMINISTRATIVE REGION
## CIVIL ACTION NO. 763 OF 2018

———————

BETWEEN

O'NEILL, BRAGG & STAFFIN, P.C.                    Plaintiff

and

EXTRADE ELECTRONIC (HK) LIMITED            Defendant

———————

—————————————————

### FINAL JUDGMENT
—————————————————

Dated the 8th day of May 2018
Filed on the 8th day of May 2018

**Tanner De Witt**
Solicitors for the Plaintiff
1806, Tower Two
Lippo Centre
89 Queensway
Hong Kong

Tel: 2573 5000
Fax: 2802 3553

Reference: 1700869/JHL/ATM
1700869_072

# EXHIBIT 15



**Bank of America**
**Merrill Lynch**

Escrow Management Services
PA6-580-01-02
1 Fleet Way
Scranton, PA 18507

## ATTORNEY TRUST ACCOUNT
## OVERDRAFT REPORT

December 12, 2017

RECEIVED
DEC 14 2017
PENNSYLVANIA LAWYERS
FUND FOR CLIENT SECURITY

Pennsylvania Lawyers Fund for Client Security Board
P O Box 62585
Harrisburg, PA 17106

Re:   Account No. xxxxxxxxxxxx1003
      O'NEILL, BRAGG & STAFFIN,  CUS
      ESCROW ACCOUNT
      ATTORNEY TRUST ACCOUNT
      720 JOHNSVILLE BLVD STE 1220
      WARMINSTER            PA   18974

To Whom It May Concern:

We are writing this letter to notify you regarding an overdraft on the above Escrow Attorney Trust Account with Bank of America.

Please be advised that a transaction in the amount of $580,000.00 was presented for payment on 12/6/2017 for the Attorney Trust Account client IOLTA-EAGLE FUNDING MIDTOWN LOAN , sub account number 0000000000000728.  There were insufficient funds at the time of presentation, causing an overdraft on the client account in the amount of  -$578,100.00.  The item was Honored.

If you have any questions regarding this notice, please call the Escrow Operations Department Customer Service Unit at 800-285-5245.

Sincerely,

Escrow Management Services

cc:   O'NEILL, BRAGG & STAFFIN,  CUS

# EXHIBIT 16

SUPREME COURT OF PENNSYLVANIA



**PENNSYLVANIA LAWYERS FUND FOR CLIENT SECURITY**
P.O. BOX 62585, HARRISBURG, PA 17106-2585
601 COMMONWEALTH AVENUE, SUITE 5400
HARRISBURG, PA 17120-0901
(717) 231-9510
(800) 962-4618
FAX: (717) 231-9511
EMAIL: admin@palawfund.com
WEB: www.palawfund.com

*MEMBERS OF THE BOARD*
Lewis F. Gould Jr., Esquire
*Board Chair*
Daniel I. Booker, Esquire
*Vice Chair*
Honorable Stefanie J. Salavantis
*Treasurer*
Robert A. Gleason, Jr.
Honorable Albert H. Masland
John A. Barbour, Esquire
George P. Hartwick, III

*STAFF*
Kathryn Peifer Morgan, Esquire
*Executive Director and Counsel*
Susan L. Erdman
*Administrative Assistant*

January 12, 2018


Gary L. Bragg, Esquire
Alvin M. Staffin, Esquire
O'NEILL, BRAGG & STAFFIN, P.C.
720 Johnsville Boulevard
Suite 1220
Warminster, PA 18974

      RE:    **Negative Balance Notification**
                  **DC–3368-01-17**

Dear Messrs. Bragg & Staffin:

      This will acknowledge receipt of your letter of January 2, 2018, with enclosed documentation, in connection with the above-referenced matter. The information provided was satisfactory and this matter is closed. Be assured this has not been treated as a disciplinary matter and no disciplinary file has been opened against O'Neill, Bragg and Staffin.

      Your cooperation has been appreciated.

          Sincerely,

          Kathryn Peifer Morgan, Esquire
          Executive Director and Counsel

KPM:se

# EXHIBIT 17

# O'NEILL, BRAGG & STAFFIN, P.C.

ATTORNEYS AT LAW
720 JOHNSVILLE BLVD., SUITE 1220
WARMINSTER, PA 18974

———

(215) 956-2800
FAX (215) 956-2838

GARY L. BRAGG
ALVIN M. STAFFIN*

WILLIAM G. O'NEILL
1926 - 2014

*LL.M. IN TAXATION

December 19, 2017

Bank of America, N.A.
Attention:  Adam Lewinski
        Assistant Vice President/Client Manager

Re:    O'Neill, Bragg & Staffin, P.C. IOLTA Account #49990 51003

Dear Mr. Lewinski:

As requested by you in your e-mail to me today, I am instructing you to close our firm's above referenced IOLTA Account. As you are aware, because of recent events and your inability to change the account number, we have withdrawn the remaining funds in the account and deposited them in a newly created IOLTA account at another banking institution.

Please let me know if you need anything further to close this account.

Sincerely,

Alvin M. Staffin

# EXHIBIT 18

Bank of America, N.A., NC1-028-14-04
150 N College St
Charlotte, North Carolina 28255

**Bank of America**
**Merrill Lynch**



O'NEILL, BRAGG & STAFFIN, CUS
ESCROW ACCOUNT
ATTORNEY TRUST ACCOUNT
720 JOHNSVILLE BLVD STE 1220
WARMINSTER, PA 18974-3547

**Business account
ending in:**
51003

**Date:**
**February 28, 2018**

## In April, the Escrow Management Service will be removed from your Full Analysis Business Checking ending in 51003

In an effort to continue to deliver value to our clients, we review account types and associated services to gauge the usefulness of certain products based on client needs. After a review of your account activity we have made the decision to remove the Escrow Management Service from this account. To give you time to assess how our business checking products can continue to help you meet your business needs, this will occur in April 2018.

