IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

O'NEILL, BRAGG & STAFFIN, P.C.,  :        CIVIL ACTION
et al.                           :
                                 :
           v.                    :
                                 :
BANK OF AMERICA CORP., et al.    :        NO. 18-2109

MEMORANDUM

Bartle, J.                                November 13, 2018

        This case involves the effort of a law firm to recover
money from its bank which it alleges a computer hacker stole
from the law firm's bank account by deceiving a law firm
shareholder.

        Plaintiffs Gary L. Bragg, Esq. ("Bragg"), Alvin M.
Staffin, Esq. ("Staffin") and the law firm of O'Neill, Bragg,
and Staffin, P.C. ("OBS") have sued defendants Bank of America
Corporation and Bank of America, N.A. ("Bank of America") for
breach of several written agreements plaintiffs had with Bank of
America.  Plaintiffs also allege violations of the Pennsylvania
Commercial Code, 13 Pa. Cons. Stat. Ann. § 4A211, and a federal
regulation related to electronic fund transfers, 12 C.F.R. §
205.17(d)(5).  Finally, the complaint contains two counts of
negligence.

        Before the court is the motion of Bank of America to
dismiss the first amended complaint for failure to state a claim

for relief under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

I

When deciding a Rule 12(b)(6) motion, the court must accept as true all factual allegations in the complaint and draw all inferences in the light most favorable to the plaintiffs. See Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008); Umland v. PLANCO Fin. Servs., Inc., 542 F.3d 59, 64 (3d Cir. 2008). We must then determine whether the pleading at issue "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Under this standard, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. On a motion to dismiss for failure to state a claim, the court may consider "allegations contained in the complaint, exhibits attached to the complaint, and matters of public record." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) (citing 5A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990)).

The following factual allegations from plaintiffs' detailed amended complaint are taken as true for present purposes. OBS is a law firm based in Warminster, Pennsylvania that provides real estate and corporate legal services. Bragg is a shareholder and president of OBS while Staffin is a shareholder and vice president of OBS.

In compliance with Pennsylvania law, OBS maintains with Bank of America an Interest on Lawyers' Trust Account ("IOLTA") for the receipt and management of client funds. Within its one IOLTA, OBS designated numerous subaccounts to identify funds by client.[1] OBS initially established the IOLTA at Summit Bancorp in 2002 with an "Escrow Account Control Agreement" signed by Staffin. Thereafter Summit Bancorp was acquired by FleetBoston Financial Corporation, which in 2004 merged with defendant Bank of America. The IOLTA is now subject

---

1. Under Pennsylvania regulations, an attorney is required to maintain an IOLTA for client funds that are nominal in amount or that are expected to be held for a short time and therefore cannot practically be invested in a separate account to benefit the owner of the funds. 204 Pa. Code §§ 81.101, 81.102. IOLTA requires that an attorney maintain records to identify and to safeguard funds appropriately, and not to comingle his or her own property with that of clients. See id. § 81.104(a). An attorney is permitted to use subaccounting to segregate IOLTA funds by owner, but is not required to do so. See id. § 81.108. Instead, an attorney may deposit all client IOLTA funds into one account and may also share an account with other attorneys from the same firm. Id. §§ 81.103(c); 81.104.

to Bank of America's "Deposit Agreement and Disclosures" and "Telephone Wire Transfer Agreement."

In 2017 Bragg, on behalf of OBS, provided legal counsel to an entity known as Eagle Funding with respect to loan transactions with a borrower, Midtown Resources. In connection with that work, Bragg created an IOLTA subaccount numbered 728 and titled "Eagle Funding Midtown Loan."

Sometime on or before December 6, 2017, a computer hacker working on behalf of an entity called Cochen International Ltd. ("Cochen") surreptitiously gained access to Bragg's email account. The hacker created email correspondence, which appeared to originate from Bragg's email address and was directed to Staffin. The correspondence demonstrated knowledge of the Eagle Funding loan to Midtown. The hacker, posing as Bragg, requested that Staffin send a wire for $580,000 on behalf of Eagle Funding to a Bank of China investment account in Hong Kong that was allegedly owned by Midtown Resources. The emails, which were attached as an exhibit to the first amended complaint, read in relevant part:

> Hacker (as Bragg): Hi Mel [Staffin] – Are you going to be in the office tomorrow?
>
> I have wire [sic] for $580,000 to send to Midtown Resources for an Eagle Funding loan to them but this is going to Midtown Resources [sic] investment account in Hong Kong.