Please note that the account referenced above is currently set up with the Escrow Management Service based on the terms of the *Deposit Agreement and Treasury Services Agreement* – *Escrow Management Service Addendum*. Your agreement with the bank, as outlined in the *Deposit Agreement and Disclosures*, states that a service can be terminated by the bank or yourself at any time with 30 calendar days' notice.

### What you need to know

Your account number will remain the same. Also, when the Escrow Management Service is removed in April, your account will remain a Full Analysis Checking account. If you subscribe to other services, standard fees for those services will apply. Sample pricing is provided on the following page. Actual pricing may vary.

In addition, our records reflect that with the Escrow Management Service, there were sub account(s) which were notated as being a trust account. With the removal of sub-accounting, it will be your responsibility to tell us whether you need additional accounts, and to also tell us how any accounts you have should be set up or titled, for example, whether the account should be titled as an IOLTA account. Any other open accounts you have at Bank of America® will not be impacted based on the removal of the Escrow Management Service from this account.

We understand that our decision to remove the Escrow Management Service may impact the way you manage your account(s) and business with us. We want to provide you with adequate time to consider other Bank of America products that might better serve your financial needs. You can go to **bankofamerica.com** to view the additional products we offer.

### Preparing for removal of the Escrow Management Service

- Additional checking accounts may be needed if you have a requirement to separately manage client funds in an IOLTA or similar account.
- The final Escrow Management Service statement will be provided for April 2018.
- Escrow account information will no longer be available through Escrow Online on CashPro.
- Your account title will remain the same; the titling we show on our records:
  O'NEILL, BRAGG & STAFFIN, CUS
  ESCROW ACCOUNT
- If you require any changes to an account title, for example, titling an account as an attorney trust account, please work with your account representative,
- 2018 year-end tax reporting will be provided for earnings on Escrow sub-accounts.

### Questions?

Please send an email message to us at **Liquidity_Team_Contact@bankofamerica.com**. We appreciate the opportunity serve your business financial needs.

# EXHIBIT 19

**From:** Liquidity_Team_Contact [mailto:liquidity_team_contact@bankofamerica.com]
**Sent:** Tuesday, March 6, 2018 5:49 PM
**To:** Mel Staffin <mstaffin@obs-law.com>
**Subject:** RE: Escrow Management Services

Mr. Staffin,

We have receive your inquiry.  We noticed that your account is in already in a close status and that is letter should not have been mailed to you. We apologize for any inconvenience this may have caused.

Sincerely,

The Liquidity Team.

**From:** Mel Staffin [mailto:mstaffin@obs-law.com]
**Sent:** Monday, March 05, 2018 10:55 AM
**To:** Liquidity_Team_Contact <liquidity_team_contact@bankofamerica.com>
**Subject:** Escrow Management Services

See attached letter I received from you today.

Please e-mail to me the "**Deposit Agreement and Treasury Services Agreement-Escrow Management Service Addendum**" referenced in your letter.

Thank you.

Mel Staffin, Esquire
O'Neill, Bragg & Staffin, P.C.
720 Johnsville Blvd., Suite 1220
Warminster, PA 18974
Phone 215.956.2800
Fax 215.956.2838
E-mail:  mstaffin@obs-law.com
_____

NOTICE:  This e-mail message and all attachments transmitted with it are intended solely for the use of the addressee and may contain legally privileged and confidential information.  If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by replying to this message or calling O'Neill, Bragg & Staffin, P.C. at (215) 956-2800, and please delete it from your computer.

PLEASE NOTE that all incoming e-mails will be automatically scanned by us to eliminate unsolicited promotional e-mails ("spam").  This could result in deletion of a legitimate e-mail before it is read by its intended recipient at our firm.  Please tell us if you have any concerns about this automatic filtering.

Any Federal tax advice contained herein is not intended or written to be used, and cannot be used by you or any other person, for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Code.  This disclosure is made in accordance with the rules of Treasury Department Circular 230 governing standards of practice before the Internal Revenue Service.  Any written statement contained herein relating to any Federal tax transaction or matter may not be used by any person without the express prior written permission in each instance of an officer of this firm to support the promotion or marketing of or to recommend any Federal tax transaction(s) or matter(s) addressed herein.

This message, and any attachments, is for the intended recipient(s) only, may contain information that is privileged, confidential and/or proprietary and subject to important terms and conditions available at http://www.bankofamerica.com/emaildisclaimer. If you are not the intended recipient, please delete this message.

# EXHIBIT 20

**Bank of America**

## Telephone Wire Transfer Agreement

This Telephone Wire Transfer Agreement (the "Agreement") sets forth the terms and conditions of the wire transfer service (the "Service") under which the undersigned Client ("you") initiates wire transfers by telephone instructions, by standing order and by draw request to Bank of America, N.A. ("we" or "us"), as more fully described in the Procedures Guide and Additional Terms for Wire Transfer Telephone Clients we provide to you in connection with the Service (the "Procedures Guide"). "Authorized Representative" means each individual, listed on a "Wire Transfer Profile" you keep on file with us, who is authorized to initiate wire transfers on your behalf. You agree to comply with the Procedures Guide.