Let me know so i [sic] can forward the wiring instructions to you first [sic] tomorrow, as tomorrow will be an [sic] busy day for me.

Thanks. . . .

<u>Staffin</u>: I am in tomorrow

<u>Hacker</u>: Mel – I just received Midtown Resources [sic] investment wiring instructions in Hong Kong see below.

* Bank Name: Bank of China Hk Ltd
* Bank Address: 774 Nathan Road Hong Kong
* Swift: BKCHHKHH
* Account Name: Cochen International Ltd
* Account#: 012-692-08439-8.

* Reference: Midtown Resources Eagle Funding

Please transfer from our trust account, they need a swift copy once the wire is sent, email that to me once you take care of this.

Thanks in advance. . . .

<u>Staffin</u>: From which subaccount?

<u>Hacker</u>: From our trust account 49990 51003, sub #728.

Thanks. . . .

<u>Staffin</u>: No time to do this right now. Will have to be tomorrow.

<u>Hacker</u>: Get this done first thing in the morning and email transfers swift copy once completed.

Regards. . . .

<u>Staffin</u>: Sounds like an order.

<u>Hacker</u>: Tomorrow will be an [sic] busy day for me and this needs to be out tomorrow.

Appreciate your help.

<u>Staffin</u>:  Me too

At the time of these emails, Bragg was in Seattle, Washington.  Staffin thus believed that Eagle Funding required a transfer in a time-sensitive manner and that Bragg was unable to execute the transfer while travelling on the west coast. Staffin was further convinced of the emails' authenticity based on the hacker's familiarity with the Eagle Funding representation and the IOLTA subaccount number, along with the use of Staffin's nickname, Mel.

At 5:22 p.m. that day, December 6, Staffin contacted Bank of America via telephone to initiate a wire transfer request for $580,000 from the Eagle Funding IOLTA subaccount, as requested by the hacker.  At the time of the wire request, the Eagle Funding IOLTA subaccount had only a balance of approximately $1,900.  At 5:50 p.m., Bank of America called Staffin to validate the wire request.  Staffin provided a personal identification number ("PIN") for the account and confirmed the wire instructions.  Thereafter at 5:52 p.m. on December 6, Bank of America issued a wire confirmation report stating that the $580,000 had been withdrawn from plaintiffs' IOLTA.

Shortly thereafter, Staffin telephoned Bragg to discuss the transfer. Bragg explained that he had not received a transfer request from Eagle Funding and had not sent the email instructing Staffin to make the transfer. Realizing that OBS had been victimized by a computer hacker, Staffin contacted Bank of America at 7:07 p.m. that evening to request that the transfer be stopped. An employee of Bank of America informed Staffin that the Bank could not stop the transfer until the funds were actually received by the Bank of China. The employee suggested that Staffin submit a wire recall request to the Bank of China. Because the Eagle Funding subaccount contained only $1,900, the employee also expressed surprise that the transfer request had not been flagged as suspicious by Bank of America's risk department.

At the same time, Bragg called Bank of America's check fraud claims team and spoke with an employee on that team. The employee informed Bragg and Staffin, who was then conferenced into the call, that "he could request the funds back, but the client would need to check their [sic] account the next day to see if the attempt was successful. If unsuccessful, the client may call the Money Movement team between 8a-8p ET." During this time, the online report for the Eagle Funding IOLTA subaccount indicated that the transfer was "processing."

In the meantime, the wire transfer for the full
$580,000 was received by the Bank of China at 5:00 a.m.
Philadelphia time on December 7, 2017. Because the money in the
Eagle Funding subaccount was insufficient to fund the transfer,
Bank of America had withdrawn funds to cover the transfer from
other subaccounts of plaintiffs' IOLTA and thus had withdrawn
funds of other clients of OBS.

At 8:35 a.m. on December 7, 2017, Staffin contacted
Bank of America to initiate a wire recall request from the Bank
of China. Staffin also spoke with a member of Bank of America's
fraud monitoring team, who confirmed the wire recall request and
informed Staffin that he would receive updates on the status of
that request from a Bank of America representative. In
addition, Staffin reported the wire fraud to the Federal Bureau
of Investigation.

Later on December 7, the hacker, again posing as
Bragg, contacted Staffin in attempt to secure another wire
transfer of $980,000 from the Eagle Funding account to the Bank
of China. After Staffin offered to call to discuss the request,
the hacker broke off further communications.