### 1. Authorization to Transfer Funds

(a)      Subject to the terms of this Agreement, we will act on your standing order requests, draw requests and telephone wire transfer payment orders. We will act on telephone wire transfer requests when an Authorized Representative calls our designated toll-free number, provides the Personal Identification Number (PIN) we issue to such Authorized Representative for this Service and provides the other information necessary to effect the wire transfer.

(b)      As you instruct us, we will transfer funds to any other Bank of America account or the account of a third party at another financial institution. We will debit your Bank of America account that an Authorized Representative, standing order or draw request specifies.

(c)      You must have sufficient funds in your account to cover the wire transfer. You may initiate a wire transfer only if the offsetting debit to your account will not cause you to exceed the account balance according to your records. If your records and ours disagree regarding the account balance, our records will control for purposes of our processing your instructions. However, we may, at our option, create an overdraft in your account and complete the wire transfer. If we do so, we will not be liable to you for damages to you for creating the overdraft. You agree to repay us immediately for any overdraft created by a wire transfer, together with our costs of collection and reasonable attorney's fees.

(d)      You are obligated to pay us the amount of any wire transfer once we act on and do not reject your instructions. At our discretion, we may at any time without notice require payment before we act on your instructions.

(e)      We reserve the right to electronically record any telephone conversation between you and us. By signing this Agreement, you consent to our recording such conversations. However, the decision to record is totally within our discretion, and we will not be liable for the failure to record any conversation, whether intentional or otherwise.

### 2. Security Procedures for Telephone Wire Transfers

(a)      In order to utilize the telephone initiation Service, an Authorized Representative must call the appropriate Wire Transfer Department using the telephone numbers provided on the attached "Operating Hours" form and use his/her PIN assigned for this Service. An Authorized Signer, as defined and identified below, may identify individuals who will be considered "Authorized Representatives" by listing them as such on the attached "Wire Transfer Profile". Each Authorized Representative will be assigned a PIN to be used when requesting or confirming a wire transfer. You agree to establish and maintain procedures to ensure the security and confidentiality of these PINs. Unless you have previously notified us that a PIN has been lost, stolen or its security otherwise compromised, you will be responsible for any wire transfer that is made utilizing the PIN, whether or not you or an Authorized Representative in fact authorized the transaction. If an Authorized Representative's PIN becomes lost or stolen, or you believe that an unauthorized

person may have learned such PIN, **contact us by telephone immediately at the phone number on our "Operating Hours" form.** Telephone requests to delete a PIN must be followed by immediate written notice to us. We reserve the right to change PINs periodically upon written notice to you.

(b)      **We are authorized to act upon telephone instructions received from any person who provides your account number and the PIN assigned to an Authorized Representative. We are not required to utilize any other procedure to verify the identity of any person making a telephone wire transfer request under this Agreement, and we are not liable for following instructions we receive from any person who provides the required information, even if the request proves to be unauthorized. You agree that the foregoing constitutes a security procedure for the verification of wire transfers initiated through the telephone Service (the "Security Procedure"), and that this Security Procedure is satisfactory under the circumstances.**

(c)      We shall not act upon a telephone wire transfer request if the request is not initiated in accordance with the foregoing Security Procedure. We reserve the right to suspend or cancel the Service if we suspect that any account or PIN is being used in an unauthorized manner.

### 3. Receipt, Acceptance, and Execution of Wire Transfer

(a)      We will act upon your wire transfer request on the day it is received, if the request is on a day that is a business day for us and is received prior to the expiration of your transfer deadlines as outlined in our Procedures Guide, and provided that the communication system we select is operating properly. We reserve the right to process wire transfers in any order convenient to us and by any means of transmission, funds transfer system, clearing house or intermediary bank we reasonably select to transfer funds. We also reserve the right to process your wire transfer request the next business day if it cannot be processed the day of receipt or if we otherwise choose not to reject your wire transfer request immediately so that you will have one business day to resolve or correct the basis on which we may reject your wire transfer request.

(b)      You agree to provide us with all the information required to be obtained by us under the Bank Secrecy Act and any other applicable federal or state laws or regulations.

(c)      You must ensure that all account numbers are accurate. A beneficiary's bank (including us when we are the beneficiary's bank) may make payment to a beneficiary based solely on the account or other identifying number. We or an intermediary bank may send a request to an intermediary bank or beneficiary's bank based solely on the bank identifying number. We, any intermediary bank and any beneficiary's banks may do so even if the wire transfer request includes a name inconsistent with the account or other identifying number as long as the inconsistency is not known by us or such other bank. Neither we nor any other bank has a duty to determine whether a request contains an inconsistent name and number.

(d)   We may reject any of your wire transfer requests which do not comply with the requirements of this Agreement, including your Wire Transfer Profile.  We also may reject any of your wire transfer requests which exceed the funds on deposit with us in the applicable account.  We may also reject any payment if it may be returned for any reason under the applicable national payment system rules of the receiving country of your transaction.  Notice of rejection is given to you by telephone, by facsimile or by mail.  Notices of rejection will be effective when given.

(e)   If a wire transfer request involves a currency other than the currency in which the relevant account is denominated, your funds will be exchanged for such other currency at a current rate of exchange on or before the transfer date in accordance with our normal procedures.  Currency exchange rates fluctuate over time, and you acknowledge and accept the risks of such fluctuations between the time you initiate a wire transfer request and the time the transfer is either completed or is unwound due to a cancellation, amendment, rejection or return.