On December 8, 2017, Bragg electronically transmitted
a letter to the president and chief executive officer of Bank of
America in which he documented the wire fraud and requested
restoration of the $580,000 withdrawn from the OBS IOLTA

subaccounts. That same day, the Bank of China responded that it could only recall the wire pursuant to an order from a Hong Kong court and suggested that the case be reported to the Hong Kong police. Bragg filed a cybercrime report with the Hong Kong police two days later, on December 10, 2017.

On December 20, 2017, plaintiffs retained a Hong Kong-based law firm in an attempt to recover the stolen funds. On December 28, 2017, that firm secured an order from the High Court of the Hong Kong Special Administrative Region freezing the hacker's account at Bank of China, which at that time contained $23,497.32. The order also required further disclosure of the transactions in the hacker's account by January 5, 2018, which resulted in the garnishment from the account of $83,509.21. After paying attorneys' fees and costs, plaintiffs recovered $58,730.11 from the hacker's account. Plaintiffs also secured judgments against two recipients of the fraudulently-transferred funds, Cochen, YKY Limited and Extrade Electronic (HK) Limited, for $21,120 and $35,130 respectively. Garnishment proceedings for those judgments are ongoing.[2]

---

2. By letter dated January 12, 2018, the Pennsylvania State Bar confirmed that the overdraft of the IOLTA subaccounts by OBS "has not been treated as a disciplinary matter and no disciplinary file has been opened against O'Neill, Bragg and Staffin."

In Count I of the amended complaint, plaintiffs allege that Bank of America breached plaintiffs' 2002 Escrow Control Account Agreement with Summit Bancorp. As stated above, Summit was absorbed by Bank of America sometime in 2004. At oral argument on defendants' motion to dismiss, counsel for plaintiffs conceded that the Escrow Control Account Agreement, which was issued over a decade ago by a predecessor to Bank of America, is no longer applicable to plaintiffs' accounts. Accordingly, the motion to dismiss will be granted as to Count I of the amended complaint.

IV

Plaintiffs aver in Count II of the amended complaint a breach of contract claim against Bank of America based on the parties' Deposit Agreement and Disclosures, which states:

**Placing A Stop Payment Order**

. . . .

If we [Bank of America] pay an item subject to a valid and timely stop payment order, we may be liable to you if you had a legal right to stop payment and you establish that you suffered a loss because of the payment. Our liability, if any, is limited to the actual loss suffered, up to the amount of the item. You must prove your loss to our satisfaction. We are not liable to you for any special, incidental or consequential loss or damage of any kind.

Plaintiffs assert that Bank of America violated this portion of the "Stop Payment Order" provision when Staffin orally requested that the Bank stop payment twice on December 6, 2017 and once in writing on December 8, 2017. Plaintiffs maintain they had a legal right to stop payment because the transfer order resulted from fraud.

It is undisputed that Staffin made the first stop payment request at 7:07 p.m., over an hour after the wire was received and confirmed by Bank of America. Plaintiffs ignore the crucial section of the Deposit Agreement and Disclosures, which provides:

> **Amending or Cancelling Payment Orders**
> <u>You may not amend or cancel a payment order after we receive it</u>. If you ask us to do this, we may make a reasonable effort to act on your request. <u>But we are not liable to you if, for any reason, a payment order is not amended or cancelled</u>. You agree to reimburse us for any costs, losses or damages that we incur in connection with your request to amend or cancel a payment order.

(emphasis added). Thus, a request to cancel made after a wire is received by Bank of America is not a "valid and timely stop payment order," and plaintiffs had no legal right to stop payment. This more specific provision regarding cancellation or amendment controls over the general "Stop Payment Order" provision. See In re Alloy Mfg. Co. Emps. Tr., 192 A.2d 394, 396 (Pa. 1963).

Plaintiffs also assert that Bank of America violated the Deposit Agreement and Disclosures when defendants swept subaccounts containing the funds of unrelated clients in order to pay the wire at issue. Specifically, plaintiffs point to the following provisions of the Deposit Agreement and Disclosures:

> **Overdrafts and Declined or Returned Items**
> When we determine that you do not have enough funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item. . . . Otherwise, without notice to you, we either authorize and pay the insufficient funds item and overdraw your account (an overdraft item) or we decline or return the insufficient funds item without payment (a returned item).
>
> We pay overdrafts at our discretion, which means that we do not guarantee that we will always, or ever, authorize and pay them. . . . We may pay all, some, or none of your overdrafts, without notice to you. If we do not authorize and pay an overdraft, then we decline or return the transaction unpaid.