## 4.   Cancellation of Wire Transfer Requests

We have no obligation to cancel or amend any telephone or draw wire transfer request after we receive it or to cancel or amend any transfer to be made pursuant to a standing order which is in effect.  If you or a bank sending us a draw request sends us a wire transfer request instructing us to cancel or amend a telephone or draw wire transfer request and we are able to verify the authenticity of the cancellation or amendment request using the Security Procedure, as applicable, we will make a reasonable effort to act on that request, but we will not be liable if it is not effected.  You agree to indemnify us against and hold us harmless from any and all liabilities, claims, costs, expenses and damages of any nature, including legal expenses, we incur in connection with your request to amend or cancel.  Your obligations under this provision will survive termination of the Service.

## 5.   Confirmation

Unless you instruct us otherwise, we will provide you with a mail confirmation of each wire transfer effected under this Agreement at your address on our records or as listed for advices on the Wire Transfer Profile.  The wire transfer will also be reflected on the periodic account statement that you receive from us.  You must send us written notice, with a statement of relevant facts, promptly after you receive the first confirmation or statement indicating a discrepancy between our records and yours.  If you fail to give the required notice within 14 days, we will not be liable for any loss of interest or for any compensation for any other loss or cost relating to an unauthorized or erroneous debit to your account or because of any other discrepancy in the notice or account statement.  You must notify us promptly by telephone, confirmed in writing, if you learn or discover from any source other than a confirmation or statement from us of information concerning an unauthorized or erroneous debit to your account.

## 6.   Limitation of Liability

(a)   For wire transfer requests which are subject to Article 4A of the Uniform Commercial Code, as adopted in the state whose laws govern this Agreement ("Article 4A"), we are liable only for damages required to be paid under Article 4A or Subpart B of Regulation J of the Board of Governors of the Federal Reserve System, as amended from time to time and as applicable, except as otherwise agreed in this Agreement.

(b)   For all wire transfer requests not subject to Article 4A, our liability is limited to actual damages, resulting directly from our willful misconduct or our failure to exercise reasonable care, not exceeding the following, as applicable: (i) in case of an excessive debit to your account, the amount of the excess plus compensation equivalent to interest; (ii) in case of payment to an account not specified by you, the amount of the payment plus compensation equivalent to interest; or (iii) in all other cases, the actual damages incurred by you.  You will use reasonable efforts to assist us in recovering the amount of any overpayment for which we are liable.

(c)   If we are obligated to pay interest compensation, we will pay such compensation or credit your account, as we determine, upon your written request.  We calculate compensation for the relevant period as specified in your deposit account agreement or as advised by your client services representative.

(d)   In no event will we be liable for any indirect, consequential or punitive loss, damage, cost or expense of any nature (even if advised of the possibility of such loss, damage, cost or expense), including, without limitation, any economic loss or damage, expense and loss of business, profits or revenue, goodwill and anticipated savings, loss of or corruption to your data, loss of operation time or loss of contracts.

(e)   We will not be responsible for the acts or omissions of you or your employees or agents (including but not limited to the amount, accuracy, timeliness or authorization of any instructions or information from you) or the acts or omissions of any other person or entity, including but not limited to any clearing house association or processor, any U.S. Federal Reserve Bank or any other country's central bank, any other financial institution, and no such person or entity will be deemed our agent.

(f)   We will not be liable for and will be excused from any failure or delay in performing our obligations for the Service if such failure or delay is caused by circumstances beyond our control, including any natural disaster (such as earthquakes or floods), emergency conditions (such as war, riot, fire, theft or labor dispute), legal constraint or governmental action or inaction, breakdown or failure of equipment, or your act, omission, negligence or fault.

(g)   We also will not be liable for any failure to act on our part if we reasonably believed that our action would have violated any law, rule or regulation.

(h)   You will indemnify us against and hold us harmless from and defend us against any and all liabilities, claims, costs, expenses and damages of any nature (including legal expenses) arising out of or relating to disputes or legal actions by parties other than you and us concerning your use of the Service.  The obligations contained in the preceding sentence will continue after the Service is terminated.  This section does not apply to any cost or damage attributable to our gross negligence or intentional misconduct.

## 7.   Additional Terms and Conditions

Fees.  You agree to pay the wire transfer fees and charges as set forth in the applicable fee schedule.  The fee schedule is available from your Banking Center or account officer.  We may deduct or charge any fee applicable to wire transfer requests from any of your accounts we hold, whether individual, joint, or otherwise.

Agreement.

(a)   The terms and conditions of this Agreement supersede any prior agreements, whether oral or written, relating to your initiation of wire transfers by telephone instructions, standing orders or draw requests; provided, however, that this Agreement does not supersede any agreement or terms and conditions you have signed and which covers treasury management services, including telephone initiation of wire transfers, standing orders or draw requests, which we provide to you.  This Agreement supplements the Deposit Agreement and Disclosures, which govern your depository account(s).

(b)   NOTICE OF FINAL AGREEMENT.  THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

Amendment.  We may amend this Agreement, the Procedures Guide, and any Fee Schedule from time to time, by sending a copy of any amendment to you at least (30) days prior to the proposed effective date.  The  amendment will automatically become effective on the stated effective date unless you terminate this Service prior to the effective date by written notice to us.  This Agreement may also be amended, from time to time, in writing and signed by all parties hereto.