Plaintiffs also cite the following contractual provision, which states in relevant part:

> **Business Accounts – Overdraft Practices and Settings**
> We automatically apply our standard business overdraft setting to business accounts. With our standard business overdraft setting, we may occasionally authorize and pay overdrafts for all types of transactions.

Under this overdraft language, it is clear that there was no breach of the Deposit Agreement and Disclosures. Bank of

America had the discretion to pay the wire request and to overdraw plaintiffs' IOLTA, or to decline the wire request without payment.[3]  It opted for the former.  The "Overdrafts and Declined or Returned Items" provision cited by plaintiffs further states that "[i]f we overdraw your account, you agree to repay us immediately, without notice or demand from us.  We ordinarily use deposits you or others make to your account to pay overdrafts, fees and other amounts you owe us."  Thus, under the Deposit Agreement and Disclosures, Bank of America was permitted to use any of the deposits in plaintiffs' IOLTA to fund the wire and to seek repayment from plaintiffs for any amount that exceeded their account deposits.

While plaintiffs may have used subaccounts for record-keeping purposes, there is nothing in the Deposit Agreement and Disclosures that precluded the Bank from taking funds deposited within the account merely because subaccounts were used by plaintiffs to keep track of the funds of each client.  The only provision of the Deposit Agreement and Disclosures to address subaccounts states:

> **Subaccounts**
> For regulatory accounting purposes, we may classify checking accounts as two subaccounts:  a checking subaccount and a

---

3.  There is no allegation that plaintiffs opted out of the automatic overdraft protection program which, as noted above, is automatically applied to business accounts.

> savings subaccount. . . . <u>We may transfer</u>
> <u>funds between these subaccounts</u>.  We record
> the subaccounts and any transfers between
> them on our internal accounting records
> only.  <u>Otherwise, the subaccounts are</u>
> <u>subject to the same terms as the checking</u>
> <u>and saving accounts described in this</u>
> <u>Agreement</u>.

(emphasis added).  This single provision of the agreement to
address subaccounts supports defendants' position that funds
could be taken from other subaccounts to fund an overdraft and
that subaccounts are otherwise subject to the same overdraft
provisions as accounts in general.  Plaintiffs cite no
contractual language or statute to the contrary.

As stated above, the Deposit Agreement and Disclosures
provides that Bank of America, at its discretion and without
notice to the customer, may pay an item and overdraw an account.
The Agreement does not provide an exception to this general rule
on overdrafts for subaccounts, which after all are part of one
single account.  "When a contract does not provide for a
contingency, it is not ambiguous; rather, it is silent, and the
court may not read into the contract something it does not
contain and thus make a new contract for the parties." <u>Banks</u>
<u>Eng'g Co. v. Polons</u>, 697 A.2d 1020, 1023–24 (Pa. Super. 1997)
(internal quotation marks, citation, and alteration omitted);
<u>see also</u> <u>Steuart v. McChesney</u>, 444 A.2d 659, 662 (Pa. 1982).  In
such circumstances, we will not read into the Deposit Agreement

and Disclosures an exception from the overdraft provisions for subaccounts which it clearly does not contain.  See Seven Springs Farm, Inc. v. Croker, 748 A.2d 740, 744 (Pa. Super. 2000).

Accordingly, the motion of Bank of America to dismiss Count II of the amended complaint will be granted.

V

In Count III of the amended complaint, plaintiffs assert breach of their Telephone Wire Transfer Agreement with Bank of America.  Plaintiffs cite the following language:

> **Cancellation of Wire Transfer Requests**
> We have no obligation to cancel or amend any telephone or draw wire transfer request after we receive it or to cancel or amend any transfer to be made pursuant to a standing order which is in effect.  If you or a bank sending us a draw request sends us a wire transfer request instructing us to cancel or amend a telephone or draw wire transfer request and we are able to verify the authenticity of the cancellation or amendment request using the Security Procedure, as applicable, we will make a reasonable effort to act on that request, but we will not be liable if it is not effected.  You agree to indemnify us against and hold us harmless from any and all liabilities, claims, costs, expenses and damages of any nature, including legal expenses, we incur in connection with your request to amend or cancel.