Termination.
(a)      Either you or we may terminate this Agreement on 30 calendar days prior written notice to the other.
(b)  We may terminate this Agreement effective immediately, and we will send you notice of termination, if any of the following occurs: (i) you breach any of the terms in this Agreement or any other agreement with us; you terminate, liquidate or dissolve your business or dispose of a substantial portion of your assets; (iii) you fail generally to pay your debts as they become due; (iv) you, voluntarily or involuntarily, become the subject of any bankruptcy, insolvency, reorganization or other similar proceeding; or (v) any guaranty of your obligations to us terminates, is revoked or its validity is contested by the guarantor, or any of the events set forth in clauses (i) through (iv) attributable to you occur to the guarantor.
(c)  We may terminate this Agreement effective immediately, without notice, if you have not used the Service for the preceding 12 calendar months.

Notices.  We will direct all instructions and notices relating to this Agreement to the address provided on the Wire Transfer Profile or the most current address you have provided us.  You agree to direct all notices relating to this Agreement to your bank representative.  Such notices will be considered given after we receive and have a reasonable opportunity to act on them.  You agree to notify your bank representative in writing, when address or authorizer information changes.

Bankruptcy.  In the event you file for protection under the United States Bankruptcy Code, you agree to provide immediate oral and written notice to us.

Governing Law.  This Agreement is governed by and interpreted according to (i) U.S. federal law and (ii) the law of the state in which your deposit account is located, without reference to the principles of conflicts of law of the U.S. and of such state.

Arbitration.
(a)   We try to resolve our clients' Service problems or disputes as quickly as possible. In most cases, we can resolve a problem by telephone.
(b)      Any dispute or controversy that arises from a wire transfer subject to Article 4A will be decided by a judge without a jury in a United States of America federal or state court (except as you and we expressly agree otherwise in writing).  **This means that in these instances you waive any right to a trial by jury in any action or proceeding and agree that such action or proceeding will be tried before a judge without a jury.**
(c)   Any other dispute or controversy concerning this Agreement or your use of the Service will be decided by arbitration conducted in the United States of America (except as you and we expressly agree otherwise) in accordance with the United States Arbitration Act (Title 9, U.S. Code) under the Commercial Arbitration Rules of the American Arbitration Association. Under these procedures, the dispute is submitted to a neutral person for determination in place of a trial before a judge or jury.  Judgment upon the award made by the arbitrator may be entered in any court having jurisdiction.
(d)   Either you or we may exercise self-help remedies or obtain provisional or ancillary remedies from a court.  You or we may exercise or obtain these remedies at any time, even while the arbitration or trial by a judge is pending.  By exercising or obtaining any such remedies, neither you nor we waive the right to request that a dispute or controversy be decided by arbitration or trial by a judge.

Client Authorizations.  The person executing this Agreement on your behalf and the persons designated below are identified as your Authorized Signers who have the authority to sign the "Wire Transfer Profile" or other wire transfer documents on your behalf.

**Agreed to and Accepted**

This form must be signed in ink by the account owner and by any other Authorized Signer.

Client:
**O'Neill, Bragg & Staffin, P.C.**
CLIENT NAME
By:  _____
                              (SIGNATURE)
Name:   **Alvin M. Staffin**
                              (PRINT or TYPE)
Title: (Business Only):   **Treasurer**
                              (PRINT or TYPE)
By:  _____
                              (SIGNATURE)
Name:  _____
                              (PRINT or TYPE)
Title: (Business Only):  _____
                              (PRINT or TYPE)
By:  _____
                              (SIGNATURE)
Name:  _____
                              (PRINT or TYPE)
Title: (Business Only):  _____
                              (PRINT or TYPE)

Client Authorized Signers

Name:   **Alvin M. Staffin**
Signature:  _____
Telephone:   **215-956-2800**

Name:   **Gary L. Bragg**
Signature:  _____
Telephone:   **215-956-2800**

**Bank of America, N.A.**

By:  _____
                              (SIGNATURE)
Name:  _____
                              (PRINT or TYPE)
Title:  _____
                              (PRINT or TYPE)
Date:  _____

Telephone:  _____

 **Bank of America**

Authorization and Agreement Certification

The undersigned certifies that the signature appearing on the previous page for Client is the true signature of a person authorized to execute the form on behalf of Client, and further certifies that the undersigned has full authority to execute this certification.  Bank of America is entitled to rely upon this certification until written notice of its revocation is delivered to Bank of America.

Guidelines for completion:  If Client is a corporation, the chairman, president, chief executive officer, chief financial officer, treasurer, corporate secretary or an assistant corporate secretary who did <u>not</u> execute the Telephone Wire Transfer Agreement must sign this Certification; if Client is a partnership, limited liability company or limited liability partnership, one of the general partners or members must sign this Certification; if Client is a governmental entity, the entity's counsel must sign this Certification.

**Note:  If Client is not a U.S. legal entity or is a sole proprietor or individual, it is not required to complete this Certification.**

O'NEILL, BRAGG & STAFFIN, P.C.
                    **CLIENT NAME**

By: _____
                         (SIGNATURE)

Name:   Gary L. Bragg_____
                         (PRINT or TYPE)

Title (Business Only):   President_____
                                      (PRINT or TYPE)

Date:   08/06/2013_____

**Bank of America**

**Wire Transfer Profile – Telephone Initiation**
**Simplified Setup**

Please type or print clearly in black ink.        Date: _____        Workplan ID: _____

This simplified setup form is used to establish the Telephone Wire Transfer Service for clients with no more than two accounts and/or two representatives.