In addition, appended to the Telephone Wire Transfer Agreement is a "Procedures Guide and Additional Terms for Wire Transfer

Clients," which outlines procedures which must be undertaken to cancel a wire transfer:

> (a) Cancellation requests must be made directly to the Bank's Wire Transfer Department, using the telephone numbers provided in the Operating Hours section of this Procedures Guide.

> (b) Client's Authorized Representative must provide to the Bank their [sic] PIN and the Transaction Reference Number that was assigned upon the initiation of the wire transfer to be cancelled.

> (c) Upon receipt of a cancellation request, Bank will make a reasonable effort to cancel the wire transfer, including contacting the receiving financial institution to reverse the wire transfer; however, bank will not be liable if the wire transfer is not reversed.

Plaintiffs contend that Bank of America violated this provision by failing to make a reasonable effort to act on their request to cancel the wire transfer. Instead, according to the amended complaint, an employee of Bank of America informed Staffin that the wire could not be cancelled at all and that plaintiffs' only recourse was to contact the Wire Transfer team the following morning to request that the transfer be recalled after it was received by the Bank of China. Plaintiffs argue that this information was patently incorrect and that the opposite was true because the Bank of China stated that the wire could be cancelled at any point until it processed the transfer.

Plaintiffs' position contradicts the clear and unambiguous language of the Telephone Wire Transfer Agreement, which states that Bank of America has no obligation to cancel or amend a telephone wire request after it is received.  It further provides that the Bank "ha[s] no obligation to cancel or amend any telephone or draw wire transfer request after we receive it" and that plaintiffs agree "to indemnify [the Bank] against and hold [the Bank] harmless from any and all liabilities" in connection with any failure to cancel or amend.  Here, there is no dispute that Bank of America received the wire instructions from Staffin and that the wire was confirmed by the Bank at 5:52 p.m.  Staffin did not attempt to cancel the wire until 7:07 p.m., over an hour after the wire was requested and confirmed.

Accordingly, there is no breach of the Telephone Wire Transfer Agreement.  The motion of Bank of America to dismiss Count III of the amended complaint will be granted.[4]

---

4.  Bank of America has also asserted that the PCC preempts plaintiffs' breach of contract claims.  The PCC displaces parallel common law claims where:  (1) "it supplies a comprehensive remedy"; and (2) where "reliance on the common law would thwart the purposes of the Code."  Envtl. Equip. & Serv. Co. v. Wachovia Bank, N.A., 741 F. Supp. 2d 705, 712–13 (E.D. Pa. 2010) (citing N.J. Bank, N.A. v. Bradford Sec. Operations, Inc., 690 F.2d 339, 345 (3d Cir. 1982)).  The parties have not pointed to any inconsistencies between the contracts and the PCC.  In fact, the Telephone Wire Transfer Agreement specifically incorporates the standard of liability set forth in Article 4A of the PCC.  Even if they were not consistent, the

We turn next to plaintiffs' claim under the Pennsylvania Commercial Code ("PCC"), 13 Pa. Cons. Stat. Ann. § 4A211, in Count V of the amended complaint.[5] Plaintiffs specifically assert that Bank of America's failure to cancel the wire violated § 4A211(c)(2)(ii), "Cancellation and amendment of payment order," which reads:

> **Communication received after payment order accepted.**--After a payment order has been accepted, cancellation or amendment of the order is not effective unless the receiving bank agrees or a funds-transfer system rule allows cancellation or amendment without agreement of the bank:
>
> . . . .
>
> (2) With respect to a payment order accepted by the beneficiary's bank, cancellation or amendment is not effective unless the order was issued in execution of an unauthorized payment order or because of a mistake by a sender in the funds transfer which resulted in the issuance of a payment order:
>
> . . . .
>
> (ii) that orders payment to a beneficiary not entitled to

---

PCC permits the parties to vary their respective rights and liabilities by express agreement. <u>See</u> 13 Pa. Cons. Stat. Ann. § 4A212. Thus, we conclude that plaintiffs' breach of contract claims are not preempted by the PCC but nonetheless fail on the merits.

5. Count IV was intentionally omitted from the amended complaint.

receive payment from the
originator. . . .