## 1. ACTION

☒ New Client        ☐ Change for Existing Client        ☐ Delete Account        ☐ Delete Representative

## 2. CLIENT INFORMATION

CLIENT/ ACCOUNT NAME
**O'Neill, Bragg & Staffin, P.C. Trust Account**

MAILING ADDRESS
**720 Johnsville Blvd, Suite 1220**

| CITY | STATE | ZIP CODE | COUNTRY |
|------|-------|----------|---------|
| **Warminster** | **PA** | **18974** | **USA** |

| CONTACT NAME | PHONE |
|--------------|-------|
| **Mel Staffin** | **215-956-2800** |

## 3. ACCOUNT INFORMATION

Enter the account number(s) you wish to use for sending wires.

| ACCOUNT NUMBER | STATE WHERE ACCOUNT IS DOMICILED |
|----------------|----------------------------------|
|  | **PA** |

| ACCOUNT NUMBER | STATE WHERE ACCOUNT IS DOMICILED |
|----------------|----------------------------------|
|  |  |

☐ Check here if request is for a Standing Order Transfer (SOT) only.  When checked, completion of Section 4 is not required; and no Personal Identification Numbers (PINs) will be issued.

## 4. WIRE TRANSFER AUTHORIZATION

Enter the name(s) of the individuals you are authorizing to initiate and verify wire transfers from your account(s).  Individuals listed will receive PINs for initiation and verification.

| AUTHORIZED REPRESENTATIVE NAME | AUTHORIZED REPRESENTATIVE NAME |
|---|---|
| **Alvin M. Staffin** | **Gary L. Bragg** |

| MAXIMUM TRANSFER AMOUNT | MAXIMUM TRANSFER AMOUNT |
|---|---|
| **$ N/A** | **$ N/A** |

| PHONE FOR CALLBACK VERIFICATION | ALT. PHONE FOR CALLBACK VERIFICATION | PHONE FOR CALLBACK VERIFICATION | ALT. PHONE FOR CALLBACK VERIFICATION |
|---|---|---|---|
| **215-956-2800** | **267-2059326** | **215-956-2800** | **484-432-7757** |

## 5. CALLBACK VERIFICATION (Select one)

☒ **Recommended security procedure (default).**  Check here if you want Bank of America to place a call to an Authorized Representative to verify the details of a wire transfer.  If you choose this option, Bank of America will place a call to verify the details of every non-repetitive wire transfer you initiate that exceeds $50,000 and every repetitive wire transfer you initiate that exceeds $5,000,000.  The verification callback may be made to the initiator of the wire.

☐ Check here if you do not want us to place a call to verify the details of a wire transfer with an Authorized Representative prior to completing the transaction.

## 6. ADVICE INFORMATION (Select one)

☐ Mail (default)        ☒ Fax:   **215-956-2838** _____        ☐ Phone: _____        ☐ None
(Incoming Wires Only)

## 7. CLIENT AUTHORIZATION AND AGREEMENT

By signing below, I/we authorize Bank of America to establish wire transfer services for me/us and that the individuals listed above are authorized to initiate and/or verify wire transfers via phone pursuant to the security procedures outlined in the Procedures Guide and Additional Terms for Wire Transfer Services. I/we agree that I/we have received and read the Procedures Guide and Additional Terms for Wire Transfer Services.

Note to Wire Transfer clients about Simplified Profile:

When making changes to your telephone wire profile, please take into consideration previous settings that may have been established for your accounts and representatives and the affect that any changes may have in the overall security of your accounts. Change requests to your account level settings supersede previously established settings.

• If you need assistance with identifying how your profile is currently established, please work with your client support team to request a wire transfer account profile summary.

**This form must be signed in ink by an Authorized Signer and submitted with original signature to your Bank of America representative.**

| PRINTED NAME OF AUTHORIZED SIGNER | SIGNATURE OF AUTHORIZED SIGNER | DATE |
|---|---|---|
| Alvin M. Staffin |  | **08/06/2013** |

## 8. FOR BANK USE ONLY

| BANK REPRESENTATIVE NAME | PHONE | CO/ COST CENTER |
|---|---|---|
|  |  |  |

| BANK REPRESENTATIVE SIGNATURE | | DATE |
|---|---|---|
|  |  |  |

**INSTRUCTIONS FOR COMPLETING WIRE TRANSFER PROFILE – TELEPHONE INITIATION – SIMPLIFIED SETUP**

Fields already defined on the form, or those that do not require further explanation, are not included in the instructions below.

| 1. Type of Request | |
|---|---|
| Enter an "X" in the applicable boxes to indicate the Action and Type of Transfer being requested. | |

| 2. Client Information | |
|---|---|
| Client/Account Name | Client or account name, as it appears on the account statement or account ownership documentation. |
| Mailing Address | We will use this address to send all information regarding your wire transfer setup, including the Personal Identification Numbers (PINs) for the representative(s) entered in Section 4. |
| Contact Name | Name of individual who should be contacted regarding this wire transfer setup or related transactions. Also, if you elect to receive Fax Advices (see Section 6), this is the individual we would contact if any issue occurs with fax transmission. |

| 3. Account Information | |
|---|---|
| Account Number | Full account number for each account you wish to establish for wire transfer services. |
| State where account is domiciled | State where account is domiciled, not state where account is serviced. |