The PCC further defines "sender" as "[t]he person
giving the instruction to the receiving bank," that is, Staffin.
13 Pa. Cons. Stat. Ann. § 4A103.  The "receiving bank" is "[t]he
bank to which the sender's instruction is addressed," that is,
Bank of America.  Id.  The "beneficiary's bank" is "[t]he bank
identified in a payment order in which an account of the
beneficiary is to credited pursuant to the order," that is, Bank
of China.  Id.  The "beneficiary" is defined as "[t]he person to
be paid by the beneficiary's bank," that is, the account at Bank
of China belonging to Cochen International.  Id.

Plaintiffs assert that their cancellation was
effective because the payment order was issued "because of a
mistake by a sender in the funds transfer which resulted in the
issuance of a payment order . . . that orders payment to a
beneficiary not entitled to receive payment from the
originator."  See 13 Pa. Cons. Stat. Ann. § 4A211(c)(2)(ii).
They reason that Staffin, due to a mistake, issued a payment
order to Cochen International's account at Bank of China
believing the account belonged to Midtown Resources.

We reject plaintiffs' interpretation of
§ 4A211(c)(2)(ii).  The PCC begins with a clear presumption that
cancellation or amendment of a payment order is not effective

after a payment order has been accepted.  We again note that plaintiffs concede in their amended complaint that the attempted cancellation occurred after Bank of America had accepted Staffin's payment order.  See 13 Pa. Cons. Stat. Ann. § 4A211(c).  After acceptance, a payment order may be amended or canceled only under two circumstances:  (1) by agreement of the bank; or (2) if a funds-transfer system rule allows cancellation or amendment without agreement of the bank under certain circumstances.  See id.  Here, there is no allegation that Bank of America agreed to cancellation—if it had, this matter would not be before the court.  Further, there is no allegation that any funds-transfer system rule allowed plaintiffs to cancel the order after receipt by Bank of America.  Thus, § 4A211(c)(2)(ii) does not apply.

In interpreting Article 4A of the PCC, we are guided by its purpose as set forth in the commentary prepared by the National Conference of Commissioners on Uniform State Laws and to which the Pennsylvania Supreme Court has given substantial weight[6]:

---

6.  Although the commentary does not have the weight of legislation and thus is not binding, the Pennsylvania Supreme Court has given "substantial weight" to it as "evidencing the intended application" of PCC provisions.  In re Bristol Assocs., Inc., 505 F.2d 1056, 1058 n.2 (3d Cir. 1974) (citing Phila. Title Ins., Co. v. Fidelity-Phila. Tr. Co., 212 A.2d 222, 225 (Pa. 1965)); see also Cucchi v. Rollins Protective Servs. Co., 574 A.2d 565, 570-71 (Pa. 1990).

In the drafting of Article 4A, a deliberate
decision was made to write on a clean slate
and to treat a funds transfer as a unique
method of payment to be governed by unique
rules that address the particular issues
raised by this method of payment.  A
deliberate decision was also made to use
precise and detailed rules to assign
responsibility, define behavioral norms,
allocate risks and establish limits on
liability, rather than to rely on broadly
stated, flexible principles.  In the
drafting of these rules, a critical
consideration was that the various parties
to funds transfers need to be able to
predict risk with certainty, to insure
against risk, to adjust operational and
security procedures, and to price funds
transfer services appropriately.  This
consideration is particularly important
given the very large amounts of money that
are involved in funds transfers.

See 13 Pa. Cons. Stat. Ann. § 4A102, cmt.  Thus, the PCC,

including § 4A211, was adopted to create a set of bright-line,

predictable rules.

The PCC provides that generally "the rights and

obligations of a party to a funds transfer may be varied by

agreement."  13 Pa. Cons. Stat. Ann. § 4A501(a).  It also

provides that "[a] receiving bank is not the agent of the sender

or beneficiary of the payment order it accepts or of any other

party to the funds transfer, and the bank owes no duty to any

party to the funds transfer except as provided in this division

or by express agreement."  Id. § 4A212.  The operative

agreements here did not depart from the scheme set forth in

§ 4A211 but instead similarly provided that a wire request could not be canceled or amended after receipt by Bank of America and that the Bank would not be liable for failure to do so.

While the PCC rule limiting cancellation after receipt to situations where the bank has explicitly agreed or where a funds-transfer system rule permits cancellation may at times lead to harsh results, as is the case here, it ultimately serves the greater good by facilitating commercial transactions involving large sums of money.  Interpreting § 4A211(c) in this manner helps to allocate responsibility and risk, rather than permitting cancellation after receipt merely due to a mistake by the sender that could be neither known nor anticipated by the bank before it sent the wire instructions to the beneficiary.