| 4. Wire Transfer Authorization | |
|---|---|
| Authorized Representative Name | Enter full first and last name of person(s) who have authority to initiate and/or verify wire transfers via telephone. |
| Maximum Transfer Amount | Enter the maximum dollar amount for which the representative is authorized to initiate and verify wires. This amount applies to repetitive and non-repetitive wires. |
| Phone and Alt. Phone for Callback Verification | Enter the representative's primary and secondary phone numbers. We will use these phone numbers when contacting this representative to complete PIN acknowledgement, verify wire transfers, and provide phone advices, as applicable (see Section 6). Cell phone numbers are acceptable. |

| 5. Callback Verification | |
|---|---|
| You must select one of the Callback Verification options provided. If you select the second option, rather than the Recommended Security Procedure, you are acknowledging that the Bank will verify the authenticity of all wire transfers only by verifying the PIN provided by the Authorized Representative who initiates the wire. The Recommended Security Procedure is the default and will automatically be established if you do not select a Callback Verification option. | |

| 6. Advice Information | |
|---|---|
| This selection will apply to all accounts listed in Section 3. If you do not enter an "X" in any box in this section, you will automatically receive a mail advice; and the applicable fee will be charged. | |
| Fax | If you so choose, we will provide a Fax Advice for all outgoing (debit) and incoming (credit) wire transfers posted to your account. If the Fax Advice option is selected, you must provide a Fax Number. Applicable fee will be charged if selected. |
| Phone | If you so choose, we will contact your Authorized Representative(s) by telephone to provide the details on any incoming wire transfer credited to your account(s). Applicable fee will be charged if selected. |
| None | If you do not wish to receive any type of advice for your wire transfer activity, enter an "X" in this box. |

| 7. Client Authorization and Agreement | |
|---|---|
| Printed Name and Signature of Authorized Signer | Print name of Authorized Signer whose signature appears on form. Form must be signed in ink and submitted with original signature to the Bank. Facsimile stamps are not acceptable. An Authorized Signer is a person designated as such in the "Client Authorized Signers" section of the Telephone Wire Transfer Agreement or the Delegation of Authority form (Terms and Conditions Booklet or General Provisions.) |

**Bank of America**

# Repetitive Template/Standing Order Transfer Authorization
## Simplified Setup

| Please type or print clearly in black ink. | Date: | Workplan ID: |
|---|---|---|

This form is used to establish repetitive wires and/or standing order transfers for clients who completed the Wire Transfer Profile - Simplified Setup.

| **1. Type of Request** Make one selection in each column. | **ACTION** (Select only one.) ☒ Add ☐ Change ☐ Delete | **TYPE OF TRANSFER** (Select only one.) ☒ **Repetitive Transfer:** All funds transfer text is consistent; only amount, date, and Text Information is subject to change. ☐ **Standing Order Transfer (SOT):** A fixed dollar amount funds transfer is automatically generated based on predetermined instructions provided on this form. Bank-Assigned Repetitive ID (Complete only if this is a change or deletion.): |
|---|---|---|

**2. Client Information**
Account Number, State, and Account Title are always required. Also provide Ordering Party information, if applicable.

| DEBIT ACCOUNT NUMBER | STATE PA | ACCOUNT TITLE O'Neill, Bragg & Staffin, P.C. Trust Account |
|---|---|---|

☐ International transactions sent in destination country's local currency unless this box is checked. (SOTs will always be initiated in US$.)

**If Ordering Party is different from Account Title (Debit Party), complete the following:**

| ORDERING PARTY IDENTIFIER (e.g., Account Number, Client Number) | Type of Identifier: ☐ Account Number ☐ Non-Account |
|---|---|
| ORDERING PARTY | |
| ADDRESS | |
| CITY/ STATE/ ZIP | COUNTRY |

**3. Intermediary Bank Information**
Optional; only applicable if beneficiary bank is not an on-line Fedwire member or CHIPS participant.

| INTERMEDIARY BANK NAME | INTERMEDIARY BANK ROUTING INFO. (provide one only): |
|---|---|
| ADDRESS | FEDWIRE ROUTING NUMBER (ABA) – 9 digits |
| CITY/ STATE/ ZIP    COUNTRY | CHIPS PARTICIPANT NUMBER – 4 digits |
| BENEFICIARY BANK'S ACCT NUMBER WITH INTERMEDIARY BANK (if applicable) | |

**4. Beneficiary Bank Information**

| BENEFICIARY BANK NAME Wells Fargo Bank N.A. | BENEFICIARY BANK ROUTING INFO. (provide one only): |
|---|---|
| ADDRESS 217 Baltimore Pike | FEDWIRE ROUTING NUMBER (ABA) – 9 digits |
| CITY/ STATE/ ZIP Media, PA 19063    COUNTRY USA | CHIPS PARTICIPANT NUMBER – 4 digits SWIFT ADDRESS – 8 or 11 digits |

**5. Beneficiary Information**

| BENEFICIARY NAME Constance or Paschal DeJohn | |
|---|---|
| ADDRESS 17 Ardmoor Lane | BENEFICIARY'S ACCOUNT NUMBER AT BENEFICIARY BANK 1010067646195 |
| CITY/ STATE/ ZIP Chadds Ford, PA 19317    COUNTRY USA | |

**6. Reference Information**
Optional information for beneficiary.

(140 characters maximum)
DeJohn Medical Labs

**7. Standing Order Transfer Information - Beginning of Day**
Optional; only complete if SOT is selected in Section 1.

| ☐ Daily | | |
|---|---|---|
| ☐ Weekly | (Enter day of week; i.e., Mon., Tues., etc.) | Transfer Fixed Amount: $ |
| ☐ Semi-weekly (every other week) | (Enter day of week; i.e., Mon., Tues., etc.) | |
| ☐ Monthly | (Enter day of month; i.e., 1st, 15th, 20th, etc.) | |
| ☐ End of Month | | (Variable amount and intraday SOTs are not supported on this form.) |