We therefore will grant the motion of defendants to dismiss plaintiffs' claim under § 4A211(c)(2)(ii) of the PCC in Count V of the amended complaint.

VII

Plaintiffs further allege in Count VI of the amended complaint that defendants violated § 4A211(e) of the PCC, which states:

> **Canceled payment order.**--A canceled payment order cannot be accepted.  If an accepted payment order is canceled, the acceptance is nullified and no person has any right or obligation based on the acceptance.  Amendment of a payment order is deemed to be cancellation of the original order at the

> time of amendment and issue of a new payment
> order in the amended form at the same time.

13 Pa. Cons. Stat. Ann. § 4A211(e).  Counsel for plaintiffs
conceded at oral argument that this provision of the PCC does
not apply because the payment order at issue was never
effectively canceled.

We will dismiss plaintiffs' claim under § 4A211(e) of
the PCC in Count VI of the amended complaint.

VIII

In Count VII of the amended complaint plaintiffs aver
violation of a regulation promulgated by the Board of Governors
of the Federal Reserve System on banks and banking.
Specifically, plaintiffs assert that Bank of America violated
12 C.F.R. § 205.17(d)(5), known as "Regulation E," which
implements the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693
et seq.  That portion of the regulation provides:

> Alternative plans for covering overdrafts.
> If the institution offers a line of credit
> subject to the Board's Regulation Z (12 CFR
> part 226) or a service that transfers funds
> from another account of the consumer held at
> the institution to cover overdrafts, the
> institution must state that fact.  An
> institution may, but is not required to,
> list additional alternatives for the payment
> of overdrafts.

12 C.F.R. § 205.17(d)(5).  Plaintiffs maintain that the sweeping
of its IOLTA subaccounts by Bank of America violated this
regulation because it failed to disclose that it offered such

-23-

"service that transfers funds from another account of the consumer held at the institution to cover overdrafts." <u>See</u> <u>id.</u>

By its own terms, Regulation E applies only to accounts "established primarily for personal, family, or household purposes." 12 C.F.R. § 205.2(b)(1); <u>see</u> <u>also</u> <u>Shames-Yeakel v. Citizens Fin. Bank</u>, 677 F. Supp. 2d 994, 1007 (N.D. Ill. 2009); <u>Regatos v. N. Fork Bank</u>, 257 F. Supp. 2d 632, 638 & n.10 (S.D.N.Y. 2003). Plaintiffs' IOLTA was established primarily for business purposes, that is, the deposit by a law firm of client money.

Regulation E does not apply here and Count VII will be dismissed.

IX

In Counts VIII and IX of the amended complaint, plaintiffs aver claims against Bank of America for negligence per se and negligence respectively. Like plaintiffs' other causes of action, these claims stem from defendants' failure to cancel the wire and the sweeping by Bank of America of plaintiffs' IOLTA subaccounts to fund the wire transfer. Plaintiffs assert that these acts and omissions violated Bank of America's duty to act in good faith and to exercise ordinary care when dealing with its customers. <u>See</u> 13 Pa. Cons. Stat. Ann. § 4103(a).

Plaintiffs' negligence per se claim is based on defendants' alleged breach of the provisions of the PCC and Regulation E set forth in Counts V through VII of the amended complaint. As discussed above, we find no violation of the PCC or Regulation E by Bank of America. Plaintiffs simply have not stated a negligence per se claim in Count VIII on which relief can be granted.

Plaintiffs plead a claim for negligence in Count IX of the amended complaint. Under Pennsylvania law, "[i]t is well established that the legal relationship between a financial institution and its depositors is based on contract, and that the contract terms are contained in the signature cards and deposit agreements." First Fed. Sav. & Loan Ass'n of Hazleton v. Office of State Treasurer, 669 A.2d 914, 915 (Pa. 1995). There is no special or fiduciary relationship between a bank and its customer. See, e.g., Bucci v. Wachovia Bank, N.A., 591 F. Supp. 2d 773, 783-84 (E.D. Pa. 2008). Thus, the relationship between Bank of America and plaintiffs here is purely contractual. Under the operative contracts, Bank of America owed simply a duty of ordinary care to plaintiffs.[7]

_____

7. Consistent with Pennsylvania law, the Deposit Agreement and Disclosures provides: "Our deposit relationship with you is that of debtor and creditor. This Agreement and the deposit relationship do not create a fiduciary, quasi-fiduciary or special relationship between us. We owe you only a duty of ordinary care."