## 8. Client Authorization and Agreement

This form must be signed in ink by an Authorized Signer, as defined in the Procedures Guide and Additional Terms for Wire Transfer Clients, and submitted with the original signature to your Bank of America Representative.

| PRINTED NAME OF AUTHORIZED SIGNER Gary L. Bragg | SIGNATURE OF AUTHORIZED SIGNER | DATE 08/06/2013 |
|---|---|---|

## 9. For Bank Use Only

| BANK REPRESENTATIVE NAME | PHONE | CO/COST CENTER |
|---|---|---|
| BANK REPRESENTATIVE SIGNATURE | | DATE |

**Bank of America** ◤◣◢◥

# Repetitive Template/Standing Order Transfer Authorization
## Simplified Setup

| Please type or print clearly in black ink. | Date: **08/06/2013** | Workplan ID: |
|---|---|---|

This form is used to establish repetitive wires and/or standing order transfers for clients who completed the Wire Transfer Profile - Simplified Setup.

| **1. Type of Request** Make one selection in each column. | **ACTION** (Select one only.) ☒ Add  ☐ Change  ☐ Delete | **TYPE OF TRANSFER** (Select one only.) ☒ **Repetitive Transfer:** All funds transfer text is consistent; only amount, date, and Text Information is subject to change. ☐ **Standing Order Transfer (SOT):** A fixed dollar amount funds transfer is automatically generated based on predetermined instructions provided on this form. Bank-Assigned Repetitive ID (Complete only if this is a change or deletion.): |
|---|---|---|

| **2. Client Information** Account Number, State, and Account Title are always required. Also provide Ordering Party information, if applicable. | DEBIT ACCOUNT NUMBER | STATE **PA** | ACCOUNT TITLE **O'Neill, Bragg & Staffin P.C. Trust Account** |
|---|---|---|---|

☐ International transactions sent in destination country's local currency unless this box is checked. (SOTs will always be initiated in US$.)

If Ordering Party is different from Account Title (Debit Party), complete the following:

| ORDERING PARTY IDENTIFIER (e.g., Account Number, Client Number) | Type of Identifier: ☐ Account Number  ☐ Non-Account |
|---|---|
| ORDERING PARTY | |
| ADDRESS | |

| CITY/ STATE/ ZIP | COUNTRY |
|---|---|

| **3. Intermediary Bank Information** Optional; only applicable if beneficiary bank is not an on-line Fedwire member or CHIPS participant. | INTERMEDIARY BANK NAME | **INTERMEDIARY BANK ROUTING INFO.** (provide one only): |
|---|---|---|
| | ADDRESS | FEDWIRE ROUTING NUMBER (ABA) – 9 digits |
| | CITY/ STATE/ ZIP        COUNTRY | CHIPS PARTICIPANT NUMBER – 4 digits |
| | BENEFICIARY BANK'S ACCT NUMBER WITH INTERMEDIARY BANK (if applicable) | |

| **4. Beneficiary Bank Information** | BENEFICIARY BANK NAME **Wells Fargo Bank, N.A.** | **BENEFICIARY BANK ROUTING INFO.** (provide one only): |
|---|---|---|
| | ADDRESS **217 Baltimore Pike** | FEDWIRE ROUTING NUMBER (ABA) – 9 digits |
| | CITY/ STATE/ ZIP **Media, PA 19063**     COUNTRY **USA** | CHIPS PARTICIPANT NUMBER – 4 digits SWIFT ADDRESS – 8 or 11 digits |

| **5. Beneficiary Information** | BENEFICIARY NAME **Jean DeJohn** | |
|---|---|---|
| | ADDRESS **3 Gray Hawk Lane** | BENEFICIARY'S ACCOUNT NUMBER AT BENEFICIARY BANK **1000026008153** |
| | CITY/ STATE/ ZIP **Thornton, PA 19373**     COUNTRY **USA** | |

| **6. Reference Information** Optional information for beneficiary. | (140 characters maximum) **DeJohn Medical Labs** |
|---|---|

| **7. Standing Order Transfer Information - Beginning of Day** Optional; only complete if SOT is selected in Section 1. | ☐ Daily ☐ Weekly _(Enter day of week; i.e., Mon., Tues., etc.)_ ☐ Semi-weekly (every other week) _(Enter day of week; i.e., Mon., Tues., etc.)_ ☐ Monthly _(Enter day of month; i.e., 1st, 15th, 20th, etc.)_ ☐ End of Month | Transfer Fixed Amount: $ _____ (Variable amount and intraday SOTs are not supported on this form.) |
|---|---|---|

## 8. Client Authorization and Agreement

This form must be signed in ink by an Authorized Signer, as defined in the Procedures Guide and Additional Terms for Wire Transfer Clients, and submitted with the original signature to your Bank of America Representative.

| PRINTED NAME OF AUTHORIZED SIGNER **Gary L. Bragg** | SIGNATURE OF AUTHORIZED SIGNER *[signature]* | DATE **08/06/2013** |
|---|---|---|

## 9. For Bank Use Only

| BANK REPRESENTATIVE NAME | PHONE | CO/COST CENTER |
|---|---|---|
| BANK REPRESENTATIVE SIGNATURE | | DATE |