In _Bruno v. Erie Insurance Co._, a case not cited by
either party, the Pennsylvania Supreme Court recognized the
long-standing "gist of the action" doctrine.  106 A.3d 48, 64-69
(Pa. 2014).  Under that doctrine, a party is precluded from
recasting breach of contract claims into tort claims.  _Id._; _see
also_ _Jones v. ABN Amro Mortg. Group, Inc._, 606 F.3d 119, 123 (3d
Cir. 2010) (quoting _Erie Ins. Exch. v. Abbott Furnace Co._, 972
A.2d 1232, 1238 (Pa. Super. 2009)).  As explained in _Bruno_, "the
nature of the duty alleged to have been breached, as established
by the underlying averments supporting the claim in a
plaintiff's complaint, [is] the critical determinative factor in
determining whether the claim is truly one in tort, or for
breach of contract."  106 A.3d at 68.  In conducting our
analysis, we thus must focus on the substance of the allegations
comprising plaintiffs' claims and not the labels used.  _Id._

In _Bruno_, the plaintiffs brought a tort action against
their insurer and a third party engineer hired by the insurer
stemming from statements made by the insurer and the engineer
that mold which the plaintiffs discovered while performing home
renovations was harmless and that plaintiffs' renovations should
proceed.  _Id._ at 51-53.  As a result of the defendants'
statements, the plaintiffs were exposed to toxic mold and
developed serious health problems, including cancer of the
throat and esophagus.  _Id._ at 52.  Plaintiffs were also forced

to abandon and later demolish their home after the mold could not be abated.  Id.

The Pennsylvania Supreme Court concluded that plaintiffs' negligence claim was not barred under the gist of the action doctrine.  It reasoned that plaintiffs' claim was not based on the parties' insurance contract, which merely required the insurer to pay up to $5,000 for the costs of removing mold, testing air, and incidental increased living expenses.  Id. at 70.  The insurance contract did not provide for advice concerning the effects of mold or coverage for illness caused by mold.  Id.  The plaintiffs' claim was predicated on defendants' negligence in rendering unfounded advice to plaintiffs unrelated to the contract that the mold was "harmless" and that they should continue their renovations, which caused both severe physical and financial harm to plaintiffs, as well as their minor children.  Id. at 70-71.  Defendants' conduct implicated a general social duty, not a duty based on the insurance contract. Id. at 71.

Here, in contrast, plaintiffs' negligence claim is based on the same allegations as plaintiffs' breach of contract claims, that is, Bank of America's failure to cancel the wire and its sweeping of plaintiffs' IOLTA subaccounts to fund the wire transfer.  Any duty Bank of America owed to plaintiffs was a contractual duty based on the agreements between the parties,

not a duty based on social policy.  Thus, plaintiffs may not recast their breach of contract claims against Bank of America as a tort-based claim.

Similarly, Pennsylvania's economic loss doctrine "provides that no cause of action exists for negligence that results solely in economic damages unaccompanied by physical or property damage."  Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 175 (3d Cir. 2008) (quoting Adams v. Copper Beach Townhome Cmtys., L.P., 816 A.2d 301, 305 (Pa. Super. 2003)); see also Excavation Techs., Inc. v. Columbia Gas Co. of Pa., 985 A.2d 840, 841–43 (Pa. 2009).  In Azur v. Chase Bank, USA, N.A., our Court of Appeals applied the economic loss doctrine to foreclose a negligence claim for money damages against Chase for failure to detect adequately and to report embezzlement committed by an employee of the plaintiff.  601 F.3d 212, 222-24 (3d Cir. 2010).  Plaintiffs have not alleged physical or property damage but only economic losses.  Consequently, their negligence claim is also foreclosed by the economic loss doctrine.

The negligence claims of plaintiffs in Counts VIII and IX of the amended complaint will be dismissed.

X

What is alleged to have happened to the law firm here is indeed unfortunate.  The computer hacker, of course, is the

-28-

real culprit but is not a party to this lawsuit. For the reasons stated above, as between the law firm and the bank, the law firm must bear the loss based on the facts set forth in the amended complaint. Accordingly, the motion of Bank of America to dismiss the amended complaint will be granted.